## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. | § | |
| SANFILIPPO & SON, INC., | § | |
| BLITZ REALTYGROUP, INC., | § | |
| and VINCENT E. "BO" JACKSON, | § | |
| Individually and on Behalf of All | § | |
| Others Similarly Situated, | § | Civil Action No. 07 CV 3371 |
| | § | |
| Lead Plaintiffs, | § | |
| | § | JUDGE MANNING |
| v. | § | |
| | § | |
| GOOGLE INC., OVERSEE.NET, | § | |
| SEDO LLC, DOTSTER, INC., AKA | § | |
| REVENUEDIRECT.COM, | § | |
| INTERNET REIT, INC. d/b/a IREIT, INC., | § | |
| and JOHN DOES I-X, | § | CLASS ACTION COMPLAINT |
| | § | |
| | § | |
| Defendants. | § | (DEMAND FOR JURY TRIAL) |

## FIRST AMENDED CLASS ACTION COMPLAINT IN LAW AND EQUITY

VULCAN GOLF, LLC, JOHN B. SANFILIPPO & SON, INC. ("JBSS"), BLITZ

REALTY GROUP ("BLITZ"), and VINCENT E. "BO" JACKSON ("JACKSON"), Lead

Plaintiffs, on behalf of themselves and all others similarly situated, pursuant to Rule 23 of the

Federal Rules of Civil Procedure, by and through their undersigned Counsel of Record, complain

and allege, upon information and belief, except as to those paragraphs applicable to the named

Lead Plaintiffs, which are based on personal knowledge, against Defendants GOOGLE INC.

("GOOGLE"), OVERSEE.NET ("OVERSEE"), SEDO.COM, LLC ("SEDO"), DOTSTER,

INC. (also known as) REVENUEDIRECT.COM ("DOTSTER"), and INTERNET REIT, INC.,

doing business as IREIT, INC. ("IREIT"), as follows:

## I.     <u>NATURE OF THE ACTION</u>

1.This case involves a shockingly deceptive Internet-based modern day racketeering scheme ("Deceptive Domain Scheme") that is being intentionally carried out by Defendants through the use of sophisticated and proprietary technology/software that allows them to generate and transact in billions of dollars in ill-gotten advertising and marketing revenue annually from blatant and intentional violations of federal and state laws that govern the domain name system (DNS), Internet-based commercial/business practices, intellectual property and trademark rights, and related laws.  In a nutshell, the scheme uses illegal domain names on the Internet to generate and transact in billions of dollars of revenue, at Lead Plaintiffs' and the putative Class Members' expense.

2.     The illegal domains are referred to herein as "Deceptive Domains" and are monetized domain names that are the same or confusingly similar to Lead Plaintiffs' and the putative Class Members' venerable, valuable, protected, distinctive and famous, registered and common law names, marks, trade names, logos, famous names, and other distinctive/valuable marks ("Distinctive and Valuable Marks"). Deceptive Domains are central to Defendants' massive scheme to generate and transact in money from the knowing diversion of and monetization of Internet traffic.

3.     The Deceptive Domain Scheme consists of, but is not limited to, the following actions:  (1) the deliberate registration, trafficking, license, use and monetization of Deceptive Domains; (2) the deliberate hijacking, redirecting, dilution and infringement of Distinctive and Valuable Marks; (3) the deliberate creation and promotion of an illegal aftermarket for the resale of Deceptive Domains; (4) the deliberate tasting and kiting of Deceptive Domains; (5) the deliberate cybersquatting and typosquatting; (6) the derivation, use and generation of illegally

obtained money/revenue/profit from their illegal and deceptive action; (7) the investment and transaction in the money and property obtained from their illegal actions; (8) the illegal use and intentional diminution of Lead Plaintiffs' and the putative Class Members' valuable property rights and interests; and, (9) the other related actions and omissions intended to generate revenue from the unauthorized, improper, and illegal use/infringements/dilution/misappropriation of Lead Plaintiffs' and the putative Class Members' property.

4.      Defendants' scheme is being conducted through strategically contrived automated software/programs that mask the massive and intentional scale of the second-by-second, 24-hour, 7-day/week, scheme that produces ill-gotten money from Internet advertising and marketing generated by the use of Deceptive Domains that are identical to, substantially similar to, or confusingly similar to Distinctive and Valuable Marks, for their own commercial gain.

5.      Defendants use semantics software programs to understand the "meaning" of Distinctive and Valuable Marks, and what goods and services are associated with those marks, and then register/license/traffic-in/use Deceptive Domains to generate revenue from advertisers that pay for advertising, usually competitor or identical or substantially similar products/services, in blatant violation of federal and state law.  The process of generating revenue from the use of Deceptive Domains is referred to as "monetization" of domains.

6.      Defendants have the practical ability to add filtering devices to their software to block Deceptive Domains without degrading the system's ability to provide advertising on appropriate legal and non-infringing domains, but willfully turn a blind eye, and simply refuse to implement said filtering and blocking devices.

7.      Defendant Google is integral to, controls, and directs the Deceptive Domain

Scheme, in part, in the following ways:

a.  Defendant Google creates, devises, contracts for, arranges, places, collects revenue from, monitors and otherwise controls almost all of the revenue-generating, advertising and marketing involved in this lawsuit ("Google Advertising");

b.  Defendant Google contractually restricts parking companies, domain registrants, licensees and aggregators from placing any advertising or marketing, other than Defendant Google Advertising, on their sites as a term of participation;

c.  Defendant Google created a hierarchical system that requires small domain portfolio owners/licensees and aggregators to license and monetize their sites through the parking companies and to share revenue with parking companies;

d.  Defendant Google collects, deposits, and distributes all of the advertising revenue from the advertisers;

e.  Defendant Google determines which parking companies, domain registrants, domain licensees, and domain aggregators can monetize domains, monetize Deceptive Domains, and/or otherwise participate in the Deceptive Domain Scheme;

f.  Defendant Google determines which domains are monetized, and with which advertisements; and

g.  Defendant Google's proprietary software is used to generate advertising content, create advertising, direct and place advertising, transact in the money generated from the advertising (from the collection of revenue from advertisers through to its distribution through the chain of parking companies, domain registrants/aggregators), generate and distribute reports related to the monetization of domains, as well as all other aspects of the Deceptive Domain Scheme.

8.      In order to effectuate the Deceptive Domain Scheme, Defendants utilize and take commercial advantage of the extensive and well established Defendant Google "networks," consisting of millions of individuals and entities located throughout the world involved in Internet advertising and marketing.

9.      Defendants have actual and constructive knowledge of the illegal actions alleged herein and materially contribute to the illegal actions alleged herein, by among other things,

contriving, designing, inducing, encouraging, facilitating and producing the networks, functions, and programs that result in the proliferation of the infringements.

10.    Defendants receive and will continue to receive direct financial benefits from the Deceptive Domain Scheme.

11.    As a direct and proximate result of Defendants' unlawful conduct and illegal conspiracy, Lead Plaintiffs and putative Class Members have suffered injury to their businesses and property, suffered economic harm, and continue to be otherwise injured and damaged by Defendants' ongoing illegal conduct set forth herein.

12.    Lead Plaintiffs and putative Class Members also have, and will continue to have, their reputation and value of their Distinctive and Valuable Marks diminished/diluted as a direct result of Defendants' ongoing Domain Scheme and other unlawful activity alleged herein.

13.    Therefore, Lead Plaintiffs bring this Fourteen (14) Count class action complaint pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class (the "Class") of similarly situated entities and individuals against Defendants under the Lanham Act, *15 U.S.C. § 1051 et seq.;* the Anticybersquatting Consumer Protection Act, *15 U.S.C. § 1125(d)*; trademark infringement under *15 U.S.C. § 1114(1)*; false designation of origin under *15 U.S.C. § 1125(a)*; dilution under *15 U.S.C. § 1125(c)*; Racketeering Influenced Corrupt Organizations Act violations under *18 U.S.C. §1962(c)* and *(d)* ("RICO"); the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2; the Illinois Uniform Deceptive Trade Practices Act, ILCS 510/2; and the identical or substantially similar consumer fraud and fair trade practices acts established by statute or common law in each of the fifty states.

## II.    JURISDICTION AND VENUE

14. This Court has original federal question jurisdiction over this action. This Complaint is brought against Defendants under the Lanham Act, *15 U.S.C. § 1051 et seq.;* the AntiCybersquatting Consumer Protection Act, *15 US.C. § 1125(d)*; trademark infringement under *15 U.S.C. § 1114(1)*; false designation of origin under *15 U.S.C. § 1125(a)*; dilution under *15 U.S.C. § 1125(c)*; Racketeering Influenced Corrupt Organizations Act violations under *18 U.S.C. §1962(c) and (d)* ("RICO"), to recover treble damages and the costs of this suit, including reasonable attorney's fees, for injunctive and equitable relief, and for the damages sustained by Lead Plaintiffs and the members of the Class by reason of Defendants' violations of federal law as more fully set forth hereunder.

15. This Court has jurisdiction over this action pursuant to *28 U.S.C. §§ 1331, 1337,* and *1338, 18 U.S.C. §§1961, 1962, 1964*, and other applicable federal statutes. This Court has supplemental jurisdiction over the claims in this Complaint that arise under state statutory and common law pursuant to *28 U.S.C. § 1367(a)* because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

16. This Court has *in personam* jurisdiction over each of the Defendants, as each was engaged in federal cybersquatting violations and trademark infringements that were directed at and/or caused damages to persons and entities residing in, located in, or doing business throughout the United States, including the Northern District of Illinois.

17. This Court has *in personam* jurisdiction over each of the Defendants, as each was engaged in RICO violations, committed RICO predicate acts, was involved in a RICO conspiracy, that was directed at and/or caused damages to persons and entities residing in,

located in, or doing business throughout the United States, including the Northern District of Illinois.

18.    Venue is proper in this judicial district pursuant to *15 U.S.C. § 22, 18 U.S.C. §1965(a), and 28 U.S.C. § 1391(b)* and *(c)* because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Lead Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in the Northern District of Illinois.

19.    No other forum would be more convenient for the parties and witnesses to litigate this action.

## III.    PARTIES

### A.    Lead Plaintiff Vulcan

20.    Lead Plaintiff VULCAN GOLF, LLC ("Vulcan Golf"), is an Illinois Limited Liability Company with its principal place of business located at 2701 DuKane Drive, St. Charles, Illinois 60174.

21.    Vulcan Golf was founded in 1995 to design and manufacture high performance innovative game improvement golf clubs for serious and recreational golfers.

22.    Vulcan Golf owns the trademark VULCAN and trade name Vulcan Golf (collectively the "Vulcan Marks").  The Vulcan Marks were publicized as of November 1993 and have been featured on the Internet, in various forms of media advertisements and in stories published throughout the United States.

23.    Vulcan Golf offers and provides a full array of golf and related products and

services under the Vulcan Marks.  Vulcan Golf uses the Vulcan Marks in connection with the provision of golf clubs, golf balls, golf lessons, custom golf club fitting and other golf accessories.

24.    The Vulcan Marks are widely known and recognized among consumers and members of the golfing community.

25.    The Vulcan Marks are unique and distinctive and, as such, designate a single source of origin.

26.    Vulcan Golf's main Internet website using the Vulcan Marks and featuring information on many of the products and services of Vulcan Golf can be accessed via the domain name "www.VulcanGolf.com" which has been registered and used since May 1997.

27.    The Vulcan Marks are valid and enforceable trademarks.  Vulcan Golf owns the following United States trademark registration for its Vulcan Marks:

Trademark:  VULCAN;  Registration No. 1973892;   Goods and Services Int'l Class 028. US 022 023 038 050. G & S: golf clubs;  First Use:  November 8, 1993.  Registration Date May 14, 1996

28.    Plaintiff Vulcan has been personally injured in its business and property as a direct and proximate result of the Deceptive Domain Scheme and violations set forth herein. The injury and damage suffered is economic and non-economic in nature and includes, but is not limited to: diversion of business; confusion; dilution of distinctive and valuable marks; loss of revenue; and other such related injury and damage.

**B.    Lead Plaintiff JBSS**

29.    Lead Plaintiff, John B. Sanfilippo & Sons Inc. ("JBSS"), is a Delaware Corporation with its principal place of business located at 1703 N. Randall Road, Elgin, Illinois

60123.

30.     JBSS was founded in 1991 to manufacture and distribute a full line of edible nut

products.

31.     JBSS owns trademarks including "Fisher" (collectively the "JBSS Marks").  The

JBSS Marks were publicized as of 1995 and have been featured on the Internet, in various forms

of media advertisements and in stores published throughout the United States.

32.     JBSS offers and provides a full array of nuts and related products and services

under the JBSS Marks.  JBSS uses the JBSS Marks in connection with the sale of a complete

product line of ingredient nuts, including pecans, almonds, walnuts, peanuts, cashews and pine

nuts.

33.     The JBSS Marks are widely known and recognized among consumers.

34.     The JBSS Marks are unique and distinctive and, as such, designate a single source

of origin.

35.     JBSS's main Internet website using the JBSS Marks and featuring information on

many of the products and services of JBSS can be accessed via the domain name

"www.Fishernuts.com" which has been registered and used since at least 1995.

36.     The JBSS Marks are valid and enforceable trademarks.  JBSS owns the following

United States trademark registration for its JBSS Marks:

> Trademark FISHER; Registration No. 1100900; First Use: 1937.  Registration
> Date 04/11/77.

37.     JBSS's primary corporate website is located at "www.FISHERNUTS.COM" and

at "www.JBSSINC.COM".

38.     Plaintiff JBSS has been personally injured in its business and property as a direct

and proximate result of the Deceptive Domain Scheme and violations set forth herein. The injury and damage suffered is economic and non-economic in nature and includes, but is not limited to: diversion of business; confusion; dilution of distinctive and valuable marks; loss of revenue; and other such related injury and damage.

**C.     Lead Plaintiff BLITZ**

39.     Lead Plaintiff Blitz is an Illinois Corporation with its principal place of business located in Geneva, Illinois 60134.

40.     Blitz was founded in 2006 and engages in the real estate business. Blitz offers real estate brokerage and sales services for commercial and residential real estate. Blitz has a logo and promotes its services with flyers, signs, business cards, Internet/website, and other such related methods.

41.     Blitz maintains a website at www.blitzrealtygroup.com as an integral part of its business operations. Blitz uses its website to display properties for sale in the local area, and to introduce its company and services to prospective and current customers.

42.     Blitz has valid, enforceable, protected and valuable legal rights to the use of the names, "Blitz", "Blitz Realty" and "Blitz Real Estate" (collectively the "Blitz Marks") in the local northern Illinois area. Blitz has used its names and logo since at least 2002 in commerce, for business purposes, in connection with its real estate operations located in Illinois, as well as, having been featured on the Internet, in various forms of advertisements.

43.     Blitz offers and provides a full array of real estate services under the Blitz Marks.

44.     The Blitz Marks are widely known and recognized among the community in northern Illinois.

45.     The Blitz Marks are unique and distinctive and, as such, designate a single source of origin.

46.     Blitz's main Internet website using the Blitz Marks and featuring information on many of the products and services of Blitz can be accessed via the domain name www.blitzrealtygroup.com which has been registered and used since 2006.

47.     After Blitz's Distinctive and Valuable Mark became famous, Defendants monetized Deceptive Domains (including www.blitzrealty.com) to unlawfully generate revenue from infringing/using Blitz's Distinctive and Valuable Mark.

48.     The gross and blatant intent of Defendants, Google and Oversee, to make and transact in money from directly infringing/monetizing Blitz's Distinctive and Valuable Mark, is illustrated by their bold placement of competitor advertisements for Geneva, Illinois real estate services on the deceptive domain www.blitzrealty.com.

49.     Defendants Google and Oversee exclusively use the deceptive domain www.blitzrealty.com for monetization purposes, insofar as the only content associated with the Deceptive Domains are revenue-generating advertisements.

50.     The predatory, deceptive, and illegally infringing conduct of Defendants, Google and Oversee, toward Blitz (a small, local real estate company) demonstrates the egregious and widespread implementation of the Defendants' Deceptive Domain Scheme.

51.     Like Blitz, the Class includes tens of thousands of small businesses and commercial entities throughout the United States that have property rights in Distinctive and Valuable Marks that Defendants boldly and wantonly infringe on by their second-by-second, hour-by-hour, daily Internet scheme.

52.     Plaintiff Blitz has been personally injured in its business and property as a direct and proximate result of the Deceptive Domain Scheme and violations set forth herein.   The injury and damage suffered is economic and non-economic in nature and includes, but is not limited to, diversion of business, confusion, dilution of Distinctive and Valuable Marks,  loss of revenue, and other such related injury and damage.

## D.     Lead Plaintiff BO JACKSON

53.     Lead Plaintiff Vincent E. "Bo" Jackson is a famous person.

54.     Bo Jackson resides in the Northern District of Illinois and is an Illinois resident.

55.     Bo Jackson was born November 30, 1962, and became famous at least on or about 1985 when he won the 1985 Heisman Trophy as the most outstanding college football player in the United States.

56.     Bo Jackson was a first round draft pick (1st picked) into the National Football League ("NFL").   Bo Jackson was a multi-sport professional athlete who played both professional football and professional baseball.

57.     Bo Jackson played running back for the Los Angeles Raiders NFL football team.

58.     Bo Jackson played left field and designated hitter for the Kansas City Royals, the Chicago While Sox, and the California Angels of the American League in Major League Baseball.

59.     Bo Jackson was the first ever athlete to be named an All-Star in two major professional sports, and is considered on information and belief to be the best "two-sport athlete" in the history of sports.

60.     As a multi-sport professional football player and baseball player,  Bo Jackson has

been featured in numerous commercial advertisements.

61.     In 1989 and 1990, Bo Jackson achieved national commercial fame through the "Bo Knows" advertising campaign (Advertising Nike, Inc. cross-training shoes that had his name).

62.     Bo Jackson has, and continues, to generate revenue from his fame (sale of memorabilia, paid advertisements, etc.).

63.     Bo Jackson has a valid and enforceable legally protectible interest in his name.

64.     Bo Jackson has suffered and continues to suffer injury to his person, business, and property as a direct and proximate result of the Deceptive Domain Scheme and violations set forth herein.  The injury and damage suffered is economic and non-economic in nature and includes, but is not limited to:  diversion of business; confusion, damage to reputation; dilution of distinctive and valuable famous name; loss of revenue; and other such related injury and damage.

**E.     Deceptive Domains Infringing Lead Plaintiffs' Distinctive and Valuable Marks**

65.     Defendants taste, register, license, own, traffic in, monetize and/or otherwise utilize and control Deceptive Domains that are identical and/or substantially similar to Lead Plaintiffs, including but not limited to the following:

| Domain Name | Defendant(s) | Date Of Use |
| --- | --- | --- |
| | **VULCAN GOLF LLC** | |
| VolcanGolf.com | Dotster, Google | Cited in Complaint, Deleted, Re-registered and Used After Complaint Filed |
| wwwVulcanGolf.com | Dotster, Oversee.net, Google | Cited in Complaint, Deleted, Re-registered and Used After Complaint Filed |

| VulcnaGolf.com | Dotster, Google | Registered and Used After Complaint Filed |
| VulcanGolfClubs.com | Oversee.net, Google | Registered and Used After Complaint Filed, Deleted, Registered and Used After MTD Filed, Currently in use. |
| VulcanGolfTechnology.com | Oversee.net, Google | Registered and Used After Complaint Filed |
| VulconGolf.com | Oversee.net, Google | Registered and Used After Complaint Filed |
| VulganGolf.com | Dotster, Google | Registered and Used After MTD Filed |
| VulgonGolf.com | Dotster, Google | Registered and Used After MTD Filed |
| Vulcanogolf.com | Sedo, Google | Registered and Used Prior To and After Complaint Filed |
| **JOHN B. SANFILIPPO & SON, INC.** | | |
| wwwfishernuts.com | Dotster, Google | |
| fishersnuts.com | IREIT, Google | |
| fisherpeanuts.com | Dotster, Google | |
| fisherpeanut.com | Dotster, Google | |
| fishernutrecipes.com | Dotster, Google | |
| fischernuts.com | Oversee.net, Google | |
| wwwjbssinc.com | Oversee.net, Google | |
| johnsanfilliposons.com | Dotster, Google | |
| **BO JACKSON** | | |
| nobojackson.com | Sedo, Google | |
| aintnobojackson.com | Sedo, Google | |
| **BLITZ REALTY GROUP** | | |
| BlitzRealty.com | Oversee.net, Google | |

## F.    The Putative Class

66.    The Class of Plaintiffs (collectively, the "Class") consists of the owners of the

Distinctive and Valuable Marks which have been infringed by one or more of the Defendants

through the Deceptive Domain Scheme described herein.

## G.    Defendants

67.     Defendant Google is a publicly held corporation that was incorporated in California in September 1998 and reincorporated in Delaware in August 2003.  Its headquarters is located at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Defendant Google's website is located at www.Google.com.  In the year 2006, Defendant Google earned $10.6 Billion in revenue, a large percentage of which was earned from its advertising enterprise.

68.     This Court has personal jurisdiction over Defendant Google because it conducts substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial district, and has engaged in conduct related to the unlawful activities at issue in this action causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

69.     Defendant Oversee.net is a resident of California with its Corporate Headquarters at 818 West 7th Street, Suite 700, Los Angeles, California 90017.

70.     This Court has personal jurisdiction over Defendant Oversee because it conducts substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial district, and has engaged in conduct related to the unlawful activities at issue in this action causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

71.     Defendant Sedo, LLC, is a division of Sedo GmbH of Cologne, Germany.  Defendant Sedo has it principal place of business located at:  One Broadway, 14th Floor Cambridge, Massachusetts 02142.

72.     As of February 1, 2007, Defendant Sedo actively managed a database of over 7,000,000 domain names, including at least 3,000,000 undeveloped parked domain names.

73.     This Court has personal jurisdiction over Defendant Sedo because it conducts substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial district, and has engaged in conduct related to the unlawful activities at issue in this Complaint causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

74.     Defendant Dotster is a Delaware corporation located at 8100 NE Parkway Dr., Suite 300, Vancouver, Washington 95622.  Dotster acts as both a domain name registrar and also owns a large portfolio of domain names many of which are Deceptive Domains.

75.     This Court has personal jurisdiction over Defendant Dotster because it conducts substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial district, and has engaged in conduct related to the unlawful activities at issue in this action causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

76.     Defendant Ireit is a Delaware corporation having its principal place of business in Houston, Texas. As of May 12, 2007, Defendant Ireit owns and actively manages over 400,000 domain names many of which are Deceptive Domains.

77.     This Court has personal jurisdiction over Defendant Ireit because it conducts

substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial district, and has engaged in conduct related to the unlawful activities at issue in this action causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

78.     Defendants Oversee, Sedo, Dotster, and unnamed co-conspirators, are referred to collectively herein as the "Parking Company" Defendants.

79.     Each Defendant has acted in concert, and is independently profiting and deriving commercial gain from the illegal conduct alleged herein.

**H.     Unnamed Co-Conspirators**

80.     On information and belief, at all relevant times, other "Parking Companies," registrants, and domain registrars, the identities of which are unknown to Lead Plaintiffs, participate in the Deceptive Domain Scheme engaging in "Domain Tasting" and "Domain Kiting," (as defined herein) referred to herein as John Does I-X (collectively, the "Co-conspirators"), willingly conspired with other Defendants in the Deceptive Domain Scheme and in their fraudulent, illegal, and deceptive actions, including but not limited to, RICO violations, and various state law violations.   All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

**I.     Defendants' Agents**

81.     The acts alleged to have been done by Defendants were authorized, ordered or done by their directors, officers, agents, employees, subsidiaries, or representatives while actively engaged in the management of each of the Defendants' affairs, for Defendants'

commercial gain on behalf of and for the benefit of Defendants, as co-conspirators, and against Lead Plaintiffs and the Class.

82.     Each of the Defendants acted for itself and by and through its local agents, who act on the Defendants' behalf.  As such, each Defendant is responsible for all acts or omissions of any of its agents which relate to allegations contained herein.  The acts complained of herein have been within the actual or apparent authority of the Defendants, have been for their benefit, and have been ratified by Defendants.

## IV.     DEFINITIONS

83.     For purposes of this Complaint, the following terms will be deemed to have the following meanings:

> a.  **Address Bar:**  as used in this Complaint, means the text box used to enter a website's address in a web browser. On the web browser Internet Explorer, the Address Bar is identified by the word "Address."  The Address Bar allows an Internet user to manually type in the specific website the user wishes to visit.  The Address Bar is also known as the Location Bar in Netscape.

> b.  **Click:** as used in this Complaint, means: the action of an Internet user in selecting ("clicking on") a hyperlink, button, or advertisement.

> c.  **Cybersquatting:** as used in this Complaint, means: the practice of registering, licensing, trafficking in, using, and/or monetizing domain names – usually based on prominent Distinctive and Valuable Marks or corporate names – without any right or legitimate interest in such marks or names.

> d.  **Deceptive Domains:**  as used in this Complaint, means: a domain that is licensed, used and/or traffic in for commercial gain, and is identical to or confusingly similar to a Distinctive and Valuable Mark.

> e.  **Distinctive and Valuable Marks:**  as used in this Complaint, means: venerable, valuable, distinctive, famous, registered or common law trademarks, trade names, logos, famous names, corporate names and other such distinctive/valuable marks.

f.  **Domain:** as used in this Complaint, means: a unique alphanumeric address that consists of a host name and at least a top-level domain (TLD),  that is registered though the Domain Name System.

g.  **Domain Forwarding:** as used in this Complaint, means: configuring a website such that when a user requests that website, the user is forwarded onwards to some other site at a different domain name.

h.  **Domain Kiting:**  as used in this Complaint, means: the practice of registering a domain name, returning that domain name within five (5) days to the original domain registrar for a full refund, and then re-registering that same domain name to avoid paying the domain registration fee.

i.  **Domain Names:**  as used in this Complaint, means:  a textual identifier registered within the Domain Name System.  A domain name comprises two or more components, each separated by a period.  The right-most component is the top-level domain, such as .com or .org.  Most domain names are registered directly within a top-level domain, e.g. google.com.  Domain names consist of letters, numbers, periods, and hyphens, but no other characters.

j.  **Domain Name System ("DNS"):** as used in this Complaint, means: the system used to translate alphanumeric domain names into Internet Protocol numbers.

k.  **Domain Registrars:**  as used in this Complaint, means: an organization, such as Network Solutions, that registers domains within top-level domains.  Persons that seek a domain name can obtain one from a domain registrar.

l.  **Domain Tasters:**  as used in this Complaint, means: persons involved in the practice of Domain Tasting.

m.  **Domain Tasting:**  as used in this Complaint, means: the practice of domain registrants registering a domain name to assess its profitability for the display of online advertising.  Via the tasting procedure, a registrant may return a domain name within five days for a full refund.  Domain tasters typically return domain names that they project to be unprofitable.

n.  **Google Network:**  as used in this Complaint, means: (1) the advertisers participating in the Google AdWords Program or otherwise contracted with Google for advertising and marketing services; (2) the Parking Company Defendants; (3)  the third party Domain registrants, licensees and aggregators that enter into agreements with Defendant Google for the monetization, through Google advertisements, of domains under their license/control; and (4) Google AdSense Partners.

o. **Google Adsense for Domains Program:** as used in this Complaint, means: the technology, systems, and processes that Google developed, formulated, controls and uses to operate the displaying of Google advertisements on the domain names in the Google Adsense for Domains Network.

p. **Google Adsense for Domains Network**: as used in this Complaint, means: the millions of domain names using the Google AdSense for Domains Program, which Google controls and manages.

q. **Google Advertising**: as used in this Complaint, means  Internet/electronic advertising and marketing (CPC, PPC, banner, pop-up, pay-per-impression, etc) that advertisers pay Defendant Google to design, place, effectuate, direct and/or otherwise control.  It is Internet/electronic advertising that is under the direction and control of Defendant Google.

r. **Internet Protocol ("IP") addresses:**  as used in this Complaint, means: a unique address consisting of four numbers that uniquely identify a computer on the Internet.

s. **Landing Page:**  as used in this Complaint, means: the specific page that an Internet user reaches after clicking on a link.

t. **Masked Redirection / Framed Forwarding / Stealth Forwarding:**  as used in this Complaint, means: a method or system for preventing a user's web browser from accurately reporting the true origin of the content the user is viewing.  Through such methods, a user can request one domain name and see that address in the browser's Address Bar, even as the user actually is shown content from a different destination.

u. **Monetize / monetizataion:**  as used in this Complaint, means: the practice of using a domain name for commercial gain by generating revenue from Internet advertising located on a web page.

v. **Parked Domains:**  as used in this Complaint, means: a domain which is being monetized through the use of an advertising service.

w. **Parking Companies:**  as used in this Complaint, means: a company that aggregates numerous domain names from individual domain name registrants and contracts with an advertising service to license and monetize those domain names.

x. **Typosquatting:**  as used in this Complaint, means: a form of cybersquatting, aimed at registering domain names confusingly similar to Distinctive and Valuable Marks or corporate names.

y.  **Undeveloped Site/Domain:** as used in this Complaint, means: a site or domain that does not contain any content or contains less than 10% non-advertising content.

z.  **Website ("site"):**  as used in this Complaint, means: a collection of web pages or other materials available on the World Wide Web.

## V.     BACKGROUND INFORMATION

84.    Internet users are well-accustomed to "domain names" which identify computers on the Internet and the websites available on those computers.  To reach a website a user types that site's domain name into the user's web browser.

85.    Each domain name must be unique, even if it differs from another domain name by only one character (*e.g.*, "vulcangolf.com" is different from "volcangolf.com" or "wwwvulcangolf.com").

86.    A domain name can be registered to only one entity, the "domain registrant."

87.    A domain registrant must pay an annual fee to a registrar for the domain name.

88.    As described by Network Solutions, one of the preeminent domain registration companies:

> *A domain name is really just your address on the Internet.  It's where people can find you, and it serves as your online identity. Businesses typically register domain names with their company name and sometimes also register their product names.  Individuals often register family names or names that have a personal interest to them.*
>
> *Domain names have two parts: the label and the extension, or top-level domain, separated by a 'dot.'  In NetworkSolutions.com, 'NetworkSolutions' is the label and 'com' is the top-level domain.*

89.    A significant number of domain names are inadvertently misspelled by Internet users, creating a large market for "typo" domain names that exploit and monetize typo traffic at the mark holder's expense.  This practice, known as typosquatting, is estimated to cost mark

holders millions of dollars each year in lost revenues and fraud.

   A.     **General Background--Defendant GOOGLE**

        1.     ***Defendant Google's Operations***

90.     Defendant Google creates, develops, sponsors, promotes, maintains, manages, and directs the largest single online marketing/advertising business in the world.

91.     In 2004, 2005, and 2006, Defendant Google generated approximately 99% of its annual revenue from its advertisers through the Google AdWords Program and AdSense Network (See 2006 Google 10K at 20, 38 and 40).

92.     Aggregate paid clicks on Google Network sites increased by 65% from year-end 2005 through year end 2006  (*See* 2006 Google 10K at 43).

        2.     ***Defendant Google's AdWords Program and the AdSense Network***

93.     Defendant Google utilizes its AdWords Program and AdSense Network in effectuating the Deceptive Domain Scheme described herein.

94.     Defendant Google AdWords Program is an automated auction-based advertising program that places advertisements on  Google-owned/licensed/or otherwise controlled domains, including those in the Google AdSense Network.

95.     Since approximately January 2002, Google AdWords advertisers have paid Defendant Google for advertisements on a CPC/PPC  basis ( *See* 2006  Google 10K at 38).   That is, advertisers pay Defendant Google each time an advertisement is clicked.

96.     Google offers advertisers a number of other types of Internet advertising and marketing, with varying payment options.

97.     The Google AdSense Network consists of: (1) Google AdSense for Search

partners' websites (Aol.com, Ask.com., etc.); (2) Google AdSense for Content partners' websites, which include NewYorkTimes.com and FoodNetwork.com; and (3) Google AdSense for Domains Network partners' domain names, which are the millions of additional domain names Google controls and manages via direct contracts with Domain registrants, aggregators, and the Parking Company Defendants (who aggregate domain portfolios, and in some cases, also own domains).

98.    Defendant Google's strategic search partnerships, partnerships with the Parking Company Defendants, and a well-developed network of domains, enable Google to "offer extensive search and content inventory on which advertisers can advertise." (*See 2006 Google 10K at 7*).

### 3.    *Google AdSense for Domains Network*

99.    Google created, designed and implemented the Google Adsense For Domains Program and the Google AdSense for Domains Network.

100.    Through the AdSense for Domains Network, Google partners with Domain registrants, the Parking Company Defendants and others, and has millions of domains under its direct or indirect license, use, control, and management, including Deceptive Domains.

101.    Defendant Google, utilizing sophisticated software, processes the said domains in its system and monetizes said domains with revenue-generating Defendant Google Advertisements.

102.    Defendant Google controls the domains via contracts directly with large domain holders and through contracts with the Parking Company Defendants who aggregate domains from smaller domain portfolios, and in some cases, own large portfolios of domain names

themselves.

103.    When Defendant Google contracts directly with a domain owner, Defendant Google acts as a Parking Company, providing its Adsense for Domains Program directly to the domain owner.

104.    Defendant Google supplies a Defendant Google-owned testing environment for Adsense For Domains partners and instructs domain owners or domain licensees on how to implement the Adsense For Domains Program.

105.    Defendant Google directs its partners in the Defendant Google's Adsense for Domains Network to redirect the traffic from the domain names they own and/or control to Defendant Google's AdSense for Domains Program.

106.    Defendant Google processes the domain names in the Defendant Google AdSense for Domains Network through Defendant Google's sophisticated semantic technology.

107.    Defendant Google's semantic technology analyzes and understands the meaning of domain names.

108.    Defendant Google generates the HTML code to place its targeted Defendant Google AdWords advertisements on the domain names.

109.    HTML refers to "*Hypertext Markup Language*," a language used for the creation of web pages.

110.    Defendant Google's HTML contains paying Defendant Google advertisers, such as pay-per click advertisers, and related ad categories, which when clicked on bring up more Defendant Google advertisers.

111.    Defendant Google and the Parking Company Defendants collaborate in the

placement of advertisements on domains and in the design/optimization of the landing pages associated with those domains.

112.    When a visitor clicks on one of the pay-per-click ads, Defendant Google, the domain owner, and/or the Parking Company Defendants and/or another third party, share in the revenue Defendant Google collects from the advertiser.

113.    To encourage Internet users to click, Defendant Google, and in some instances other Parking Company Defendants, use targeting solutions that intelligently select the most relevant ads and categories for the domain names.

114.    Defendant Google's semantic technology and targeting solutions increase the click through rate (CTR) and Defendant Google's pay-per-click revenue.

115.    Defendant Google augments its semantic technology with manual and automated optimization techniques.

116.    Defendant Google provides comprehensive online per-domain reporting, to help Domain registrants, aggregators, and Parking Company Defendants analyze their portfolios, and advanced popular categories of revenue-generating domain names.

117.    Defendant Google represents to Domain registrants, aggregators, and Parking Company Defendants that they will maximize revenue from parked domains through participation in Defendant Google's AdSense for Domains Program. More specifically, Defendant Google expressly promises owners/licensees/aggregators/parking companies that Google will provide sage advice to optimize revenue from parked domains.

118.    Domain registrants, aggregators, and Parking Company Defendants redirect the traffic from users typing in the domain names using "masked" (also known as "stealth")

redirection which hides the destination URL.

119.    Defendants use redirection, framing, masking, or other methods to prevent or deter even sophisticated users from identifying or confirming Defendant Google's role.

120.    Defendant Google then processes the domain name and returns either a formatted HTML webpage for each domain that contains the Defendant Google Advertisements and related ad categories, or an XML feed containing the Defendant Google Advertisements.  XML stands for "extensible mark-up language," another programming language used in the creation of websites.

121.    Defendant Google's AdSense for Domains partners can either display the Defendant Google-generated full page HTML or include it, unaltered, in a frame.

122.    Further, if Defendant Google's HTML page is displayed in a frame, Defendant Google controls the look and design of the partner frame.

123.    When using masked redirection, the actual Defendant Google destination URL is concealed from the user who continues to only see the domain name which the user typed in the address bar.

124.    For larger partners, such as the Parking Company Defendants, Defendant Google offers a proprietary XML feed of the AdWords contextual ads and related searches which are displayed on the domain names.

125.    Defendant Google AdSense for Domains is only for undeveloped/parked domains.

126.    Defendant Google processes the Deceptive Domain traffic through several Google domain names, including, but not limited to: googlesyndication.com;

appliedsemantics.com; oingo.com, apps5.oingo.com; and, domains.googlesyndication.com.

127.    Defendant Google assigns each domain partner its own identification code.

128.    Using each partners' unique identification code, Defendant Google's automated systems identify and provide domain-by-domain reporting that includes: which partner licensed the domain to Defendant Google; how many page views each domain gets;  how much money each domain generates from clicks on the ads; and, how many unique users each domain gets.

129.    Defendant Google provides this data to Defendant Google AdSense for Domains Network partners on a domain-by-domain report.

130.    Prior to acceptance and participation in the AdSense for Domains Network, Defendant Google reviews all domains in the Defendant Google AdSense for Domains Network.

131.  Defendant Google is aware of the identity of every domain that participates in its advertising networks, or otherwise contains Defendant Google advertising.

132.    On an ongoing basis, Defendant Google reviews and monitors every domain that shows Defendant Google advertisements.

133.    Defendant Google analyzes, evaluates, determines, designs, controls and maintains advertisements on all participating domains.

134.    Defendant Google exclusively manages relationships and communications with the advertisers who whose ads appear on participating domains.

135.  Defendant Google contracts, bills, collects, and distributes all revenue generated from its advertisements placed on domains, including but not limited to advertising revenue generated on  Deceptive Domains.

136.    Defendant Google distributes, divides, and/or otherwise shares the revenue with

domain registrants, aggregators, parking companies, defendants and others, according to its agreements with said entities.

137.    Only Defendant Google is allowed to change any of the advertising data Defendant Google provides via the HTML page (if the domain is hosted by Defendant Google) or XML feed to domains. Domain registrants/licensees/aggregators/parking companies or any of the Parking Company Defendants are not allowed to change any of the advertising data Defendant Google provides via the HTML page or XML feed.

138.    Defendant Google has direct control and authority over the participation of all domain names in itse AdSense for Domains Network, including the Deceptive Domains, and Defendant Google has the ability to block any domain from displaying Defendant Google advertisements.

139.    Defendant Google and all of the Parking Company Defendants knowingly monetize and utilize Deceptive Domains for commercial gain.

140.    All Defendants knowingly generate revenue from monetization of Deceptive Domains.

141.    Defendant Google uses its extensive international advertising and marketing networks to actively seek out, promote, encourage, solicit, and induce participation of Domain registrants/licensees/aggregators/parking company defendants in their advertising network.

**B.    General Background -The Parking Company Defendants**

142.    For purposes of this Complaint, Defendants Oversee, Sedo, and Dotster are referred to collectively as the "Parking Company Defendants."

143.    Each Parking Company Defendant is in the business of, registering domains,

licensing    domains,    parking    domains,    monetizing    domains,    aggregating    domains, auctioning/reselling domains, brokering domains and/or coordinating, facilitating and offering solutions for monetization of domains, with many of those domain names being Deceptive Domains.

144.    Each Parking Company Defendant has knowingly and intentionally engaged in the Deceptive Domain Scheme, as set forth herein, and has derived commercial gain from their participation.

145.    Defendant Google and the Parking Company Defendants contrived, participated in,  and implemented a scheme where small domain portfolio owners cannot directly participate in Defendant Google's AdSense for Domains Network, but are required to utilize a parking aggregator, such as one of the Parking Company Defendants.

146.    If a small domain portfolio owner seeks to monetize its domain name portfolio, it must go through one of the Parking Company Defendants in order to monetize through the Google Network.

147.    Defendant Google, Parking Company Defendants and/or the Domain registrants enter into agreements where Defendant Google and the Parking Company Defendants share advertising/marketing  revenue generated on parked domains.

148.    The Parking Company Defendants enter into license agreements with the Domain registrants for the license and rights to control, monitor, maintain, use and place advertising on their domains, including Deceptive Domains.

149.    Defendant Parking Companies enter into agreements with Defendant Google and license to Defendant Google the rights to control, monitor, maintain, use and place advertising

on all of the domains under the Parking Company's control, including Deceptive Domains.

150.    Defendant Google and the Defendant Parking Companies conspired to engage in and transact in money derived from the Deceptive Domain Scheme alleged herein.

151.    Defendant Google requires "exclusivity" and "loyalty" from the Parking Company Defendants, and the other participants in its advertising networks.

152.    Once the Parking Company Defendants license a domain, the following generally occurs:

a.    The Parking Company Defendant redirects the domains through to Defendant Google;

b.    Defendant Google processes the domains through the Defendant Google AdSense for Domains Program, utilizes semantics and other proprietary programs/software to analyze the meaning of the domain names, analyzes the Internet traffic to said domain (identity of, volume, etc.), and identifies/selects revenue maximizing advertisements from the Defendant Google AdWords program to be placed on the domains;

c.    Defendant Google then returns the results to the domains via XML feed;

d.    Defendant Google and the Parking Company Defendants then share the revenue generated at each domain from advertising;

e.    Defendant Google provides each Parking Company Defendant with complete statistics on each domain name, including revenue, clicks and visitors per day;

f.    The Parking Company Defendants share revenue with the Domain registrants; and

g.    The Parking Company Defendants provide the Domain registrants with activity reports for each domain.

153.    The Parking Company Defendants have access to semantics software and other technologies that allow them to identify Deceptive Domains.

154.    The Parking Company Defendants knowingly refuse to identify or attempt to

identify all the Deceptive Domains and/or to utilize software and technology available to identify all of the Deceptive Domains.

155.    The Parking Company Defendants intentionally taste, register, and otherwise assist Domain registrants in procuring Deceptive Domains for the express purpose of monetization with Defendant Google advertisements.

156.    The Parking Company Defendants typically instruct Domain registrants to do URL forwarding using frames, a practice commonly known as "framed forwarding, masking, or stealth." Such forwarding further impedes identification of the parties responsible for the Deceptive Domain.

157.    Each Parking Company Defendants actively traffic in, uses and/or licenses Deceptive Domains, in furtherance of the Deceptive Domain Scheme alleged herein.

158.    The Parking Company Defendants intentionally and knowingly register Deceptive Domains through the use of proprietary methods/tools by which they can determine the domain names that Internet users are attempting to access, but which domain names have not been registered by any entity, and they then register these recurring mishits or mistypes.

159.    The Parking Company Defendants engage in typosquatting, in furtherance of the Deceptive Domain Scheme alleged herein.

160.    The Parking Company Defendants engage in cybersquatting and cyberpiracy, in furtherance of the Deceptive Domain Scheme, alleged herein.

161.    The Parking Company Defendants cause popups or popunder advertisements on the Deceptive Domains and receive money for each popup or popunder displayed, in furtherance of the Deceptive Domain Scheme alleged herein.

162.    Defendant Google has a close relationship with the Parking Company Defendants and sends representatives to attend, and sponsor, conferences put on by Parking Company Defendants.

163.    Defendant Google and the Parking Company Defendants participate in trade organizations and informal associations in furtherance of their conspiracy.

164.    Defendant Google acts as a "Featured Sponsor" for invitation-only conferences attended by Parking Company Defendants and individuals who own Deceptive Domains.

## VI.    THE DECEPTIVE DOMAIN SCHEME

165.    All Defendants conspired to commercially profit/gain and transact in money derived from the Deceptive Domain Scheme, set forth in detail in the allegations herein, including, but not limited to, the following:

a.    Intentionally and deceptively registering, licensing, monetizing and utilizing Deceptive Domains that are identical or confusingly similar to or dilutive of the Lead Plaintiffs' and other members of the Class' Distinctive and Valuable Marks;

b.    Intentionally and deceptively redirecting Internet traffic to Defendants' Deceptive Domains that contain "pay-per-click/cost-per-click" (herein "PPC" or "CPC") or similar HTML links/advertising;

c.    Utilization of semantics programs, algorithms, statistical tools, and other software designed and intended to maximize revenue by "intelligent placement" of Internet advertisements on Deceptive Domains, as well as identifying and facilitating revenue maximizing Internet traffic redirection;

d.    Redirection of Internet traffic to paid HTML links/advertising, and away from the legal and rightful owners of Distinctive and Valuable Marks;

e.    Defendants' use of false and misleading WhoIs domain registration data in an attempt to conceal their identities and wrongful conduct;

f.    Defendants' knowing and intentional use of Lead Plaintiffs' and the Class'

Distinctive and Valuable Marks for the purpose of Defendants' own commercial gain;

g.  Defendants' knowing creation of an illegal domain aftermarket for Deceptive Domains;

h.  Intentionally and knowingly causing confusion, dilution and misuse/misappropriation of Lead Plaintiffs' and other members of the Class' Distinctive and Valuable Marks; and

i.  Intentionally conspiring to generate, collect, distribute, and otherwise transact in illegally gained money.

166.  Each of the named Defendants, and the other unnamed Co-conspirators, knowingly and intentionally engage in the Deceptive Domain Scheme set forth herein for the purpose of directly profiting and unjustly obtaining revenue/money/commercial profit/gain, that they could not otherwise obtain, but for the illegal and criminal acts of infringement, dilution, diminution, misuse, misappropriation, unauthorized association, and other unauthorized use of Lead Plaintiffs' and the Class' Distinctive and Valuable Marks.

167.  Defendants' common purpose in registering, licensing, using, and monetizing Deceptive Domains, and otherwise engaging in the Deceptive Domain Scheme alleged herein, is to profit from the confusion between the Deceptive Domains and the Lead Plaintiffs' and the Class' Distinctive and Valuable Marks.

168.  Defendants have a primary financial interest in the exploitation of Plaintiffs' and the Class Members' distinctive and valuable marks.

169.  Defendants are the primary beneficiaries of the infringements and illegal conduct alleged herein.

170.  Defendants facilitate, encourage, promote, allow, enable and otherwise permit the illegal conduct alleged herein, in the course of their businesses.

171.    Defendants maintain the right, power and ability to control, edit, alter, modify and maintain the software used in the Deceptive Domain Scheme.

172.    Defendants fail to exercise their policing obligations to the fullest extent, fail to utilize and implement available filtering and blocking technologies, and otherwise have engaged in a pattern of direct and intentional misconduct, or willful blindness of their actions related to the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein.

173.    Defendants control and participate in the supply of the illegal revenue-generating services, mechanisms, technology and programs necessary to engage in the Deceptive Domain Scheme, through which the Defendants and third parties infringe the Distinctive and Valuable Marks of Lead Plaintiffs and the Class.

174.    Each Defendant, through its participation in the Deceptive Domain Scheme alleged herein, has directly engaged in and/or aided and abetted in the illegal conduct alleged herein.

A.    **Use, License, Registration and Monetization of Deceptive Domains**

175.    Defendants have knowingly and intentionally manipulated the Internet domain name system for illegal commercial gain by registering, using, trafficking in or licensing infringing Deceptive Domains, including, but not limited to, mistyped domain names (i.e., wwwvulcangolf.com) and misspelled domain names (i.e., volcangolf.com).

176.    Defendants are each the authorized licensee of one or more of the Deceptive Domains utilized in the Deceptive Domain Scheme, as alleged herein.

177.    Defendant Google and the Parking Company Defendants all directly, knowingly, and intentionally monetize Deceptive Domains, for their own commercial profit/gain.

178.    Defendants monetize the Deceptive Domains by allowing their participation in Defendants' advertising networks and programs (i.e., AdSense for Domains Program and AdSense for Domains Network), and by causing Deceptive Domains to display Google advertisements. For example, Defendant Google knowingly and intentionally allows tens of thousands of blatantly infringing "www" domain names into the Defendant Google AdSense for Domains Network.  A "www" domain name is a domain name that starts with www but omits the period (".") that separates "www" from the remainder of the domain name.

179.    The sole purpose of registering a "www" Deceptive Domain is to capture the Internet users who forget to type the period (".") between the "www" and the domain name.  A user who types in "wwwvulcangolf.com" is attempting to reach "www.vulcangolf.com" but forgot to type the period (".") between "www" and "vulcangolf.com."

180.    "www" Deceptive Domains are obvious and easy to identify as illegal trademark infringements.  Nonetheless, Defendants register, use, traffic in, and license infringing "www" Deceptive Domains.

181.    The use of "www" Deceptive Domains to forward unsuspecting users to different websites was specifically addressed and identified by Congress as a deceptive practice when it passed the ACPA.

182.    Another example of how Defendant Google monetizes blatantly infringing Deceptive Domains is through the participation in  "com" domain names.

183.    Like the "www" Deceptive Domains, the "com" Deceptive Domains capture the Internet users who forget to type the period ( ".") between a domain name and the "com" suffix. The following is a small sample of "com" Deceptive Domains:

bedbathandbeyondcom.com; chevycom.com; chryslercom.com;
cocacolacom.com; discovercreditcardcom.com; disneylandcom.com;
disneyworldcom.com; ebaumsworldcom.com; espncom.com;
fordmotorscom.com; geicocom.com; homedepotcom.com; ibmcom.com;
ikeacom.com; jetbluecom.com; jcpennycom.com; kohlscom.com;
kmartcom.com; mcdonaldscom.com; musiciansfriendcom.com;
nascarcom.com; oldnavycom.com; pizzahutcom.com; randcom.com;
saabcom.com; scottradecom.com; travelocitycom.com;
usairwayscom.com; volkswagencom.com; xangacom.com.

184.    All of the aforementioned "com" Deceptive Domains have been monetized by

Defendant Google through the Defendant Google AdSense for Domains Program in furtherance

of the Deceptive Domain Scheme as alleged herein.

185.    Defendant Google further monetizes blatantly infringing Deceptive Domains

through the participation of "http" domain names in the AdSense for Domains Network.

186.    Like the "www" and the "com" Deceptive Domains, the "http" Deceptive

Domains capture the Internet users who forget to type the period (".") between "http" and the

domain name when trying to access websites of Lead Plaintiffs and the Class.

187.    The following is a small sample of "http" Deceptive Domains that have been

monetized by Defendant Google:

httpaarp.com, httpabc.com; httpabcgames.com; httpabckids.com;
httpabcnews.com; httpamericanexpress.com; httpamsouthbank.com;
httpautotrader.com; httpbankofamerica.com; httpbellsouth.com;
httpbestbuy.com; httpblackplanet.com; httpbordersbooks.com;
httpbratz.com; httpcareerbuilder.com; httpcapitalone.com;
httpcapitolone.com; httpcarmax.com; httpcartonnetwork.com;
httpcartoonetwork.com; httpcartoonnetwork.com; httpchevrolet.com;
httpchevy.com; httpcircuitcity.com; httpcisco.com; httpciti.com;
httpcitibank.com; httpciticard.com and httpciticards.com.

188.    Defendants know that registering misspellings and typographical variations of

websites is deceptive.

189.     Defendant Google's Webmaster Guidelines, located at

http://www.Google.com/support/webmasters/bin/answer.py?answer=35769, specifically criticize

the use of misspellings, by stating in pertinent part:

> **"*Quality guidelines...*** *These quality guidelines cover the most common forms of deceptive or manipulative behavior, but Google may respond negatively to other misleading practices not listed here (e.g. tricking users by registering misspellings of well-known websites)."*

In practice, Defendant Google widely ignores its supposed guidelines.

190.     Contrary to the guidelines referenced in the preceding paragraph, Defendant

Google actively monetizes Deceptive Domains for commercial profit/gain.

191.     Defendant Google aligns its goals squarely between Defendant Google and its

Defendant Google AdSense for Domains Network partners, making the user experience positive

while generating revenues for both parties.

### B.        Domain Redirection and Concealment

192.     In furtherance of the Deceptive Domain Scheme, Defendants engage in Domain

Redirection.

193.     Domain Redirection refers to the practice of redirecting an Internet user who

types in a domain name to a completely different domain name or URL without the user's

knowledge or authorization.

194.     Defendant Google knows and authorizes the Defendant Parking Companies and

third party Domain registrants to utilize masked Domain Redirection techniques to hide

Defendant Google's relationship with the Deceptive Domains.   These masked redirects prevent

users from recognizing Defendant Google's role in placing, charging, and tracking a domain's

advertising.

C.    **Defendants' Illusory Online Complaint System and Deceptive Public Statements**

195.    All of the named Defendants deceptively purport to have "online complaint" systems and procedures in which a Distinctive and Valuable Mark owner can complain to the Defendants when their Distinctive and Valuable Mark has been unlawfully infringed by another website.

196.    Defendants, in furtherance of their deception and of the Deceptive Domain Scheme, audaciously suggest that Lead Plaintiffs and Class Members submit to the Defendants' devised, maintained and imposed illusory "on-line complaint" systems that effectively make Defendants the final adjudicators of their own illegal conduct, thus perpetuating the viability of their Deceptive Domain Scheme and further misleading the public into believing that the named Defendants do not support Deceptive Domains.

197.    None of the named Defendants utilize any software or filtering technologies to prevent infringements or the proliferation, use, and/or monetization of Deceptive Domains.

D.    **Defendants Engage in Domain Tasting**

198.    Domain Tasting facilitates trademark infringements, dilution, and abuse.

199.    Defendants know that Domain Tasting of Deceptive Domains is improper and facilitates trademark infringement.

200.    Defendants attempt to conceal their actions concerning Domain Dasting.

201.    Defendant Google actively, knowingly, and intentionally participates in and facilitates Domain Tasting because domain names acquired by domain tasters such as the Parking Company Defendants are tested for revenue by redirecting and analyzing the domain names through Defendant Google Programs to determine their revenue potential.

202.   Defendant Google is fully aware that the domain names it licenses, uses and traffics in are part of the Domain Tasting process.

203.   The Defendants registered and tested the following Deceptive Domains and sent them to Defendant Google's AdSense For Domains Program:

> vulcangolfcalderaz440.com; vulcangolfcalderaz440sale.com;
> vulcangolfclub.com; vulcangolfclubs.com; vulcangolfllc.com;
> vulcangolfqpointeironsirons.com; vulcangolfstorelocation.com;
> vulcangolftechnology.com; vulcangolfwoody.com;
> vulcangolfz3hybridironsirons.com; volcangolfclubs.com and
> volcangolfshop.com.

### E.   Illegal Aftermarket for Buying and Selling Deceptive Domains

204.   By monetizing Deceptive Domains, Defendants have created an illegal aftermarket for the buying and selling of Deceptive Domains.

205.   Deceptive Domains have recently sold for remarkable sums: mypsace.com sold for approximately $35,000; myspac.com sold for approximately $31,000; ebumsworld.com sold for approximately $27,000; and statefram.com sold for approximately $9,000.

206.   Using the statistics provided by Parking Company Defendants and Defendant Google, sellers of Deceptive Domains state in detail which Parking Company Defendant is licensing the Deceptive Domains, how much the Deceptive Domains make, how many visitors each Deceptive Domain gets, and how much the seller wants for the Deceptive Domain.

207.   The statistics provided by Defendants also enable buyers to evaluate the purchase price of illegal Deceptive Domains, based on Defendants' own statistical revenue projections based on Defendants' monetization of the Deceptive Domains.

208.   Defendant Oversee purchased the expired domain auction service Snapnames.com ("Snapnames") and uses it to monetize expiring deceptive domains.

209.    After Oversee/Snapnames takes control of the domain name, Oversee/Snapnames traffics in, monetizes, and/or sells the domain names using an auction system.  The auction lasts for three days.  During the three-day auction, Oversee/Snapnames and Defendant Google use the domain names.

210.    Defendant Oversee used Snapnames to monetize Vulcan Deceptive Domains after this action was filed.

## VII.    DEFENDANTS' USE OF THE DISTINCTIVE AND VALUABLE MARKS BELONGING TO LEAD PLAINTIFFS AND THE CLASS

211.    Lead Plaintiffs and the Class own Distinctive and Valuable Marks.

212.    Lead Plaintiffs and the other members of the Class use their Distinctive and Valuable Marks in connection with their commercial activities, many of which are contained as domain names within the URLs they use in electronic online/Internet commerce.

213.    At the time Lead Plaintiffs and the Class registered their domain names, said Distinctive and Valuable Marks were protected/protectible, and/or famous.

214.    Lead Plaintiffs and the Class did not provide authorization to Defendants to use their Distinctive and Valuable Marks, domain names, or colorable imitations/confusingly similar domain names or marks in the Deceptive Domain Scheme.

215.    Defendants are making commercial use of Lead Plaintiffs' and the Class' Distinctive and Valuable Marks without authorization, license, or permission. Defendants have actual and/or constructive knowledge that they are infringing Lead Plaintiffs' and the Class' Distinctive and Valuable Marks.

216.    Defendants' use and monetization of the Deceptive Domains began after the Lead Plaintiffs' and Class' Distinctive and Valuable Marks became valuable, famous, protected,

protectible, and/or distinctive.

217.    Defendants' use of the Deceptive Domains presents a likelihood of dilution of the distinctive value of the Lead Plaintiffs' and Class' Distinctive and Valuable Marks.

218.    Each named Defendant has participated in the Deceptive Domain Scheme, as detailed, with the knowledge and intent to commercially profit therefrom.

219.    Each named Defendant knows that its participation in the Deceptive Domain Scheme, and other illegal actions as alleged herein, directly and proximately injure and damage Lead Plaintiffs and the Class in their property, person, reputation, business, and/or otherwise.

220.    Defendants cause new browser windows with more advertising links to open up when users attempt to leave the Deceptive Domains in an attempt to increase the revenue, click throughs, and confusion generated from the Deceptive Domains.

221.    When Internet users click on one or more of the displayed HTML links or popup or popunder advertisements on the websites at the Deceptive Domains, Defendants receive payment, or otherwise obtain commercial gain, from one or more advertisers, search engines, or affiliate programs.

222.    Even after the filing of this lawsuit and notice by Lead Plaintiffs' Counsel, Defendants intentionally and blatantly continue to engage in the Deceptive Domain Scheme and the other illegal action alleged herein:

    a.    Defendants knowingly register, taste, license  and monetize Vulcan Deceptive Domains:

        i.    After the Complaint was filed, wwwVulcanGolf.com and VolcanGolf.com were deleted by the original registrants.

        ii.    Almost    immediately    thereafter,    wwwVulcanGolf.com    and VolcanGolf.com were *re-registered, relicensed, and redirected to*

Defendant Google Adsense for Domains displaying Defendant Google Adwords Ads for commercial gain by Defendant Google and Oversee, despite formal notice.

iii.     Despite the fact that Defendant Google was aware of Vulcan's Marks, Defendant Google chose to allow the domains wwwvulcangolf.com and volcangolf.com to remain in the Google Adsense for Domains Program.

iv.     In fact, Defendant Google licensed and allowed even more domains that infringed the Vulcan Marks into the Adsense for Domains Program after the complaint was filed, including: VulcnaGolf.com; VulcanGolfClubs.com; VulcanGolfTechnology.com; and, VulconGolf.com.

v.     On August 7, 2007, Counsel for the Parties conducted an in-person Rule 26 Conference, where Lead Plaintiffs' Counsel put on an extensive power point presentation setting forth the "post-complaint" illegal conduct.

vi.     Defendants all agreed to block the Vulcan Deceptive Domains.

vii.     Despite those assurances to block Vulcan Deceptive Domains, VulcanGolfClubs.com was deleted and reregistered and redirected to the Defendant Google which immediately began monetizing the Deceptive Domain. As of September 11, 2007, VulcanGolfClubs.com still is displaying Defendant Google Adwords Advertisers.

viii.     Then, VulganGolf.com and VulgonGolf.com were newly registered, licensed and redirected to Defendant Google and immediately monetized through its Adsense for Domains via a direct Defendant Google feed.

b.     Defendant Google knowingly and intentionally continues to license, traffic in, monetize and/or use Deceptive Domains that have been part of FTC actions.

c.     Defendant Google knowingly and intentionally continues to license, traffic in monetize and/or use Deceptive Domains that have previously been held by various courts to be infringing domains and violations of the ACPA.

d.     Adsense for Domains is a uniform, common, automated Domain Parking program that is used to commonly effectuate the Deceptive Domain Scheme and to injure and damage Lead Plaintiffs and the Class, as set forth herein.

e.     Defendant Google purports to provide its domain partners "sage advice" so both parties can maximize revenue.

> f.    Defendants continue to transact monetary transactions, share revenue, and otherwise obtain, collect, deposit, withdraw, and share illegally and criminally obtained money derived from the monetization of Deceptive Domain, the Deceptive Domain Scheme, and as otherwise alleged herein.

223.    As a direct and proximate result of the Deceptive Domain Scheme and related unlawful conduct, as alleged herein, Lead Plaintiffs and the Class have each suffered economic injury and damage to its business.  These injuries include:  lost sales, lost customers, disruption and interference with business operations, and interference with prospective business/economic advantage, etc.  These injuries also include confusion and dilution of Distinctive and Valuable Marks, injury to property, and injury to business/personal reputation.

## VIII.   RICO ALLEGATIONS

224.    Each Defendant is a "person" within the meaning of the "Racketeering Influenced Corrupt Organization Act" *18 U.S.C. §1961(3)* ("RICO").

### A.    Enterprise:

225.    The following group of individuals and entities, associated in fact through time, and joined in common purpose, constitute an interstate "Enterprise" under RICO:  (1) Defendant Google; (2) the Parking Company Defendants; (3) all AdWords Participants/Advertisers; (4) all AdSense Participants/Publishers; (5) all other individuals and entities participating in Defendant Google's AdSense and AdWords Networks and/or the  Defendant Google Advertising Network; (6) Defendant Google Search Partners; and (7) other unnamed Co-conspirator Defendants that agreed to and engaged in the unlawful actions described herein.

226.    The Enterprise is an ongoing organization/association that engages in, and whose activities affect, interstate and foreign commerce.

227.    The Enterprise is engaged in interstate advertising and marketing and for commercial gain.

228.    The Enterprise connects Internet users, individuals and entities that seek to place online/Internet advertisements on Internet websites, and Domain registrants and licensees seeking monetization of their domains.

229.    Each participant in the Enterprise has a distinct purpose and role (as set forth more fully in the allegations herein), which is generally (and in summary) as follows:

a.    AdWords Participants and Advertiser Participants are individuals and entities that contract/arrange through Defendant Google to advertise/market goods and services on the Internet.   Advertisers/Marketers pay Defendant Google for marketing and advertising services.

b.    Defendant Google solicits and controls all advertisements and the advertising (design, content, placement, etc.) through the Defendant Google AdWords Network and other advertiser sources.  Defendant Google licenses domains and obtains domains for the placement of advertising through its Defendant Google AdSense Network and other domain sources.   Defendant Google places advertising for advertisers, determines optimal placement of advertising on particular domains, provides advertisements for monetization of domains, contracts/associates with Parking Company Defendants for the purpose of placing advertisement/marketing on domains, collects advertising/marketing revenue and distributes advertising/marketing revenue through the Enterprise.

c.    The Parking Company Defendants taste domains, register domains, aggregate domains, license domains, contract/associate with Domain registrants for the monetization of domains, contract/associate with Defendant Google to obtain advertisements for domains under their license/ownership/control, provide marketing and advertising services (such as landing page design), and assist in the procurement, collection and distribution of advertising/marketing revenue throughout the Enterprise.

d.    The Domain registrants taste, register, license, and own Internet domains. Domain registrants monetize domains and receive revenue from one or more of the Defendants in exchange for the placement of advertising on their domains.

230.    There are numerous Parked Domains that are either "generic" or do not infringe

on a Distinctive and Valuable Mark, that participate in Defendant Google's AdSense Program and are part of the Defendant Google AdSense for Domains Network.

231.    The common purpose of the Enterprise exists is to further online Internet advertising, marketing and promotion, as well as to monetize domains.

232.    To the extent that legitimate domains are used by the Enterprise, the conduct is legal.

233.    Defendants, however, have utilized the extensive international network of search and content partners, advertisers, and Domain registrants to commercially gain from the Deceptive Domain Scheme.

234.    In fact, Defendant Google admits in its 2006  Defendant Google 10K, that:  "The Google Network significantly enhances our ability to attract interested advertisers."  (*See* 2006 Defendant Google 10K at 8).

235.    Defendant Google is associated with and controls the Enterprise.

236.    Defendant Google and the Parking Company Defendants knowingly and willfully conducted or participated, directly and/or indirectly, in the conduct of the affairs of the Enterprise.

237.    Defendant Google and the Parking Company Defendants conducted and/or participated in the conduct of the affairs of the Enterprise knowingly and willfully through a pattern of racketeering activity.

238.    The members of the Enterprise function as a continuing network/unit as described below and share the common purpose of maximizing their profits and market share through cooperation, participation, fraternization, and utilization of the extensive international network

for online/Internet e-commerce, Internet marketing, Internet promotions, Internet advertising, and other Internet marketing and advertising solutions, as alleged herein.

239.    While each Defendant participates in and is a member and part of the Enterprise, it also has an existence separate and distinct from the Enterprise.

240.    In order to successfully infringe Distinctive and Valuable Marks, engage in cybersquatting, typosquatting, dilute Distinctive and Valuable Marks, unfairly compete, and otherwise engage in the illegal conduct alleged herein against Lead Plaintiffs and the Class, Defendants needed a system that would allow Defendants to develop, monitor, calculate, divert and otherwise control a large segment of the online/Internet electronic commerce, marketing, promotions, sales, and advertising market.    The Enterprise provides Defendants with that vehicle.

241.    Defendant Google controls, exerts control over, and otherwise operates the Enterprise as follows:

    a.    Defendants deliberately and knowingly conspire to control, capture, direct, and manipulate Internet traffic;

    b.    Defendants deliberately and knowingly utilize an internationally expansive online/Internet marketing and advertising network to dominate the online/Internet marketing and advertising market;

    c.    Defendants deliberately and knowingly contrived and implemented the Deceptive Domain Scheme to increase market share and profitability well-beyond that which could legally be achieved;

    d.    Defendants used the Enterprise to solicit and attract advertisers to "cost-per-click" and "pay-per-click" advertising;

    e.    Defendants use the following facts about the Enterprise to effectuate the Deceptive Domain Scheme:  Defendant Google is the largest search engine in the world; Defendant Google maintains important "Search Partners" such as AOL and Ask.com; Defendant Google maintains

important "Content Partners" such as The New York Times and The Food Network; and Defendant Google has actively devised, maintained, and controlled an extensive Internet advertising/marketing network;

f.    Defendants use the Enterprise to set up and control Deceptive Domains that divert Internet traffic to advertising, including competitor advertising, in direct violation of federal and state law;

g.    Defendants use the Enterprise to deprive Lead Plaintiffs and the Class of valuable property;

h.    Defendants utilize the Enterprise to distribute money obtained from illegal and criminal activity;

i.    Defendants utilize the Enterprise to traffic in counterfeit goods or services;

j.    Defendants conspire to and engage in a practice of cybersquatting and typosquatting as prohibited by *15 U.S.C. § 1125*;

k.    Defendants use the Enterprise to dilute trademarks in violation of *15 U.S.C. § 1051;* and

l.    Defendants entered into side agreements with Defendant Parking Companies and Deceptive Domain name registrants/owners/licensees, and concealed said agreements from Lead Plaintiffs, the Class, and the public.

242.    As set forth above, the Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

**B.    Predicate Acts**

243.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under *18 U.S.C. §1341* (relating to mail fraud) and *18 U.S.C. §1343* (relating to wire fraud); *18 U.S.C. §1952* (relating to racketeering); *18 U.S.C. §1957* (related to engaging in monetary transactions in property derived from specified unlawful activity); and *18 U.S.C. §2320* (relating to trafficking in goods or services bearing counterfeit marks).

244.    As set forth herein, each Defendant has engaged, and continues to engage on a

daily and repeated basis, since at least January 2002, within each and every State in the United States, in racketeering activity violating each of these laws to effectuate their Deceptive Domain Scheme.

245.    Defendants' business operations are all or substantially Internet-based, and therefore are substantially and materially conducted through e-mail, websites, Internet traffic, wire communications, and other electronic means.

246.    Defendants largely effectuated the Deceptive Domain Scheme, alleged herein, through utilization of e-mail, instant messaging, electronic messaging, wire, e-commerce, electronic technology, digital technology, websites, electronic tools, and other electronic media.

247.    For the purpose of executing and/or attempting to execute the herein described Deceptive Domain Scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of *18 U.S.C. §1341*, placed in post offices and/or in authorized repositories matters and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matters and things from the Postal Service or commercial interstate carriers, including but not limited to contracts, invoices, correspondence, and payments.

248.    For the purpose of executing and/or attempting to execute the above described Deceptive Domain Scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, also in violation of *18 U.S.C. §1343*, transmitted and received by wire, matters and things which include but are not limited to contracts, invoices, correspondence, disbursements, and payments.

249.    The matters and things sent by Defendants via the Postal Service, commercial

carrier, wire, e-mail, or other interstate electronic media include, related to the Deceptive

Domain Scheme, but are not limited to, *inter alia*:

a.  contracts by and between Defendants and third parties;

b.  licensing agreements and other agreements between Domain registrants and Defendants;

c.  licensing and other agreements by and between Defendants;

d.  acknowledgments, acceptances, disclosures and disclaimers by and between Defendants and Domain registrants;

e.  Defendant Google contracts/agreements with advertisers and participants in the Defendant Google AdWords Program;

f.  invoices and payments by and between Defendants and Domain registrants;

g.  invoices and payments between Defendant Google and advertisers and AdWords participants;

h.  invoices and payments by and between Defendants;

i.  reports on Internet traffic, click-through-rates, revenue generated, and other statistical and performance reporting by and between each Defendant and/or Domain registrants;

j.  other communications, correspondence, and documents related to Deceptive Domains by and between Defendants, Domain registrants, and or advertisers;

k.  communications by one or more of the Defendants with Internet users related to advertising and Deceptive Domains;

l.  wire transfer, checks/drafts, money orders, and/or payments by electronic funds transfer (EFT);

m.  on a daily, ongoing, repeated, and regular basis, Defendants use e-mail, facsimile, telephone, wire,  and/or mail to communicate with each other in furtherance of the Deceptive Domain Scheme;

n.  on a daily, ongoing, repeated, and regular basis, Defendants use e-mail, facsimile, telephone, wire, and/or mail to solicit advertisers to participate in their advertising programs and solutions, in furtherance of the Deceptive Domain Scheme;

o.  on a daily, ongoing, repeated, and regular basis, Defendant Google uses e-mail, facsimile, telephone, wire,  and/or mail to solicit Parking Company Defendants and large domain portfolio owners/licensees to participate in Defendant Google

AdSense for Domains Network, in furtherance of the Deceptive Domain Scheme;

p.  on a daily, ongoing, repeated, and regular basis, advertisers pay Defendant Google for "pay-per-click/cost-per-click" advertising by wire, mail, or electronic funds transfer, in furtherance of the Deceptive Domain Scheme;

q.  on a daily, ongoing, repeated, and regular basis, Defendant Google sends invoices, activity reports, and other important communications to advertisers, publishers, Parking Company Defendants, and large domain portfolio owners/licensees via the Internet, mail, facsimile, wire, and/or e-mail;

r.  on an ongoing, repeated, and regular basis, Defendants use e-mail, facsimile, and/or mail to negotiate and execute contracts in furtherance of the Deceptive Domain Scheme;

s.  on a daily, ongoing, repeated, and regular basis, Defendants use the Internet and other electronic solutions to redirect Internet traffic and commercially profit from the illegal use of Lead Plaintiffs' and the Class Members' Distinctive and Valuable Marks, and to otherwise effectuate the Deceptive Domain Scheme alleged herein;

t.  on an ongoing, repeated, and regular basis, Defendants use electronic funds transfer, wire transfer, and/or the mail to divide, allocate, and otherwise share the revenue generated from the Deceptive Domain Scheme;

u.  on an ongoing, repeated, and regular basis, Defendants, either alone, together and/or in conjunction with Domain registrants/third parties, use the Internet to register, license, and use Deceptive Domains;

v.  on an ongoing, repeated, and regular basis, Defendants use the Internet to engage in the practice of Domain Tasting;

w.  on an ongoing, repeated, and regular basis, Defendants use the Internet to register false WhoIs information;

x.  on an ongoing, repeated, and regular basis (continuous, day-to-day postings), Defendants use the Internet to actively market, advertise, and solicit participation in the Deceptive Domain Scheme by providing written communications, misrepresentations, and promises on Defendant-owned and sponsored websites;

y.  on a minute-by-minute, hourly, daily, ongoing and regular basis, Defendants generate revenue and commercial gain from clicks on cost-per-click/pay-per-click advertisements on Deceptive Domains; and

z.  on a minute-by-minute, hourly, daily, ongoing and regular basis, Defendants generate revenue and commercial gain from each impression on cost-per-impression advertisements on Deceptive Domains; and

aa.     Other matters and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by Defendants in furtherance of or necessary to effectuate the Deceptive Domain Scheme, such as invoices, contracts, reports, payments, certificates, and other related communications.

ab.     Defendants engaged in the following acts of racketeering, since at least January 2002, on an ongoing and repeated basis, within each and every State in the United States, in violation of *18 U.S.C. §1952* (relating to racketeering):

ac.     Defendants used the Internet, websites, wire transfers, banks, depository institutions, other electronic forums, U.S. Mail, mail carriers, and corporations and individuals, in interstate commerce, for the express and intended purpose of distributing the proceeds of their unlawful activity in violation of *18 U.S.C. §1957* and Deceptive Domain Scheme;

ad.     Otherwise traveled and acted in interstate commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management establishment, or carrying on of illegal actions and violations of *18 U.S.C.§1957.*

250.    Defendants engaged in the following acts, since at least January 2002, on an ongoing and repeated basis, within each and every State in the United States, in violation of *18 U.S.C. §1957* (related to engaging in monetary transactions in property derived from specified unlawful activity):

a.     Defendants knowingly engage in monetary transactions (deposits, money transfers, withdrawals, distributions, exchange, etc.) in criminally derived property in values in excess of Ten Thousand Dollars ($10,000.00);

b.     Defendants engage in monetary transactions involving the deposit, transfer, sharing, withdrawals, collections, and exchange of money collected from cyber squatting, typo squatting, advertisements placed on Deceptive Domains, and other related criminal activities engaged in as part of the Deceptive Domain Scheme, as alleged herein;

c.     The criminally derived money is in excess of $1 Billion annually; and

d.     One example of how Defendants criminally derive and distribute criminally derived money is as follows: Defendant Google collects advertising revenue generated on a CPC/PCP basis for advertisements (from Advertisers in its AdWords Program) on Deceptive Domains and then distributes the criminally derived advertising revenue to Parking Company Defendants, and other

Defendants, and/or domain registrants/authorized licensees; and

e.    Otherwise engage in money transactions and in property derived from criminal activity as alleged herein.

251.    Defendants engaged in the following acts, since at least January 2002, on an ongoing and repeated basis, within each and every State in the United States, in violation *of 18 U.S.C. §2320* (relating to trafficking in goods or services bearing counterfeit marks):

a.    Actions of Defendants in effectuating the Deceptive Domain Scheme, as alleged herein, constitutes knowingly trafficking in goods or services bearing counterfeit marks;

b.    For example, Defendants actions in knowingly registering, using, placing advertising, reselling for monetization, and otherwise monetizing Deceptive Domains is an act constituting the trafficking of goods or services bearing counterfeit marks; and

c.    Otherwise engaging in the trafficking in goods or services bearing counterfeit marks, as part of the Deceptive Domain Scheme, as alleged herein.

252.    Defendants' racketeering activities, violations of the law, other actions, misrepresentations, acts of concealment, and failures to disclose are knowing and intentional, and made for the purpose of wrongfully obtaining, using and distributing money and property through the illegal use for commercial gain of Deceptive Domains, as set forth herein.

## C.    Pattern of Racketeering Activity

253.    Each Defendant has engaged in a "pattern of racketeering activity," as defined by *18 U.S.C. § 1961(5)*, by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of *18 U.S.C. §1341* (relating to mail fraud) and *18 U.S.C. §1343* (relating to wire fraud); *18 U.S.C. §1952* (relating to racketeering); *18 U.S.C. §1957* (related to engaging in monetary transactions in property derived from specified unlawful activity); and *18 U.S.C. §2320* (relating to trafficking in goods or services bearing counterfeit

marks), as described herein, within the past ten years.  In fact, Defendants have committed thousands of acts of racketeering activity.

254.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Lead Plaintiffs and the Class Members.

255.    Each Defendant participated in, conducted, directed, and facilitated the affairs of the Enterprise and the Deceptive Domain Scheme being perpetrated by the RICO enterprise.

256.    These multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in *18 U.S.C. § 1961(5).*

257.    The pattern of multiple acts of racketeering activity, as alleged herein, was continuous and related over a period of over three years.

**D.      Interstate Trade and Commerce**

258.    The online/Internet electronic commerce marketing and advertising market generated an estimated $130.3 Billion in 2006.

259.    Throughout the Class Period (as herein defined), there was a continuous and uninterrupted flow of transactions by Defendants in interstate commerce throughout the United States and internationally.

260.    Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce between Defendants and Plaintiff Class Members who were located in states other than the states in which Defendants are located, and had a direct, substantial, and

reasonably foreseeable effect upon interstate commerce.

**E.      Acts in Furtherance of Conspiracy**

261.     Defendants conspired to generate, transact in, and distribute ill-gotten and criminally derived revenue, profit, and money through effectuation of the Deceptive Domain Scheme, alleged herein.

262.     Defendant Google actively developed and solicited participation in the Deceptive Domain Scheme.

263.     The method by which Defendants agreed and conspired to effectuate the Deceptive Domain Scheme is set forth herein, and includes, but is not limited to:

a.      Intentionally and deceptively registering, licensing, and utilizing Deceptive Domains that are identical or confusingly similar to or dilutive of the Lead Plaintiffs' and other members of the Class' Distinctive and Valuable Marks;

b.      Intentionally parking the Deceptive Domains for the sole and exclusive purpose of placing "pay per click" or "pay per impression" HTML links/advertising on said Deceptive Domain sites;

c.      Diverting Internet traffic from the Deceptive Domains for commercial gain;

d.      Defendants' use of semantics programs, algorithms, and other intellectual electronic programs designed and intended to maximize revenue from the placement of advertisements on Deceptive Domains to capture and redirect Internet traffic away from the legal and rightful owners of the Distinctive and Valuable Marks and send it to advertisers and competitors that participate in the "pay per click" advertising programs;

e.      Using software to capture slight misspellings or keystroke errors to capture and redirect Internet traffic to Deceptive Domains and away from the Internet user's intended site, thus diverting traffic away from Lead Plaintiffs' and the Class' valuable marks and causing confusion, dilution, and misuse/misappropriation of Lead Plaintiffs' and other members of the Class' Distinctive and Valuable Marks. Defendant Google, Defendant domain name registrants, and the Parking Company Defendants all profit

from clicks on the HTML advertising links that are placed on the Deceptive Domains;

f.      Defendants' use of false and misleading WhoIs domain registration data in an attempt to conceal their participation in the Deceptive Domain Scheme; and

g.      Defendants' efforts to conceal the Deceptive Domain Scheme by using encryption and/or disabling the "View Source" functions at the Deceptive Domains.

264.    The above-described practices are unreasonable and unlawful, and result in violations of RICO, other criminal statutes alleged herein, cybersquatting, typosquatting, cyber-piracy, unlawful interference with current and prospective economic advantage.

265.    Defendants' concerted actions in furtherance of the conspiracy as alleged herein, are knowing, intentional, and taken in bad faith.

266.    Defendants hosted a website at each of the Deceptive Domains which displayed HTML links featuring advertisements for goods and services that are directly competitive with those sold or provided in connection with Lead Plaintiffs' Marks or Distinctive and Valuable Marks belonging to the Class.

267.    Defendants do not have any intellectual property rights or any other rights in Lead Plaintiffs' and the Class' Distinctive and Valuable Marks.  None of the Deceptive Domains consist of the legal name of the Defendants, or a name that is otherwise commonly used to identify the Defendants.

268.    None of the Defendants have made any prior use of any of the Deceptive Domains in connection with the *bona fide* offering of any goods or services.

269.    All of the Deceptive Domains are being used by the Defendants for commercial gain.

**F.     Injury/Harm to Lead Plaintiffs, the Class, and the General Public**

270.    Lead Plaintiffs and the Class have suffered injury to their business and property as a direct and proximate result of Defendants' illegal actions, as alleged herein.  The injuries to the business and property of Lead Plaintiffs and the Class include, but are not limited to:

      a.      Damage to property;

      b.      Damage to value of domain;

      c.      Diversion of business;

      d.      Dilution of the Distinctive and Valuable Marks;

      e.      Infringement of Distinctive and Valuable Marks;

      f.      Lost profits/revenue;

      g.      Lost sales;

      h.      Lost customers;

      i.      Lost market share;

      j.      Lost reputation;

      k.      Confusion of goods/services;

      l.      Lost goodwill; and

      m.      Other such injury and damage directly and proximately caused by Defendants' illegal actions alleged herein.

271.    Lead Plaintiffs and the Class were all injured in a similar fashion by the Defendants' predicate acts in violation of RICO.

272.    The injury and harm suffered by the Lead Plaintiffs, and the Class, as alleged herein, was directly caused by, and was the direct result of, the Defendants' violations of *18*

*U.S.C. §1962(a)(b)(c)* and/or *(d)*.

273.    Defendants' Deceptive Domain Scheme, which includes, but is not limited to, the unauthorized registration and/or use of the Deceptive Domains, is likely to cause confusion, mistake, and deception as to the source or origin of the Deceptive Domains, and is likely to falsely suggest a sponsorship, connection, license, or association of Defendants, and the Deceptive Domains with Lead Plaintiffs and the Class.

274.    Defendants' activities have irreparably harmed and, if not enjoined, will continue to irreparably harm Lead Plaintiffs and the Class and the long-used and federally registered trademarks and the Distinctive and Valuable Marks belonging to Lead Plaintiffs and the Class.

275.    Defendants' activities have irreparably harmed, and if not enjoined, will continue to irreparably harm the general public, which has an inherent interest in being free from confusion, mistake, deception, confusion as to the source, affiliation, association, or sponsorship of goods or services.

276.    Trademark infringement and unfair competition laws are designed and intended to protect the public from exactly such confusion and deception.

277.    Defendants' bad actions, constituting violations of those laws, directly cause injury to the public and circumvent the very important trademark safeguards that the laws are designed to protect and promote.

## IX.    THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT

278.    In 1999, Congress passed the Anticybersquatting Consumer Protection Act ("ACPA" or "Act"), *15 U.S.C.A. § 1125(d)*, to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners.

279.    Congress enacted the ACPA to include not only individuals and companies who register domain names, but rather, to apply equally to three classes of persons/entities:  (1) registrants of the Deceptive Domains; (2) anyone who "uses" the domain name which is defined as the registrant or the "authorized licensee" of the registrants of the Deceptive Domains; and (3) anyone who "traffics in" Deceptive Domains, which refers to anyone involved in any transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration, whether or not the person is the registrant of the Deceptive Domain.

280.    Congress drafted the ACPA to prevent the use, licensing, pledging, trafficking in, or any other exchange of consideration for the use of the infringing domain names.

281.    The Deceptive Domain Scheme and other illegal activities of Defendants constitutes the very conduct which Congress declared to be illegal and in which Defendants brazenly engage.

282.    Congress provided clear examples of some of the specific types of improper domain names and activities that had been brought to its attention and which were included within the scope of the ACPA, activities in which the Defendants have engaged, and are continuing to engage in violation of the ACPA.

> As stated by Senator Hatch:
>
> *The Committee also heard numerous examples of online bad actors using domain names to engage in unfair competition. For example, one domain name registrant used the name ''wwwcarpoint.com,'' without a period following the ''www,'' to drive consumers who are looking for Microsoft's popular Carpoint car buying service to a competitor's site offering similar service."*  From August 5, 1999 CONGRESSIONAL RECORD —SENATE S10515

283.   "WWW" Deceptive Domains were clearly targeted by Congress and declared to be illegal by the ACPA.  The only reason for these "www" domains is to capture and redirect users looking for the original, legitimate websites.

284.   *15 USC § 1125(d)* applies to registrants who engage in cybersquatting and typosquatting by registering Deceptive Domains and using them for commercial gain.  *15 USC § 1125(d)* applies equally to persons who are the "registrant's authorized licensee," whether or not the person is the registrant of the Deceptive Domain.  *15 USC § 1125(d)* applies equally to a person who "traffics in" (as defined in *15 USC § 1125 (d)(1)(E)*) Deceptive Domains, whether or not the person is the registrant of the Deceptive Domain.

285.   All of the Defendants are authorized licensees of domains and Deceptive Domains.  All Defendants license and sub-license domains, including Deceptive Domains, either through express or implied, direct or indirect licenses. For example, but not limited to:

a.   ActiveAudience (a parking company that contracts with Defendant Google to monetize the ActiveAudience aggregated domains with Defendant Google Ads through the Adsense For Domains parking programs), contracts with Domain registrants in their license agreements as follows: "You [domain owner] hereby grant ActiveAudience a revocable license to display, at ActiveAudience's option, content on Your Parked Domains for the duration of this Agreement."

b.   Gold Key (a parking company that contracts with Defendant Google to monetize the Gold Key aggregated domains with Defendant Google Ads through the Adsense For Domains parking programs), contracts  with Domain registrants with following express provision:  "You [domain owner] hereby grant GoldKey a revocable license to display, at GoldKey's option, content on Your Parked Domains for the duration of this Agreement."

c.   In addition, each above-referenced contract contains the following provision: "**Sublicensing and Assignment**....GoldKey [and Active Audience] may assign its rights and duties under this Agreement to any party at any time without notice to You [domain owner]."

286.   The Defendants acts as alleged herein constitute trafficking in Deceptive

Domains, in violation of the ACPA.

287.     The Defendants acts as alleged herein constitute cyberpiracy, cybersquatting, and/or typosquatting, in violation of the ACPA.

288.     The Defendants acts as alleged herein otherwise violate the ACPA.


X.     **CLASS ACTION ALLEGATIONS**

289.     Lead Plaintiffs bring this action against Defendants on their own behalf and pursuant to Rules 23(a), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of the following class:

> **Any and all individuals and/or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) domiciled within the United States that own or are a licensee of a "distinctive or valuable mark" that has been infringed, diluted, cybersquatted, typosquatted, and/or otherwise improperly used by one or more of the Defendants, as part of the Deceptive Domain Scheme alleged herein, during the period January 1, 2002 through the present.**

290.     Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or are a parent or subsidiary of, or any entity that is controlled by Defendants and any of its officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

291.     The Class Period is January 1, 2002, through the date of filing of this Complaint (the "Class Period").

292.     There are millions of geographically dispersed putative members of the Class. Accordingly, the Class is so numerous that joinder of all members is impracticable.

293.     The Class is ascertainable, as the names and addresses of all Class Members can

be identified in business records maintained by Defendants.

294.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class.

295.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other Class Members.

296.    Lead Plaintiffs are represented by counsel experienced and competent in the prosecution of complex class action litigation.

297.    There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members.  Such common questions include, but are not limited to the following:

    a.     Whether one or more of the Defendants' actions as alleged herein violate the ACPA, *15 U.S.C. § 1125(d)*;

    b.     Whether one or more of the Defendants' actions, as alleged herein, constitute violations of RICO, *18 U.S.C. §1962(c)* and *(d)*;

    c.     Whether one or more of the Defendants' actions as alleged herein violate Lanham Act, *15 U.S.C. § 1051* et seq.;

    d.     Whether one or more of the Defendants' actions, as alleged herein, constitute trademark infringement under *15 U.S.C. § 1114(1)*;

    e.     Whether one or more of the Defendants' actions, as alleged herein, constitute violations of false designation of origin under *15 U.S.C. § 1125(a)*;

    f.     Whether one or more of the Defendants' actions, as alleged herein, constitute dilution under *15 U.S.C. § 1125(c)*;

    g.     Whether one or more of the Defendants' actions, as alleged herein, violate

the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2; the Illinois Uniform Deceptive Trade Practices Act, ILCS 510/2, and/or the identical or substantially similar consumer fraud and fair trade practices acts of other various states;

h.    Whether one or more of the Defendants' actions, as alleged herein, constitute contributory, vicarious, statutory, and/or common law trademark infringement;

i.    Whether one or more of the Defendants' actions, as alleged herein, constitutes Intentional Interference With Current and Prospective Economic Advantage;

j.    Whether any of the Defendants committed or are responsible for the acts alleged herein;

k.    Whether any of the Defendants' actions are continuing in nature;

l.    Whether any of the Defendants engaged in a pattern of racketeering activity;

m.    Whether the alleged Enterprise is an enterprise within the meaning of *18 U.S. C. 1961(4)*;

n.    Whether any of the Defendants conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity in violation of *18 U.S.C. 1962(c)*;

o.    Whether Defendants' overt and/or predicate acts in violation of *18 U.S.C. 1962(c)* proximately cause injury to Lead Plaintiffs' and Class Members' business or property;

p.    Whether Defendants fraudulently concealed their Deceptive Domain Scheme and other unlawful activities alleged herein;

q.    Whether Lead Plaintiffs and the Class are entitled to declaratory and/or injunctive relief to rectify the alleged violations of law and, if so, what is the appropriate nature of the equitable and injunctive relief to which Lead Plaintiffs and the Class may be entitled;

r.    Whether any of the Defendants' conduct is willful and/or intentional;

s.    Whether any of the Defendants directed, controlled, or agreed to facilitate the perpetration of the Deceptive Domain Scheme being perpetrated by

the RICO Enterprise;

t.    The duration of the conspiracy alleged in this Complaint, and the nature and character of the acts performed by any of the Defendants in furtherance of the conspiracy;

u.    Whether the conduct of any of the Defendants, as alleged in this Complaint, caused damages to the Lead Plaintiffs or to the other members of the Class;

v.    The appropriate measure of damages sustained by Lead Plaintiffs and other members of the Class; and

w.    Whether Defendants were unjustly enriched as a result of their Deceptive Domain Scheme and other unlawful conduct, as alleged herein.

298.    Lead Plaintiffs' claims are typical of the claims of the Class Members because they originate from the same illegal and confiscatory practices of Defendants, and because Defendants have acted in the same way toward Lead Plaintiff and the Class.

299.    Defendants' operations are Internet-based/automated and technology-based. Defendants' actions toward the Class are identical or substantially similar, and arise out of a common course of illegal conduct, because Defendants effectuate the Deceptive Domain Scheme, and all of the actions alleged herein, through the use of a common, systemic, uniform, electronic and largely automated process that cause injury and damage to Lead Plaintiffs and the Class in a common and consistent manner.

300.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class litigation, and have no interests antagonistic to or in conflict with those of the Class. As such, Lead Plaintiffs are adequate Class representatives.

301.    The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the Class.

302.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs alleged herein.   There will be no difficulty in the management of this action as a class action.

303.    This action is maintainable as a class action under Rule 23(b)(2), since the unlawful actions of Defendants, as alleged herein, have been taken on grounds equally applicable to all members of the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class and subclasses as a whole.

304.    Alternatively, this action is maintainable as a class action under Rule 23(b)(1), as the prosecution of separate actions by or against individual members of the class would create a risk of:  (a) inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for the party opposing the class; or (b) adjudications with respect to individual members of the class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

305.    Alternatively, this action is maintainable as a class action under Rule 23(b)(3), as common questions of law and fact described above predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

306.   All allegations and claims are plead in the alternative to the extent required for proper construction under applicable state or federal law.

## XI.   LEGAL CLAIMS

### COUNT ONE:  RICO VIOLATIONS
### Violation of 18 U.S.C. § 1962(c)

307.   Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

308.   This Count is brought by Lead Plaintiffs in their individual and representative capacities, against all Defendants.

309.   This claim for relief alleges that Defendants have violated *18 U.S.C. §1962(c)* by conducting, or participating directly or indirectly in the conduct of the Enterprise's affairs through a pattern of racketeering.

310.   The acts set forth herein constitute a pattern of racketeering activity pursuant to *18 U.S.C. § 1961(5)*.

311.   Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purposes, as set forth herein.

312.   Pursuant to and in furtherance of their Deceptive Domain Scheme, Defendants committed multiple related acts of racketeering and activity, as described herein.

313.   As a direct and proximate result, Lead Plaintiffs and the Class Members have been injured in their business or property by the predicate acts which make up the Defendants' patterns of racketeering activity through the Enterprise.

314.    As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of *18 U.S.C.§ 1962(d)*, Lead Plaintiffs and the Class have been injured in their business and property, by having their Distinctive and Valuable Marks infringed and diluted, their economic relationships interfered with, their reputation and affiliations misrepresented, and otherwise as alleged more fully herein.

315.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT TWO:  RICO VIOLATIONS
### Violation of 18 U.S.C. § 1962(d)

316.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

317.    This Count is brought by Lead Plaintiffs in their individual and representative capacities, against all Defendants.

318.    This claim for relief arises under *18 U.S.C. §1962(d)*, which makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

319.    Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common Deceptive Domain Scheme and conspiracy.

320.    Each Defendant and members of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to commit acts of unfair competition, false advertising, dilution, Distinctive and Valuable Mark infringement, and other such illegal acts as contained herein to obtain unfair enrichment and benefit at the expense of Lead Plaintiffs

and the Class, and Defendants actually committed such acts.

321.    For the Deceptive Domain Scheme described above to be successful, each Defendant and other members of the conspiracy had to agree to further the conspiracy.

322.    Defendants' conspiracy to damage Lead Plaintiffs and the Class through the Deceptive Domain Scheme described above violates *18 U.S.C. §1962(d)*.

323.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, including numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of *18 U.S.C. §1962(c)*.

324.    Each of the Defendants intended to further the endeavors of the RICO Enterprise and adopted the goals of the RICO Enterprise that fraudulently used the mail or wire to commit the Deceptive Domain Scheme and related illegal activities alleged herein.

325.    As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of *18 U.S.C.§ 1962(d)*, Lead Plaintiffs and the Class have been injured in their business and property, by having their Distinctive and Valuable Marks infringed and diluted, their economic relationships interfered with, their reputation and affiliations misrepresented, and otherwise as alleged more fully herein.

326.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

### COUNT THREE: CYBERSQUATTING
### Violation of 15 U.S.C. § 1125(d)

327.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

328.    This Count is brought by Lead Plaintiffs, in their individual and representative capacities, against all Defendants.

329.    Defendants registered, trafficked in, or used the infringing Deceptive Domains for commercial gain.

330.    The Lead Plaintiffs' Distinctive and Valuable Marks and the Distinctive and Valuable Marks of the Class are distinctive, famous, venerable, valuable, and or federally registered at the USPTO at the time Defendants registered and used the infringing Deceptive Domains.

331.    The infringing Deceptive Domains are identical or confusingly similar to the Lead Plaintiffs' Distinctive and Valuable Marks and the Distinctive and Valuable Marks of the Class.

332.    Defendants registered, trafficked in, or used the infringing Deceptive Domains in bad faith and with the intent to profit from the goodwill long established by Lead Plaintiffs in their Distinctive and Valuable Marks and the Distinctive and Valuable Marks of the Class.

333.    Defendants do not have any intellectual property rights or any other rights in the Lead Plaintiffs' Distinctive and Valuable Marks or the Distinctive and Valuable Marks of the Class.

334.    None of the infringing Deceptive Domains consist of the legal name of the Defendants, or a name that is otherwise commonly used to identify the Defendants.

335.    None of the Defendants have made any prior use of any of the infringing Deceptive Domains in connection with the *bona fide* offering of any goods or services.

336.    None of the Defendants have made any bona fide fair use of the Lead Plaintiffs' Distinctive and Valuable Marks or the Distinctive and Valuable Marks of the Class on a website

accessible under any of the infringing Deceptive Domains.

337.     Defendants registered, used, and/or trafficked in the infringing Deceptive Domains to divert consumers attempting to reach Lead Plaintiffs' and the Class' websites to websites accessible under the infringing Deceptive Domains for Defendants' commercial gain.

338.     Defendants registered and used the infringing Deceptive Domains to divert consumers from Lead Plaintiffs' and the Class' websites to websites accessible from the infringing Deceptive Domains.  Defendants thereby create a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Deceptive Domain websites.

339.     Defendants offered to transfer, sell, or otherwise assign the infringing Deceptive Domains for financial gain without having used, or having an intent to use, the infringing Deceptive Domains in the bona fide offering of any goods or services.

340.     Defendants intentionally provided material and misleading false contact information for some of the infringing Deceptive Domains.

341.     Defendants have registered multiple Deceptive Domains which Defendants knew were identical or confusingly similar to the protected and Distinctive and Valuable Marks of Lead Plaintiffs and the Class that were distinctive at the time of the registration and continue to be distinctive, to the confusingly similar infringing Deceptive Domains.

342.     Defendants' registration, trafficking in, or use of the infringing Deceptive Domains constitutes cybersquatting in violation of *15 U.S.C. § 1125(d)*, entitling Lead Plaintiffs and the Class to relief.

343.     By reason of Defendants' acts alleged herein, Lead Plaintiffs' and the Class' remedy at law is not adequate to compensate them for the injuries inflicted by Defendants.

Accordingly, Lead Plaintiffs and the Class are entitled to preliminary and permanent injunctive relief pursuant to *15 U.S.C. § 1116.*

344.    By reason of Defendants' acts alleged herein, Lead Plaintiffs and the Class are entitled to recover Defendants' profits, actual damages and the costs of the action, or statutory damages under *15 U.S.C. § 1117*, on election by Lead Plaintiffs and the Class, in an amount of One Hundred Thousand Dollars ($100,000) per Deceptive Domain name infringement.  Further, this is an exceptional case making Lead Plaintiffs eligible for an award of attorneys' fees under *15 U.S.C. § 1117.*

345.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT FOUR: TRADEMARK INFRINGEMENT
### Violation of 15 U.S.C. § 1114(1)

346.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

347.    This Count is brought by Lead Plaintiffs in their individual and representative capacities, against all Defendants.

348.    Defendants' use in commerce of the Lead Plaintiffs' and the Class' Distinctive and Valuable Marks and the infringing Deceptive Domains and the websites and popup and popunder advertisements displayed at the infringing Deceptive Domains, is likely to cause confusion, mistake, and deception.

349.    Defendants' use of the Lead Plaintiffs' and the Class' Distinctive and Valuable Marks and the infringing Deceptive Domains is likely to cause initial interest confusion among the general public.

350.    Defendants knowingly provided material false contact information in registering and maintaining the infringing Deceptive Domains.

351.    The above-described acts of Defendants constitute trademark infringement in violation of *15 U.S.C. § 1114(1)*, entitling Lead Plaintiffs to relief.

352.    Defendants have unfairly profited from the infringing actions alleged herein.

353.    By reason of Defendants' acts, Lead Plaintiffs and the Class have suffered damage to the goodwill associated with the Lead Plaintiffs and Class' Distinctive and Valuable Marks.

354.    Defendants' activities have irreparably harmed and, if not enjoined, will continue to irreparably harm Lead Plaintiffs and the Class and their long-used Distinctive and Valuable Marks.

355.    Defendants' activities have irreparably harmed, and if not enjoined, will continue to irreparably harm, the general public.  The general public has an interest in being free from confusion, mistake, and deception.

356.    By reason of Defendants' acts, Lead Plaintiffs' and the Class' remedy at law is not adequate to compensate them for the injuries inflicted by Defendants.  Accordingly, Lead Plaintiffs and the Class are entitled to preliminary and permanent injunctive relief pursuant to *15 U.S.C. §1116.*

357.    By reason of Defendants' willful acts, Lead Plaintiffs and the Class are entitled to damages, and that those damages be trebled under *15 U.S.C. § 1117.*

358.    This is an exceptional case, making Lead Plaintiffs and the Class eligible for an award of attorneys' fees under *15 U.S .C. § 1117.*

359.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

### COUNT FIVE:  FALSE DESIGNATION OF ORIGIN
### Violation of 15 U.S.C. § 1125(a)

360.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

361.    This Count is brought by Lead Plaintiffs, in their individual and representative capacities, against all Defendants.

362.    Defendants' use in commerce of the Distinctive and Valuable Marks and the infringing Deceptive Domains, as alleged herein.

363.    The infringing Deceptive Domains are likely to cause confusion, or to cause mistake, or to deceive the relevant public that the Deceptive Domains and the websites and pop up and pop under advertisements displayed at the Deceptive Domains are authorized, sponsored or approved by, or are affiliated with, Lead Plaintiffs or with members of the Class.

364.    Defendants' use of the confusingly similar and infringing Deceptive Domains is likely to cause confusion among the general public.

365.    Defendants knowingly provided material false contact information in registering, using, trafficking in, and/or maintaining the infringing Deceptive Domains.

366.    The above-described acts of Defendants constitute trademark infringement of Lead Plaintiffs' and the Class' Distinctive and Valuable Marks and false designation of origin in violation of *15 U.S.C. § 1125(a)*, entitling Lead Plaintiffs and the Class to relief.

367.    Defendants have unfairly profited from the actions alleged herein.

368.    By reason of Defendants' acts alleged herein, Lead Plaintiffs and the Class have suffered damage to the goodwill associated with their Distinctive and Valuable Marks.

369.    Defendants' activities have irreparably harmed and, if not enjoined, will continue to irreparably harm Lead Plaintiffs and the Class, and their long-used Distinctive and Valuable Marks.

370.    Defendants' activities have irreparably harmed, and if not enjoined, will continue to irreparably harm the general public, who has an interest in being free from confusion, mistake, and deception.

371.    By reason of Defendants' acts alleged herein, Lead Plaintiffs' and the Class' remedy law is not adequate to compensate them for the injuries inflicted by Defendants. Accordingly, Lead Plaintiffs and the Class are entitled to preliminary and permanent injunctive relief pursuant to *15 U.S.C. § 1116.*

372.    By reason of Defendants' willful acts, Lead Plaintiffs and the Class are entitled to damages, and those damages should be trebled under *15 U.S .C. § 1117.*

373.    This is an exceptional case making Lead Plaintiffs and the Class eligible for an award of attorneys' fees under *15 U.S.C. § 1117.*

374.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.


### COUNT SIX:  DILUTION
### Violation of 15 U.S.C. § 1125(c)

375.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if

fully set forth herein.

376.     This Count is brought by Lead Plaintiffs in their individual and representative capacities, against all Defendants.

377.     Lead Plaintiffs and the other members of the Class own Distinctive and Valuable Marks use in connection with their commercial activities and which are contained as domain names within the URLs they use in Internet commerce.  At the time that the Lead Plaintiffs and the members of the Class registered their domain names, the Distinctive and Valuable Marks were distinctive, protected/protectible, and/or famous.

378.     Lead Plaintiffs' and the Class' Distinctive and Valuable Marks are valuable and protected marks under *15 U.S.C. § 1125(c)*, and were so before Defendants' infringement of the Distinctive and Valuable Marks by the use of the infringing Deceptive Domains in commerce, based on, among other things, the inherent distinctiveness and federal registration of the Distinctive and Valuable Marks and the extensive, and exclusive nationwide use, advertising, promotion, and recognition of the Distinctive and Valuable Marks.

379.     Defendants' infringement of the Distinctive and Valuable Marks (and/or confusingly similar marks) and use of the infringing Deceptive Domains in commerce is likely to cause dilution by blurring or dilution by tarnishment of the Lead Plaintiffs' and Class' Distinctive and Valuable Marks.

380.     Defendants knowingly provided material false contact information in registering and maintaining the infringing Deceptive Domains.

381.     The above-described acts of Defendants constitute dilution by blurring and dilution by tarnishment in violation of *15 US.C. § 1125(c)*, entitling Lead Plaintiffs and the Class

to relief.

382.    Defendants have unfairly profited from their unlawful actions alleged herein.

383.    By reason of Defendants' acts, Lead Plaintiffs and the Class have suffered damage to the goodwill associated with their Distinctive and Valuable Marks and have suffered irreparable harm.

384.    By reason of Defendants' acts, Lead Plaintiffs' and the Class' remedy at law is not adequate to compensate them for the injuries inflicted by Defendants.  Accordingly, Lead Plaintiffs and the Class are entitled to preliminary and permanent injunctive relief pursuant to *15 US.C. § 1116*.

385.    By reason of Defendants' willful acts, Lead Plaintiffs and the Class are entitled to damages, and those damages should be trebled under *15 U.S.C. § 1117*.

386.    This is an exceptional case-making Lead Plaintiffs and the Class eligible for an award of attorneys' fees under *15 US.C. § 1117*.

387.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

**COUNT SEVEN:**
**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**815 ILCS 505/2 and the ILLINOIS UNIFORM DECEPTIVE**
**TRADE PRACTICES ACT 815 ILCS 510/2**
**AND THE SIMILAR OR IDENTICAL STATE STATUTES OF THE VARIOUS STATES**

388.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

389.    This Count is brought by Lead Plaintiffs individually, and in their representative capacity on behalf of the Class, against all Defendants.

390.    At all relevant times herein, there were in full force and effect in the State of

Illinois statutes commonly known as the *Illinois Uniform Deceptive Trade Practices Act* 815

ILCS 510/2 and the *Illinois Consumer Fraud and Deceptive Business Practices Act,* 815 ILCS

505/2.  The Illinois Uniform Deceptive Trade Practices Act provides in pertinent part as follows:

> *Unfair methods of competition and unfair deceptive acts or practices,*
> *including but not limited to the use or employment of any deception, fraud,*
> *false pretense, false promise, misrepresentation, or the concealment,*
> *suppression or omission of any material fact with the intent that others*
> *rely upon the concealment, suppression or employment of any practice*
> *described in section 2 of the "Uniform Deceptive Trade Practices Act,"*
> *approved August 5, 1965, in the conduct of any trade or commerce are*
> *hereby declared unlawful where any person has in fact been misled,*
> *deceived or damaged thereby.  In construing this section, consideration*
> *shall be given to the interpretations of the Federal Trade Commission and*
> *the federal courts relating to section 5(a) of the Federal Trade*
> *Commission Act.*

391.    The Illinois Consumer Fraud and Deceptive Business Practices Act further

provides, in 815 ILCS 505/10(a), as follows:

> *Any person who suffers actual damage as a result of a violation of this Act*
> *committed by any other person may bring an action against such person.*
> *The court, in its discretion may award actual economic damages or any*
> *other relief which the court deems proper...*

392.    Each member of the putative Class is a consumer within the meaning of the

Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1(e) and/or the similar

state law consumer protection acts of their resident state.

393.    Other various states have identical or substantially similar state law statutes

prohibiting false advertising.

394.    By means of the actions alleged above, Defendants have advertised to the public

that the Defendants' infringing Deceptive Domains and the websites located at the Deceptive

Domains are related to, or are an official website of, Lead Plaintiffs and/or the Class.

395.    Neither Lead Plaintiffs nor the Class authorized Defendants to advertise to the public using identical or confusingly similar Deceptive Domains and website content substantially likely to lead to mistake or confusion with the Distinctive and Valuable Marks of the Lead Plaintiffs and the Class.

396.    The false and misleading advertisements are disseminated to and received by the public by means of the Internet.

397.    Defendants' advertising was and is untrue or misleading and was and is likely to deceive the public into believing that the Deceptive Domains and the websites located at the Deceptive Domains are related to, or an official website of, Lead Plaintiffs and/or the Class, when in fact, the infringing Deceptive Domains and websites have not been sponsored or authorized in any manner by Lead Plaintiffs and/or the Class.

398.    The conduct of Defendants as alleged herein constitutes the use or employment of deception, fraud, false pretense, false promise, misrepresentation and the concealment, suppression or omission within the meaning of the *Illinois Consumer Fraud and Deceptive Business Practices Act,* 815 ILCS 505/2 and the *Illinois Uniform Deceptive Trade Practices Act* 815 ILCS 510/2, and the applicable similar state law consumer protection statutes of the various states.

399.    Defendants knew, or should have known, that their actions violated the *Illinois Consumer Fraud and Deceptive Business Practices Act,* 815 ILCS 505/2 and the *Illinois Uniform Deceptive Trade Practices Act,* 815 ILCS 510/2.

400.    Defendants' illegal actions alleged herein create a likelihood of confusion or of

misunderstanding as to affiliation, connection, association, or certification of the infringing Deceptive Domains with Lead Plaintiffs and the Class.

401.    Defendants' actions further tend to cause confusion as to the sponsorship, approval, status, affiliation, or connection between the infringing Deceptive Domains and the Lead Plaintiffs and the Class.

402.    Defendants have knowingly, intentionally, and deliberately engaged in conduct that creates a likelihood of confusion or misunderstanding.

403.    Defendants' illegal actions, as alleged herein, constitute unfair methods of competition under the laws and the common law of Illinois, and other similar state laws and common law.

404.    Lead Plaintiffs and each member of the putative Class have suffered actual economic damages, injuries, and other related damages as a direct and proximate result of the aforesaid violations.

405.    Defendants' actions have caused, and will continue to cause, substantial and irreparable harm, damage, and injury to Lead Plaintiffs, the Class, and the public.

406.    Unless Defendants are enjoined from continuing their illegal actions, Defendants will continue to engage in the untrue and misleading use of the Deceptive Domains as part of the Deceptive Domain Scheme, as alleged above, thus tending to render judgment in the instant action ineffectual.

407.    Lead Plaintiffs and the Class have no adequate remedy at law because Defendants will continue to engage in the misleading Deceptive Domain Scheme, as alleged above, thus engendering a multiplicity of judicial proceedings.

408.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT EIGHT:  FOR DECLARATORY JUDGMENT
## ON BEHALF OF THE CLASS

409.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

410.    This Count is brought by both Lead Plaintiffs individually, and in their representative capacity on behalf of the Class, against all Defendants.

411.    Lead Plaintiffs and the Class Members are entitled to declaratory judgment that, by the acts alleged herein, Defendants have violated and continue to violate, Section 43(a) of the Lanham Act, *15 U.S.C. § 1051 et seq.*; the Anticybersquatting Consumer Protection Act, *15 U.S.C. § 1125(d)*; the RICO Statute, *18 U.S.C. § 1962 (c)* and *(d)*;  and other federal and state laws as set forth herein, and have been, and continue to be, unjustly enriched all to the detriment of Lead Plaintiffs and the Class.

412.    Pursuant to *28 U.S.C. §§ 2201-2202*, this Court is empowered to, and should, declare that Defendants' activities have violated the federal and state statutory and/or common laws set forth above.

413.    Such a declaration would serve a useful purpose by terminating and affording relief from uncertainty, insecurity and controversy that has been created as a result of Defendants' Deceptive Domain Scheme and other illegal actions as alleged herein.

414.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT NINE:  COMMON LAW TRADEMARK VIOLATION

415.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

416.    This count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

417.    Each and every state recognizes a cause of action for breach of common law trademark rights.

418.    Lead Plaintiffs and the Class have protected and/or protectible common law trademark rights in their Distinctive and Valuable Marks.

419.    Lead Plaintiffs and the Class utilize their Distinctive and Valuable Marks in the course of commerce and in conjunction with their legitimate business operations.

420.    Defendants' Deceptive Domain Scheme and unlawful conduct, as alleged herein, infringes, dilutes, interferes with and otherwise harms Lead Plaintiffs' and the Class Members' common law trademark rights in their Distinctive and Valuable Marks.

421.    Defendants' common law trademark violations have directly and proximately caused injury and damage and continue to cause injury and damage to Lead Plaintiffs and to the Class by, among other things, causing them to lose control of their business reputation, causing confusion, diverting customers and sales, and otherwise causing significant commercial loss.

422.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT TEN:  CONTRIBUTORY TRADEMARK INFRINGEMENT

423.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if

fully set forth herein.

424.     This Count is brought by Lead Plaintiffs, individually and in their representative capacity against all Defendants.

425.     Contributory infringement occurs when a defendant either intentionally induces a third party to infringe the person's mark, or supplies a service or product to a third party with actual or constructive knowledge that the service or product is being used to infringe the person's mark.

426.     Defendants have actual knowledge, or have reason to know, of the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein.

427.     Defendants supply the illegal revenue-generating services, mechanisms, technology and programs necessary to engage in the Deceptive Domain Scheme, through which the Defendants and third parties infringe the Distinctive and Valuable Marks of Lead Plaintiffs and the Class.

428.     Defendants knowingly conspired to engage in the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein.

429.     Defendants, on an ongoing basis, knowingly and voluntarily continue to engage in the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein, in order to obtain revenue and profit, and commercial gain, despite knowledge that their activities are in direct violation of applicable state and federal law.

430.     Defendants induce, cause, and/or materially contribute to the Deceptive Domain Scheme and other unlawful conduct alleged herein.

431.     Statements or actions by Defendants directed to promoting and controlling the

Deceptive Domain Scheme and other unlawful conduct alleged herein, include, but are not limited to the following:

      a.     Defendant Google states that it monitors the domains and utilizes tools to maximize placement of "pay-per-click/cost-per-click" advertising on the Deceptive Domains based on the meaning of the domain name and other language and semantics programs;

      b.     Defendant Google creates, designs, maintains, monitors, changes, and otherwise controls the HTML web page associated with each Deceptive Domain in Google's advertising network;

      c.     Defendant Google controls which advertisements appear on each of the Deceptive Domain's HTML web pages;

      d.     Defendant Google generates substantial revenue from Deceptive Domains that show Google advertising;

      e.     Defendant Google collects the advertising revenue from its advertisers;

      f.     Defendant Google disperses the revenue generated from the Deceptive Domains;

      g.     Defendant Google pays Parking Companies and domain name registrants for the licenses to use the Deceptive Domains;

      h.     Defendant Google actively seeks, solicits, and promotes advertising for placement on the Deceptive Domains;

      i.     Defendant Google controls and directs the Internet traffic from the Deceptive Domains through the Defendant Google advertising system through acts of cybersquatting, typosquatting, cyberpiracy, and as otherwise alleged herein;

      j.     Defendant Google maintains records of each domain showing Defendant Google advertising and provides reports specific to each such domain; and

      k.     Defendant Google pays each of it partners based on how much each Deceptive Domain generates in advertising revenue.

432.    All other Defendants participate with Defendant Google in one or more of the above-referenced illegal actions in furtherance of the Deceptive Domain Scheme.

433.    Defendants' actions as alleged herein constitute Contributory Infringement.

434.    Defendants' Contributory Trademark Infringement has directly and proximately injured and damaged and continues to injure and damage Lead Plaintiffs and the Class by, among other things, causing them to lose control of their business reputation, causing confusion, diverting customers and sales, and otherwise causing significant commercial loss.

435.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.


## COUNT ELEVEN:  VICARIOUS TRADEMARK INFRINGEMENT

436.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

437.    This Count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

438.    Vicarious infringement occurs when a defendant controls, directs, facilitates, encourages, promotes, allows, enables, or otherwise permits a third party to infringe a mark, and receives the benefit therefrom.

439.    Defendants facilitate, encourage, promote, allow, enable and otherwise permit direct infringements, and the other illegal conduct alleged herein, in the course of their businesses.

440.    Defendants maintain the right, power and ability to control, edit, alter, modify and maintain the software used to effectuate the infringements and in the Deceptive Domain Scheme.

441.    Defendants fail to exercise their policing obligations to the fullest extent, fail to

utilize and implement available filtering technologies, and otherwise have engaged in a pattern of direct and intentional misconduct, or willful blindness of their actions related to the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein.

442.    Defendants control and participate in the supply of the illegal revenue-generating services, mechanisms, technology and programs necessary to engage in the Deceptive Domain Scheme, through which the Defendants and third parties infringe the Distinctive and Valuable Marks of Lead Plaintiffs and the Class.

443.    Defendants knowingly conspired to engage in the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein.  Defendants, on an ongoing basis, knowingly and voluntarily continue to engage in the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein, in order to obtain revenue and profit, and commercial gain, despite knowledge that their activities are in direct violation of applicable state and federal law.

444.    Defendants have the primary financial interest in the exploitation of Lead Plaintiffs' and the Class Members' Distinctive and Valuable Marks.  Defendants are the primary beneficiaries of the infringements and illegal conduct alleged herein.

445.    Defendants induce, cause, and/or vicariously engage in the Deceptive Domain Scheme and other unlawful conduct, as alleged more fully herein above

446.    Defendants' actions as alleged herein constitute vicarious infringement.

447.    Defendants' vicarious infringements have directly and proximately injured and damaged and continues to injure and damage Lead Plaintiffs and the Class by, among other things, causing them to lose control of their business reputation, causing confusion, diverting

customers and sales, and otherwise causing significant commercial loss.

448.     Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.


### COUNT TWELVE:
### INTENTIONAL INTERFERENCE WITH CURRENT AND PROSPECTIVE ECONOMIC ADVANTAGE

449.     Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

450.     This Count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

451.     A current and prospective economic relationship exists between the Lead Plaintiffs/Class Members and third party Internet users/consumers and that such relationship, if not interfered with, provides the probability and likelihood of future economic benefit to the Lead Plaintiffs and the Class Members.

452.     The entire Internet advertising market and business is premised on the buying power of the Internet users.

453.     Defendants know and understand the existence of the relationship between the Lead Plaintiffs/Class Members and third party Internet consumers that is directly established, premised and created by the Distinctive and Valuable Marks of the Lead Plaintiffs and the Class.

454.     Defendants intentionally register, use and traffic in Deceptive Domains with the direct intent of luring and diverting Internet user traffic away from Lead Plaintiffs/Class Members and redirecting said Internet consumer traffic for commercial gain to Defendants.

455.     The actions of Defendants are intended to, and do disrupt, misappropriate, divert, and otherwise interfere with Lead Plaintiffs'/Class Members' current and prospective economic relationships with Internet users.  By diverting Internet consumer traffic away from Lead Plaintiffs and the Class Members, Defendants cause actual disruption of the relationship between the Lead Plaintiffs/Class Members and Internet users.

456.     Defendants' interference and bad actions, as alleged herein, directly and proximately caused injury and damage to Lead Plaintiffs and the Class Members.

457.     Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

### COUNT THIRTEEN:
### UNJUST ENRICHMENT

458.     Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

459.     This Count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

460.     This Count is brought in the alternative to any contract and statutory claims.

461.     By the Deceptive Domain Scheme, Defendants unjustly derived a benefit from Lead Plaintiffs and the Class in the form of higher payments, increased advertising click revenue, increased market share, and other economic and related benefits and commercial gain, to which Defendants had no right or entitlement.  The benefits to Defendants were conferred as a result of Defendants' deception, misconduct, and material misrepresentations involving the Distinctive and Valuable Marks of Lead Plaintiffs and the Class.

462.    It would be unjust to allow the Defendants to retain the said benefit, thereby enriching them, without compensating the Lead Plaintiffs and the Class.

463.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT FOURTEEN:
## CIVIL CONSPIRACY

464.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

465.    This Count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

466.    Each of Defendants knowingly and voluntarily agreed, combined and conspired, as set forth herein, to engage in the Deceptive Domain Scheme and to transact in money derived from said scheme.

467.    Each Defendant committed overt unlawful direct and indirect acts, aided and abetted, assisted, planned, encouraged and otherwise facilitated acts and omissions for the knowing and intentional purpose of furthering the conspiracy, as alleged herein.

468.    Each Defendant did in fact knowingly and voluntarily participate in the conspiracy, concerted action, performance of acts in furtherance of the Deceptive Domain Scheme, transacted in money derived from said scheme, and otherwise knowingly took action to effectuate the purposes of their conspiracy.

469.    Defendants' conspiracy, and actions as alleged herein, have directly and proximately cause injury and damage to Lead Plaintiffs and the Class Members.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, individually and on behalf of the Class, respectfully request judgment as follows:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

2.    The Court certify the Class as follows:

> **Any and all individuals and/or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' Co-conspirators) domiciled within the United States that own or are a licensee of a "Distinctive or Valuable Mark" that has been infringed, diluted, cybersquatted, typosquatted, and/or otherwise improperly used by one or more of the Defendants, as part of the Deceptive Domain Scheme alleged herein, during the period January 1, 2002 through the present.**

3.    The Court adjudge, appropriate and appoint Lead Plaintiffs as Class Representative for the Class;

4.    The Court adjudge, appropriate and appoint Lead Plaintiffs' Counsel of record as Class Counsel for the Class;

5.    The Court adjudge and decree that Defendants violated the rights of Lead Plaintiffs and the Class in their Distinctive and Valuable Marks in violation of *15 U.S.C. § 1125(a), (c)* and *(d)*;

6.    The Court adjudge and decree that Defendants infringed the rights of Lead Plaintiffs and the Class in their Distinctive and Valuable Marks in violation of *15 U.S.C. § 1114(1);*

7.    The Court adjudge and decree that Defendants' conduct alleged herein violates Section 1962(c) and (d) of RICO and breached Defendants' contractual obligation of good faith and fair dealing;

8.    The Court adjudge and decree that Defendants' conduct alleged herein infringed the rights of Lead Plaintiffs and the Class in their Distinctive and Valuable Marks in violation of the common law;

9.    The Court adjudge and decree that Defendants be ordered to transfer every Deceptive Domain to the rightful owner of the Distinctive and Valuable Marks;

10.    The Court adjudge and decree that Defendants, their agents, representatives, employees, assigns and suppliers, and all persons acting in concert or privity with them, be preliminarily and permanently enjoined from the following activities:

a.    Registering, using, or trafficking in any manner, in any domain name that incorporates, in whole or in part, the Distinctive and Valuable Marks or any name, mark or designation confusingly similar thereto ("Deceptive Domains");

b.    Using any of the Lead Plaintiffs' and Class' Distinctive and Valuable Marks, or any other name, mark, designation or depiction in a manner that is likely to cause confusion ("Deceptive Domains") regarding whether Defendants are affiliated or associated with or sponsored by Lead Plaintiffs and/or the Class;

c.    Registering any domain name using an automated process that is intended to create (or which could result in the creation of) Deceptive Domains;

d.    Registering or maintaining any domain name without complete and accurate contact information, including a Defendant's full legal name as the registrant; and

e.    Engaging in the Distinctive and Valuable Mark infringement, Distinctive and Valuable Mark dilution, unfair competition, false designation of origin, passing off, false advertising, against Lead Plaintiffs and/or any Class Member;

      f.      Engaging in typosquatting;

      g.      Engaging in cybersquatting;

      h.      Engaging in cyberpiracy;

      i.      Engaging in Domain Tasting based on the Distinctive and Valuable Marks;

      j.      Engaging in the misuse of semantics, statistical analysis, filtering, and other technologies;

      k.      Engaging in or misappropriation of Lead Plaintiffs' and/or any of the Class Members' Distinctive and Valuable Mark rights;

      l.      Engaging in any other act, practice, or conduct set forth in the Deceptive Domain Scheme and unlawful acts complained of herein; and

      m.      Assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to above.

11.    The Court adjudge and decree that Defendants be ordered to engage in corrective advertising to the extent necessary to correct any consumer confusion, misperceptions or dilution resulting from Defendants' Deceptive Domain Scheme and the unlawful acts complained of above;

12.    The Court adjudge and decree that Defendants be ordered to account to Lead Plaintiffs and the Class for, and disgorge, all profits they have derived by reason of the Deceptive Domain Scheme and unlawful acts complained of herein;

13.    The Court adjudge and decree that Defendants be ordered to pay damages, punitive damages, and/or treble damages under applicable statutes;

14.    The Court adjudge and decree that Defendants, jointly and severally, be ordered to pay statutory damages under *15 U.S.C. § 1117(d)*, on election by Lead Plaintiffs and the Class,

in an amount of One Hundred Thousand Dollars ($100,000) per domain name infringement;

15.    The Court adjudge and decree that Defendants be ordered to pay Lead Plaintiffs' reasonable attorney fees, prejudgment interest, and costs of this action;

16.    The Court adjudge and decree that Defendants be ordered to file with the Court and serve upon Lead Plaintiffs a written report under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and judgment within thirty (30) days after the service of the injunction and judgment upon Defendants; and

17.    That Lead Plaintiffs and the Class be awarded any and other such relief as may be appropriate.


## XIII.  JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so friable.

Dated:                           FOOTE, MEYERS, MIELKE & FLOWERS, LLC


/s/Robert M. Foote
Robert Foote, Esq. #03214325
Stephen W. Fung #06289522
Foote, Meyers, Mielke & Flowers, LLC
28 North First St.
Suite 2
Geneva, IL 60134
630-232-6333

Kathleen C. Chavez, Esq. #6255735
Chavez Law Firm, P.C.
28 North First St.
Suite 2
Geneva, IL  60134
630-232-4480

ATTORNEYS FOR PLAINTIFFS

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. | § | |
| SANFILIPPO & SONS, INC. | § | |
| BLITZ REALTYGROUP, INC. | § | |
| and VINCENT E."BO" JACSKON | § | |
| Individually and on Behalf of All | § | |
| Others Similarly Situated, | § | Civil Action No. 07 CV 3371 |
| | § | |
| Lead Plaintiffs, | § | |
| | § | JUDGE MANNING |
| v. | § | |
| | § | |
| GOOGLE INC., OVERSEE.NET, | § | |
| SEDO LLC, DOTSTER, INC., AKA | § | |
| REVENUEDIRECT.COM | § | |
| INTERNET REIT, INC. d/b/a IREIT, INC.; | § | |
| and JOHN DOES I-X, | § | CLASS ACTION COMPLAINT |
| | § | |
| | § | |
| Defendants. | § | (DEMAND FOR JURY TRIAL) |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2007, I electronically filed the foregoing document with the clerk of court for the U. S. District Court, Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Brett A. August
baugust@pattishall.com

Kenneth P. Held
kheld@velaw.com

Michael H. Page
mhp@kvn.com

Steven Borgman
sborgman@velaw.com
jwarren@velaw.com

Mariah Moran
mmoran@stetleranduffy.com
edocket@stetleranduffy.com

steveborgman@gmail.com
yshumaker@velaw.com

Janelle M. Carter
jcarter@winston.com
ECF_CH@winston.com

Bradley L. Cohn
bcohn@pattishall.com

Alison Conlon
conlon@wildmanharrold.com
ecf-filings@wildmanharrold.com

Jonathan M. Cyrluk
cyrluk@stetleranduffy.com
edocket@stetleranduffy.com

hardt@wildmanharrold.com

Joseph Gratz
jgratz@kvn.com

Misty Martin
mmartin@smsm.com

Alexis Payne
aep@pattishall.com

Ronald Rothstein
rrothsstein@winston.com
ECF_CH@winston.com
mconroy@winston.com

Jeffrey Singer
jsinger@smsm.com

Scott R. Wiehle
swiehle@velaw.com

Michael R. Dockterman
dockterman@wildmanharrold.com
ecf-filings@wildmanharrold.com
eckertm@wildmanharrold.com

Joseph Duffy
jduffy@stetlerandduffy.com
bdorgan@stetlerandduffy.com
edocket@stetlerandduffy.com

William J. Harte
wharte@williamharteltd.com
mccarey@williamharteltd.com

Dana Marie Pesha
dpesha@williamharteltd.com
mccarey@williamharteltd.com

Scott Ryan Wiehle
swiehle@velaw.com

I certify that I have served the foregoing document by emailing a copy to the following individuals:

Steven Atlee
SAtlee@winston.com

Vincent V. Carissimi
carissimiv@pepperlaw.com

Joanna J. Cline
clinej@pepperlaw.com

Robert J. Hickok
hickokr@pepperlaw.com

s/Robert M. Foote