**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. | § | |
| SANFILIPPO AND SONS, INC., | § | |
| BLITZ REALTYGROUP, and | § | |
| VINCENT E. "BO" JACKSON, | § | |
| Individually And On Behalf Of All | § | |
| Others Similarly Situated, | § | Civil Action No. 07 CV 3371 |
| | § | |
| Lead Plaintiff, | § | |
| | § | Hon. Blanche M. Manning, District Judge |
| v. | § | |
| | § | Hon. Geraldine Soat Brown, Magistrate Judge |
| GOOGLE INC., OVERSEE.NET, | § | |
| SEDO LLC, DOTSTER, INC., AKA | § | |
| REVENUEDIRECT.COM | § | |
| INTERNET REIT, INC. d/b/a IREIT, INC.; | § | |
| and JOHN DOES I-X, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO
<u>DEFENDANTS' MOTIONS TO DISMISS</u>**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL OVERVIEW ...................................................................................... 5

III.  DEFENDANTS' MOTIONS TO DISMISS ......................................................... 6

IV.  LEGAL STANDARDS ....................................................................................... 6

V.  ARGUMENT ...................................................................................................... 7

 **A.** Class Plaintiffs' Have Standing ..................................................................... 8

 **B.** The Claims Pled Are Not Mutually Exclusive ............................................... 11

 **C.** Plaintiffs State Lanham Act/Trademark Claims (Counts III, IV, V, VI, IX, X, XI and XII) ................................................................................................................ 13

  1. Class Plaintiffs Plead Valid and Cognizable Claims Against ALL Defendants for a Violation of the ACPA (Count III) ................................ 13

   a. The FAC Properly Alleges that Class Plaintiffs Own Marks that are Distinctive or Famous ("Distinctive and Valuable Marks") ............................. 14

   b. Class Plaintiffs Allege that the Parking Company Defendants Intend, in Bad Faith, to Profit from Class Plaintiffs' Marks ........................................ 15

   c. The FAC alleges that Defendants "register, traffic in or use" domain names that are identical or confusingly similar to Class Plaintiffs' marks .......................... 22

    (i) Google ............................................................................................. 22

    (ii) The Parking Company Defendants ..................................................... 24

  2. Class Plaintiffs State a Claim for Direct Trademark Infringement Under 15 U.S.C. § 1114(1) (Count IV) ..................................................................................... 28

   a. Class Plaintiffs Properly Alleged that Defendants Used Class Plaintiffs' Marks .... 28

   b. Class Plaintiffs Adequately Allege Likelihood of Confusion................................. 33

  3. Class Plaintiffs Properly Allege, Against All Defendants, a Claim for Common Law Trademark Infringement for which Relief can be Granted (Count IX) ..................... 36

  4. Class Plaintiffs State a Claim for False Designation of Origin Under 15 U.S.C. § 1125(a)  (Count V)................................................................................................ 36

  5. Class Plaintiffs State a Claim for Trademark Dilution Under 15 U.S.C. §1125(c)...... 38

  6. Class Plaintiffs Have Sufficiently Alleged Contributory and Vicarious Infringement 42

   a. Contributory Trademark Infringement .................................................................. 42

   b. Vicarious Trademark Infringement....................................................................... 47

  7. Innocent Infringer/Publisher Defense Argument........................................................ 50

   a. Innocent Infringer/Publisher Defense Is Inapplicable ........................................... 51

   b. Knowledge or Reason to Know the Domains Were Infringing............................... 52

   c. Injunctive Relief Is Available ............................................................................... 57

 **D.** RICO (Counts I and II) ............................................................................................... 59

  1. Civil RICO ................................................................................................................ 60

  2. Class Plaintiffs Have Adequately Alleged A RICO Enterprise.................................... 61

   a. The FAC Sufficiently Pleads the Structure of an Association-in-Fact Enterprise.... 63

   b. The FAC Pleads an Enterprise Distinct from the Alleged Predicate Acts............... 67

   c. The Members of the Enterprise Share a Common Purpose ..................................... 68

   d. Class Plaintiffs Have Suffered a Direct, Non-Derivative Injury, as a Result of Defendants' RICO Violations.................................................................................. 70

i

3.   The Predicate Acts Were Pleaded With Sufficient Particularity ................................... 73
    a.   18 U.S.C. §1341 (Mail Fraud) and 1343 (Wire Fraud) ............................... 73
    b.   18 U.S.C §1952 ................................................................................................. 77
    c.   18 U.S.C. §1957 ................................................................................................. 79
    d.   18 U.S.C. §2320 ................................................................................................. 79
4.   Class Plaintiffs Have Alleged Defendants' Alleged Misrepresentations Were Material ................................................................................................................................. 80
5.   Class Plaintiffs Have Alleged That the Object of the Fraud Was Property Or Money In The Hands of the Class Plaintiffs ................................................................................. 81
6.   Class Plaintiffs' Allegations of Mail and Wire Fraud Have Provided Sufficient Particularity to Satisfy Rule 9(b) ................................................................................. 84
7.   A "Pattern of Racketeering" Was Adequately Pled ...................................................... 87
8.   Class Plaintiffs' Adequately Plead a RICO CONSPIRACY ....................................... 88
E.   General State Law Claims .................................................................................................. 89
1.   Class Plaintiffs Sufficiently Plead a Claim Under the Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII) ............................................................ 89
2.   Class Plaintiffs are Entitled to Declaratory Relief (Count VIII).................................. 91
3.   Class Plaintiffs Sufficiently State a Claim for Intentional Interference with Prospective Economic Advantage (Count XII) ................................................................................. 92
4.   Class Plaintiffs Sufficiently State a Claim for Unjust Enrichment (Count XIII) ......... 92
5.   Class Plaintiffs Sufficiently State a Claim of Civil Conspiracy Upon Which Relief Can be Granted (Count XIV) ............................................................................................... 92
6.   Class Plaintiffs Sufficiently State a Claim of Civil Conspiracy Upon Which Relief Can be Granted (Count XIV) ............................................................................................... 93
7.   Even If Class Plaintiffs' Claims Under Federal Law are Dismissed, the Court Has Jurisdiction Over Its State Law Claims ..................................................................... 94
VI.   CONCLUSION ........................................................................................................................... 94

# TABLE OF AUTHORITIES

## Cases

*800-Jr Cigar v. Goto.com*, 437 F. Supp. 2d 273 (D.N.J. 2006)...................................................... 35

*Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.*, 363 F. Supp. 2d 952 (S.D. Ohio 2005) ................................................................................................................................................ 28

*Academy of Motion Picture Arts and Sciences v. Network Solutions, Inc.*, 989 F. Supp. 1276 (C.D. Cal. 1997)................................................................................................................. 36

*Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888 (Ill. 1994)............................................................... 93

*Addis v. Moser,* No. 83 C 6118 (N.D. Ill. Feb. 15, 1984)............................................................ 11

*Am Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796 (7th Cir. 2002).................................... 41

*Amerimax Real Estate Partners, Inc. v. RE/MAX Intern'l Inc.*, 2006 WL 2794934, at *4-*5 (N.D. Ill. Sep. 26, 2006)........................................................................................................... 21

*Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc.*, 288 F. Supp. 2d 105 (D.N.H. 2003)................. 21

*Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006)..................................................... 72, 75

*Audi AG v. D'Amato*, 381 F. Supp. 2d 644 (E.D. Mich. 2005) ................................................... 17

*Baker v. IBP, Inc.*, 357 F.3d 685 (7th Cir. 2004)........................................................................ 69

*Baleski v. Paine, Webber, Jackson & Curtis, Inc,* 514 F. Supp. 535 (N.D. Ill. 1981).................. 85

*Beck v. Prupis,* 529 U.S. 494 (2000).......................................................................................... 88

*Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007) ............................................................... 7

*Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002) ........................................................ 25, 26, 27, 33

*Blisscraft v. United Plastics Co.,* 294 F.2d 694 (2nd Cir.1961) .................................................. 59

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) 22, 32, 34, 35

*Burdett v. Miller*, 957 F.2d 1375 (7th Cir. 1992).......................................................................... 67

*Buti v. Perosa, S.R.L.,* 139 F.3d 98 (2d Cir. 1998), *cert. denied,* 525 U.S. 826 (1998) .............. 28

*Cable News Network L.P., L.L.L.P. v. CNNews.com*, 177 F. Supp. 2d 506 (E.D. Va. 2001) ...... 26

*Carnegie v. Household Int'l, Inc.*, 220 F.R.D. 542 (N.D. Ill. 2004)............................................. 67

*Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir. 1982), *cert. denied,* 103 S.Ct. 177 (1982) ............................................................................................................................. 60

*Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City,* 383 F.3d 110 (3rd Cir. 2004) ................................................................................................................................................ 82

*Commercial Cleaning Services, LLC v. Colin Service Systems, Inc.,* 271 F.3d 374 (2d Cir. 2001) ................................................................................................................................................ 72

*Conopco, Inc. v. Rosa Distributors*, 967 F. Supp. 1068 (N.D. Ill. 1997) ..................................... 53

*Contract Buyers League v. F. & F. Investment,* 300 F. Supp. 210 (N.D. Ill. 1969) ...................... 9

*Cook v. Winfrey*, 141 F.3d 322 (7th Cir. 1998)............................................................................ 92

*Corley v. Rosewood Care Center, Inc.*, 152 F. Supp. 2d 1099 (C.D. Ill. 2001) ........................... 73

*Corley v. Rosewood,* 142 F.3d 1041 (7th Cir. 1998) ................................................................... 86

*Cumis Ins. Soc., Inc. v. Peters*, 983 F. Supp. 787 (N.D. Ill. 1997) .............................................. 93

*David Berg & Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306 (7th Cir. 1989) .............................. 47

*Days Inns Worldwide v. Lincoln Park Hotels*, 500 F. Supp. 2d 770 (N.D. Ill. 2007) ................. 43

*Dell, Inc. v. Solares, et al.,* Case No. 07-2668 (E.D. La., April 26, 2007) ............................ 12, 88

*Dial One of the Mid-South, Inc. v. BellSouth*, 269 F.3d 523 (5th Cir. 2001) ........................ 51, 53

*Drake Bliss v. Cyberline Enters.,* WIPO Case No. D2001-0718................................................. 17

iii

*Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.,* 36 F.2d 354 (7th Cir. 1929)............... 49

*E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F. Supp. 457 (N.D.Cal.1991).............. 59

*E. & J. Gallo Winery v. Gallo Cattle Co.,* 12 U.S.P.Q.2d 1657 (E.D. Cal. 1989) ...................... 17

*E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033 (S.D. Tex. 2001)................... 19

*E. & J. Gallo Winery v. Spider Webs Ltd.,* 286 F.3d 270 (5th Cir. 2002) ................................... 19

*Educational Tours, Inc. v. Hemisphere Travel, Inc.*, 2004 WL 887417 (N.D. Ill. 2004)............. 30

*Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456 (7th Cir. 2000).................... 33, 38, 40, 41

*Express Media Group, LLC v. Express Corp.,* 2007 WL 1394163 (N.D. Cal. 2007) ................. 83

*F.T.C. v. Royal Milling Co.,* 288 U.S. 212 (1993) ....................................................................... 82

*Ferleger v. First American Mortg. Co.,* 662 F. Supp. 582 (N.D. Ill. 1987) ........................ 84, 86

*First Savings Bank of Hegewisch v. Orchowski,* 1994 WL 148668 (N.D. Ill. 1994) ................... 67

*Flentye v. Kathrein*, 485 F. Supp. 2d 903 (N.D. Ill. 2007) ......................................... 12, 27, 28, 90

*Fonovisa, Inc., v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)................................... 43, 47

*Ford Motor Co. v. Ford Financial Solutions,* 103 F. Supp. 2d 1126 (N.D. Iowa 2000).............. 32

*Ford Motor Co. v. GreatDomains.Com, Inc.,* 177 F. Supp. 2d 635 (E.D. Mich. 2001).. 18, 19, 20, 25, 26

*Fulk v. Bagley,* 88 F.R.D. 153, (M.D. N.C. 1980) ....................................................................... 85

*Galerie Furstenberg v. Coffaro,* 697 F.Supp 1282 (S.D.N.Y. 1988) ......................................... 12

*Garden of Life, Inc. v. Letzer*, 318 F. Supp. 2d 946 (C.D. Cal. 2004)................................... 18, 20

*Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134 (7th Cir. 1994)...... 84

*GEICO v. Google,* 330 F. Supp. 2d 700 (E.D. Va. 2004)..................................... 33, 44, 45, 49, 50

*Gen. Elec. Co. v. Networking Mktg.,* WIPO Case No. D2005-1064 ........................................... 17

*General Media Communications, Inc. v. Crazy Troll, LLC,* 2007 WL 102988 (S.D.N.Y. 2007) 17

*Gershwin Publishing Corporation v. Columbia Artists Management, Inc.,* 443 F.2d 1159 (2d Cir. 1971) ......................................................................................................................................... 43

*Gibson v. City of Chicago,* 910 F.2d 1510 (7th Cir. 1990)............................................................. 6

*Gillman v. Burlington N. R.R. Co.,* 878 F.2d 1020 (7th Cir. 1989)............................................... 7

*Google, Inc. v. Sergey Gridasov,* Nat'l Arb. Forum, Claim No. FA0505000474816 (Dorf, Arb.) last visited November 5, 2007) .................................................................................................. 18

*Goren v. New Vision Intern., Inc.,* 156 F.3d 721, 727 (7th Cir. 1998) ................................... 59, 88

*Graehling v. Village of Lombard*, 58 F.3d 295 (7th Cir. 1995)................................................... 15

*Great Eastern Resort Corp. v. Virtual Resort Solutions, L.L.C.,* 189 F. Supp. 2d 469 (W.D. Va., 2002) ......................................................................................................................................... 15

*Gros v. Midland Credit Management,* 2007 WL 2601225 (N.D. Ill. 2007)................................... 7

*Gucci America v. Hall & Associates*, 135 F. Supp. 2d 409 (S.D.N.Y. 2001)................... 46, 47, 52

*Hagstrom v. Breutman, MEB*, 572 F. Supp. 692 (N.D. Ill. 1983) ............................................... 86

*Hamptons Locations, Inc. v. Rubens*, 2005 WL 2436209 (E.D.N.Y. Sept. 20 2005)................... 28

*Hard Rock Café Licensing Corp. v. Concession Servs.*, 955 F.2d 1143 (7th Cir. 1992). 42, 43, 44, 47, 48, 49, 50, 56, 58

*Haroco, Inc. v. American National Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir. 1984) ..................................................................................................................... 11, 60, 61, 85

*Harrods Ltd. v. Sixty Internet Domain Names,* 157 F. Supp. 2d 658 (E.D. Va. 2001)................. 18

*Hartog & Co. AS v. SWIX.com,* 136 F. Supp. 2d 531 (E.D. Va. 2001) ....................................... 19

*Hasbro, Inc. v. Clue Computing, Inc.,* 66 F. Supp. 2d 117 (D. Mass. 1999)............................... 22

*HER, Inc. v. RE/MAX First Choice, LLC,* 468 F. Supp. 2d 964 (S.D. Ohio, 2007) .............. 14, 28

*Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619 (6th Cir. 1996)......................... 33, 34, 35

*Hollinger Intern., Inc. v. Hollinger, Inc.* 2005 WL 327058 (N.D.Ill. 2005) ................................ 12

*Hudson v. City of Chicago*, 242 F.R.D. 496 (N.D. Ill. 2007)........................................................ 8

*Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251 (2d Cir. 2004)................................................. 75

*In Re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3rd Cir. 1997) ................ 92

*In re EDC, Inc.*, 930 F.2d 1275 (7th Cir. 1991).......................................................................... 74

*In re Napster, Inc. Copyright Litigation*, 2005 WL 1287611 (N.D. Cal. 2005)............................ 4

*In Re Nice Systems, Ltd. Securities Litigation*, 135 F. Supp. 2d. 551 (D.N.J. 2001).................. 92

*In Re Rockefeller Center Properties, Inc., Securities Litigation*, 311 F.3d 198 (3rd Cir. 2002). 92, 93

*Information Exchange Systems, Inc. v. First Bank Nat. Ass'n,* 1992 WL 494607 (D. Minn. 1992)
.................................................................................................................................................. 12

*Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227 (N.D. Ill. 1996)................................. 29, 32, 39, 41

*International Profit Assocs. v. Paisola*, 461 F. Supp. 2d 672 (N.D. Ill. 2006)...................... 30, 34

*Internet Archive v. Shell*, 505 F. Supp. 2d 755 (D. Colo. 2007)................................................. 12

*Interscope Records v. Leadbetter*, 2007 WL 1217705 (W.D. Wash. 2007)................................. 52

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982)......................... 42, 47

*Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250 (7th Cir. 1995) .. 72, 74, 84

*Jennings v. Emry*, 910 F.2d 1434 (7th Cir. 1990)............................................................ 62, 66, 67

*Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321 (7th Cir. 1994)........................................... 75, 85, 87

*Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J. 1998) ............................................. 29, 38, 84

*JouJou Designs, Inc. v. JoJo Ligne Internationale, Inc.*, 821 F. Supp. 1347 (N.D.Cal. 1992) .... 36

*Kauffmann v. Yoskowitz*, 1990 WL 300795 (S.D.N.Y. 1990) ................................................... 62

*KP Permanent Make-up, Inc. v. Lasting Impression I. Inc.*, 543 U.S. 111 (2004)...................... 17

*Land's End, Inc. v. Remy*, 447 F. Supp. 2d 941 (W.D. Wis. 2006) ....................................... 16, 83

*Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co.,* 527 F. Supp. 206 (E.D. Mich. 1981) ........................................................................................................................................ 12

*Lane's Gifts and Collectibles v. Yahoo et al., Case No. CV-2005-52-1, Miller County, Arkansas*
.................................................................................................................................................. 55

*Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993)
.................................................................................................................................................. 10

*Lee v. Allstate Life Ins. Co.*, 838 N.E.2d 15 (Ill.App.Ct. 2005)................................................. 91

*Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980 (9th Cir. 1999) ..................... 45

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949 (C.D. Cal. 1997) 27, 31, 33, 40, 46, 56

*Louis Vuitton S.A. v. Lee*, 875 F.2d 584 (7th Cir. 1989)................................................... 16, 56

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991)...................................................... 53

*Mattel, Inc. v. Barbie-Club.com,* 301 F.3d 293 (2d. Cir. 2002).................................................. 83

*McKinney v. Indiana Michigan Power Co.*, 113 F.3d 770 (7th Cir. 1997) .......................... 57, 58

*McMath v. City of Gary, Ind.*, 976 F.2d 1026 (7th Cir. 1992)...................................................... 7

*Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260 (4th Cir. 1994) .......... 74

*Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016 (7th Cir. 1992).............................. 75, 85, 86

*Mirage Resorts v. Stirpe*, 152 F. Supp. 2d 1208 (D. Nev. 2000)......................................... 30, 34

*Morgan v. Kobrin Securities, Inc.*, 649 F.Supp 1023 (N.D. Ill. 1986) ........................................ 84

*Morrison & Foerster, LLP v. Wick*, 94 F. Supp. 2d 1125 (D. Colo. 2000) ................................... 20

*Moxie Co. v. Noxie Kola Co. of New York*, 29 F. Supp. 167 (D.C.N.Y. 1939) ............................ 51

*National Geographic Soc'y v. Conde Nast Publications Inc.*, 687 F. Supp. 106 (S.D.N.Y.1988)59

*NBA Properties v. Untertainment Records, LLC* 1999 WL 1103006 (S.D.N.Y. 1999) ............... 52

*New England Data Services v. Becher, Inc.*, 829 F.2d 286 (1st Cir. 1987)................................ 62

*New York Times v. Sullivan*, 376 U.S. 254 (1964)............................................................. 52, 53, 54

*Nike, Inc. v. Circle Group Internet, Inc.*, 318 F. Supp. 2d 688 (N.D. Ill. 2004)........................... 13

*Niresek v. Federal Trade Commission*, 278 F.2d 337 (7th Cir. 1960) ........................................ 90

*Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir. 2004) ................. 38, 40, 83

*Northern Light Technology, Inc. v. Northern Lights Club*, 97 F. Supp. 2d 96 (D. Mass. 2000),
    *aff'd* 236 F.3d 57 (1st Cir. 2001) ...................................................................................... 19

*OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176 (W.D.N.Y. 2000)..................... 29, 37

*Office Depot v. Zuccarini*, 2007 WL 2688460 (N.D. Cal. 2007) ................................................ 83

*Old Dearborn Dist. Co. v. Seagram-Distillers Corp.*, 299 U.S. 183 (1936) ............................... 82

*Omega S.A. v. Omega Eng'g Inc.*, 228 F. Supp. 2d 112 (D. Conn. 2002)............................. 20, 21

*P&P Marketing Inc. v. Ditton*, 746 F. Supp. 1354 (N.D. Ill. 1990) ............................... 85, 86, 87

*Paccar Inc. v. Telescan Tech., LLC*, 319 F.3d 243 (6th Cir. 2003).................................. 15, 17, 83

*PACCAR, Inc. v. Telescan Techs., L.L.C.*, 115 F. Supp. 2d 772 (E.D. Mich. 2000) ................... 19

*Pace American, Inc. v. Elixir Industries*, 2007 WL 495302 (N.D. Ill. 2007).............................. 91

*Panavision Int'l v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998)........................................... 35, 37, 41

*Panavision Int'l, L.P. v. Toeppen*, 945 F. Supp. 1296 (C.D. Cal 1996) *aff'd* 141 F.3d 1316 (9th
    Cir. 1998) ........................................................................................................................... 41

*Papa John's Int'l, Inc. v. Rezco*, 446 F. Supp. 2d 801 (N.D. Ill. 2006)..................................... 38

*Parkway Bank & Trust Co. v. City of Darien*, 357 N.E.2d 211 (Ill.App. 1976)......................... 92

*Partipilo v. Hallman*, 510 N.E.2d 8 (Ill.App.Ct. 1987) .............................................................. 92

*Patmont Motor Werks, Inc. v. Gateway Marine, Inc.*, 1997 WL 811770 (N.D. Cal. 1997)......... 32

*Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002) ............................................................. 8

*People for Ethical Treatment of Animals, Inc. v. Doughney*, 113 F. Supp. 2d 915 (E.D. Va. 2000)
    ................................................................................................................. 29, 32, 37, 83, 84

*Perkins v. Johnston*, 431 F. Supp. 2d 898 (N.D. Ind. 2006)......................................................... 7

*Phelan v. City of Chicago*, 347 F.3d 679 (7th Cir. 2003) ............................................................. 7

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .............................................................. 90

*Phillips v. Girdich*, 408 F.3d 124 (2d Cir. 2005)........................................................................ 62

*Phoenix Bond & Indemnity Co. v. Bridge et al.*, 477 F.3d 928 (7th Cir. 2007) ... 71, 72, 73, 74, 84

*Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815 (N.D. Ill.
    1999) .................................................................................................................................. 30

*Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, (S.D.N.Y. 1997), *aff'd,* 152
    F.3d 920 (2d Cir. 1998), *cert. denied,* 525 U.S. 834 (1998).......................................... 29, 84

*Playboy Enters., Inc. v. Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004) ... 22, 83

*Porsche Cars North America, Inc. v. Porsche.net*, 302 F.3d 248 (4th Cir. 2002)....................... 83

*Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808 (7th Cir. 2002)........................... 22, 35

*Prudhomme v. Procter & Gamble Co.*, 800 F. Supp. 390 (E.D. La. 1992).................................. 15

*R2 Medical Systems, Inc. v. Katecho, Inc.*, 931 F. Supp. 1397 (N.D. Ill. 1996).......................... 47

*Russello v. United States*, 464 U.S. 16 (1983) ..................................................................... 11, 60

*SCA Services of Indiana, Inc. v. Thomas*, 634 F. Supp. 1355 (N.D. Ind. 1986).......................... 84

*Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983) ................................................................. 11, 60

*Scotch Whisky Ass'n v. Barton Distilling Co.*, 489 F.2d 809 (7th Cir.1973) .............................. 59

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ........................................................... 59, 60

*Segreti v. Lome*, 747 F. Supp. 484 (N.D. Ill. 1990) ................................................................. 66

*Shapo v. O'Shaughnessy,* 246 F. Supp. 2d 935 (N.D. Ill. 2002)......................................... 75, 79

*Shields v. Zuccarini*, 254 F.3d 476, (3d Cir. 2001)............................................................. 15, 19

*Siegel v. Levy Org. Dev. Co.,* 153 Ill.2d 534, 180 Ill.Dec. 300, 607 N.E.2d 194 (Ill.App.Ct. 1992) .................................................................................................................................. 90

*Size v. Network Solutions, Inc.,* 255 F. Supp. 2d 568 (E.D. Va. 2003)...................................... 44

*Slaney v. The Int'l Amateur Athletic Fed.,* 244 F.3d 580 (7th Cir. 2001).................................. 67

*Smith Fiberglass Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327 (7th Cir. 1993) .......................... 21

*Sony Corporation of America, et al. v. Universal City Studios, Inc., et al.*, 464 U.S. at 417, 104 S.Ct. 774 (1984)............................................................................................................... 43

*Sotelo v. DirectRevenue, LLC,* 384 F. Supp. 2d 1219 (N.D. Ill. 2005) ....................................... 7

*Sporty's Farm LLC v. Sportsman's Mkt., Inc.,* 202 F.3d 489 (2nd Cir. 2000)...................... 16, 19

*St. Martin v. Mobil Exploration & Producing, Inc.,* 224 F.3d 402 (5th Cir. 2000)..................... 51

*Station Casinos, Inc. v. Domain Magic, LLC,* 2006 WL 3838221 (D. Nev. 2006)..................... 83

*Stella D'oro Biscuit Co. v. Patron Group, Inc.,* WIPO Case No. D2000-0012 ........................... 18

*Strachon v. United Consumers Club et al.*, 229 F.3d 673 (7th Cir. 2000).................................. 70

*Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633 (7th Cir.1999).......................... 39

*Systems Management, Inc. v. Loiselle,* 303 F.3d 100 (1st Cir. 2002)......................................... 74

*Sze v. I.N.S.,* 153 F.3d 1005 (1998).......................................................................................... 59

*Teletech Customer Care Management, Inc. v. Tele-Tech Co.,* 77 F. Supp. 1407 (C.D. Cal. 1997) .................................................................................................................................. 22

*The Neiman Marcus Group, Inc., et al. v. Dotster, Inc., et al.,* No. 3:06-CV-05292-RBL (W.D. Wash., filed May 30, 2006) ............................................................................................... 55

*Too, Inc. v. TJX Cos.*, 229 F. Supp. 2d 825 (S.D. Ohio 2002).................................................. 28

*Trade Media Holdings Ltd. v. Huang & Assocs.*, 123 F. Supp. 2d 233 (D.N.J. 2000)................. 34

*Trans Union v. Credit Research, Inc.,* 142 F. Supp. 2d 1029, 1043-44 (N.D. Ill. 2001) . 33, 34, 35

*Ty Inc. v. Perryman*, 306 F.3d 509 (7th Cir. 2002)................................................................... 39

*Ty, Inc. v. Agnes M.,* 2001 WL 1414201 (N.D. Ill. 2001) ........................................................ 32

*U.S. ex rel Landsberg v. Argentis Medical, P.C.,* 2006 WL 1788381 (W.D. Pa. 2006) ............. 10

*U.S. ex rel. Glaser v. Wound Care Consultants, Inc.,* 2007 WL 837203 (S.D. Ind. 2007) ......... 86

*U.S. v. Aleman*, 609 F.2d 298 (7th Cir. 1979)........................................................................... 61

*United States Parole Comm'n v. Geraghty,* 445 U.S. 388, (1980)........................................... 59

*United States v. Brocksmith,* 991 F.2d at 1363 (7th Cir. 1993) ............................................... 75

*United States v. Hickok,* 77 F.3d 992 (7th Cir. 1996) ............................................................. 75

*United States v. Huber,* 603 F.2d 387 (2d Cir. 1979) ............................................................. 63

*United States v. Turkette,* 452 U.S. 576 (1981) ....................................................... 11, 60, 61, 63

*United We Stand America, Inc. v. United We Stand America New York,* 128 F.3d 86, 89-90 (2nd Cir. 1997) ......................................................................................................................... 29

*Universal City Studios v. Sony Corp. of America,* 659 F.2d 963 (9th Cir. 1981)....................... 43

*Verizon North Inc., et al. v. Internet Reit, Inc.*, No. 4:07-CV-00996 (S.D. Tex., filed March 23, 2007) ............................................................................................................................... 55

*Veuve Clicquot Ponsardin v. Polygenix Group Co.,* WIPO Case No. D2000-0163 ................... 18

vii

*Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771 (7th Cir. 1994) ........................ 59
*Victoria's Cyber Secret Ltd. Partnership v. V Secret Catalogue, Inc.*, 161 F. Supp. 2d 1339 (S.D. Fla. 2001) ................................................................................................................. 19, 41
*Victoria's Secret Stores v. Artco Equipment Co., Inc.,* 194 F. Supp. 2d 704 (S.D. Ohio 2002) .. 17, 83
*Watts v. Network Solutions, Inc.*, 1999 WL 994012 (7th Cir. 1999) ............................................ 42
*Weiss v. Winners Circle,* 1995 WL 755328 (N.D. Ill. December 14, 1995) ................................. 9
*WMX Technologies, Inc. v. Miller,* 80 F.3d 1315 (9th Cir. 1996) ................................................ 84
*World Wrestling Federation, Inc. v. Posters, Inc,* 2000 WL 1409831 (N.D. Ill. 2000) .............. 52
*Zekman v. Direct Am. Marketers, Inc.*, 182 Ill.2d 359, 231 Ill.Dec. 80, 695 N.E.2d 853 (Ill.App.Ct. 1998) ...................................................................................................................... 90
*Zipee Corp. v. United States Postal Service*, 140 F. Supp. 2d 1084 (D. Or. 2000) ..................... 19

## Statutes

15 U.S.C. §1114 ................................................................................... 28, 34, 36, 51, 57
15 U.S.C. §1125(a) ..................................................................................... 36, 37, 51
15 U.S.C. §1125(c) .............................................................................................. 38, 40
15 U.S.C. §1125(d) ........................................................ 13, 15, 19, 22, 23, 25, 26
15 U.S.C. §1127 .............................................................................................. 32, 38, 40
15 U.S.C. §1129(2) ..................................................................................................... 83
15 U.S.C.§1125(c) ....................................................................................................... 38
18 U.S.C. §1341 ...................................................................................................... 73, 74
18 U.S.C. §1343 ...................................................................................................... 73, 74
18 U.S.C. §1952 ...................................................................................................... 73, 77
18 U.S.C. §1956 ................................................................................................. 77, 78, 79
18 U.S.C. §1957 ................................................................................................. 73, 77, 79
18 U.S.C. §1961(4) ....................................................................................................... 62
18 U.S.C. §1962(c) ................................................................................................... 59, 60
18 U.S.C. §1962(d) ................................................................................................... 60, 88
18 U.S.C. §1964(c) ....................................................................................................... 61
18 U.S.C. §2320 ................................................................................................. 73, 78, 79
28 U.S.C. §1441 .......................................................................................................... 94
28 U.S.C. §1711 .......................................................................................................... 94
28 U.S.C. §2201(a) ....................................................................................................... 91
815 ILCS 505/2 ........................................................................................................... 89
815 ILCS 510/2 ........................................................................................................... 89

## Publications

1 Niel Boorstyn, Boorstyn On Copyright § 10.06[2] (1994) ...................................................... 43
145 Cong. Rec. at S10629-01 ...................................................................................... 83
4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§25:71, 25:72 (4th Ed. 2000) ....................................................................................................................... 32
Pub.L. 91-452, §904(a), 84 Stat. 947 .......................................................................... 61

## Rules

Fed.R.Civ.P. 12(b)(6) .............................................................................................. 1, 6
Fed.R.Civ.P. 9(b) ......................................................................... 1, 6, 75, 84, 85, 93

Fed.R.Civ.P. Rule 8(a)(2) ......................................................................................... 62, 85

## I.    <u>INTRODUCTION</u>

In response to Class Plaintiffs' First Amended Complaint ("FAC"), Defendants filed consolidated, and several individual, motions to dismiss ("MTD").   In 95 pages of largely redundant briefing, Defendants failed to identify any legal basis for dismissal, littered their arguments with extrinsic facts (outside the four corners of the FAC), and repeatedly urged this Court to engage in "merits analysis" and make final determinations of hotly contested issues of fact.  Defendants' MTDs did not, and cannot, establish that the well-pleaded FAC failed to state a claim upon which relief could be granted (Fed.R.Civ.P. 12(b)(6)) or that the detailed pleading was somehow factually deficient.  (Fed.R.Civ.P. 9(b)).

Distilled to its essence, this case is about Defendants' knowing and intentional massive internet-based scheme (Deceptive Domain Scheme) to make and transact in money derived from the unauthorized/unlawful use of Class Plaintiffs' property (domains, Distinctive and Valuable Marks, internet traffic, goodwill, customers and prospective business).  (FAC¶¶1, 270).  As a central part of the Deceptive Domain Scheme, Defendants identify, create, register, use, and monetize Deceptive Domains in order to "cyber-steal" and use Class Plaintiffs' and the putative class members' valuable property/interests.  (FAC¶¶3, 65).  The Deceptive Domain Scheme is carried out in a common manner through automated, sophisticated, electronic (done primarily on the internet) programs that aggregate and monetize millions of Deceptive Domains.  (FAC¶¶1, 165-210).

Importantly, Defendants' MTDs attempt to focus this Court's attention on only one component of the Deceptive Domain Scheme (individual trademark infringements), essentially admitting that they generate, collect, and transact in money derived from a few "bad apple"

Deceptive Domains.[1]  (Google MTD at 4).  However, Defendants' seeming "fall on the sword" acknowledgment, is not a remorseful admission, but rather it is the furious back peddling of the proverbial "child caught with his hand in the cookie jar."  It is a clever and strategic attempt to dodge the grenade, and take a bullet – creating a smoke screen to divert attention away from their much more significant and substantial liability arising from the entire "Deceptive Domain Scheme."  Defendants understand that if they can avoid a Court order enjoining the Deceptive Domain Scheme, and just tackle each individual trademark based claim as it arises, the practical effect is that they can continue the larger Deceptive Domain Scheme indefinitely — making money from using even the smallest business operations in America (i.e., Class Plaintiff Blitz Realty, a small realty company in Geneva, Illinois).

Defendants hinted at their critically focused strategy to avoid liability for the larger Deceptive Domain Scheme at the very first status conference before this Court, at which Google, rather than denying the substantive allegations, attempted to shift the focus to the minuteness and unworthiness of Class Plaintiff Vulcan's individual claim,[2] asserting:  "*Unless this case is certified as a class, the initial Plaintiff's claims are worth about $17.00.  I mean, that is the total amount of money at issue.*"  (Hearing Transcript at 7).

Defendants, however, are not masters of Class Plaintiffs' well-pleaded FAC.  The FAC properly and specifically alleges a massive Internet scheme involving Defendants' common,

---

[1]  Google refers to Deceptive Domains as "bad apples".  Dotster did not even file dismissal motions challenging trademark claims.  IREIT only challenges standing for Deceptive Domains that were not identified as directly connected to them in the FAC.  None of the Defendants deny or disclaim generating and transacting in money from Deceptive Domains.

[2]  Class Plaintiffs do not agree with Google's methodology for calculating damages (apparently confining damages to profit made by Google).  Rather, Class Plaintiffs note that there are a range of available damages, including but not limited to: statutory damages, compensatory relief, treble/punitive damages, and unjust enrichment and disgorgement.

contrived, automated and sophisticated programs that aggregate and monetize millions of Deceptive Domains, and then further aggregate the many pennies per click into billions of dollars of unlawful spoils shared among the Defendants.  (FAC¶¶1, 165-210).  The FAC clearly alleges that Deceptive Domains have not *slipped through* an otherwise legitimate system. (FAC¶¶231-233).  Rather, Defendants have knowingly and intentionally created and exploited "bad apple" domains, introduce and use "bad apples" domains in the system for the express reason of generating exponential financial gain.  (FAC¶¶4-10, 165-210).  The FAC alleges that Defendants have done more than turn a "blind eye" to the monetization of Deceptive Domains; rather, working together, they created an entire system to make enormous amounts of money by exploiting the Deceptive Domains, while creating the appearance of innocence (through masking, redirecting, false registrations, and illusory and bad faith online complaint processes, and a multi-layer scheme with layers of participants).  (FAC¶¶4-10).

This case is important to hundreds of thousands of putative class members throughout the United States that lack the technological savvy, sophistication, and money to identify and stop Defendants' cyber scheme — but who, without redress, will continue to be injured and lose valuable property/interests. As the masking and concealment allegations make clear, unless a putative class member is extremely technologically savvy, they will not be able to accurately identify and seek redress for the full scope of Defendants' illegal acts.  As Google made clear at the first status conference, many of the putative class members claims are so small that individual access to the Courts is nearly impossible.  *Supra.*  Yet, as Defendants' very conduct in this action illustrates,[3] without this Court's intervention — Defendants will continue to flaunt the

---

[3]  Since the filing of the initial Complaint, written notice from Class Plaintiffs' Counsel, and the filing of the FAC, Defendants continue to take valuable property from Class Plaintiffs through

rights and interests of Plaintiffs and the Class in order to enjoy illegal financial gain.

The importance of total "scheme" adjudication versus just "individual" infringement determinations was recognized by the court in *In re Napster, Inc. Copyright Litigation*, 2005 WL 1287611 (N.D. Cal. 2005). In certifying a class of "music publisher-principals of the Fox Agency that own or control at least one copyrighted musical work that has without their permission been made available through the Napster service," the *Napster* court rejected Defendants' argument that each class member's infringement required an individual case-by-case adjudication and in so doing explained: "Viewing these determinations as purely 'individual issues' ignores the fact that the claims of every member of the class are uniformly premised upon the uploading or downloading of a copyrighted work by Napster users. This shared factual predicate in turn gives rise to a host of common legal issues." *Id.* at *7.

The *Napster* court acknowledged that individual copyright issues were outweighed by common legal issues, judicial efficiency, and the unfair burden that maintaining individual actions would place on the members of the class. *Id.* Like the *Napster* Copyright Class, a liability determination in the instant case will involve adjudication of a common widespread "scheme" that cannot be subsumed by or extricated from any concomitant intellectual property claims. The illegality of the Deceptive Domain Scheme should be determined once, in this forum, for all affected individuals.

Defendants' absolute failure to identify factual insufficiencies, their reliance on extrinsic arguments (outside the four corners of the FAC), their mischaracterization of Class Plaintiffs' claims and injuries, their legally unsupported arguments to limit the scope of this case to just one

---

the monetization of at least the Deceptive Domains shown in *List of Infringing Domains Registered After Filing of Complaint, attached hereto as Exhibit "A"*.

4

component of the Deceptive Domain Scheme (trademark infringements), and their failure to establish any legal insufficiencies in the FAC, require denial of the MTDs in their entirety.

## II.    FACTUAL OVERVIEW

Class Plaintiffs' well-pled 94 page First Amended Complaint ("FAC") is replete with carefully researched and specifically pleaded factual and technical allegations supporting and establishing the 14 legal causes of action that they brought against Defendants.

Defendants (FAC¶¶67-79) have unlawfully conspired, contrived and effectuated an unlawful scheme, the "Deceptive Domain Scheme," (FAC¶3) to obtain financial benefits from the unlawful and unauthorized use of Class Plaintiffs' and the putative class members' property, rights and interests. (FAC¶¶10-11).

The FAC alleges that Defendants contrived, designed, implemented and otherwise engaged and continue to engage in the Deceptive Domain Scheme intentionally and knowingly (FAC¶¶9, 166) in order to obtain control and use over Class Plaintiffs' and the putative class members' property (distinctive and valuable marks, domains, deceptive domains, internet traffic, goodwill, prospective business and customers (FAC¶¶165, 241, 270, 421)) and to financially profit and transact in the money gained from the illegal misappropriation, taking, use and monetization of Class Plaintiffs' and the putative class members' property. (FAC¶¶1, 10, 218, 238, 261, 263, 270). Defendants' actions constituting the fraudulent scheme are carried out 24 hours a day, 7 days a week on a second-by-second, ongoing and regular basis. (FAC¶¶4,249). The FAC alleges that Defendants carry out the Deceptive Domain Scheme using sophisticated, highly organized, automated, systemic programs through use of the Mails and Wire. (FAC¶¶245, 246, 248, 249, 323, 324).

5

Class Plaintiffs (FAC¶¶20-64) and the putative class members (FAC¶289) are the direct victims of Defendants' Deceptive Domain Scheme because it is their property/interests that Defendants unlawfully took/used in furtherance of the fraudulent scheme.  (FAC¶¶11-12).

Additionally, Class Plaintiffs attach *Factual Overview Chart, attached hereto as Exhibit "B"*.

## III.    DEFENDANTS' MOTIONS TO DISMISS

Not all Defendants filed motions to dismiss all counts.  *See "Summary of MTD Chart", attached hereto as Exhibit "C"*.  Importantly, Dotster has chosen not to file Motions to Dismiss with respect to *any* of the Lanham Act and Trademark Claims and IREIT did not move to dismiss the Lanham Act or trademark claims brought against it by Class Plaintiff JBSS.  The decision by these two Defendants not to seek dismissal of those claims speaks volumes about the strength and viability of those claims given that the underlying, supporting allegations in the FAC are the same as to all of the Parking Company Defendants and the legal allegations are the same as to all of the Defendants.

## IV.    LEGAL STANDARDS

Defendants moved for dismissal pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6).  Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss any complaint that fails to state a claim upon which relief can be granted.  A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint, not the merits of the lawsuit.  *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed.R.Civ.P. 9(b).

6

In reviewing a motion to dismiss, the Court's inquiry is "limited to the factual allegations contained within the four corners of the complaint." *Sotelo v. DirectRevenue, LLC,* 384 F. Supp. 2d 1219, 1236 (N.D. Ill. 2005). Courts must accept all well-pled facts as true and draw all reasonable inferences in favor of the plaintiff. *Phelan v. City of Chicago,* 347 F.3d 679, 681 (7th Cir. 2003). A court can deny an amendment (or dismiss a pleading) only if it is clear that no set of facts consistent with its allegations would entitle the plaintiff to relief. *McMath v. City of Gary, Ind.,* 976 F.2d 1026, 1031 (7th Cir. 1992); *Gillman v. Burlington N. R.R. Co.,* 878 F.2d 1020, 1022 (7th Cir. 1989).

In challenging the sufficiency of the FAC, Defendants misstate the holding in *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007), urging this Court to adopt a pleading standard that is tantamount to "proving the merits" at the pre-discovery/pleading stage. *Perkins v. Johnston,* 431 F. Supp. 2d 898, 900 (N.D. Ind. 2006). *Twombly* requires no such thing. Rather, *Twombly* requires only that the factual allegations in the complaint "raise a right to relief above the speculative level." See *Gros v. Midland Credit Management,* 2007 WL 2601225 (N.D. Ill. 2007) (citing *Twombly,* 127 S.Ct. at 1965). This recent ruling leaves intact the well-established rule that courts must accept all well-pled allegations in the complaint as true. *Id. Twombly* in no way transformed routine motions to dismiss into hearings on the merits.

## V.   ARGUMENT

Defendants' motions must be denied in their entirety because: (1) they fail to demonstrate that the FAC was insufficiently pled, and (2) they have failed to assert any legal basis for dismissal. Defendants' motions are largely predicated on "alleged" insufficiencies in pleading that can be dispelled by even a cursory reading of the FAC. The MTDs also improperly

rely upon factual information that is outside of the four corners of the Complaint (and irrelevant to MTD determinations), in an effort to "muddy the waters" and transform 12(b)(6) and 9(b) motions into final determinations on the merits. Defendants' failure to identify any significant factual deficiencies, coupled with their failure to set forth any legal basis for dismissal, requires denial of their MTDs in their entirety.

### A.    Class Plaintiffs' Have Standing

Defendants IREIT and Sedo seek dismissal of certain claims against them brought by specific named Class Plaintiffs[4]:  IREIT moves against Vulcan, Blitz, and Vincent E. "Bo" Jackson, and Sedo moves against Blitz and JBSS, both arguing that the specific Deceptive Domains, as identified in the chart at ¶65 of the FAC, were not directly connected to them. These arguments are both premature and legally wrong.

Relying on the so-called "Juridical Link Analysis," the Seventh Circuit will allow named plaintiffs to bring a class action against multiple Defendants, including those against whom the named plaintiff did not have a direct claim if all of the Defendants "took part in a similar scheme that was sustained either by a contract or conspiracy." *Payton v. County of Kane*, 308 F.3d 673, 679-680 (7th Cir. 2002).  The Courts within this Circuit have consistently applied the Juridical Link Analysis to class actions finding that the named Plaintiffs are not required to have direct dealings with each named Defendant in order to state claims against them on behalf of proposed classes. *Hudson v. City of Chicago,* 242 F.R.D. 496 (N.D. Ill. 2007) (finding a Juridical Link between the City of Chicago, the police department, and numerous individual police officers allegedly involved in a "concerted scheme" and "a common course of conduct," but denying

---

[4]  IREIT and Sedo do not claim that none of the named Plaintiffs has standing to bring a claim against them.

8

class certification on other grounds); *Contract Buyers League v. F. & F. Investment,* 300 F. Supp. 210 (N.D. Ill. 1969) (applying the Juridical Link Doctrine in certifying a class where the plaintiffs argued that the defendants actions in discriminating against plaintiffs in housing contracts "resulted from a concert and pattern of discriminatory activity including other similar contracts"); *Weiss v. Winners Circle,* 1995 WL 755328 (N.D. Ill. December 14, 1995) (where defendant assigned plaintiff's contract to various lenders, Juridical Link Doctrine applied because of the interconnectedness of lender's relationship, even though there was no actual claim between some of the plaintiffs and some of the lenders).

Even without the Juridical Link Analysis, the FAC sufficiently sets forth specific facts against each Defendant sufficient to establish that each Class Plaintiff has standing to bring the claims alleged. Although not identifying a specific Deceptive Domain for each Class Plaintiff vs. each Defendant, the FAC adequately alleges that every Defendant engaged in the very conduct against each Class Plaintiff giving rise to the well-pleaded claims. The FAC chart provides examples and is preceded by the very explicit language: "Defendants taste, register, license, own, traffic in, monetize and/or otherwise utilize and control Deceptive Domains that are identical and/or substantially similar to Lead Plaintiffs, ***including but not limited to the following***:" (FAC¶65, emphasis added).

Class Plaintiffs Vulcan, Blitz, and Jackson, in addition to Class Plaintiff JBSS, have alleged that **every one** of the named Parking Company Defendants, as well as the numerous unnamed co-defendants, has committed deceptive acts aimed at **every one** of the named Class Plaintiffs, as well as the multitude of unnamed putative class members. (*See, e.g.*, FAC¶¶165-67). It is not necessary for Class Plaintiffs to specifically identify each and every Deceptive Domain at this stage in the litigation. In fact, the pleading requirements do not require that Class

9

Plaintiffs identify *any* specific Deceptive Domains. Instead, Class Plaintiffs must simply make allegations that Deceptive Domains were used. Nothing more is required under even the most stringent pleading standards. *Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 167 (1993) ("State with factual detail and particularity the basis for the claim…"). Proof is not required at this stage in the litigation. *U.S. ex rel Landsberg v. Argentis Medical, P.C.,* 2006 WL 1788381 at *4 (W.D. Pa. 2006).

Class Plaintiffs bring their allegations in good faith and based on the following:

1.    All of the misconduct arises from the identical, common, core of bad actions/Deceptive Domain Scheme (FAC¶¶1, 3);

2.    Defendants' conduct is so interrelated, cohesive, and cooperative in nature, each Defendant will have taken action during the class period that either directly or vicariously resulted in said violations against each named Class Plaintiff (FAC¶238);

3.    Parking Company Defendants "trade" or "switch" Deceptive Domains on a frequent basis, thus many Deceptive Domains have been parked and monetized by more than one parking company (FAC¶143);[5]

4.    In fact, the Parking Company Defendants swap the Deceptive Domains as part of the concealment and deception inherent in the scheme (FAC¶3);

5.    The false and concealed submission of WHOIS data makes it impossible, prior to discovery, to identify with certainty which Parking Company Defendants have direct privity with which Class Plaintiffs (FAC¶165, 263(f)); and

---

[5]  For example, after the filing of the original complaint in this action, the following conduct occurred: wwwvulcangolf.com and volcangolf.com ***were deleted by the original registrants and "unparked/unmonetized" by Defendant Oversee and Defendant Google.*** As stated in the FAC:

ii.    Almost immediately thereafter, wwwVulcanGolf.com and VolcanGolf.com were *re-registered, relicensed, and redirected to* Google AdSense for Domains displaying Google AdWords Ads for commercial gain by Defendant Google and Oversee, despite formal notice. (FAC¶222(a)).

The key change, however, was that the Deceptive Domain was "swapped" and a new parking company (DomainSponsor.com) was parking it and monetizing it in concert with Defendant Google.

6.     Stealth redirect, masking, and framed forwarding make it impossible to identify, prior to discovery, which Parking Company Defendants have direct privity with which Class Plaintiffs (FAC¶156).

Nowhere in the Class Plaintiffs' FAC do the Class Plaintiffs ever limit the claims of any named Class Plaintiffs to individual Defendants, because such allegations would be inaccurate as **all** of the Defendants have harmed **all** of the Class Plaintiffs.

## B.    The Claims Pled Are Not Mutually Exclusive

Class Plaintiffs bring several distinct claims that directly arise out of Defendants' illegal Deceptive Domain Scheme. Class Plaintiffs did not "transform" a federal trademark case into a racketeering scheme, in violation of RICO; rather, Class Plaintiffs seek redress for multiple claims **because** Defendants themselves chose to violate multiple laws and engage in a variety of illegal conduct.

Both the Seventh Circuit and the U.S. Supreme Court have consistently rejected defense arguments urging narrow construction of the civil RICO provision and arguments that civil RICO does not apply to "garden variety" business fraud cases. *Haroco, Inc. v. American National Bank & Trust Co. of Chicago,* 747 F.2d 384 (7th Cir. 1984); *Schacht v. Brown,* 711 F.2d 1343, 1357-1358 (7th Cir. 1983);; *Russello v. United States,* 464 U.S. 16, 25 (1983). Further, it is well understood that "injury to free competition in the marketplace" caused by racketeering was a major concern of Congress in enacting RICO. *Haroco,* 747 F.2d at 391, citing *United States v. Turkette,* 452 U.S. 576, 590-591 (1981). Contrary to Defendants' suggestion, a business competitor harmed by infiltration or by other effects of racketeering may well be able to state a claim under RICO by alleging a "competitive" injury. *See Addis v. Moser,* No. 83 C 6118, slip op. at 14 & n.9 (N.D. Ill. Feb. 15, 1984); *Landmark Savings & Loan v. Loeb*

11

*Rhoades, Hornblower & Co.,* 527 F. Supp. 206, 208-209 (E.D. Mich. 1981).

Notably, while the civil RICO provision contains an express "RICO bar" that excludes claims if the conduct "would have been actionable as fraud in the purchase or sale of securities," 18 U.S.C. §1964(c), **that bar does not apply to the instant facts**.  Courts faced with facts giving rise to such securities claims cannot allow them to proceed as RICO claims.  *Hollinger Intern., Inc. v. Hollinger, Inc*. 2005 WL 327058 (N.D.Ill. 2005).  The "RICO Bar", however, does not extend to facts that also give rise to trademark and state law claims.  If Congress had intended trademark/cybersquatting/typosquatting claims to fall outside the reach of RICO, surely it would have explicitly carved such claims out as it did with the securities claims that are precluded by the RICO bar.

Courts acknowledge the ability of plaintiffs to simultaneously pursue RICO and intellectual property claims.  *See, e.g., Galerie Furstenberg v. Coffaro,* 697 F.Supp 1282 (S.D.N.Y. 1988) (sustaining RICO claims at the motion to dismiss stage based on predicate acts of mail and wire fraud where Defendants' scheme primarily involved the copying and sale of counterfeit Salvador Dali prints).  *See also Internet Archive v. Shell,* 505 F. Supp. 2d 755 (D. Colo. 2007); *Information Exchange Systems, Inc. v. First Bank Nat. Ass'n,* 1992 WL 494607 (D. Minn. 1992); *Dell, Inc. v. Solares, et al.,* Case No. 07-2668 (E.D. La., April 26, 2007).

A court in this very district recently denied motions to dismiss Lanham Act, ACPA, and state law claims, in a case involving the use of trademarks in a domain name.  *Flentye v. Kathrein*, 485 F. Supp. 2d 903 (N.D. Ill. 2007).  The fact that Defendants infringed upon certain marks and other intellectual property owned by Class Plaintiffs does not immunize Defendants from responsibility for also violating RICO and state law.  Defendants would like this Court to carve down the scope of their liability for the multiple bad actions in which they engage.

However, limiting the civil claims against Defendants in the instant action would be as unjust as limiting charges against a criminal defendant to "breaking and entering" when he also set the house on fire.

C.    **Plaintiffs State Lanham Act/Trademark Claims (Counts III, IV, V, VI, IX, X, XI and XII)**

Class Plaintiffs allege a total of seven Lanham Act and trademark causes of action: cybersquatting (Count III), direct trademark infringement (Count IV), contributory and vicarious trademark infringement (Counts X and XI), false designation of origin (Count V), dilution (Count VI), and common law trademark violation (Count IX). Defendants' strained attempts to dismiss these claims fall well short.

1.    **Class Plaintiffs Plead Valid and Cognizable Claims Against ALL Defendants for a Violation of the ACPA (Count III)**

Pursuant to the Anticybersquatting Consumer Protection Act ("ACPA"), a plaintiff may bring a civil action against a defendant if it establishes that: (1) the plaintiff owns a mark that is distinctive or famous; (2) the defendant in bad faith intends to profit from the plaintiff's mark; and (3) the defendant "registers, traffics in, or uses" a domain name that, at the time of its registration, is identical or confusingly similar to the plaintiff's mark. *See* 15 U.S.C. §1125(d)(1)(A). *See also, e.g., Nike, Inc. v. Circle Group Internet, Inc.*, 318 F. Supp. 2d 688, 690-91 (N.D. Ill. 2004). As explained below, Class Plaintiffs have sufficiently alleged a valid claim against each of the Defendants in Count III of the FAC for a violation of the ACPA and related trademark claims.

### a.    The FAC Properly Alleges that Class Plaintiffs Own Marks that are Distinctive or Famous ("Distinctive and Valuable Marks")

Class Plaintiffs satisfy the first required element, as they allege that they own unique, distinctive, famous, and/or publicized marks that the Parking Company Defendants are infringing:

- Plaintiff Vulcan Golf owns the registered trademark VULCAN and trade name Vulcan Golf (since November 1993) and the domain name www.VulcanGolf.com (registered in 1997) which, since their origins, have been publicized and featured on the Internet, in media and published stories, and are widely known and recognized among consumers and members of the golfing community (FAC¶¶20-28);

- Plaintiff JBBS owns trademarks and registered domains, including Fisher and www.FISHERNUTS.COM, which, since 1995, have been publicized and featured on the Internet, published in media and stores, and are widely known and recognized among consumers (FAC¶¶29-38);

- Plaintiff Blitz has valid, enforceable, protected and valuable legal rights to the use of the names Blitz, Blitz Realty and Blitz Real Estate in the northern Illinois area, and in the website www.blizrealtygroup.com is used to display properties for sale in the local area and to advertise the company and its services to customers, and has used its names and logo since 2002 in commerce, the Internet and, in other advertisements, which are widely known and recognized among the community in northern Illinois (FAC¶¶39-52);

- Plaintiff Bo Jackson is a well known Heisman Trophy winning football player and athlete who achieved national commercial fame in 1989 and 1990 through the "Bo Knows" advertising campaign by Nike, and has a valid and enforceable legally protected interest in his name (FAC¶¶53-64); and

- The FAC details how Defendants have violated and continue to violate Class Plaintiffs' rights in their marks and names, as well as those of other similarly situated unnamed Class Members.  (*See, e.g.,* FAC¶¶211-223, 270-277.)

Sedo argues, contrary to the plain language of the ACPA and all applicable authority, that because Class Plaintiff Bo Jackson has not alleged that he has registered his name, he is not afforded protection under the Lanham Act.  *HER, Inc. v. RE/MAX First Choice, LLC,* 468 F. Supp. 2d 964, 972-973 (S.D. Ohio, 2007) (Court issues injunction on the basis that Defendant's

registration of domain names incorporating the "personal names of Plaintiffs, Harley E. Rouda, Sr., Harley E. Rouda, Jr. and Kaira Sturdivant-Rouda," violated the ACPA because their personal names "are worthy of trademark protection"). See also *Shields v. Zuccarini*, 254 F.3d 476, (3d Cir. 2001), (Court affirmed the award of statutory damages of $10,000 against the defendant for his registration and use of five domain names joescartoon.com, joecarton.com, joescartons.com, joescartoons.com and cartoonjoe.com. which were confusingly similar to the plainitiff's unregistered, but distinctive "Joe Cartoon"; *Great Eastern Resort Corp. v. Virtual Resort Solutions, L.L.C.,* 189 F. Supp. 2d 469, 476 (W.D. Va., 2002) (acknowledging that ACPA protection is not limited to registered trademarks); *Prudhomme v. Procter & Gamble Co*., 800 F. Supp. 390, 395 (E.D. La. 1992).

### b.    Class Plaintiffs Allege that the Parking Company Defendants Intend, in Bad Faith, to Profit from Class Plaintiffs' Marks

The FAC contains numerous factual allegations of "bad faith" and "intent to profit." As a threshold legal matter, the bad faith determination, at a minimum, is a "mixed question of fact and law." *Paccar Inc. v. Telescan Tech., LLC*, 319 F.3d 243, 250 (6th Cir. 2003). A determination of bad faith, therefore, cannot be made on a motion for failure to state a claim under Rule 12(b)(6). *Graehling v. Village of Lombard*, 58 F.3d 295, 298 (7th Cir. 1995).

The ACPA lists nine factors that may guide a court in determining whether a party, in bad faith, intends to profit from another's mark. 15 U.S.C. §1125(d)(1)(B). The factors include: whether the ***defendant possesses any intellectual property rights*** in the domain name at issue; the extent to which the domain name consists of the ***defendant's legal name***; the defendant's ***prior use*** of the domain name in connection with the bona fide offering of goods or services; the defendant's ***intent to divert consumers from the owner's website*** domain to another website domain, for purposes of commercial gain; and the defendant's ***registration or acquisition of***

15

*multiple domain names which it knows are identical or confusingly similar* to the marks of others. *Id*.

All of these factors indicate Defendants' bad faith intent to profit from Class Plaintiffs' marks. However, the foregoing factors are not exhaustive of the analysis of whether Defendants acted with a bad faith intent to profit and a court may also consider "unique circumstances ... which do not fit neatly into the specific factors enumerated by Congress." *Sporty's Farm LLC v. Sportsman's Mkt., Inc.,* 202 F.3d 489, 499 (2nd Cir. 2000). *See, e.g. Land's End, Inc. v. Remy*, 447 F. Supp. 2d 941, 948-49 (W.D. Wis. 2006). For example, the Seventh Circuit has specifically held that willful blindness "is a sufficient basis for a finding of violation of the Lanham Act*." Louis Vuitton S.A. v. Lee,* 875 F.2d 584, 590 (7th Cir. 1989).

Just a few of the many allegations in the FAC that support a finding of bad faith, are:

- Defendants contrive, register, taste, monetize and/or use hundreds of thousands of Deceptive Domains for the exclusive purpose of monetization with revenue generating advertising (FAC¶177);

- Deceptive Domains resolve to non-content, parked sites that contain only revenue generating advertising (FAC¶¶7(a), 101);

- Defendants have no *intellectual property rights* in or *legal names* that form the basis of the Deceptive Domains; and have not made *prior use* of the Deceptive Domains in connection with the bona fide offering of goods or services (FAC¶¶160, 178-191);

- The Defendants' sole use of the Deceptive Domains is to divert and redirect internet traffic to sites containing said revenue generating advertising (FAC¶¶241(f), 263(c)(e), 337);

- Defendants knowingly and intentionally participated in the Deceptive Domain Scheme and derived *commercial gain* from their participation, including through the generation of revenue from various revenue generating advertisements (FAC¶¶144, 161, 225-277);

- Defendants are willfully blind, refusing to utilize reasonable and available technology to prevent or mitigate against the violations and infringements (FAC¶197);

16

- Defendants intentionally "mask" and conceal said practices (FAC¶¶152; 155, 192-194, 337-342); and

- Defendants engage in typosquatting, cybersquatting, and cyberpiracy, including by registering, using, trafficking in, licensing and exploiting *numerous* Deceptive Domains, such as those with a "www" or missing "." or that are *intentionally misspelled or confusingly similar spelling variations of Class Plaintiffs' marks* (FAC¶¶160, 178-191).

A "presumption of bad faith" arises when defendants have never used the infringing domain names in connection with the bona fide offering of goods or services, or for a legitimate non-commercial or "fair use" purpose. *See Victoria's Secret Stores v. Artco Equipment Co., Inc.,* 194 F. Supp. 2d 704, 722 (S.D. Ohio 2002), quoting *E. & J. Gallo Winery v. Gallo Cattle Co.,* 12 U.S.P.Q.2d 1657, 1675 (E.D. Cal. 1989). Using a domain name exclusively for the purpose of monetization with revenue generating advertising is not a legitimate use. *General Media Communications, Inc. v. Crazy Troll, LLC,* 2007 WL 102988, at *6 (S.D.N.Y. 2007) (citing *Gen. Elec. Co. v. Networking Mktg.,* WIPO Case No. D2005-1064, ¶ 6(B) ("Since the ... marks and names are well known and Respondent has no rights in them, the only reason why Respondent could have wanted to register and use a domain name incorporating the composite mark ... was not for any legitimate noncommercial or fair use or purpose, but rather because it wanted to use Complainant's famous mark in order to profit from the web traffic it would generate from consumers."); *Drake Bliss v. Cyberline Enters.,* WIPO Case No. D2001-0718, ¶6(C) (same)).

Courts have repeatedly found that unauthorized domain names that ***contain*** protected marks can and do infringe on those marks. *See, e.g.*, *Paccar*, 319 F.3d at 243 (overruled in part on other grounds); *KP Permanent Make-up, Inc. v. Lasting Impression I. Inc.*, 543 U.S. 111 (2004) (Peterbilt and Kenworth marks infringed by www.peterbiltnewtrucks.com, www.peterbiltusedtrucks.com, etc.); *Audi AG v. D'Amato*, 381 F. Supp. 2d 644, 660 (E.D. Mich. 2005) (AUDI mark infringed by www.audisport.com); *Garden of Life, Inc. v. Letzer*, 318 F.

17

Supp. 2d 946, 962 (C.D. Cal. 2004) ("Garden of Life" and "The Maker's Diet" infringed by www.gardenoflifecommunications.com and www.gardendietmaker.com).

Defendants do not, and frankly cannot, dispute that Deceptive Domains are confusingly similar to Class Plaintiffs' marks. *Veuve Clicquot Ponsardin v. Polygenix Group Co.,* WIPO Case No. D2000-0163, ¶6 (where a domain name "is so obviously connected with such a well-known product ... its very use by someone with no connection with the product suggests opportunistic bad faith"); *Stella D'oro Biscuit Co. v. Patron Group, Inc.,* WIPO Case No. D2000-0012, ¶5(c). As an initial matter, Google itself recognizes that at least one category of Deceptive Domain Names – "typosquatting" domain names which are one character off from the protectible mark – are confusingly similar. Indeed, Google has gone after typosquatters that registered domain names similar to its own GOOGLE mark, and prevailed in binding arbitrations:

> Each of the <googkle.com>, <ghoogle.com>, <gfoogle.com> and <gooigle.com> domain names is comprised of a confusingly similar version of Complainant's GOOGLE mark, which differs from the mark merely by the addition of one letter. Under the Policy, panels have widely held that the addition of one letter to a mark does not create a distinct domain name. Therefore, the Panel determines that the disputed domain names are confusingly similar to Complainant's mark[.]

(*Google, Inc. v. Sergey Gridasov,* Nat'l Arb. Forum, Claim No. FA0505000474816 (Dorf, Arb.) last visited November 5, 2007) 2007). Google cannot credibly claim that the "typosquatting" marks are not confusingly similar to Class Plaintiffs' and the putative class members' marks.

What constitutes "confusingly similar" under the ACPA was summarized by the district court in *Ford Motor Co. v. GreatDomains.Com, Inc.*, 177 F. Supp. 2d 635 (E.D. Mich. 2001):

> Courts generally have held that a domain name that incorporates a [protected mark] is "confusingly similar to" that mark if "consumers might think that [the domain is] used, approved, or permitted" by the mark holder. *Harrods Ltd. v. Sixty Internet Domain Names,* 157 F. Supp. 2d 658, 677 (E.D. Va. 2001). Thus,

18

courts consistently have found that "slight differences between domain names and registered marks, such as the addition of minor or generic words to the disputed domain names are irrelevant." *Victoria's Cyber Secret Ltd. Partnership v. V Secret Catalogue, Inc.,* 161 F. Supp. 2d 1339, 1351 (S.D. Fla. 2001); *see also PACCAR, Inc. v. Telescan Techs., L.L.C.,* 115 F. Supp. 2d 772, 777 (E.D. Mich. 2000) (granting holder of PETERBILT mark injunction against defendant's use of "peterbilttrucks.com", "peterbiltnewtrucks.com", "peterbiltusedtrucks.com", "peterbiltdealers.com", and "peterbilttruckdealers.com"). This court similarly concludes that, unless words or letters added to the plaintiff's mark within the domain name clearly distinguish it from the plaintiff's usage, allegations that a domain name incorporates a protected mark generally will suffice to satisfy the "identical or confusingly similar to" requirement.

*Ford*, 177 F. Supp. 2d, at 641-642.

A domain name that is "substantially the same" as the protected mark is "confusingly similar." *E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1043 (S.D. Tex. 2001). A single letter difference is sufficient for liability. *See Northern Light Technology, Inc. v. Northern Lights Club*, 97 F. Supp. 2d 96, 117 (D. Mass. 2000), *aff'd* 236 F.3d 57 (1st Cir. 2001) ("Northern Lights" confusingly similar to "Northern Light"). The court in *Hartog & Co. AS v. SWIX.com,* 136 F. Supp. 2d 531 (E.D. Va. 2001), concluded that "confusingly similar" under the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. §1125(d)(1) means approximate distinctive marks and not the traditional "likelihood of confusion" analysis in trademark law.

Defendants' conduct qualifies precisely as the kind of bad faith conduct that courts consistently have held to be actionable under the ACPA. *See E. & J. Gallo Winery v. Spider Webs Ltd.,* 286 F.3d 270, 276 (5th Cir. 2002); (defendant doing business in domain names, which it did not use and in which had no intellectual property rights, and which were "identical or similar" to others' names); *Shields*, 254 F.3d at 485 (domain names with various spellings, in which defendant had no intellectual property rights); *Sporty's Farm,* 202 F.3d at 495-96 (no intellectual property rights in domain name which was not defendant's legal name); *Zipee Corp.*

*v. United States Postal Service*, 140 F. Supp. 2d 1084, 1087 (D. Or. 2000) (counterclaim defendant doing business in domain names with which "it has no apparent connection"); *Morrison & Foerster, LLP v. Wick*, 94 F. Supp. 2d 1125 (D. Colo. 2000) (misspelling variations of plaintiff's name). *See also Garden of Life*, 318 F. Supp. 2d at 952-953 (granting preliminary injunction against defendant that was "divert[ing] traffic" from plaintiff's website to earn fees).[6]

Perhaps most illustrative of Defendants' bad faith is Sedo's astonishing "explanation" of its conduct. Incredibly, Sedo argues that one of its websites (vulcanogolf.com) does not intend to trade off of Plaintiff Vulcan Golf's website and name. Perhaps because it is so patently obvious at first glance, Sedo cites no law in support of its claim that "Vulcanogolf" is not confusingly similar to "Vulcangolf." Rather, according to Sedo, vulcanogolf.com concerns "volcano golf" and "golfing in and around volcanoes." Sedo appeals to the Italian language, no less:

> Vulcano is the Italian word for volcano. Italian to English dictionary: http://www.wordreference.com/iten/vulcano (last accessed 10/17/2007). Thus a legitimate consideration is that vulcanogolf does not relate to Vulcan Golf or its products but to **volcano golf** or **golfing in and around volcanoes.**

Sedo MTD at 6, n. 4 (emphasis added). Sedo's assertion does not pass the "red face" test.

Similarly, "nobojackson.com" and "aintnobojackson.com" are substantially the same as Bo Jackson's name, in which he clearly has a protected interest. *See* FAC¶¶55-63 (alleging facts in support). The "minor or generic" words "no" and "aint" appended to his name do not insulate Sedo from liability under the ACPA. See *Ford Motor Co.*, 177 F. Supp. 2d at 640-641; *see also Omega S.A. v. Omega Eng'g Inc.*, 228 F. Supp. 2d 112, 127 (D. Conn. 2002) (finding

---

[6] Defendant Oversee's argument that the existence of Defendants' purported "online complaint" systems and procedures "negates" Defendants' bad faith intent (Oversee MTD at 13) ignores that these systems, as alleged, are "illusory" mechanisms that Defendants use to further their deception and of the Deceptive Domain Scheme." (FAC¶¶195-97). Not surprisingly, Oversee cites no case to support its *ipse dixit* assertion.

"Omegatime" and "Omegawatch" confusingly similar to the protected marks "Omega" and
"O."). "[A] contrary result would directly contravene Congressional intent in enacting the
ACPA and would permit a cybersquatter to evade the scope of the statute merely by adding to a
distinctive or famous mark a generic term or word that has no connection to the goods or
services attached to that mark by its owner." *Omega S.A.*, 228 F. Supp. 2d at 127. In fact, the
additional words "no" and "aint" do not differentiate the site from Mr. Jackson, but reinforce its
connection with him. (*See* FAC¶61 (Mr. Jackson's personal fame was reinforced through the
"Bo ***Knows***" Nike advertising campaign)).

    Sedo misplaces reliance on Judge Norgle's unpublished opinion in *Amerimax Real Estate
Partners, Inc. v. RE/MAX Intern'l Inc.*, 2006 WL 2794934, at *4-*5 (N.D. Ill. Sep. 26, 2006)
(*see* Sedo MTD at 7). In that case, the court did not analyze the seven factors the Seventh
Circuit uses to determine whether a trademark has been infringed. *See Smith Fiberglass
Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327 (7th Cir. 1993).[7] The court simply recognized that
the use of the highly-generic term "max" in advertising did not infringe on RE/MAX
International's protected mark. *Amerimax,* 2006 WL 2794934.

    Here, by contrast, Sedo's offending domain name incorporates all of Class Plaintiff's
"Vulcan Golf" trade name and its VULCAN trademark, adding only a single letter. That there
are other marks that also use "vulcan" does not render plaintiff's marks unprotected. For
example, Sedo does not identify a single such "vulcan" mark that also includes "golf." (Sedo
MTD at 8). The combination is distinctive and thus protectible. *See Anheuser-Busch, Inc. v.*

---

[7] Those factors are: the similarity between the marks in appearance and suggestion; similarity of
products; area and manner of concurrent use; degree of care likely to be exercised by consumers;
strength of complainant's mark, actual confusion; and intent of defendant to palm off his product
as that of another. *Smith Fiberglass,* 7 F.3d at 1329. None of the seven factors alone are
dispositive and weight accorded to each factor will vary from case to case. *Id.*

*Caught-On-Bleu, Inc.*, 288 F. Supp. 2d 105, 114 (D.N.H. 2003) ("Marks are to be assessed 'on the basis of the total effect of the designation ... .'").[8]

The court held that the fact that consumers were misled into visiting another website, through the use of a protected mark, was a likely trademark violation; for this reason it supported a preliminary injunction. *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812-13 (7th Cir. 2002). Even if the consumers were immediately aware that the website they were visiting was not the one for the protected mark, this "initial interest confusion" is sufficient under Seventh Circuit law to violate the trademark. *Id.*; *see also Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1062-1063 (9th Cir. 1999) (recognizing "initial interest confusion" in the context of misdirected web sites).[9]

      **c.**      **The FAC alleges that Defendants "register, traffic in or use" domain names that are identical or confusingly similar to Class Plaintiffs' marks**

      **(i)**      **Google**

Google argues that the ACPA applies only to domain registrants and licensees, and that it is neither. (Google MTD at 12.) Its argument fails because: (1) the FAC alleges that Google is a "licensee" of the Deceptive Domains; and (2) the ACPA also applies to entities that "traffic in" or "use" domains. 15 U.S.C. §1125(d). As explained below, the ACPA applies equally to a person who is the "registrant's authorized licensee" and to a person who "traffics in" a Deceptive

---

[8]  Unlike the *Playboy Enters., Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1024-1026 (9th Cir. 2004) case Sedo cites, there is no evidence here that the First Amendment or other legitimate rights of anyone would be violated by protecting Vulcan Golf's distinctive mark. *Playboy* also involves a motion for a preliminary injunction, which is adjudged by a much higher standard than one governing a Rule 12(b)(6) motion.

[9]  The older, out-of-circuit, district court cases Sedo cites for the proposition that "initial interest confusion" is not cognizable are simply wrong. *See* Sedo MTD at 10-11 (citing *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117 (D. Mass. 1999) and *Teletech Customer Care Management, Inc. v. Tele-Tech Co.*, 77 F. Supp. 1407 (C.D. Cal. 1997).

Domain (as "traffics in" is defined in 15 U.S.C. §1125(d)(1)(E)), whether or not that person is the registrant of the Deceptive Domain.  15 U.S.C. §1125(d).

**(a)    The FAC properly alleges that Google is a "licensee" of the Deceptive Domains**

Class Plaintiffs specifically allege that Google "licensed" the Deceptive Domains. (FAC¶222(a)(iv)).  Google claims that its contractual agreement to provide advertising content cannot constitute a "license" (Google MTD at 12).  The relationship whereby Google obtains control over and exclusive rights to monetize (with revenue generating internet advertisements) a partner's domains is a license.  Indeed, FAC¶285(a) through (c) give specific examples of domain contracts wherein a "license" conveys control over the domain, including but not limited to the right to monetize the domain with paid internet advertisements.  Far from making "inchoate legal conclusion[s]" (Google MTD at 12), Class Plaintiffs have gone the extra step of providing specific contractual language that matches the ACPA's requirements.  (FAC¶285).

**(b)    Google also "traffics in" or "uses" infringing domains.**

The ACPA applies equally to a person who is the "registrant's authorized licensee" and to a person who "traffics in" (as defined in 15 U.S.C. §1125(d)(1)(E)) a Deceptive Domain whether or not the person is the registrant of the Deceptive Domain.  15 U.S.C. §1125(d).  "Use" liability may attach to either the registrant or a licensee.  (15 U.S.C. §1125(d)(1)(D); FAC ¶¶279, 284).  "[T]raffics in" is defined as "transactions that include, ***but are not limited to***, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration."  15 U.S.C. §1125(d)(1)(E) (emphasis added).

The FAC alleges that Google "traffics in" and "uses" the Deceptive Domains.  (FAC¶¶7,

23

165, 241). Google's use, trafficking in, and general control of and participation in the Deceptive Domain Scheme is well-chronicled in the FAC. (FAC¶7, 165, 241). For example, the FAC specifically alleges that Google "processes the domains, … utilizes semantics … to understand the meaning of the domain names …, and … selects revenue maximizing advertisements" for display (FAC¶152(b)). The FAC further alleges that Google "analyzes, evaluates, … controls and maintains advertisements" on the Deceptive Domains. (FAC¶133.).

Google actively "traffics in" the Deceptive Domains, as alleged in the FAC. (FAC¶¶5, 65, 175). Just a few of the specific examples in the FAC of how Google "traffics" in Deceptive Domains are that it pays domain registrants for its use of the Deceptive Domains (FAC¶136); provides domain performance reporting, including traffic statistics, that are well-known to be used in the domain industry to value domains for aftermarket sales (FAC¶¶206, 207); and participates in the "tasting" of Deceptive Domains by allowing said Domains to be monetized with Google Ads during the tasting period. (FAC¶¶201, 203). The FAC also specifically alleges that Google Advertising is the sole or primary source of monetizing of the Deceptive Domains (FAC¶¶7, 241) and that Google "controls" and is at the center of the entire Deceptive Domain Scheme. (FAC¶¶7, 241).

### (ii)    The Parking Company Defendants

With similar detail, Class Plaintiffs allege that each of the Parking Defendants "registers, traffics in, or uses" the Deceptive Domain Names at issue, including domain names that are deliberate misspellings of and, in other ways, confusingly similar to Class Plaintiffs' domain names. (FAC¶¶158, 165(a)).

In extensive detail, and throughout the FAC, Class Plaintiffs allege that the Parking

Defendants:

- actively register, traffic in, license and sublicense (through direct and indirect licenses and sublicenses), and assist in the procurement of Deceptive Domains to receive and share revenue from advertising (FAC¶¶143, 155, 157, 158, 175-177; 198-203, 208-210, 285-288);

- enter into license agreements with the Domain registrants and Google for the license and rights to control, monitor, maintain, use and place advertising on domains, including the Deceptive Domains (FAC¶148, 149); and

- are in the business of registering, parking, monetizing, aggregating, auctioning/reselling, tasting, licensing and brokering domains, with many of those domains being Deceptive Domains. (FAC¶¶143, 144, 152, 153, 155-161).

Class Plaintiffs expressly allege that each of the Parking Company Defendants engaged in the enumerated unlawful and infringing conduct with respect to each of Class Plaintiffs' marks and names. (FAC¶¶142-164).

Sedo attempts to insulate itself from liability under the ACPA by underplaying its role in the Deceptive Domain Scheme — twice underlining for emphasis that the ACPA is aimed at abusive **registration** of domains (Sedo MTD at 5-6), despite the fact that a plain reading of the statute shows that it is not so limited. In fact, the ACPA protects the holder of a protected mark from a party that "registers, traffics in, *or* uses a domain name" with a bad faith intent to profit from it. 15 U.S.C. §1125(d)(1)(A)(ii) (emphasis added).

The cases cited by the Parking Company Defendants are inapplicable and do nothing to mitigate applicability of the ACPA. *Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002) and *Ford*, 177 F. Supp. 2d 635 merely hold that a plaintiff asserting an ACPA claim must allege that a defendant is a registrant or licensee of, or traffics in, a domain name. Class Plaintiffs have done precisely that. (FAC¶¶90-210). This is in marked contrast to *Bird*, in which the complaint contained no allegation to that effect; see *Bird*, 289 F.3d at 881, and to *Ford,* in which the

25

defendant was merely alleged to be a passive auction site.[10]  *See Ford,* 177 F. Supp. 2d at 645.

*Bird* stands for the proposition that a domain registrar does not violate the "register" prong of the ACPA when a customer uses that registrar's system to register an infringing domain, without more. *Bird*, 289 F.3d at 881. But the court in *Bird* leaves open the "traffic in" and "use" prongs of the ACPA. *Id.* at 881. Citing a provision of the ACPA, 15 U.S.C. §1125(d)(1)(D), *Bird* specifically confirms that ACPA liability does extend to a registrant's licensee. *Id.* at 881. The court in *Bird* then confirms that ACPA liability extends to those who "participate in any transaction" where consideration arises out of the trademark infringement. *Id.* at 881. Unlike the Parking Company Defendants in this case, in *Bird*, Dotster was not alleged to have profited specifically from the fact that the domain name ("www.efinancia.com") was similar to the plaintiff's registered tradename ("Financia"). *Bird*, 289 F.3d at 881. In fact, in that case, the court found it "entirely possible that the value of a domain name ... will be significantly greater if the name resembles an established trademark" but noted that the complaint did not "include any factual allegations that would support such a theory." *Bird,* 289 F.3d at 879.[11]

---

[10]  Defendant Oversee's argument that Oversee is alleged to be merely an auction site (Oversee MTD at 12) is belied by the very allegation it cites (FAC¶209), as well as the scores of allegations discussed *supra* in which Plaintiffs assert that Oversee registers, licenses, sublicenses, and traffics in domain names. Defendant Sedo makes the same failing argument. Sedo's mischaracterization of the FAC is highlighted by the fact that Sedo spends over a page of its brief discussing the *Bird* decision but one sentence purportedly summarizing Plaintiffs' pleading, which – with dramatic flair – it misstates contains allegations "nearly identical to the allegations made in *Bird*." (Sedo MTD at 5.)

[11]  The *Bird* court's comments regarding trading on the value of the trademarks were made in the section of its decision that analyzed the Lanham Act trademark dilution claim. However, the "use" element of an infringement claim and a dilution claim are the same. *See Cable News Network L.P., L.L.L.P. v. CNNews.com*, 177 F. Supp. 2d 506, 521 (E.D. Va. 2001) (vacated in part on other grounds, 56 Fed. Appx. 599 (4th Cir. 2003)) ("the phrase 'use in commerce' is defined the same for trademark dilution as it is for trademark infringement"). Indeed, Oversee has used the two interchangeably. The *Lockheed Martin* language quoted by Oversee in support of its trademark infringement argument (Oversee MTD at 3) was actually taken from the court's

26

Here, of course, Class Plaintiffs explicitly allege that the value to Defendants of the Deceptive Domain Names is due to their resemblance to established trademarks, FAC¶¶175-190 (explaining monetization scheme), and thus that defendants "trade on the value of domain names as trademarks." *Bird*, 289 F.3d at 879 (citing *Lockheed Martin*, 985 F. Supp. at 960).

*Bird*'s holding is limited to circumstances where a domain service provider's fee does not turn on the underlying conduct addressed by the ACPA. *Bird*, 289 F.3d at 881. In contrast, Defendants here receive greater revenue when a domain earns more advertising revenue and that revenue is directly related to the underlying trademark infringement. *See, e.g.,* FAC¶¶198-210 (explaining that "the statistics provided by Parking Company Defendants and Google" regarding "how many visitors each Deceptive Domain gets" impact the revenue earned by Deceptive Domain and the selling price of that Deceptive Domain). The facts in the instant action are exactly the opposite of the facts resulting in dismissal in *Bird*. Interestingly, not even Doster*,* despite its successful motion to dismiss in *Bird,* believes that *Bird* is relevant in the instant action. Dotster chose not to file MTDs seeking dismissal of the Lanham Act claims and did not therefore raise *Bird* as a basis for dismissal.

Class Plaintiffs handily meet the pleading standard that the District Court for the Northern District of Illinois, Eastern Division, applied in upholding an ACPA claim, only months ago, in *Flentye*. In *Flentye*, a defendant moved to dismiss an ACPA claim against it, arguing that the plaintiff failed to allege the defendant was a registrant or a licensee of the domain at issue. The court rejected the argument, holding that "at a minimum, Class Plaintiffs do allege that Defendants as a group registered the domain names at issue [citing complaint], so

---

discussion of the dilution claim. *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 959-960 (C.D. Cal. 1997).

the Court cannot say that Kathrein could not be considered the registrant or an authorized licensee." *Flentye,* 485 F. Supp.3d. at 914 (citing *Hamptons Locations, Inc. v. Rubens*, 2005 WL 2436209 at *8 (E.D.N.Y. Sept. 20 2005) (in an ACPA action, evidence that an individual defendant was involved in the development, launching and operation of the website precluded summary judgment in favor of the defendant). Class Plaintiffs easily satisfy these pleading requirements.

### 2.    Class Plaintiffs State a Claim for Direct Trademark Infringement Under 15 U.S.C. § 1114(1) (Count IV)

To state a valid claim for trademark infringement under 15 U.S.C. §1114, a plaintiff must allege: (1) ownership of a valid, protectible trademark; (2) that Defendant used the mark in commerce and without the registrant's consent; and (3) a likelihood of consumer confusion.[12] *HER, Inc.*, 468 F. Supp. 2d at 978 (citing, *Too, Inc. v. TJX Cos.*, 229 F. Supp. 2d 825, 829 (S.D. Ohio 2002). Class Plaintiffs do not need to prove intent in order to establish liability. *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.*, 363 F. Supp. 2d 952, 957 (S.D. Ohio 2005). The FAC sets forth factual allegations sufficient to state a claim under §1114.

### a.    Class Plaintiffs Properly Alleged that Defendants Used Class Plaintiffs' Marks

The FAC sets forth numerous facts establishing Defendants' use of Class Plaintiffs' marks. *See discussion above, §C1.* (*See also* FAC¶¶28, 38, 52, 64, 65, 66, 166, 203, 211-223).

---

[12] The "use in commerce" requirement of the Lanham Act is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause. The "history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause." *Buti v. Perosa, S.R.L.,* 139 F.3d 98, 102 (2d Cir. 1998) (internal quotations and citations omitted), *cert. denied,* 525 U.S. 826, 119 S.Ct. 73, 142 L.Ed.2d 57 (1998).

It is well-recognized that use of a domain name, containing another's Distinctive and Valuable Mark, to disseminate information on the internet or redirect internet users to sites containing links to advertisers/businesses, constitutes the requisite "use." A defendant does not actually have to cause goods or services to be placed into the stream of commerce in order to satisfy the "use" requirement. *Jews for Jesus v. Brodsky,* 993 F. Supp. 282, 309 (D.N.J. 1998). The term "services" has been interpreted broadly to include the dissemination of information and redirection of internet users to web sites containing hyperlinks to commercial operations offering goods and services. *Id.;* see also *People for Ethical Treatment of Animals, Inc. v. Doughney,* 113 F. Supp. 2d 915 (E.D. Va. 2000), *United We Stand America, Inc. v. United We Stand America New York,* 128 F.3d 86, 89-90 (2nd Cir. 1997) (citations omitted). In *PETA,* the court explained that: "(u)se of a misleading domain name has been found to be "in connection with the distribution of services" when it impacts the Plaintiff's business:

> [I]t is likely to prevent Internet users from reaching [PETA]'s own Internet web site. The prospective users of [PETA]'s services who mistakenly access Defendant's web site may fail to continue to search for [PETA]'s own home page, due to anger, frustration, or the belief that the Plaintiff's home page does not exist. *Id., citing Planned Parenthood Fed'n of Am., Inc. v. Bucci,* 1997 WL 133313, at *3 (S.D.N.Y. 1997), *aff'd,* 152 F.3d 920 (2d Cir. 1998), *cert. denied,* 525 U.S. 834 (1998); *Jews for Jesus,* 993 F. Supp. at 309.

Courts have, in fact, found a range of activities to qualify as "use" for purposes of a trademark infringement claim. In *OBH, Inc. v. Spotlight Magazine, Inc.,* 86 F. Supp. 2d 176 (W.D.N.Y. 2000), the court found that: "(t)he national, and even international, nature of the Internet itself makes defendants' use of plaintiffs' trademark as a domain name a "use in commerce" for purposes of the Lanham Act." *OBH,* F. Supp. 2d at 186 (citing, *Planned Parenthood,* 1997 WL 133313, at *3; *Intermatic, Inc. v. Toeppen,* 947 F.Supp 1227, 1239-1240 (N.D. Ill. 1996)). In *International Profit Assocs. v. Paisola,* 461 F. Supp. 2d 672 (N.D. Ill.

29

2006), the court held that plaintiff's trademark infringement claim was likely to succeed where defendant had "established a domain name for one of his websites ... that is confusingly similar to [the plaintiff]'s trademark." *Paisola,* 461 F. Supp. 2d at 677; s*ee also Educational Tours, Inc. v. Hemisphere Travel, Inc.*, 2004 WL 887417 (N.D. Ill. 2004) (refusing to dismiss trademark infringement claim and finding that plaintiffs sufficiently alleged "use" where defendants "'registered the domain names 'e-educationaltours.com' and 'e-educationaltours.net,' that are slight misspellings of [the plaintiff]'s mark and related domain name 'et-educationaltours.com'"); *Mirage Resorts v. Stirpe*, 152 F. Supp. 2d 1208, 1217 (D. Nev. 2000) ("Clearly, offering to lease Plaintiffs the use of their own trademarks [in domain names registered by the defendant] is a commercial use of Plaintiffs' trademarks in commerce.").

Oversee incorrectly argues that Class Plaintiffs must allege that Oversee "communicated the marks to the public as indicators of the source or origin of goods and services." (Oversee MTD at 3). That is not a required element under §1114. While that is certainly one use of a trademark that satisfies the "use" element of a Lanham Act claim, it is not the only qualifying use. Indeed, even a casual reading of the cases cited by Oversee makes clear that "use" cannot be construed nearly as narrowly as Oversee suggest.

First, Oversee cites the discussion of "use" in *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 879 (N.D. Ill. 1999). (Oversee MTD at 3). That discussion, however, is not about an infringing *defendant's* use of the mark, but rather involves the "use" that a *plaintiff* trademark owner must make of a mark in order to gain trademark protection in the first place. *See Planet Hollywood*, 80 F. Supp. 2d at 879 ("Distinctiveness is only one element necessary to establish the right to trademark protection. A trademark owner must also show that a mark has been used in public."). In other words, it is the trademark

*owner's* use of a distinctive mark to "identify or distinguish the marked goods in an appropriate segment of the public mind" as having a particular source or origin that entitles a mark to protection against infringement. *Id*. That is the "use" discussed in *Planet Hollywood* – not the "use in commerce" that a defendant must make in order to infringe the mark once it qualifies for protection.

Oversee and Sedo also rely on *Lockheed Martin*. In that case, the defendant, Network Solutions, Inc. ("NSI") contracted with the National Science Foundation to be the "exclusive registrar of most Internet domain names." *Lockheed Martin,* 985 F. Supp. at 951. NSI performed two functions: (1) screening domain name applications against its registry to prevent repeated registrations of the same domain name; and (2) maintaining a directory linking domain names with the unique internet protocol "IP" numbers of domain name servers. *Id.* at 953. The court there held that "where, as with NSI, the pure machine-linking function is the only use at issue, there is no trademark use and there can be no infringement." *Id.* Nowhere did the *Lockheed Martin* court hold that the only trademark use that could give rise to infringement was communication of the marks to the public as indicators of source or origin. Instead, as Oversee acknowledges, the court in that case noted that NSI did not "trade on the value of domain names as trademarks" (Oversee MTD at 3), because a "domain name's correspondence to a trademark does not make the domain name any more valuable to NSI, whose only interest in a domain name is as a pointer to an IP number." (Oversee MTD at 3.) Here, to the contrary, the Deceptive Domain Names' correspondence to a trademark *does* make the domain name more valuable to defendants. In fact, the Deceptive Domain Names' similarity to the corresponding trademarks is the very thing that gives them value to the defendants.

31

Even if the "use" element of an infringement claim was limited to communicating marks as sources of origin, which it is not, Class Plaintiffs have alleged facts that would establish such a use. It is well-settled that a domain name "identifies a place on the Internet where a 'home page' or 'web site' can be located."  4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§25:71, 25:72 (4th Ed. 2000), and signifies its "source of origin."  *Patmont Motor Werks, Inc. v. Gateway Marine, Inc.,* 1997 WL 811770, at *4 n. 6 (N.D. Cal. 1997); *see also Intermatic,* 947 F. Supp. at 1230-32.  Internet users generally will assume that a domain name that consists of a famous mark is associated with or sponsored by the owner of that mark. *Ty, Inc. v. Agnes M.,* 2001 WL 1414201 (N.D. Ill. 2001); *Ford Motor Co. v. Ford Financial Solutions,* 103 F. Supp. 2d 1126, 1128 (N.D. Iowa 2000); *Brookfield,* 174 F.3d at 1055; *PETA,* 113 F. Supp. 2d at 920.

Class Plaintiffs specifically allege that the Deceptive Domains are likely to "deceive the relevant public" that the pop-up and other advertisements "are authorized, sponsored or approved by, or are affiliated with" Class Plaintiffs.  (FAC¶363).  That deception or confusion is caused directly by Defendants unauthorized use of Deceptive Domains that contain Class Plaintiffs' and the Class Members' Distinctive and Valuable marks.  By (1) registering domain names and/or licensing domain names that are colorable imitations of Class Plaintiffs' marks and (2) maintaining websites that display those colorable imitations in the address bar when a user mistypes the actual trademark, Oversee has communicated the trademarks and/or colorable imitations to internet users.[13]

---

[13]    The term "colorable imitation" is defined to include "any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive."  15 U.S.C. §1127. Oversee has not contested that the Deceptive Domains are colorable imitations of the plaintiffs'

Here, of course, Class Plaintiffs explicitly allege that the value to defendants of the Deceptive Domain Names is due to their resemblance to established trademarks, FAC¶¶175-89 (explaining monetization scheme), and thus that defendants "trade on the value of domain names as trademarks." *Bird*, 289 F.3d at 879 (*citing Lockheed Martin*, 985 F. Supp. at 960).

Oversee also relies on *Bird*.  However, as discussed above, Bird in no way supports Defendants' arguments. *See discussion Supra at C1(c)(ii).*

### b.    Class Plaintiffs Adequately Allege Likelihood of Confusion

Oversee asks this Court to dismiss Class Plaintiffs' trademark clams because of a claimed failure to allege that Oversee *caused* a likelihood of confusion with respect to the source of sponsorship of goods or services.[14]  In support of its argument, Oversee relies on a Sixth Circuit case, *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619 (6th Cir. 1996), and contends that Class Plaintiffs, at most, allege that Oversee made itself the beneficiary of *preexisting* confusion from consumers' own, self-caused typographical errors.  (Oversee MTD at 5).  Oversee is wrong and its reliance on *Holiday Inns* is misplaced.[15]

---

marks, and admits that the existence of a "likelihood of confusion" is a question of fact not properly resolved on a motion to dismiss.  (Oversee MTD at 5, n 6.)

[14]   As noted, Oversee admits that the likelihood of confusion is a fact-sensitive issue that cannot be resolved on a motion to dismiss.  Oversee MTD at 5 n 6.  *See also GEICO v. Google*, 330 F. Supp. 2d 700, 704 (E.D. Va. 2004) ("Whether defendants' uses … create a likelihood of confusion [is a] fact-specific issue[] not properly resolved through a motion to dismiss.").

[15]   When examining whether defendants' use of a trade name in their domain names creates a likelihood of confusion among consumers, courts in this circuit generally consider seven factors: "(1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the complainant's mark, (6) any evidence of actual confusion, and (7) the defendant's intent (or lack thereof) to palm off its products as that of another."  *Trans Union v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1043-44 (N.D. Ill. 2001) (quoting *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461-62 (7th Cir. 2000)). "The weight given to each of these factors differs from case to case.  *Id.* at 462. 'At the same time, although no one factor is decisive, the similarity of the marks, the intent of the defendant,

33

"To succeed on a claim for Section 1114 trademark infringement, the plaintiff need only show that Defendant's use of the mark is likely to cause confusion in the consuming public." *Mirage Resorts*, 152 F. Supp. 2d at 1216 (finding that plaintiffs were entitled to summary judgment where defendants admitted that consumers were likely to be confused by the similarity between defendants' domain names and plaintiffs' trademarks). *See also Paisola*, 461 F. Supp. 2d at 676 (§1114(a) claim requires plaintiff to show that it has registered its marks, that defendants used the marks without its consent, and that the unauthorized use is likely to confuse consumers or deceive the public). In mischaracterizing itself as a mere beneficiary of preexisting confusion, Oversee attempts to divert attention away from its "use of the mark." However, the real issue remains whether Oversee's "*use* in commerce ... of a registered mark ... is likely to cause confusion ... ." 15 U.S.C. §1114(1)(a) (emphasis added). Requisite "confusion" may indeed result from a defendant's allegedly infringing use of a plaintiffs' mark in its domain name. *See*, *e.g.*, *Paisola*, 461 F. Supp. 2d at 676-77 (finding that defendants' use of terms trademarked by IPA as search terms in Google's AdWords program was likely to cause confusion, and that defendant's domain name for one of his websites was confusingly similar to plaintiff's trademark); *Trade Media Holdings Ltd. v. Huang & Assocs.*, 123 F. Supp. 2d 233, 242 (D.N.J. 2000) (holding that defendant's use of a domain name with a mark virtually identical to plaintiff's mark to operate a website on the Internet was a "use in commerce" that would likely cause confusion).

Courts have also considered and rejected the *Holiday Inns* case as a basis for finding no likelihood of confusion in connection with Internet websites. For example, in *Brookfield*, the

---

and evidence of actual confusion are the most important considerations.' *Id.*" *Trans Union*, 142 F. Supp. 2d at 1041.

Ninth Circuit expressly rejected *Holiday Inns* in holding that an entertainment-industry information provider established a likelihood of success on its trademark infringement claim that a video rental store chain's use of "MovieBuff" in its domain name would create a likelihood of confusion. *Brookfield,* 174 F.3d at 1065; *see also Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1325 (9th Cir. 1998) (also distinguishing *Holiday Inns* as a case in which defendant used a phone number rather than a trademark and held that defendant's registration of plaintiff's marks in an Internet domain name was a "commercial use" under the dilution statutes).

Here, Class Plaintiffs have specifically alleged affirmative, intentional actions by Oversee and other Defendants in that they taste, register, license, own, traffic in, and/or otherwise utilize and control Deceptive Domains that are identical and/or substantially similar to Plaintiffs'; these actions were taken in order to unlawfully generate revenue from infringing/using Plaintiffs' Marks, as evidenced by, among other things, bold placement of competitor, revenue generating advertisements for similar goods or services on the deceptive domains and utilization of Domain Redirection techniques. *See*, *e.g.*, FAC, ¶¶ 47-49, 65, 89, 139-40, 142-222.

Furthermore, Class Plaintiffs also allege initial interest confusion by the general public. FAC¶¶348-51. *See also Promatek*, 300 F.3d at 813 (recognizing that initial interest confusion occurs when consumers are led to an unintended website); *Trans Union*, 142 F. Supp. 2d at 1043-1044 (when customers seeking a particular website are diverted by allegedly infringing domain names and metatags to a competing website, and where they realize they have accessed a site they were not looking for but decide to use offerings of the infringing site, this weighs in favor of finding actual confusion); *800-Jr Cigar v. Goto.com*, 437 F. Supp. 2d 273, 290-92 (D.N.J. 2006) (initial interest confusion supports a violation of the Lanham Act).

35

3. **Class Plaintiffs Properly Allege, Against All Defendants, a Claim for Common Law Trademark Infringement for which Relief can be Granted (Count IX)**

Common Law Trademark claims are subject to the same analysis as Lanham Act claims. *JouJou Designs, Inc. v. JoJo Ligne Internationale, Inc.*, 821 F. Supp. 1347, 1353 (N.D.Cal. 1992).

4. **Class Plaintiffs State a Claim for False Designation of Origin Under 15 U.S.C. § 1125(a)  (Count V)**

Oversee, Google, Sedo and IREIT bring motions to dismiss Class Plaintiffs' False Designation of Origin claim under 15 U.S.C. §1125(a).  Defendants' arguments regarding false designation of origin under 15 U.S.C. §1125(a) are primarily a rehash of their arguments regarding trademark infringement under 15 U.S.C. §1114.  For example, Oversee repeats its argument that Class Plaintiffs have not alleged the "use" element of the claim, adding only one new case citation.  (Oversee MTD at 8).  The single new case, *Academy of Motion Picture Arts and Sciences v. Network Solutions, Inc.*, 989 F. Supp. 1276 (C.D. Cal. 1997), is part of a string-cite supporting a proposition with which Class Plaintiffs agree:  That NSI, the exclusive registrar of domain names ending in .com, .net, .edu and .gov under a contract with the National Science Foundation, does not use trademarks in connection with goods and services when it performs its automated, ministerial function of registering and cataloguing domain names, charging the same fee for each domain without regard to whether it is similar or identical to a registered mark.

Defendants here, of course, are alleged to do much more than perform a ministerial function.  Defendants are alleged to intentionally "identify", "register", "taste", and "park" domain names which are known to be deceptively similar to registered marks, for the express purpose of monetizing and profiting from them.  (*See, e.g.,* FAC¶¶83(m), 198-203 (defining and

explaining defendants' practice of "domain tasting"), FAC¶¶83(u), 175-94 (defining

monetization and explaining system of profiting from parked domain names through the use of

advertising on Deceptive Domains)).

Oversee then makes the argument that the allegations that "Defendants" provided false

contact information in connection with their registration of, trafficking in and maintaining the

Deceptive Domains are not sufficient because they do not specifically identify Oversee.  Oversee

cites no authority for this and with good reason – Class Plaintiffs are not required to repeat the

names of each Defendant when making factual allegations that apply to all Defendants.

Finally, Defendants' unsupported arguments that Deceptive Domains are neither goods

nor services (Oversee MTD at 8; see also Google MTD at 13, Sedo MTD at 9-10) miss the mark.

First, a domain does provide a service:  it connects an internet user to the numerical IP address of

a website.   Class Plaintiffs claim that Defendants hijack and redirect "Internet traffic to

defendants' Deceptive Domains that contain 'pay-per-click/cost-per-click'" advertising."

(FAC¶165; *see also* FAC¶173.)  It does not matter that Defendants do not attach the mark to a

physical product for sale.  *Panavision*, 141 F.3d at 1325.  Defendants do attach the mark to the

Deceptive Domain (inherent in the name) and then intentionally profit from consumers' mistake

in attempting to reach a particular website.[16]

More importantly, 15 U.S.C. §1125(a)(1) requires only that a defendant use any word,

term, name, symbol, or device or any false designation of origin "**in connection** with any goods

or services."  (Emphasis added.)  Advertising, of course, is a service, and often the thing being

advertised is a good or service. *OBH,* 86 F. Supp. 2d at 176; *PETA,* 113 F. Supp. 2d at 920; *Jews*

---

[16]  A domain name identifies the source of the information on the attached website.  *Panavision*,
141 F.3d 1316, 1325.  Thus, when a user types in a specific domain name containing the mark of
a company, they expect to retrieve that company's web page.  *Id.*

*for Jesus,* 993 F. Supp. at 309.  None of the Defendants can deny that their monetization of Deceptive Domains – which is done entirely through advertising – is not "in connection" with goods or services.

### 5.    Class Plaintiffs State a Claim for Trademark Dilution Under 15 U.S.C. §1125(c)

Oversee, Google, Sedo and IREIT bring motions to dismiss alleging that Class Plaintiffs fail to state a viable "Dilution" claim under 15 U.S.C.§1125(c).  Dilution is the "lessening of the capacity of a famous mark to identify and distinguish goods or services."  15 U.S.C. §1127; *see also Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1012 (9th Cir. 2004) ("The point of dilution law is to protect the owner's investment in his mark").  To plead dilution, Class Plaintiffs must allege that:  1) plaintiff's mark is famous, 2) defendant adopted its domain name after plaintiff's mark became famous, 3) defendant's use of its domain name causes dilution of plaintiff's mark, and 4) defendant's use of its domain name is commercial.[17]   15 U.S.C. §1125(c); *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000); *Papa John's Int'l, Inc. v. Rezco*, 446 F. Supp. 2d 801, 808 (N.D. Ill. 2006).

Defendants Google, Sedo, and Oversee argue that Class Plaintiffs' use of "and/or" in the allegations that their marks are "distinctive, protected/protectible and/or famous" is "fatal" because the marks must be alleged to be famous in order to state a claim for dilution.  (Oversee MTD at 9; Google MTD at 14-16; Sedo MTD at 12).  In making said argument, Defendants Google, Sedo, and Oversee ignore the fact that the specific allegations relating to each separate

---

[17]  Defendant does not argue that its use occurred before plaintiffs' marks became famous.

Class Plaintiff's marks do, in fact, clearly establish which marks are alleged to be famous.[18]  For example, the FAC allegations for the marks owned by JBSS allege those marks are specifically alleged to have been featured on the internet, in various forms of media advertisements and in stores "throughout the United States," and to be "widely known and recognized among consumers."  (FAC¶31, 33).  Vulcan Golf alleges that its marks are "unique and distinctive" and "widely known and recognized among consumers and members of the golfing community."  (FAC¶¶24, 25).  Additionally, Vulcan's mark has been featured on the Internet and publicized throughout the United States.  (FAC¶¶22, 26).[19]  Class Plaintiff Jackson is a famous athlete who achieved further national commercial fame through the "Bo Knows" advertising campaign.  (FAC¶¶53, 55-61).  Jackson's dilution claim pertains to his name in conjunction with his fame and the "Bo Knows" marketing campaign.  (FAC¶59, 61-63, 65).  Indeed, Defendant's entire purpose of utilizing the Deceptive Domain names "nobojackson.com" and "aintnobojackson.com" is to profit from people who search for Jackson based on the "Bo Knows" campaign.  Accordingly, Jackson has adequately alleged that his mark is famous and protected under section 1125(c).

The "use" element of a dilution claim requires proof that the mark was used "in commerce" and that the use was "commercial."  *Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227, 1239 (N.D. Ill. 1996).  The Act defines "use in commerce" as use "in the ordinary course of

---

[18]  Oversee's comment that there are "potentially millions" of marks at issue in this putative class action is premature.  At this stage, the only claims at issue are those of the named plaintiffs.  Issues relating to manageability of the claims of absent class members, such as dividing plaintiffs in sub-classes for famous and non-famous marks for purposes of the dilution claim, are appropriately addressed, if ever, during the class certification stage of this proceeding.

[19]  Those allegations clearly establish the required fame.  *See Ty Inc. v. Perryman*, 306 F.3d 509, 511 (7th Cir. 2002) (noting that fame cannot be local but can exist in national niche markets); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 640-641 (7th Cir.1999) (same).

trade." 15 U.S.C. §1127. "Use of the Internet is sufficient to meet the 'in commerce' requirement of the Act." *Intermatic,* 947 F. Supp. at 1240; *see also Nissan Motor Co.*, 378 F.3d at 1012 (use of "Nissan" mark in conjunction with "computers" in domain name constitutes use "in commerce"). Class Plaintiffs allege Defendants diluted their marks through the use of Deceptive Domains on the Internet. (FAC¶¶152, 175-83, 212, 215, 222, 228, 231 and 258). Defendants strategically used and intended to profit from its billion dollar marketing and advertising business. (FAC¶¶258, 261). Thus, Class Plaintiffs have adequately pleaded the "in commerce" element of dilution.

Sedo contends "innocent third party users of a trademark or service have no duty to police the mark." (Def. Cons. MTD at 13). Sedo is once again trying to analogize its actions with the mere registration of domain names like NSI in *Lockheed Martin*. But Defendants' actions are unlike NSI's. Class Plaintiffs do not allege Defendants merely provided a resting place for a domain name.

Defendants next argue that Class Plaintiffs have failed to properly plead the use has caused dilution of the protected marks. (Sedo MTD at 14; IREIT MTD at 8; Oversee MTD at 8-9). Dilution by tarnishment occurs when the reputation of the protected mark is harmed by association to an inferior mark. *Eli Lilly & Co.*, 233 F.3d at 466; *see also* 15 U.S.C. §1125(c) ("'Dilution by tarnishment' is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.").

The FAC plainly sets forth facts establishing that Defendants' use has caused dilution by tarnishment because the protected marks are associated with Deceptive Domain names that provide a service or product not controlled or authorized by Class Plaintiffs. (FAC¶¶3, 148-149, 166, 173, 273, 379, 395, 397). Defendants knowingly engage in a scheme that redirects internet

40

traffic to websites based on a Deceptive Domain that contains revenue generating advertising. (FAC¶¶165, 175, 178, 220, 221).  The Deceptive Domain name is designed and intended to capture Internet users who mistype the web address relating to Class Plaintiffs' protected marks. (FAC¶¶179, 180).  It is not necessary that the consumer confuse the source of the service or products.  *Am Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002).  The mere fact that Class Plaintiffs' marks could be associated with unsavory advertising and lesser quality products is sufficient.  *See Eli Lilly & Co.*, 233 F.3d at 466 (tarnishing where mark associated with inferior products); *Victoria's Cyber Secret,* 161 F. Supp. 2d at 1355 (tarnishing where mark associated with adult sites).

Dilution by blurring occurs "by the 'whittling away' of the selling power and value of the trademark." *Panavision Int'l, L.P. v. Toeppen*, 945 F. Supp. 1296, 1304 (C.D. Cal. 1996) *aff'd* 141 F.3d 1316 (9th Cir. 1998); *see also Eli Lilly & Co.*, 233 F.3d at 466 (describing blurring as harm to the distinctiveness of the mark by association to a "plethora of goods and services").

Prohibited use of a mark in a domain name clearly dilutes a protected mark by lessening the owner's capacity to identify its products to potential customers.  *Intermatic Inc.*, 947 F. Supp. at 1236.  Redirecting a customer to an unintended website through the use of similar marks may discourage the consumer from reaching the intended website and in turn dilutes the protected mark.  *Panavision II*, 141 F.3d at 1327.  Here, Defendants intentionally use virtually identical marks (Deceptive Domains) to redirect consumers.  (FAC¶158, 203, 222).  As a result, Class Plaintiffs do not have the ability to control the association of their protected marks and have suffered damage to their good will.  (FAC¶¶219, 220, 383).  Consumers may become discouraged in attempting to find the intended web page because they are redirected to numerous other deceptive sites.  (See FAC¶203 for a sample list).  This creates a direct dilution in value of

Class Plaintiffs' trademarks.  (FAC¶217).  Accordingly, Class Plaintiffs have properly pleaded the dilution element.

### 6.      Class Plaintiffs Have Sufficiently Alleged Contributory and Vicarious Infringement

Class Plaintiffs have clearly set forth claims of Contributory Trademark Infringement and Vicarious Trademark Infringement for which relief can be granted.  Defendants contend that Class Plaintiffs' contributory and vicarious trademark infringement claims are flawed because Class Plaintiffs have not pleaded an underlying direct infringement to support these claims or their elements.[20]  Defendants are wrong.  As demonstrated below, Defendants' arguments to the contrary are without merit.

### a.      Contributory Trademark Infringement

The law establishing contributory trademark infringement liability is well-established.  *See Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 844-46, 102 S.Ct. 2182, 2184, 72 L.Ed.2d 606 (1982).  In *Inwood Laboratories,* the U.S. Supreme Court said that contributory trademark liability is applicable if defendant (1) intentionally induces another to infringe on a trademark or (2) continues to supply a product knowing that the recipient is using the product to engage in trademark infringement.  *Inwood* at 854-55, 102 S.Ct. at 2188-89.  S*ee also Hard Rock*

---

[20]  Plaintiffs and Google appear to agree on the standard formulation of a claim for contributory trademark infringement.  Google's quotation from *Watts v. Network Solutions, Inc*., 1999 WL 994012, *2 (7th Cir. 1999), itself cites the Supreme Court's holding in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc*., 456 U.S. 844, 853-54 (1982), also cited by Google, and it is functionally equivalent to Class Plaintiffs' allegation in paragraph 425 of the FAC.  Google MTD at 9.  Google, however, chooses to limit the remainder of the argument only to those portions of Class Plaintiffs' FAC that it can hope to describe as conclusory, ignoring, for example, the eleven categories of conduct attributed to Google by Class Plaintiffs, including, among other things, Google's active seeking, solicitation and promotion of advertising for placement on Deceptive Domains and payment to its partners on the basis of advertising revenue generated from use of the Deceptive Domains.  (FAC¶431.)

*Cafe,* 955 F.2d 1143; *Days Inns Worldwide v. Lincoln Park Hotels*, 500 F. Supp. 2d 770, 775-776 (N.D. Ill. 2007).

As with other infringement claims (i.e., copyright infringement), contributory trademark infringement has its roots in "tort law and stems from the notion that one who directly contributes to another's infringement should be held accountable." *Fonovisa, Inc. v. Cherry Auction, Inc.* 76 F.3d 259 (9th Cir. 1996), *citing Sony Corporation of America, et al. v. Universal City Studios, Inc., et al.,* 464 U.S. at 417, 104 S.Ct. 774, 774-776 (1984); 1 Niel Boorstyn, Boorstyn On Copyright § 10.06[2], at 10-21 (1994) ("In other words, the common law doctrine that one who knowingly participates in or furthers a tortious act is jointly and severally liable with the prime tortfeasor, is applicable under copyright law").  The *Fonovisa* Court explained: "The classic statement of the doctrine is in [*Gershwin Publishing Corporation v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971)]:  "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."  *See also Universal City Studios v. Sony Corp. of America,* 659 F.2d 963, 975 (9th Cir. 1981), *rev'd on other grounds,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (adopting *Gershwin* in this circuit).  *Hard Rock Cafe,* 955 F.2d 1143.

In *Fonovisa*, the plaintiffs brought a copyright and trademark enforcement action against the operators of a swap meet, based on third-party vendors routine sales of counterfeit recordings that infringe on the plaintiff's copyrights and trademarks.  *Fonovisa,* 76 F.3d 259.  The *Fonovisa* court found that the defendants provision of "support services for swap meet, including space, utilities, parking, advertising, plumbing, and customers" in combination with defendants' knowledge of the sales of counterfeit recordings sufficient to establish contributory trademark

and copyright infringement. *Id. at* 264. The Seventh Circuit, in a factually similar "swap meet" case, also held appropriate the imposition of liability for contributory trademark infringement against the owners of a flea market. *Hard Rock,* 955 F.2d 1143. In both instances, the flea market defendants had less control over the trademark infringements, and most certainly did less to "induce, cause or materially contribute" to the infringing conduct than Defendants in the instant action.

Defendants' contention that Class Plaintiffs have failed to allege the elements of a contributory infringement claim lacks merit. (FAC¶¶423-435). In this regard, *GEICO v. Google, Inc.*, 330 F. Supp. 2d 700 (E.D. Va. 2004), a case that should be familiar to Google (but which, tellingly, none of the Defendants cited), is instructive. In *GEICO*, an insurance company sued Internet search engine operators for infringement of its trademark and related state law torts based on the defendants' use of GEICO trademarks in selling advertising on defendants' Internet search engines. As in the instant action, one of the defendant search engine operators, Overture, argued for dismissal of the contributory infringement count on the grounds that GEICO had not pled either intentional inducement to infringe or that defendant continued to supply a product while having actual or constructive knowledge of infringement. *GEICO*, 330 F. Supp. 2d. at 705. The court rejected Overture's challenge to GEICO's allegations:

> GEICO has alleged that Overture encourages advertisers to bid on trademarked words, and monitors and controls the allegedly infringing third-party advertisements. Although Overture argues that its monitoring is intended to prevent, not encourage, trademark infringement, that argument raises a disputed fact that cannot be resolved by a motion to dismiss. **The claim that Overture monitors and controls the third-party advertisements is sufficient to plead the actual or constructive knowledge required to allege contributory infringement.** *Size v. Network Solutions, Inc.,* 255 F. Supp. 2d 568, 573 (E.D. Va. 2003) (Brinkema, J.) (*citing Lockheed Martin Corp. v. Network*

44

*Solutions, Inc.,* 194 F.3d 980 (9th Cir. 1999)).

*GEICO*, 330 F. Supp. 2d. at 705 (emphasis added).[21]

Here, as in *GEICO*, the allegations plainly set forth conduct that constitutes the elements of a claim for Contributory Trademark Infringement. The FAC details how each Defendant intentionally cooperates in transactions which collectively constitute complete infringement of Class Plaintiffs' and the class members' Distinctive and Valuable Marks. (FAC¶152, 165, 166). For example, the FAC alleges that the Parking Company Defendants intentionally taste, register, and otherwise assist domain registrants in procuring Deceptive Domains for the express purpose of monetization with Google advertisements; enter into agreements with the domain registrants for licenses and rights to control, monitor, maintain, use and place advertising on their domains, including Deceptive Domains; and cause popups or popunder advertisements on the Deceptive Domains and receive money for each popup or popunder displayed, in furtherance of the Deceptive Domain Scheme. (FAC¶¶148-174). Thus, Class Plaintiffs allege that the Parking Company Defendants, among other things, encourage (*i.e.*, induce) domain registrants to procure Deceptive Domains, taste Deceptive Domains, lease the Deceptive Domains from registrants, enter into agreements (sublease) with Google to monetize the Deceptive Domains, and together with Google, monitor, evaluate, analyze, report on, generate and share revenue from and otherwise control the Deceptive Domains and the advertising contained thereon. (FAC¶¶430-432) (allegations that Defendants encourage and induce the illegal conduct).[22]

---

[21]    Although it is Class Plaintiffs' understanding that the claims brought by GEICO were eventually defeated at trial on the merits, the instant action involves a different trademark use and, as in *GEICO*, should be allowed to proceed based on Class Plaintiffs' well-pleaded allegations.

[22]    Like Oversee and Sedo, Defendant IREIT owns and *actively manages* numerous domain names, many of which are Deceptive Domains. IREIT participated in the Deceptive Domain

The FAC also contains allegations that Google intentionally induced infringement and continued to supply a product while having actual or constructive knowledge of infringement of Class Plaintiffs' trademarks.  Specifically, Class Plaintiffs allege that Google orchestrates the Deceptive Domain Scheme by engaging in a variety of actions, including but not limited to: entering into agreements with Parking Company Defendants, parking companies, domain owners and advertisers (FAC¶102, 149, 241(l)); creating and implementing the AdSense and AdWords programs (FAC¶93, 99); controlling the advertising revenue generated from the use of Deceptive Domains (FAC¶135); controlling the source, content, and placement of advertisements on Deceptive Domains (FAC¶133); controlling the type of internet advertising that is used to monetize Deceptive Domains (FAC¶139); providing performance reporting (including details on volume of traffic, number of clicks, revenue, etc.) on each and every Deceptive Domain (FAC¶¶116, 128); and development and use of sophisticated proprietary software to effectuate the Deceptive Domain Scheme.  (FAC¶¶7(g), 101, 152(b)).  All of the Defendants also engage in masking, redirecting, hijacking, and other fraudulent acts and concealment.  (FAC¶¶119, 156).

Defendants' reliance on *Lockheed Martin*, 985 F. Supp. at 949, is misplaced.  In *Lockheed*, the court specifically distinguished the nature of the role played by the defendant in connection with domain names from the role played by companies like Google.  *See Gucci America v. Hall & Associates*, 135 F. Supp. 2d 409, 416 (S.D.N.Y. 2001) ("*Lockheed Martin* does not foreclose the possibility that ISPs may be liable for contributory trademark infringement.").  In *Lockheed*, unlike here, the defendant merely maintained a registry of domain names.  In the present case, however, Class Plaintiffs allege that Defendants have done much

---

Scheme and exerted the same ownership and control as the other Parking Company Defendants. (FAC¶¶76, 83(w), 165-210).

more than just register and sell domain names as did the defendant in *Lockheed*. *Gucci America*, 135 F. Supp. 2d at 416 n.14 (noting that *Hard Rock Café* and *Fonovisa, Inc.* held that a defendant can be held liable for contributory trademark infringement under the test set forth in *Inwood* where defendant exercises direct "control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark"). Thus, Class Plaintiffs' allegations at a minimum describe the same type of actionable conduct – monitoring and controlling of advertisements – that the *GEICO* court held to be sufficient to plead the actual or constructive knowledge required to properly allege a contributory trademark infringement claim. Accordingly, the elements of Class Plaintiffs' contributory infringement claim are properly alleged and the claim should therefore not be dismissed.

Finally, certain Defendants contend that Class Plaintiffs have failed to properly allege the underlying direct infringement in that the challenged domains make a trademark use of Class Plaintiffs' marks or are the cause of any confusion as to the source or origin of goods or services.[23] (*See, e.g.*, Oversee MTD., 10; Sedo MTD, 16). This is incorrect for the reasons stated above. Thus, this repeated basis for dismissing the FAC should once again be rejected.

### b. Vicarious Trademark Infringement

The Seventh Circuit has long recognized vicarious liability for the trademark infringement by another. *David Berg & Co. v. Gatto Int'l Trading Co.,* 884 F.2d 306 (7th Cir. 1989). Vicarious trademark infringement liability lies where a defendant and the infringer have an apparent or actual partnership, and have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product. *Hard Rock Café*,

---

[23] The FAC alleges that the Defendants' use of Deceptive Domains constitutes the underlying Direct Infringement. (FAC¶¶427-429); *see R2 Medical Systems, Inc. v. Katecho, Inc.*, 931 F. Supp. 1397 (N.D. Ill. 1996).

955 F.2d at 1150.   Citing *Hard Rock Cafe*, a single case that declines to apply vicarious

trademark liability, Google argues that it is immune from suit for vicarious trademark

infringement.   (Google MTD at 10-11) (misinterpreting *Hard Rock Café* as holding that

vicarious trademark infringement liability is not available under Seventh Circuit law).   But

Google's authority actually supports the viability of this claim in holding that "a joint tortfeasor

may bear vicarious liability for trademark infringement by another." *Hard Rock Café*, 955 F.2d

at 1150.[24]   Thus, Google's argument that the Seventh Circuit rejects vicarious trademark

infringement liability has no merit.

    Moreover, the FAC properly pleads vicarious infringement by Google.   For example, the

FAC plainly alleges that Defendants enter into agreements with each other to monetize and

transact in money generated from the Deceptive Domains.   (FAC¶¶136, 147).   Defendants act in

concert to effectuate the Deceptive Domain Scheme.   (FAC¶¶165-174).   Defendants enter into

license and other agreements with third parties and domain owners to aggregate, control, use and

monetize Deceptive Domains.   (FAC¶148).   With respect to Google, the FAC alleges that it

enters into agreements with parking companies and other third parties to monetize and share

revenue from monetization of Deceptive Domains (FAC¶¶149-150), controls the advertisements

(FAC¶¶229(b), 431(c)), controls the participation of Deceptive Domains (FAC¶¶7(b), 138),

selects ads for monetization of domains (FAC¶152(b)), provides ads to the Deceptive Domains

(FAC¶229(b)), and provides performance reporting on each Deceptive Domain (FAC¶152(e),

(g)).   Further, FAC¶133 alleges that Google "analyzes, evaluates, … controls and maintains

advertisements" on the Deceptive Domains.   FAC¶138 specifically alleges that "Google has the

---

[24]   It is worth noting that Defendant Oversee acknowledges this very holding by the Seventh
Circuit in *Hard Rock Café* regarding the viability of a vicarious liability claim.   (Oversee MTD
at 11).

48

ability to block any domain from displaying" Google ads.  The FAC further alleges that Google's computers receive information about each domain showing Google ads (FAC¶101), and that each ad is retrieved from Google's AdSense for Domains Network (FAC¶106).  These facts are more than sufficient to establish the requisite control required by the Seventh Circuit in *Hard Rock Cafe*.  Further, FAC¶¶119-123, 192-194 alleges masking and concealment by Google which supports a finding that Google is attempting to hide behind the "undercapitalized 'dummy' operations" to avoid liability when the mark holder eventually sues.  *See Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.,* 36 F.2d 354, 355 (7th Cir. 1929).

The dismissal arguments made by Defendants Oversee and Sedo also lack merit. Oversee and Sedo contend that Class Plaintiffs' vicarious trademark liability claim fails because Class Plaintiffs have not alleged an underlying direct infringement, simply relying on its earlier argument that no allegations exist that Oversee used the Class Plaintiffs' marks as a trademark or that the domains at issue caused a likelihood of confusion as to the source or origin of goods or services.  (Oversee MTD at 11).  This argument should be rejected for the same reasons that Class Plaintiffs already have discussed above.  *See GEICO*, 330 F. Supp. 2d at 705 (rejecting Google's reliance on repeated argument that complaint did not allege that third-party advertisers used GEICO trademarks in commerce, and finding that GEICO stated a claim for vicarious trademark infringement against Google).

Defendants Oversee, Sedo and IREIT also argue that Class Plaintiffs have failed to allege that these Defendants entered into any agreement, apparent or actual partnership, or joint ownership with any other party which exerted any sort of direct control over any other Defendants or users of their services.  Class Plaintiffs herein have alleged, however, that Defendants enter into agreements between each other that share ownership, control, and revenue

from the Deceptive Domains. (FAC¶¶148-149, 152, 438-443). The *GEICO* court held that such

allegations were sufficient to state a claim for vicarious liability:

> GEICO argues ... that vicarious liability can also occur if the
> defendant and the infringer "exercise joint ownership and control
> over the infringing product." *Hard Rock Licensing Corp. v.
> Concession Services, Inc.,* 955 F.2d 1143, 1150 (7th Cir.1992).
> Because GEICO has alleged that both Overture and the advertisers
> control the appearance of the advertisements on Overture's search
> results page and the use of GEICO trademarks therein, plaintiff has
> stated a claim for vicarious infringement against Overture.

*GEICO,* 330 F. Supp.2d at 705.

Contrary to Defendants' reaching assertions, as stated above, Class Plaintiffs have clearly

alleged a claim for vicarious liability for which relief can be granted. Accordingly, Defendants'

motions to dismiss Class Plaintiffs' vicarious trademark infringement claim should be denied.

### 7.    Innocent Infringer/Publisher Defense Argument

Google improperly seeks dismissal based on hyperextension of the innocent

infringer/publisher defense set forth in §1114(2) of the Lanham Act, which limits persons

bringing actions under §§1114(1) and 1125(a) to injunctive relief if the defendant is an "innocent

infringer." *See* 15 U.S.C. §1114(2). Google's MTD based on the "Innocent Infringer" defense

fails, because:

    a.    Innocent Infringer/Publisher Defense is inapplicable;

    b.    The FAC sets forth facts establishing that Google "knew or had reason to know"
          of the deceptive and infringing nature of the Deceptive Domains (FAC¶¶426,
          443);

    c.    Even if this Court later determines that Defendant Google is an "innocent
          infringer," the availability of injunctive relief makes dismissal inappropriate. (15
          U.S.C. §1114(2)(B)).

Additionally, whether Google is an "innocent infringer" is a question of fact, and is

therefore not amenable to disposition through Google's MTD.  *Dial One of the Mid-South, Inc. v. BellSouth,* 269 F.3d 523, 527 (5th Cir. 2001) (citing *St. Martin v. Mobil Exploration & Producing, Inc.,* 224 F.3d 402, 405 (5th Cir. 2000)).  The innocent infringer Defense is a "defense" that Google must set forth and prove.  It should not be determined at this stage in the litigation.

### a.    Innocent Infringer/Publisher Defense Is Inapplicable

The facts and claims set forth in the FAC are clearly outside the innocent infringer/publisher defense, which only offers a narrow exception for infringements occurring *within* the ads shown by a publisher.  15 U.S.C. §1114(2)(B).  The plain language is directly on point, immunizing only those infringements that are "*part of* paid advertising matter".  15 U.S.C. §1114(2)(B) (emphasis added).[25]

Google attempts to distort the plain facts of the FAC by couching itself as just a "publisher of paid advertising" and arguing that it is not responsible for infringing advertisements.[26]  Fatal to Google's argument is that the FAC does not challenge the content of advertising or the source of advertising utilized by Google.  In fact, the FAC does not allege any

---

[25]  15 U.S.C. §1114 provides in pertinent part:  "Where the infringement or violation complained of is contained in or is part of paid advertising matter in a newspaper, magazine, or other similar periodical or in an electronic communication as defined in Section 2510(12) of Title 18 United States Code, the remedies of the owner of the right infringed or person bringing the action under Section 43(a) [15 U.S.C. §1125(a)] as against the publisher or distributor of such newspaper, magazine, or other similar periodical or electronic communication shall be limited to an injunction against the presentation of such advertising matter in future issues of such newspapers, magazines, or other similar periodicals or in future transmissions of such electronic communications. The limitations of this subparagraph shall apply only to innocent infringers and innocent violators."

[26] The "Publisher Exception" was designed to apply in situations, for example, where a publisher of the *Wall Street Journal* printed, in their newspaper, an ad with the words "Koca Kola" that infringed the trademark of Coca Cola.  *See, e.g. Moxie Co. v. Noxie Kola Co. of New York,* 29 F. Supp. 167 (D.C.N.Y. 1939).

trademark infringement occurring within the text of ("part of") the ads Google distributes. Instead, the FAC alleges that Google's *use* of the Deceptive Domain (as the advertising venue) constitutes the infringement. It is not the advertisement itself, the content of the advertisements or the source of the advertisement that is illegal or infringing. Rather, the illegality lies in "where" the advertisement appears — the Deceptive Domain. This distinction is critical. Google may not permissibly show any ads — not for legitimate products, not for infringing parties, not even for itself – in connection with the Deceptive Domains. Google is far from "innocent" when it intentionally and knowingly uses and monetizes Deceptive Domains as an advertising venue — the use of the Deceptive Domain, not the content of the advertising, is illegal. Therefore, the innocent infringer/publisher defense does not apply.

### b.    Knowledge or Reason to Know the Domains Were Infringing

Google argues, in bad-faith ignorance of the plain language of the FAC, that Class Plaintiffs' failed to allege Google "had knowledge of or had reason to know" that the Deceptive Domains were infringing. (Google MTD at 4). Google implausibly asserts that "nowhere do Plaintiffs allege facts indicating that Google had any reason to know that the 'bad apple' domains identified in the complaint were infringing…." (Google MTD at 4). Google's absurd assertion begs the question whether it even read the FAC. The allegations of "knowledge and intent" prominently pepper the entire FAC, and are too numerous to reasonably regurgitate in this section. Further, whether Google has "knowledge or reason to know" is an issue of material fact. *Interscope Records v. Leadbetter,* 2007 WL 1217705 (W.D. Wash. 2007).

Google cites *Gucci*, 135 F.Supp 2d. at 420; *NBA Properties v. Untertainment Records, LLC* 1999 WL 1103006 (S.D.N.Y. 1999); *World Wrestling Federation, Inc. v. Posters, Inc,* 2000 WL 1409831 (N.D. Ill. 2000); and *New York Times v. Sullivan,* 376 U.S. 254 (1964) for the

proposition that whether Google is an "innocent infringer" should be determined by an "actual malice" standard that requires proof that Google acted either:  (1) with knowledge of the infringement or (2) with reckless disregard as to whether the material infringed the trademark owner's rights.  Google also nods at the line of cases adopting an "objective reasonableness" standard in determining "innocent infringer" status.  *See Dial One,* 269 F.3d at 526.

In *Dial One*, the court rejected the *New York Times* malice standard and adopted the objective reasonableness test to define an "innocent infringer."  *Id.* at 526.  The court noted the absence of a constitutional mandate to protect commercial speech, denied the existence of strong evidence of a congressional intent to effect substantive change, rejected the premise of an actual conflict between the First Amendment and private enforcement of the Lanham Act and found the logic of the actual malice standard inapplicable.  *Id.* at 526.

Class Plaintiffs submit that the appropriate test in the instant action is the objective reasonableness standard as adopted in *Dial One* and applied in *Conopco, Inc. v. Rosa Distributors*, 967 F. Supp. 1068 (N.D. Ill. 1997).  A defendant "is an innocent infringer only if, regardless of state of mind, its conduct is reasonable."  *Dial One,* 269 F.3d at 525.  Further, the "clear and convincing evidence" standard advanced by Google applies only in the context of proof of malice, and, then, in the context of defamation actions.  *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 510 (1991) does not stand for anything further.  Although Class Plaintiffs argue that the "objective reasonableness" standard is the more appropriate standard for determination of whether a defendant is an "innocent infringer,"[27] the FAC allegations more than

---

[27] The "actual malice" standard established in the case of *New York Times v. Sullivan* concerned constitutional protections for speech and press that prohibited a public official from recovering damages for a defamatory falsehood relating to their official conduct unless the statement was

satisfy the heightened "actual malice" standard.  Therefore, for the purposes of Google's Motion to Dismiss, the applicable standard is not relevant.

The very crux of Class Plaintiffs' claims is that Defendants engaged in a highly organized, intentional, and carefully contrived bad faith scheme.  (FAC¶¶1, 265).  The FAC so focuses on the "intentional and knowing" aspect of the scheme that 8 of the 13 first paragraphs in the FAC (introductory section alone) contain specific allegations alleging and demonstrating knowledge or "reason to know" that the Deceptive Domains are infringing **and** that the Deceptive Domain Scheme is illegal.  A cursory review of those first 8 paragraphs underscore the utter invalidity of Google's argument.  (FAC¶¶1-8.  Google's role in the Deceptive Domain Scheme is critically central and controlling, as set forth in (FAC¶7).  Additional examples include how FAC¶178 specifically alleges that "Google knowingly and intentionally allows tens of thousands of blatantly infringing 'www' domain names into the Google AdSense for Domains Network."; Google receives information, approves of, and controls advertisements on each and every domain showing Google advertisements (FAC¶133); Google knows and authorizes the Defendant Parking Companies and third party domain owners to utilize masked domain redirection techniques to hide Google's relationship with the Deceptive Domains (masked redirects prevent users from recognizing Google's role in placing, charging, and tracking a domain's advertising) (FAC¶194); and Google allows the Parking Company Defendants and other third parties to use their advertising programs/systems to "taste" Deceptive Domains to determine if Deceptive Domains are lucrative.  (FAC¶200-202).  Google is fully aware that the domain names it licenses, uses and traffics in are part of the Domain Tasting process (FAC¶202);

made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times* 376 U.S. at 280.

Google even continues monetizing disputed Deceptive Domains **after** the filing of the FAC in this action and repeated notice from Class Plaintiffs to stop. (FAC¶222).

The FAC also alleges Google's constructive knowledge of the Deceptive Domains. (FAC¶9). The FAC alleges that Google shows ads on Deceptive Domains that have been part of FTC actions (FAC¶222(b)) and that have been held to violate the ACPA before various courts (FAC¶222(c)). In other litigation to which Google is a party (of which this court may properly take judicial notice), filings have specifically reported many thousands of infringing domains showing Google ads. (*See e.g.* the appendix accompanying the objection of Donald E. Petersen in *Lane's Gifts and Collectibles v. Yahoo et al., Case No. CV-2005-52-1, Miller County, Arkansas,* (listing _number_ infringing domains all showing Google ads), *attached hereto as Exhibit D*. Similarly voluminous exhibits have accompanied other major litigation against the Parking Company Defendants. *See e.g.* the appendix accompanying *The Neiman Marcus Group, Inc., et al. v. Dotster, Inc., et al.,* No. 3:06-CV-05292-RBL (W.D. Wash., filed May 30, 2006), *attached hereto as Exhibit E*; *Verizon North Inc., et al. v. Internet Reit, Inc.*, No. 4:07-CV-00996 (S.D. Tex., filed March 23, 2007*, attached hereto as Exhibit F.*)

The FAC offers inferential allegations of Google knowledge by listing numerous Deceptive Domains showing Google ads (including the 59 domains listed in FAC¶183 and FAC¶187), sufficient to support an inference of widespread Deceptive Domains within Google's advertising system.

In a grasping effort to "prove" that it lacks "knowledge or reason to know," Google cites its "Trademark Complaint Process page" to support its supposed lack of knowledge of trademark infringements. (Google MTD at 5). To the contrary, the complaint process does nothing to eliminate knowledge. If anything, the existence of the complaint process demonstrates Google's

knowledge. The fact that Google's complaint system is inadequate/illusory (FAC¶196) and that Google willfully refuses to use available and reasonable blocking and filtering technologies to prevent or reduce trademark infringements (FAC¶6), establishes Google's bad faith, knowledge and intent.

Contrary to Defendants' urging, *Lockheed Martin,* 985 F. Supp. at 949 does nothing to advance their immunity from liability. Google cannot shield itself from liability for its knowledge and responsibility by raising an illusory, non-binding, and inadequate on-line complaint system. Google receives numerous complaints through its trademark complaint process. These many complaints put Google on notice of the massive scope of infringements occurring through its advertising systems. Class Plaintiffs do not dispute that complaints were received. Class Plaintiffs allege that Google does nothing about the complaints and fails to meaningfully take any action to address complaints. (FAC¶196). Meanwhile, as the FAC specifically alleges, Google engages in an illusory game of temporarily shutting down some Deceptive Domains, and then allowing those same domains and similar others to quickly reappear. (FAC¶222). This game of whack-a-mole is the essence of reckless disregard and intentional deception in an electronic era: Google ignores the problem of Deceptive Domains, instead forcing others to investigate and complain — even then only taking illusory action to appear to address the problem. (FAC¶196). At a minimum, such conduct by Google constitutes its turning "a blind eye"[28] and abdicating its responsibility to use reasonable blocking and filtering technologies to prevent said infringing conduct. (FAC¶6). More surely, it represents

---

[28] Willful blindness is equivalent to actual knowledge for purposes of the Lanham Act. *Hard Rock Cafe,* 955 F.2d 1143 (citing, *Louis Vuitton,* 875 F.2d at 590). Further, willful blindness, the *Loius Vuitton* court said, "is a sufficient basis for a finding of violation of the Lanham Act". *Id.*

one more step in the Deceptive Domain Scheme that is being conducted knowingly and in bad-faith for Google's and the other Defendants' pecuniary gain. (FAC¶¶7, 9, 10).

      **c.      Injunctive Relief Is Available**

The liability limitation (injunctive relief) afforded under the "innocent infringer" defense," codified at 15 U.S.C. §1114(2), does not provide a viable basis for dismissal. Google makes a convoluted argument that since the "innocent infringer/publisher" defense limits relief to injunctive relief, and in its opinion it is an "innocent infringer/publisher", and in its opinion it has given Class Plaintiffs the relief they seek, the claim is moot and should be dismissed. (Google MTD at 4-9). Google's argument is dramatically attenuated, contains numerous material factual issues, and presupposes that it has successfully applied and established that it is an "innocent infringer/publisher." As set forth *supra*, the FAC contains explicit allegations that are in direct conflict with Google's alleged "innocent publisher" defense and whether Google is an "innocent publisher/infringer" is an issue of fact that cannot be disposed of pursuant to Google's MTD. Furthermore, even if Class Plaintiffs were only permitted to seek injunctive relief against Google — based on Google's establishing its "innocent infringer/publisher" defense — this claim would not be moot as to Google. Injunctive relief is a valuable remedy. Importantly, Google's conduct has not ceased and it has not provided Class Plaintiffs with the relief that they seek — *i.e.,* to stop using/monetizing Deceptive Domains.

Google cites the inapposite case of *McKinney v. Indiana Michigan Power Co.,* 113 F.3d 770, 772 (7th Cir. 1997), for the proposition that Class Plaintiffs are due no money damages because Google is at most an innocent infringer and that Class Plaintiffs are not entitled to an injunction because Google has already granted them the relief they seek. Google misapplies *McKinney*, and ignores the fact that the *McKinney* court rejected the mootness claim. *Id.*

57

Further, *McKinney* was not even a trademark case. Such reaching misapplication of case law fails to support Google's MTD.

At the same time, Google fails to present *Hard Rock*, a case upon which it relies in other contexts. In *Hard Rock*, the Seventh Circuit held that it lies with the discretion of the trial court to grant or deny an injunction against conduct which has ceased and is not likely to recur, and that, in the particular context of a trademark case, any doubt in respect to the extent of the relief given must be in favor of the plaintiff and against the infringer. *Id.* at 1151.

Importantly, Google's conduct has not stopped. Despite touting itself to this Court as "exceedingly solicitous of trademark owners who request removal," even after the filing of the initial complaint, Rule 26 conference, written requests from Class Plaintiffs' counsel, and the filing of the FAC, Google *continues* to monetize Deceptive Domains to the detriment of Class Plaintiffs (not to mention the putative class), Google's "solicitous response" is better characterized as subterfuge and consists of, at best, temporarily blocking domain names and then within days re-monetizing the exact same or substantially similar names. Since the filing of the original complaint, FAC and repeated requests by all Class Plaintiffs that Google prevent Deceptive Domains infringing Class Plaintiffs' Distinctive and Valuable Marks, Google has monetized at least the Deceptive Domains shown in *List of Infringing Domains Registered After Filing of Complaint, attached hereto as Exhibit "A"*.

Google also continues on an ongoing basis to blatantly and egregiously violate the substantive rights of the putative class members by its ongoing Deceptive Domain Scheme. (FAC¶¶11, 12, 226). Even if Google prospectively stops its conduct against the Class Plaintiffs, Class Plaintiffs would still have standing to represent the class, as they held that standing at the time the original Complaint was filed. *United States Parole Comm'n v. Geraghty,* 445 U.S. 388,

402, (1980); *Sze v. I.N.S.,* 153 F.3d 1005 (1998).  Based on Google's conduct to date, it is unlikely said conduct will stop absent a court order.  Courts routinely grant injunctions if they suspect that defendant might infringe again, even if the infringement has ceased for the moment. *Scotch Whisky Ass'n v. Barton Distilling Co.,* 489 F.2d 809, 813 (7th Cir.1973) (upholding injunction where defendant should have known of violation yet continued to sell spurious whiskey for three years); *Blisscraft v. United Plastics Co.,* 294 F.2d 694 (2nd Cir.1961); *E. & J. Gallo Winery v. Consorzio del Gallo Nero,* 782 F. Supp. 457, 468 (N.D.Cal.1991) ("[Defendant's] past conduct does not reasonably ensure continued adherence to its present position."); *National Geographic Soc'y v. Conde Nast Publications Inc.,* 687 F. Supp. 106, 110 (S.D.N.Y.1988) (granting injunction where defendant did not present any affirmative defenses and agreement "came only in response to [the] lawsuit.").

### D.    RICO (Counts I and II)

Defendants' motions to dismiss Counts I and II (the "RICO Counts") are insufficient and should be denied.  In order to state a viable cause of action under 18 U.S.C. §1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Goren v. New Vision Intern.*, *Inc.* 156 F.3d 721, 727 (7th Cir. 1998) (citing *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (quoting *Sedima*, *S.P.R.L. v. Imrex Co*., 473 U.S. 479, 496, (1985))).  In order to state a claim under §1962(d), a plaintiff must allege:  (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that someone would commit at least two predicate acts to accomplish those goals.  *Goren,* 156 F.3d at 731.

Class Plaintiffs properly pled facts establishing each of the requisite elements of both RICO counts, therefore stating cognizable legal claims under both 18 U.S.C. §1962(c) and (d). Even more importantly, the bare factual allegations of the FAC overwhelmingly reveal Defendants' bad-faith, knowingly contrived, and intentionally conducted sophisticated racketeering scheme to obtain profits. *See §C7(b) supra* for discussion of knowledge and intent. As the U.S. Supreme Court has said of RICO, "[t]he aim is to divest the association of the fruits of its ill-gotten gains." *Turkette,* 452 U.S. at 585. The Seventh Circuit has also acknowledged the dual purpose of RICO in both preventing "infiltration of legitimate businesses" and also "the broader purpose of ***separating racketeers from their profits.***" *Haroco,* 747 F.2d 392 (citing *Russello* at 25*).* (Emphasis added.)

### 1.    Civil RICO

Racketeering is no less actionable when it is carried out by legitimate business. *Haroco,* 747 F.2d at 394 (citing *Schacht,* 711 F.2d at 1356-1358). It is well-established that RICO is not only intended to address the sundry underbelly of illegitimate organizations, but also applies to violations between legitimate businesses and business competitors. *Turkette,* 452 U.S. at 580-81; *Sedima*, 473 U.S. at 499 (RICO is not limited to the "the archetypal, intimidating mobster"); *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 457 (7th Cir. 1982), *cert. denied,* 103 S.Ct. 177 (1982) ("We therefore ask whether a treble damages action by auditors of criminal enterprises would contribute to the compensatory and deterrent objectives of RICO. We think it would not, though not because the draftsmen of RICO were concerned with the penetration of lawful enterprises by "organized crime," a euphemism for what used to be called the Mafia, and there was nothing of that sort here. **This court has interpreted the RICO statute … to forbid**

penetration of business enterprises by "any pattern of racketeering activity" embraced by that section [1962], whether or not "organized crime" is involved." (citing *U.S. v. Aleman,* 609 F.2d 298, 303-304 (7th Cir. 1979)).  (Emphasis added.)  Even the plain statutory language makes clear that the type of injuries that civil RICO is intended to address includes injury to business.  See 18 U.S.C. §1964(c).[29]

Congress made the express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub.L. 91-452, §904(a), 84 Stat. 947.  Further, the U.S. Supreme Court has directed that RICO is to be read broadly.  See *Turkette,* 452 U.S. at 586-587.

The fact that §1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued. Nor does it reveal the "ambiguity" discovered by the court below.  "[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth."  *Haroco,* 747 F.2d at 390.

### 2. Class Plaintiffs Have Adequately Alleged A RICO Enterprise

The FAC sufficiently identifies a RICO Enterprise (FAC¶¶225-242), in specifically pleading:  (a) an ongoing and structured association of individuals and entities joined in the common purpose of *engaging in internet advertising and marketing* (FAC¶¶225-227); (b) an identifiable hierarchy and control structure, with each distinct Enterprise member engaging in particular functions and roles (identified in the FAC), and that each of Defendants played a role

---

[29]  "Any person injured in his *business or property* by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." §1964(c).  (Emphasis added.)

in the operation and management of the Enterprise (FAC¶229); (c) Defendants use and control of the Enterprise to engage in conduct constituting racketeering activity (FAC¶237); and (d) the legitimate conduct of the Enterprise existing separate and apart from the Racketeering Activity. (FAC¶239).

A RICO enterprise can be made up of "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). This definition has been interpreted to include any "ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Jennings v. Emry,* 910 F.2d 1434, 1440 (7th Cir. 1990). The enterprise must be "distinct, separate, and apart from a pattern of racketeering activity: although a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the enterprise, for an enterprise is defined by what it is, not what it does." *Jennings,* 910 F.2d at 1440.

A plaintiff asserting the existence of a RICO enterprise need only satisfy the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. *Kauffmann v. Yoskowitz,* 1990 WL 300795, 2 (S.D.N.Y. 1990). Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed.R.Civ.P. Rule 8(a)(2)) and does not require "a plaintiff to plead the legal theory, facts, or elements underlying his claim." *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) (citations omitted).

Class Plaintiffs more than sufficiently plead a RICO enterprise, and factual allegations supporting said structure and decision-making. (FAC¶¶225-242) Without discovery, Class Plaintiffs cannot be required to plead with any more specificity than exists in the FAC. *New England Data Services v. Becher, Inc.,* 829 F.2d 286, 289 (1st Cir. 1987).

62

### a.    The FAC Sufficiently Pleads the Structure of an Association-in-Fact Enterprise

The FAC sets forth how Google, the Parking Company Defendants and other unnamed co-conspirators comprise an association-in-fact enterprise that functions as a cohesive group, both for the common purpose of creating and sustaining an internet advertising network, as well as carrying out a Deceptive Domain Scheme to divert internet users from viewing their intended websites in favor of deceptive imposter websites.  (FAC¶¶225, 233, 238, 240).[30] Nevertheless, Defendants erroneously assert the FAC fails to set forth the requisite structure to establish the existence of an enterprise under RICO.

The FAC alleges that the members of the Enterprise worked together through a structured association-in-fact (FAC¶¶163, 226, 242) to achieve a common purpose (FAC¶¶167, 225, 232, 238) in full satisfaction of the liberal pleading standards applicable to establishing the existence of a RICO enterprise in this circuit and elsewhere. The core of the Enterprise consists of Google and the Parking Company Defendants, all of which are defendants in this action.  (FAC¶¶225, 229, 237).[31]  Further, the FAC specifically identifies the nature and scope of the relationships between these entities (FAC¶¶225-229) and identifies the Enterprise structure.  (FAC¶¶7, 152,

---

[30]  The Supreme Court has explained that a RICO enterprise may consist of an informal group of persons, "associated together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. 576.  A group of corporations may comprise an association-in-fact enterprise. *United States v. Huber*, 603 F.2d 387, 393-394 (2d Cir. 1979).

[31]  As Defendants note, paragraph 225 of the FAC also alleges that the Enterprise includes advertisers and publishers that participate in Google's AdSense and AdWords Networks. Defendants focus on the reference to these entities in this paragraph to raise the specter of an unwieldy enterprise consisting of millions of participants.  (Def. Cons. MTD at 7).  However, as the rest of the FAC makes clear, these other entities utilize the Enterprise, which functions as a necessary mechanism to bring together entities who wish to advertise on the Internet, and entities that wish to allow advertisements to be placed on their websites.  To the extent that the Court deems it necessary, Class Plaintiffs can readily amend the FAC to make this clarification. (FAC¶¶421, 434, 447).

165).  The members of the Enterprise associate for the purpose of creating an internet advertising network and the monetization of domains through internet advertising.  (FAC¶¶2, 7, 65, 99, 102, 146).  While this network has a legitimate business purpose insofar as it directs web-users to websites that use legitimate domain names (FAC¶¶231, 232), it is also used to carry out a Deceptive Domain Scheme designed to divert internet traffic, electronic commerce, and marketing to websites other than the ones users intended to visit.  (FAC¶¶90, 102, 139, 175-191).  Internet traffic is hijacked and redirected to Deceptive Domains on which are parked non-content advertising sites that generate revenue for Defendants.    (FAC¶¶193-194, 263(d), 454).  Defendants and their third party conspirators use sophisticated software to identify likely mistypes and misspellings of distinctive and valuable marks (FAC¶¶90, 159, 188), then register/taste/monetize/use those identical or confusingly similar names (Deceptive Domains) (FAC¶¶263, 329, 339) to generate money that they otherwise would not be entitled to but for the use of Class Plaintiffs' and the putative class' property (distinctive and valuable marks, domains, internet traffic, prospective business, goodwill, etc.).    (FAC¶¶158-161).    Defendants intentionally use Deceptive Domains to confuse, capture, and misdirect internet traffic/users.  (FAC¶¶231, 232, 233, 241).

Each participant plays a necessary and important role in carrying out the Enterprise.  (FAC¶¶229(a)-(d)).  For its part, Google arranges to provide advertising and marketing services for companies that participate in its AdWords program.  (FAC¶229(a)).  It solicits and controls all advertising design, content and placement.  (FAC¶229(b)).  Google designs and controls the structure and program of the internet advertising and marketing systems, and the system for reporting domain performance and transacting in revenue generated from the domains.  (FAC¶229(b)).    Google collects all advertising money from advertisers and initiates the

distribution of said money throughout the enterprise.  (FAC¶229(b)).  The Parking Company Defendants identify possible deceptive domains (FAC¶¶153, 154), taste (FAC¶¶155, 229(c)), kite (FAC¶3), register (FAC¶¶65, 155, 229(c)), license (FAC¶¶5, 65, 155, 229(c)), park (FAC¶263), aggregate (FAC¶¶98, 103, 143, 229(c)), and perform other related activities in connection with domain names, which they in turn sublicense to Google, through participation in Google's AdSense program and/or other associated advertising programs.  (FAC¶229(c)).  The Parking Company Defendants enter into agreements with Google in order to monetize domains through the placement of internet advertising (Google advertising) on said domains. (FAC¶229(c)).  The Parking Company Defendants enter into license agreements with domain owners to license domains.  (FAC¶229).  Google and the Parking Defendants work together, through the Enterprise, to financially gain from monetization of Deceptive Domains, a scheme that utilizes an otherwise legitimate internet marketing/advertising program (FAC¶¶231-232) to conceal and profit from illegal conduct (unauthorized and illegal use and taking of Class Plaintiffs and the class members' property).  (FAC¶233).

Defendants market powerful, sophisticated, masking and concealment software (FAC¶102), access to proprietary algorithms and software (FAC¶¶152(b), 153, 165(c)), control of the technology (FAC¶¶153, 154), and control of the internet advertising market (FAC¶240) allow them to exert control over the enterprise and effectuate the illegal Deceptive Domain Scheme for their own insidious financial gain.  (FAC¶¶4-5, 7).  Google further controls the enterprise by blocking access to participation in its AdSense programs to large portfolio holders and/or parking companies.  (FAC¶¶102, 124).  Smaller domain owners are required by Google to license their domains to larger portfolio owners/parking companies in order to monetize domains.  (FAC¶¶7(c), 103, 145, 146).

65

Defendant Google ultimately determines which entities (Parking Companies, Domain Owners, and advertisers) can participate in the Enterprise and the terms of their participation (FAC¶¶7, 138); however, the structure is set up in such a way that the Parking Companies solicit and license directly with small domain owners and control the first-line relationship with the small domain owners. (FAC¶¶7(c), 102, 145, 146). Then, in turn, Google licenses and controls all of the domains through its agreements/licenses with the Parking Companies/large domain aggregators. (FAC¶102). The FAC describes a hierarchal decision making structure, whereby Google directs the Enterprise through its unique position as the largest search engine in the world and largest internet advertising company in the world. (FAC¶¶90, 241). Paragraph 7 of the FAC plainly identifies Google as "integral to" the Enterprise.

Defendants' attempt to discount these allegations by characterizing them as "amorphous" and "conclusory" and likening them to the allegations that were rejected as insufficient in *Jennings*, 910 F.2d at 1439-41 (7th Cir. 1990) and *Segreti v. Lome*, 747 F. Supp. 484, 486 (N.D. Ill. 1990). In *Jennings,* the Court sought in vain to make sense of an unwieldy complaint alleging a RICO conspiracy by various government agencies to persecute chiropractors. The Court rejected plaintiffs' enterprise allegations because it found "lots of entities, legal or otherwise, floating about in their complaint" but held that plaintiffs had failed to "adequately identify the enterprise upon which our attention should be directed." *Jennings* 910 F.2d at 1440.

In contrast, the FAC in this case clearly identifies an association-in-fact enterprise – it states who the participants are, it describes the role of each participant, and it describes the hierarchical structure of enterprise. (FAC¶¶225, 229). This is more than sufficient to satisfy the standard set forth in *Jennings*, that an enterprise is "an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or

consensual decision-making." *Jennings,* 910 F.2d at 1440.[32]

The law in this Circuit holds that while "there must be some structure, to distinguish an enterprise from a mere conspiracy ... there need not be much." *Burdett v. Miller*, 957 F.2d 1375, 1379 (7th Cir. 1992). The Court found that the requisite structure was supplied "by the *continuity* of the informal enterprise … and by the *differentiation* of roles within it." *Id.* Relying on *Burdett*, the Court in *First Savings Bank of Hegewisch v. Orchowski*, 1994 WL 148668 (N.D. Ill. 1994) held that plaintiffs' mere allegation that "Clearly, [defendants] formed an enterprise which affected interstate commerce" was sufficient to withstand a motion to dismiss. *Id.* at *6; s*ee also Carnegie v. Household Int'l, Inc.*, 220 F.R.D. 542, 546 (N.D. Ill. 2004) ("an enterprise need not have the complexity of a corporation").

Class Plaintiffs allege that the enterprise has been ongoing since at least January 2002 (FAC¶¶244, 249(a), 249(b), 250), and that it continues to the present with each participant playing a distinct role in furtherance of the Enterprise (FAC¶229). These allegations are sufficient to defeat Defendants' motion to dismiss.

### b.  The FAC Pleads an Enterprise Distinct from the Alleged Predicate Acts

Defendants attempt to dismiss Class Plaintiffs' allegations by arguing that they have failed to plead an Enterprise separate and apart from the predicate acts described in the

---

[32]  Defendants argue that Class Plaintiffs' enterprise allegations fail for the additional reason that they do not allege that defendants directed the operation of the enterprise by participating in its management. (Def. Cons. MTD at 10). The allegations relating to structure and hierarchy that suffice to plead the existence of an enterprise readily satisfy any additional requirement that plaintiffs plead participation in the direction of the enterprise. Defendants' reliance on *Slaney v. The Int'l Amateur Athletic Fed., 244 F.3d 580 (7th Cir. 2001) is misplaced. In *Slaney*, the Court held that the United States Olympic Committee could not have conducted the affairs of the alleged enterprise when the complaint suggested that the enterprise operated under the authority of the IOC. In this case, Class Plaintiffs allege an enterprise in which each participant operates in necessary cooperation with the other participants. Each Defendant participates in the direction of the enterprise by conducting its affairs in association with the other members of the enterprise to achieve a common purpose.

Complaint. They argue that plaintiffs cannot demonstrate structure by reference to the predicate acts. (Def. Cons. MTD at 6-8). Yet, Class Plaintiffs have clearly pled an Enterprise distinct from the racketeering activity. (FAC¶¶225, 229).

Specifically, Class Plaintiffs have alleged that the members of the Enterprise associated for the purpose of forming an internet advertising network. (FAC¶¶178, 225, 241(b)). Indeed, as Class Plaintiffs allege in the FAC: "The common purpose of the Enterprise exists is to further online Internet advertising, marketing and promotion, as well as to monetize domains." (FAC¶231). "To the extent that legitimate domains are used by the Enterprise, the conduct is legal." (FAC¶232). Thus, the FAC clearly alleges a specific and viable Enterprise that exists and is distinct from the predicate acts of racketeering.

### c. The Members of the Enterprise Share a Common Purpose

Defendants also argue that Class Plaintiffs' RICO Enterprise allegations are insufficient because they fail to allege a common purpose among the members of the Enterprise. (Def. Cons. MTD at 8-10).

Class Plaintiffs clearly allege that the common purpose of the Enterprise is to engage in internet marketing and advertising and to maximize each participant's profits through online internet advertising, marketing and promotion, and the monetization of domains. (FAC¶¶231, 238). Defendants, however, contend that this alleged common purpose is deficient due to the purported divergent goals arising out of the different economic incentives each participant has in the larger marketplace. (Def. Cons. MTD at 9).

Specifically, Defendants argue that they cannot all share a common purpose because the Parking Defendants are competitors of one another. (Def. Cons. MTD at 9). As a preliminary matter, Defendants once again urge a determination on an issue of fact — whether Parking

Company Defendants are in competition with one another and whether that competition was of a nature/scope that it operated to bar their otherwise alleged misconduct and participation in the Enterprise. Such determination is not appropriately made at this pre-discovery (non-merits) stage in the litigation.

Although it may be true that the certain members of the Enterprise may be economic competitors in some situations, they have a common purpose with respect to the operation of the Enterprise, and every member profits from its success. (FAC¶238). Thus, while Oversee, Sedo, Dotster and IREIT may be competitors insofar as they seek to maximize the volume of domain names that they individually park/license, they are not competitors with respect to the monetization and use of those aggregated domains through Google Advertising. In fact, the FAC alleges that Google limits the participation of domain owners in their AdSense and advertising programs, and requires most domain owners to license their domains to authorized parking companies (including but not limited to the Parking Company Defendants). (FAC¶¶102, 138). Google's limitations on participation in their advertising programs actually decreases competition for Parking Company Defendants by creating a whole market of domains that can only be monetized with Google Advertisements by licensing first with a parking company. (FAC¶¶7(b) and 7(f)).

Further, if Defendants' statement of the law was correct, it would immunize all competitors in the marketplace from potential RICO liability because they would be incapable of forming a RICO enterprise. This is simply not the law.[33]

---

[33] In support of their argument Defendants rely on dicta from two Seventh Circuit cases. In *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004), the Court stated that "it is not altogether clear" how the alleged enterprise had a common purpose because, as the Court analyzed the

### d. Class Plaintiffs Have Suffered a Direct, Non-Derivative Injury, as a Result of Defendants' RICO Violations

Class Plaintiffs are the legal property owners of distinctive and valuable marks, goodwill, internet traffic, and prospective business. (FAC¶¶211-212). As alleged in the FAC, Defendants fraudulently and deceptively use said property for Defendants' own financial gain. (FAC¶166). The unauthorized use of Class Plaintiffs' and the putative class members' property directly and proximately injures Class Plaintiffs and the putative class members, and occurs in several ways, including but not limited to: (a) identifying, registering, tasting, and kiting Deceptive Domains that belong to Class Plaintiffs and the putative class members (FAC¶229(d)); (b) monetizing Deceptive Domains that belong to Class Plaintiffs and the putative class members[34] (FAC¶¶231-266); (c) hijacking, capturing, and redirecting internet traffic that belongs to Class Plaintiffs and the putative class member (FAC¶¶193-194, 263(d), 454); (d) taking valuable prospective business opportunities, sales and customers that belong to Class Plaintiffs and the putative class members (FAC¶¶270, 455); and (e) using the goodwill that belongs to Class Plaintiffs and the putative class members. (FAC¶¶270, 332).

Contrary to Defendants' assertions, Class Plaintiffs' injuries are not derivative of injury caused to internet users – they are directly injured by *the loss of their own property and valuable prospective business.* Specifically, the FAC alleges that Defendants actions have

---

situation, each member had divergent goals. The Court, however, dismissed the RICO claim because the defendant and the enterprise were one and the same. *Id.* at 692. Similarly, in *Strachon v. United Consumers Club et al.*, 229 F.3d 673, 677 n.4 (7th Cir. 2000), the Court considered the potential lack of a common purpose *after it dismissed the RICO claim*, stating "the RICO claim is worthy of dismissal, notwithstanding whether the participants had a common purpose."

[34] Importantly, the Deceptive Domains do not only infringe and dilute distinctive and valuable marks, the Deceptive Domains **are** the legal property of the Class Plaintiffs and putative class members.

caused injury to Class Plaintiffs' business and property by taking and using without authorization Class Plaintiffs' Distinctive and valuable marks, domains,[35] internet traffic, customers and prospective business — thus, depriving them of their property, diminishing the value of their property, causing lost reputation, lost goodwill, lost profits, sales, revenue, and related property and business interests.  (FAC¶270).[36]

Consider the Seventh Circuit's recent decision in *Phoenix Bond & Indemnity Co. v. Bridge et al.*, 477 F.3d 928 (7th Cir. 2007).  In *Phoenix Bond,* defendants allegedly manipulated the process used by Cook County, Illinois to award bids for the purchase of property tax liens from Cook County.  By arranging for related firms to bid on the same parcel (*Id.* at 930), defendants allegedly increased the share of parcels they received.  *Id.*  In furtherance of the scheme, defendants were alleged to have submitted false affidavits to the County through the mail.  *Id.* at 930.  The Seventh Circuit held that even though plaintiffs were not the recipients of the misrepresentations, their injury was proximately caused by defendants' conduct, because "Extra bids reduce plaintiffs' chance of winning any given auction, and loss of a (valuable) chance is real injury."  *Id.* at 930-932.  In doing so, the Court rejected defendants' argument that the County was the direct victim of the fraud.  *Id.* at 931.  The relevant inquiry to determine proximate cause is "whether the alleged violation led directly to the plaintiff's injuries."  *Anza*, 126 S.Ct. at 1998; *see also Commercial Cleaning Services, LLC v. Colin Service Systems, Inc.,*

---

[35]  Including the "Deceptive Domains" which legally belong to Class Plaintiffs and the putative class members pursuant to the ACPA (since Deceptive Domains are identical or confusingly similar to their Distinctive and Valuable Marks).

[36]  To the extent the FAC references injury to the general public, those allegations are intended to convey the injury to the public's interest in preserving an open and honest marketplace, free of consumer deception.  The FAC does not seek damages for injury to business or property on behalf of the general public and the Class Plaintiffs do not represent the general public.

271 F.3d 374, 381-382 (2nd Cir. 2001). Similarly, in this case, the Class Plaintiffs and the putative class members are directly injured as they lose their property, domains, internet traffic, prospective business, goodwill and sales as a result of Defendants' fraudulent scheme.[37]

In an attempt to fit the facts of this case within *Israel Travel*, Defendants argue that "Plaintiffs allege that Defendants perpetrated a fraud on internet users attempting to reach web pages owned and controlled by Plaintiffs and other putative class members," making the internet users "the direct victim of any fraud." (Def. Cons. MTD at 21-23). This simply mischaracterizes the FAC. The FAC alleges that Defendants perpetrated a fraud on *Class Plaintiffs and other putative class members* by identifying, registering, using, and monetizing Deceptive Domains (domains created to capture/infringe/dilute the distinctive and valuable marks and goodwill belonging to Class Plaintiffs and the Class) (FAC¶¶2, 332), and by diverting internet traffic (also belonging to and property of Class Plaintiffs and the putative class) away from their legitimate domains. (FAC¶¶3, 337). As a result, Class Plaintiffs suffered injury to their respective businesses and property from the unauthorized use of their distinctive and valuable marks, domains, goodwill, internet traffic, customers, and resulting prospective business/sales. (FAC¶¶11, 12, 223). Such injury is entirely separate and apart from any injury that may be suffered by the internet users.

Any damages or redress would not be duplicative, because internet users do not have a right to recover the Deceptive Domain itself, profits generated by Defendants' illegal use of the

---

[37] Significantly, in arguing that plaintiffs' injury was derivative, the defendants in *Phoenix Bond* relied on the same cases that defendants in this case rely on – *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250 (7th Cir. 1995) and *Anza v. Ideal Steel Supply Corp.*, 126 S.Ct. 1991 (2006). As the Court made clear, however, neither of these cases precludes a RICO claim where, as in the instant action, the injury is direct rather than derivative. *Phoenix Bond,* 477 F.3d at 933.

Deceptive Domains, lost goodwill, damages for dilution/infringement/confusion caused by use of Deceptive Domains, statutory damages under the ACPA, lost profits and damages for lost prospective business.  No individual or entity would have a right to recover those damages, except Class Plaintiffs and the putative class.  In the instant action, there is no better enforcer than Class Plaintiffs and the putative class.  Any recovery by them will not come at the expense of a more deserving party or a more "direct victim."  *Phoenix Bond,* 477 F.3d at 932.

### 3.    The Predicate Acts Were Pleaded With Sufficient Particularity

Class Plaintiffs adequately plead, with sufficient particularity, the following predicate acts:  18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud); 18 U.S.C. §1952 (relating to racketeering); 18 U.S.C. §1957 (related to engaging in monetary transactions in property derived from specified unlawful activity); and 18 U.S.C. §2320 (relating to trafficking in goods or services bearing counterfeit marks).  (FAC¶¶243-252).  Once again, Defendants improperly seek a standard that would, in essence, require Class Plaintiffs to "prove" the predicate acts at the initial pleading stage – a standard that is not required.

### a.    18 U.S.C. §1341 (Mail Fraud) and 1343 (Wire Fraud)

To establish the predicate of acts of mail and wire fraud sufficient to support a civil RICO claim, Class Plaintiffs must only allege "(1) a scheme or artifice to defraud or with the intent to defraud; (2) through a deception about a material fact; and (3) the use of the mails (or interstate telecommunication) to further the fraud."  *Corley v. Rosewood Care Center, Inc.*, 152 F. Supp. 2d 1099, 1108 (C.D. Ill. 2001), citing 18 U.S.C. §§1341 and 1343.  As consistently pled throughout the FAC, acts of fraud, concealment, omission, and misrepresentation are central to the Deceptive Domain Scheme, and in fact the Defendants' ability to derive financial gain from the scheme is dependent upon successful actuation of the fraud/deception/misrepresentation.

(FAC¶165). The specific fraudulent actions include registration/utilization/monetization of deceptive domains, masking, redirecting, utilization of false identities, and other related acts of concealment. (FAC¶¶118, 165). Actuation of the Deceptive Domain Scheme is primarily done on the internet, through a series of largely automated electronic (wire) and mail communications. The Deceptive Domain Scheme could not be effectuated without the use of the internet, wire, and mails. (FAC¶¶193, 228, 245).

In order for RICO plaintiffs to establish predicate acts of mail and wire fraud, they must: (1) demonstrate that the RICO defendants used mail and/or wire to effectuate a fraudulent scheme; and (2) the fraudulent scheme causes injury/damage to the RICO plaintiffs. 18 U.S.C. §§1341, 1343.

The mail and wire fraud statutes, 18 U.S.C. §1341 and §1343, define "a fraudulent *scheme,* rather than a particular false statement, as the crime." *Phoenix Bond,* 477 F.3d at 932. Further, it is unnecessary for RICO defendants to make a false or fraudulent statement to the victims/injured parties. *Id.* at 932 (holding that "that's why it is unnecessary to show that the false statement **was made to the victim**. A scheme that injures D by making false statements through the mail to E is mail fraud, and actionable by D through RICO if the injury is not derivative of someone else's. So we held in both *In re EDC, Inc.,* 930 F.2d 1275, 1279-80 (7th Cir. 1991), and *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.,* 61 F.3d 1250, 1257 (7th Cir. 1995), and we see no reason to change course. Three other circuits that have considered this question agree with our conclusion that the direct *victim* may recover through RICO whether or not it is the direct *recipient* of the false statements. See *Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.,* 18 F.3d 260, 263-64 (4th Cir. 1994); *Systems Management, Inc. v. Loiselle,* 303 F.3d 100, 103-04 (1st Cir. 2002); *Ideal Steel Supply Corp. v. Anza,* 373 F.3d

74

251, 263 (2d Cir. 2004), reversed on other grounds, *Anza,* 126 S.Ct. 1991 (2006)."  (Emphasis added).

It is well-recognized that "a mailing or wiring itself, for example, does not have to contain false or misleading information."  *Shapo v. O'Shaughnessy,* 246 F. Supp. 2d 935 (N.D. Ill. 2002) (citing, *United States v. Hickok,* 77 F.3d 992, 1005 (7th Cir. 1996)).  "The mailings do not even need to cause pecuniary loss on their own."  *Id.* (citing, *United States v. Brocksmith,* 991 F.2d at 1363, 1368 (7th Cir. 1993)).  The mail and wire communications only need to be in furtherance of the scheme.  *Shapo,* 246 F.Supp at 957.

In RICO cases based on mail or wire fraud, "the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications."  *Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1328 (7th Cir. 1994).  "Specificity requirements may be relaxed, of course, when the details are within the defendant's exclusive knowledge."  *Id.*  Rule 9(b) requires that a RICO plaintiff allege "only a general outline of the alleged fraud scheme-one sufficient to reasonably notify the defendants of their purported role in the scheme ...."  *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir. 1992).  In the instant action, Class Plaintiffs have specifically pled the "Deceptive Domain Scheme" was carried out, on an ongoing and repeated basis, through the use of the mails and wire.  Numerous predicate acts of mail and wire fraud including, but not limited to:

| Fraudulent Action | Method/Manner | FAC ¶ # |
|---|---|---|
| Using software and automated programs to identify revenue generating Deceptive Domain Names | Wire – electronically, on the internet with automated software | 249, 263 |

| | | |
|---|---|---|
| Using software to capture slight misspellings or keystroke errors to capture and redirect Internet traffic to Deceptive Domains and away from the Internet user's intended site, thus diverting traffic away from Class Plaintiffs' and the Class's valuable marks and causing confusion, dilution, and misuse/misappropriation of Class Plaintiffs' and other members of the Class's Distinctive and Valuable Marks. | Wire – electronically, on the internet with automated software | 249, 263 |
| Registered Deceptive Domains | Wire- electronically, on the internet with automated software | 249, 263 |
| Tasted Deceptive Domains | Wire – electronically, on the internet with automated software | 249 |
| Kited Deceptive Domains | Wire – electronically, on the internet with automated software | 249 |
| Licensed Deceptive Domains | Wire – electronically, on the internet with automated software. Also, through mails. | 249, 263 |
| Parked Deceptive Domains | Wire – electronically, on the internet with automated software | 249, 263 |
| Associated Google Advertising with Deceptive Domains | Wire – electronically, on the internet with automated software | 249, 263 |
| Collected revenue from advertising on Deceptive Domains | Wire – electronically, on the internet with automated software | 249 |
| Distributed revenue from advertising on Deceptive Domains | Wire – electronically, on the internet with automated software | 249 |
| Advertised for participation of Deceptive Domains in Google Advertising | Wire – electronically, on the internet with automated software | 249 |
| Generate Deceptive Domain performance reports and distribute those reports | Wire – electronically, on the internet with automated software | 249 |
| Hosting websites associated with Deceptive Domains | Wire – electronically, on the internet with automated software | 249, 263 |
| Concealment of the Deceptive Domain Scheme by using encryption and/or disabling the "View Source" functions at the Deceptive Domains | Wire – electronically, on the internet with automated software | 263 |
| Use of false and misleading WhoIs domain registration data in an attempt to conceal their participation in the Deceptive Domain Scheme | Wire – electronically, on the internet with automated software | 249, 263 |

| Use of semantics programs, algorithms, and other intellectual electronic programs designed and intended to maximize revenue from the placement of advertisements on Deceptive Domains to capture and redirect Internet traffic away from the legal and rightful owners of the Distinctive and Valuable Marks and send it to advertisers and competitors that participate in the "pay per click" advertising programs | Wire – electronically, on the internet with automated software | 263 |
|---|---|---|

Defendants' argument that Class Plaintiffs did not specifically plead deception, fraud, omissions and materiality is simply untrue. The entire Deceptive Domain Scheme focuses on such conduct and it was pled with specificity, including but not limited to allegations of fraudulently registering and using Deceptive Domains (which by definition in the FAC are materially fraudulent and misleading in and of themselves) but also specific facts such as masking, redirection, concealment, etc. – establishing the fraud and deception. (FAC¶165).

### b.    18 U.S.C §1952

The FAC sets forth the essential elements of predicate acts under Section 1952, as: (1) Defendants use mails or travels in interstate commerce, (2) for the purpose of distributing the proceeds of an unlawful activity and/or to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity. (FAC¶¶244-246). Defendants conveniently ignore the plain language of 18 U.S.C. §1952(b)(i)(3) which defines illegal activity as including: "(a)ny act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under Section 1956 or 1957 of this title." The conduct of Defendants is indictable under both §1956 and 1957. *See infra.* Sections 1956(1) and (7)(A) and (D) contain the following explicit statutory language identifying the type/scope of unlawful activity:

> (1) the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7); and

> (7) the term "specified unlawful activity" means—

>> (A) any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31.

>> (D)…section 2320 (relating to trafficking in counterfeit goods and services).

18 U.S.C. §§1956(l), 7(A), 7(D).

Consistent with the plain statutory language, Class Plaintiffs alleged facts establishing the Defendants' Deceptive Domain Scheme included:  action indictable under the mail and wire fraud statute, violations of state and federal criminal laws, and violations of section 2320 (relating to trafficking in counterfeit goods and services).  (FAC¶¶247-251).

The FAC plainly sets forth a system whereby Defendants "transact" in money obtained from the Deceptive Domain Scheme using mails, wires, and interstate commerce.  (FAC¶¶249, 323).  Class Plaintiffs allege that Defendants engage in the Deceptive Domain scheme for the express purpose of their own financial gain.  (FAC¶166).  Class Plaintiffs further specifically allege that Google collects, deposits and distributes advertising revenue from participating advertisers located throughout the United States.  (FAC¶¶7, 135).  Then, Google transfers said advertising revenue to parking companies (including but not limited to the other Defendants) and domain owners, who in turn, transfer the money to other third parties (i.e. smaller domain owners).  (FAC¶7).  Class Plaintiffs allege that said transactions are done using wire and mail. (FAC¶¶245-246).

78

### c.     18 U.S.C. §1957

Defendants argue that the FAC fails to plead the requisite elements under §§1956 and 1957. Both statutes require Class Plaintiffs to show that the proceeds used in the transactions were the result of "specified unlawful activity." *See* 18 U.S.C. §§1956(a), 1957(a). "Specified unlawful activity" includes the predicate acts under the RICO Section 1961. *See* 18 U.S.C. §§1956(c) (7), 1957(f) (1). Faced with a nearly identical defense argument, the Court in *Shapo* held that the plaintiffs had sufficiently alleged said violations, explaining:

> Because the Court finds that the Liquidator adequately pled mail and wire fraud, it follows that he has sufficiently alleged that the Defendants engaged in "specified unlawful activity" by purportedly committing those predicate acts.

*Shapo,* 246 F. Supp. 2d at 958.

The FAC sets forth facts establishing criminal mail and wire fraud, misappropriation/theft of property, trafficking in counterfeit goods and services, and related violations of state and federal laws. (FAC¶¶247-251).

The FAC alleges facts establishing commission of predicate acts in violation of 18 U.S.C. §1957, where Class Plaintiffs complain that Defendants knowingly engage on a daily basis in monetary transactions (deposit, withdrawal, division of, transfer, etc.) in unlawfully derived property (derived from mail and wire fraud, criminal deprivation of property, and trafficking in counterfeit goods and services) of a value greater than $10,000 and is derived from specified unlawful activity. (FAC¶250). Class Plaintiffs plead the acts with sufficient particularity.

### d.     18 U.S.C. §2320

Defendants argue that the FAC fails to identify a mislabled product or service, containing a counterfeit mark. (Def. Cons. MTD at 14). Again, Defendants ignore the explicit pleading in the FAC which identifies the "Deceptive Domain" as the mislabeled/counterfeit product or

service that violates the statute.  (FAC¶¶251(a)).  The Deceptive Domain is mislabled (bearing the counterfeit mark), and is then used in the provision of advertising services, in order to mislead unwitting internet users, divert internet traffic, and otherwise generate revenue from infringing/using/diluting Class Plaintiffs' and the putative class members' distinctive and valuable marks.  (FAC¶¶251, 252).  Specifically, the FAC provides in paragraph 251(b): "Defendants actions in knowingly registering, using, placing advertising, reselling for monetization, and otherwise monetizing Deceptive Domains is an act constituting the trafficking of goods or services bearing counterfeit marks."  (FAC¶251(b)).

Whether the use of the Deceptive Domain constitutes "trafficking in goods or services bearing a counterfeit mark" is an issue of fact, not a pleading deficiency.  (FAC¶251(c)). Defendants cannot properly seek determination of such issues of fact at this stage in the litigation.  The claim was sufficiently pled.

### 4.    Class Plaintiffs Have Alleged Defendants' Alleged Misrepresentations Were Material

Despite Defendants' suggestions to the contrary, Class Plaintiffs have alleged that the Defendants' use of Deceptive Domains (tasting, kiting, registering, monetizing, redirecting, masking, providing false WHOIS information, and other such uses) was material.  (FAC¶¶3, 9, 65, 118, 143, 155, 165, 222, 245, 350, 365, 380, 430, 461).

Defendants, in arguing lack of materiality, erroneously contend that because Deceptive Domains redirect internet users to websites displaying advertising for the Class Plaintiffs' "direct competitors," that no person of ordinary prudence could have been deceived by that conduct. (Def. Cons. MTD at 17-18).  Defendants' argument misses the point.  Defendants only cite cases where the alleged misrepresentations were simply sales talk or puffery.  This kind of

80

misrepresentation is, of course, a fundamentally different animal than the sort of outright targeted deception undertaken by the Defendants.

The "materiality" of Defendants' deception is underscored by the very fact that it works to capture and redirect internet traffic. (FAC¶¶3, 152, 192-194, 241, 263(d), 454-455). Inherent in the definition of "Deceptive Domain" is that it is an identical or confusingly similar name to a legitimate "distinctive and valuable mark." (FAC¶¶4, 83(d), 263(a)). In fact, a Deceptive Domain has no value, if internet users are not looking for a legitimate "distinctive and valuable mark", because the entire fraudulent scheme (as alleged in the FAC) *depends* upon the ability of Deceptive Domains to "capture" and "monetize" internet traffic that rightfully belongs to Class Plaintiffs.

Here too, Defendants attempt to make an "issue of fact" argument that is improper at this stage in the litigation. If it is relevant at all, the issue of whether a "person of ordinary prudence and comprehension" would rely on Defendants' deceptive conduct and whether said conduct is material, when it redirects the internet user to a site including ads for a competing company or entity, is an issue of fact. Defendants' attempts to decode the pop-psychology of internet users aside, Class Plaintiffs have clearly alleged that the deception was material. At this stage of the litigation, that is all that is required.

### 5. Class Plaintiffs Have Alleged That the Object of the Fraud Was Property Or Money In The Hands of the Class Plaintiffs

In order to adequately allege mail and wire fraud, Defendants are correct that Class Plaintiffs must allege that "the object of the fraud" is "money or property in the victim's hands." (Def. Cons. MTD at 18). However, despite Defendants' arguments to the contrary, it is quite clear that Class Plaintiffs have alleged this element of their mail and wire fraud predicate acts.

81

Defendants start from the incorrect position that the only money or property that the Defendants want is the advertising revenue, and that the only victims of the "Deceptive Domain Scheme" are the internet users who were misdirected to Deceptive Domains. (Def. Cons. MTD at 18). Defendants ignore the plain language of the FAC that sets forth the Defendants' critical step in generating advertising revenue: acquiring property belonging to Class Plaintiffs and the putative class in order to use it to make money. (FAC¶¶3, 140).

In order to make money from the Deceptive Domain Scheme, Defendants needed to get Class Plaintiffs' and putative class members' domains, distinctive and valuable marks, goodwill, internet traffic, customers, and prospective business. (FAC¶¶2, 3, 11, 12). The use and taking of the "deceptive domains," the "distinctive and valuable marks," goodwill, internet traffic, customers and prospective business is the "property" that Defendants wanted, because Defendants knew that using that property would make them money. (FAC¶¶2, 270).

Distinctive and valuable marks are property and well-recognized as a valuable business asset. (*F.T.C. v. Royal Milling Co.,* 288 U.S. 212, 217 (1993); *Old Dearborn Dist. Co. v. Seagram-Distillers Corp.,* 299 U.S. 183 (1936) ("Good will is a valuable contributing aid to business – sometimes the most valuable contributing asset of the producer or distributor of commodities. And distinctive trade-marks, labels and brands, are legitimate aids to the creation or enlargement of such good will. It is well settled that the proprietor of the good will is entitled to protection as against one who attempts to deprive him of the benefits resulting from the same, by using his labels and trade-mark without his consent and authority." *Old Dearborn,* 299 U.S. at 194-195 (internal quotation omitted). Loss, taking, diminution, infringement are well-recognized as causing direct injury to property and business. (*Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City,* 383 F.3d 110, 131 (3rd Cir. 2004)).

A domain name is valuable property. *Porsche Cars North America, Inc. v. Porsche.net,* 302 F.3d 248, 260 (4th Cir. 2002); *Office Depot v. Zuccarini,* 2007 WL 2688460, *3 n.7 (N.D. Cal. 2007); *Express Media Group, LLC v. Express Corp.,* 2007 WL 1394163, *3 (N.D. Cal. 2007); *Mattel, Inc. v. Barbie-Club.com,* 301 F.3d 293, *300 (2d. Cir. 2002). Unauthorized use of domain names is well-recognized to constitute direct injury to business and property. *Station Casinos, Inc. v. Domain Magic, LLC,* 2006 WL 3838221 (D. Nev. 2006); *PETA,* 113 F. Supp. 2d at 920; *Playboy,* 354 F.3d at 1024-1026; *Nissan,* 378 F.3d 1002; *Paccar,* 319 F.3d 243.

Further, the actual "Deceptive Domains" are the property of the Class Plaintiffs and putative class members, as is evidenced by the clear Congressional intention to treat domain names as property for purposes of the ACPA's *in rem* provisions. *See* 145 Cong. Rec. at S10629-01; *see also Land's End, Inc. v. Remy,* 447 F. Supp. 2d 941 (W.D. Wis. 2006). In fact one of the remedies under the ACPA (and the only remedy in a UDRP proceeding) is return of title to the domain to the Plaintiff. 15 U.S.C. §1129(2). Courts applying the ACPA have determined that defendants that have never used infringing domain names as trademarks or service marks (like Defendants in this action) have no property rights in the domains. *Station Casinos,* 2006 WL 3838221. The possession and use of the Deceptive Domain causes direct injury to Class Plaintiffs and the putative class members. *Id.*

Internet traffic is a valuable property/business interest**,** and courts recognize the direct injury to plaintiffs from said misappropriation (taking) and use. *Victoria's Secret Stores,* 194 F. Supp. 2d at 722-23; *Playboy,* 354 F.3d at 1024-1026; *Nissan,* 378 F.3d at 1002; *Paccar,* 319 F.3d at 243. The taking of internet traffic has been recognized as causing substantial injury to a mark and affecting the ability of the rightful owner to utilize the selling power of the correct

domain and/or Distinctive and Valuable mark.  *PETA,* 113 F. Supp. 2d 915 *citing Planned Parenthood*; *Jews for Jesus,* 993 F. Supp. at 309.

Goodwill is long-recognized as "property" and a valuable business asset.  *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134 (7th Cir. 1994); *SCA Services of Indiana, Inc. v. Thomas*, 634 F. Supp. 1355 (N.D. Ind. 1986).  Lost/diminished goodwill is a taking and constitutes direct injury to Class Plaintiffs and the putative class members' business and property.  *Gateway Eastern Ry. Co.,* 35 F.3d at 1134; *see also WMX Technologies, Inc. v. Miller,* 80 F.3d 1315 (9th Cir. 1996).

Business opportunities, customers, and prospective business are important property interests and their loss or diminution constitutes direct injury to Class Plaintiffs and the Class members' business and property.  *Phoenix Bond*, 477 F.3d at 928; *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250 (7th Cir. 1995).

Defendants injured/damaged Class Plaintiffs and the putative class when they took and used (without authorization or right) Class Plaintiffs' property.  (FAC¶214).  The FAC more than sufficiently alleges Defendants' taking and use of Class Plaintiffs' and the putative class members' valuable property, and the injuries that directly flowed therefrom.  (FAC¶270-277).

6.    **Class Plaintiffs' Allegations of Mail and Wire Fraud Have Provided Sufficient Particularity to Satisfy Rule 9(b)**

It is sufficient pursuant to Rule 9(b) that a RICO plaintiff adequately describes the alleged scheme to defraud, the nature of the misrepresentation, the individuals involved, how the mails were used to further the scheme, and the kinds of communications that were mailed/wired.  *Ferleger v. First American Mortg. Co.,* 662 F. Supp. 582 584, 588 (N.D. Ill. 1987), citing, *e.g.,* *Morgan v. Kobrin Securities, Inc.,* 649 F.Supp 1023, 1028-1029 (N.D. Ill. 1986).  Rule 9(b) does

84

not necessarily require a plaintiff to specifically describe each mailing in the complaint. *See, e.g., Haroco,* 747 F.2d at 400.

"Rule 9(b) requires that a RICO plaintiff provide only a general outline of the alleged fraud scheme – one sufficient to reasonably notify the defendants of their purported role in the scheme[.]"  *See Midwest Grinding*, 976 F.2d at 1020 (7th Cir. 1992).  The specificity requirements of Rule 9(b), Fed.R.Civ.P., must be read in conjunction with Rule 8, Fed.R.Civ.P., which requires a short and plain statement of the claim.  *Baleski v. Paine, Webber, Jackson & Curtis, Inc,* 514 F. Supp. 535, 540 (N.D. Ill. 1981).

The RICO "plaintiff must, *within reason*, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications."  *See Jepson,* 34 F.3d at 1328  (emphasis added).  The sufficiency of a pleading under Rule 9(b) varies with the complexity of the transaction, and less specificity is required when the transactions are numerous and take place over an extended period of time.  *Fulk v. Bagley,* 88 F.R.D. 153, 165, (M.D. N.C. 1980).  Further, "[s]pecificity requirements may be relaxed, of course, when the details are within the defendant's exclusive knowledge."  *See Jepson,* 334 F.3d at 1328.  "The key question is whether each defendant is given sufficient notice of their respective roles in order that they may answer the complaint."  *P&P Marketing Inc. v. Ditton*, 746 F. Supp. 1354, 1362 (N.D. Ill. 1990).  The touchstone under Rule 9(b), Fed.R.Civ.P. is that the allegations must provide the defendant with fair notice of the fraud claimed and, at the same time, "evidence a reasonable belief on the part of the plaintiff that there is merit to the claim."  *Baleski,* 514 F. Supp. at 540.

Class Plaintiffs have provided more than a general outline of the alleged fraud scheme and have sufficiently pled the averments of mail and wire fraud such that Defendants are

reasonably notified of their respective role in the Deceptive Domain Scheme.  *See supra.*

Class Plaintiffs allege that Defendants have utilized both mail and wire communications to carry out the scheme since January 2002 (FAC¶¶244, 249(a)-(b), 250, 251), and that the content of these communications included, *inter alia*, contracts, licensing agreements, invoices, payments, reports and certificates, registrations, tastings, communications with members of the Enterprise, hijacking and redirecting internet traffic, transactions in money derived from unlawful means, and numerous other such actions directly related to the Deceptive Domain Scheme.  (FAC¶¶3, 249-250).  Defendants erroneously contend that Class Plaintiffs must allege, with respect to *each* communication that forms the basis of the predicate RICO acts, the exact date, place and content of the communication, the specific method used to make the communication, and the identity of the parties making and receiving the communication.

Such detail is not required where, as here, the Deceptive Domain Scheme was carried out on a daily, ongoing, repeated and regular basis since January 2002.  *U.S. ex rel. Glaser v. Wound Care Consultants, Inc.,* 2007 WL 837203, 1 (S.D. Ind. 2007); *citing Midwest Grinding,* 976 F.2d at 1020.  *Corley v. Rosewood,* 142 F.3d 1041, 1050-1051 (7th Cir. 1998); *see Ferleger,* 662 F. Supp. at 588; *P&P Marketing,* 746 F. Supp. at 1362-1363 (plaintiff not required to describe each specific mailing or use of interstate wires in the complaint involving hundreds of invoices over an extended period of time).

Given the complexity of the facts underlying the Deceptive Domain Scheme, and the allegations of masking and concealment (making certain information in the exclusive possession of Defendants), it would be unreasonable to require that Class Plaintiffs plead with the level of specificity suggested by the Defendants.  *See Hagstrom v. Breutman, MEB*, 572 F. Supp. 692, 697 (N.D. Ill. 1983).

In addition, the details of the scheme are within the Defendants' exclusive knowledge given that Class Plaintiffs were not privy to the mail and wire communications at issue. *See Jepson*, 34 F.3d at 1329 (if plaintiffs are not "privy to the particular individuals responsible for the letters, telephone calls, and faxes of which they complain … they might … be excused from specificity on the subject", citing *P&P Marketing, Inc. v. Ditton*, 746 F. Supp. at 1362). In contrast, Defendants were privy to all mail and wire communications forming the predicate acts, and therefore, Defendants have been reasonably notified of their roles in the scheme.

### 7.    A "Pattern of Racketeering" Was Adequately Pled

As discussed above, the Deceptive Domain Scheme unquestionably could not have succeeded without numerous acts of mail and wire fraud,[38] the facts of which have been clearly described both in the FAC and in this brief. Class Plaintiffs have alleged a Deceptive Domain Scheme which was effectuated through mail and wire (FAC¶¶247-251), through a sophisticated, continuous, automated software system (FAC¶¶1, 4, 101), that inextricably weaved millions of individual actions into the fabric of a massive 24 hour a day, seven day a week, second-by-second scheme. (FAC¶¶4, 249-251). Class Plaintiffs have alleged continuous, repeated, numerous acts in furtherance of the fraudulent scheme. (FAC¶250). These numerous acts of mail and wire fraud in furtherance of the scheme qualify as "racketeering activity" under the

---

[38] While Defendants couch their motion to dismiss on the grounds of Class Plaintiffs' failure to plead a "Pattern of Racketeering Activity," Defendants do not actually appear to question whether the alleged racketeering activity makes up a "pattern," rather whether the alleged conduct is racketeering activity at all. Thus, this response does not spend any time arguing that the racketeering activities alleged made up a "pattern" as Defendants only real argument is that the wrongful conduct they undertook is not racketeering at all.

provisions of the Civil RICO statute.[39]

### 8.     Class Plaintiffs' Adequately Plead a RICO CONSPIRACY

Section 1962(d) of RICO makes it illegal for a person "to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. §1962(d); *Beck v. Prupis,* 529 U.S. 494, 500 (2000).   RICO's conspiracy provision requires an agreement to violate the substantive provisions of RICO. *See* 18 U.S.C. §1962(d); *Goren,* 156 F.3d at 731.  Defendants argue that since Class Plaintiffs did not allege an act of racketeering, a §1962(d) claim cannot be sustained.  (Def. Cons. MTD at 19).   As set forth *supra*., Class Plaintiffs have more than sufficiently pled §1962(d) violations.

In the instant action, the "agreement to violate" and RICO conspiracy is illustrated by the express, cohesive, and collective actions of Defendants in furtherance of the Deceptive Domain Scheme:   their express agreements (FAC¶¶136, 147, 241(l)), the knowing monetization of Deceptive Domains (FAC¶¶2, 3, 5, 177), and the transaction (division of profits) in money generated from the unlawful use of the Deceptive Domains.  (FAC¶261).   The FAC contains numerous   specific   factual   allegations   establishing   the   knowing   and   voluntary agreement/conspiracy, including, but not limited to:

1. Defendants enter into express written agreements detailing the terms and responsibilities associated with their conduct (FAC¶¶147, 148, 149, 241(l));

2. Parking Company Defendants knowingly register/license Deceptive Domains and then enter into agreements with Google to monetize (and share revenue from the monetization) those Deceptive Domains with Google Advertising (FAC¶¶149, 155);

3. Defendants each use sophisticated software to identify, taste, kite, register, and monetize

---

[39]  In *Dell,* Case No. 07-2668 (E.D. La., filed April 26, 2007), the Court recently sustained extremely similar RICO claims based on mail and wire fraud claims against a Motion to Dismiss challenge.

Deceptive Domains (FAC¶¶1, 3, 5, 155, 229(c), 229(d));

4. Parking Company Defendants mask Google association to certain parked Deceptive Domains that contain Google advertising (FAC¶¶119, 123, 194); and

5. Google collects the advertising revenue generated from advertisements on Deceptive Domains, and then divides it up with Parking Company Defendants (who in turn, often divide it up with smaller domain owners).  (FAC¶¶7, 112, 136).

Defendants cannot avoid the plain language of the FAC which contains very specific actions and conduct in furtherance of the conspiracy and knowing intent/participation of each Defendant in the conspiracy.  The conspiracy count is proper and should not be dismissed.

### E.     General State Law Claims

#### 1.     Class Plaintiffs Sufficiently Plead a Claim Under the Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII)

In Count VII of Class Plaintiffs' FAC, Class Plaintiffs properly assert a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA"), 815 ILCS 505/2, and analogous statutes of other states, and the Illinois Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 510/2.   Contrary to Defendants' arguments, the statutes cover much more than fraudulent practices (which under some circumstances may require special pleading).   The ICFDBA provides:

§2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

Long ago the Seventh Circuit found trademark violations to be actionable under the

Federal Trade Commission Act. *Niresek v. Federal Trade Commission*, 278 F.2d 337 (7th Cir. 1960). "The use of labels or trade names in a manner having a capacity or tendency to mislead the purchaser is likewise prohibited by the Act." *Id.* at 340. Therefore, by the express statutory language of the ICFDBA, the misleading use of trade names is actionable under the Act and there is no requirement to plead the specificity of common law fraud. In fact, in a recent case (denying a defendant's motion to dismiss), a court in this circuit acknowledged the viability of Illinois unfair practices claims (and related state law claims) in the context of a dispute over the unauthorized use of protected marks in a domain name. *Flentye*, 485 F. Supp. 2d at 903.

Defendants concede in their memorandum (Def. Cons. MTD at 24, n.9) that the Class Plaintiffs' statutory claims are "closely related to Plaintiffs' trademark-related claims, and (are) beyond the scope of this motion to dismiss." To establish a violation of the Act's prohibition on deceptive acts or practices, a plaintiff must prove that: (1) the defendant engaged in a deceptive act or practice; (2) the defendant intended that the consumer rely on the act or practice; and (3) the act or practice occurred in the course of conduct involving a trade or commerce. *Zekman v. Direct Am. Marketers, Inc.*, 182 Ill.2d 359, 231 Ill.Dec. 80, 695 N.E.2d 853, 860 (Ill.App.Ct. 1998); *Siegel v. Levy Org. Dev. Co.,* 153 Ill.2d 534, 180 Ill.Dec. 300, 607 N.E.2d 194, 198 (Ill.App.Ct. 1992). The very nature of the Defendants' Deceptive Domain Scheme relies upon consumer deception, as set forth repeatedly, *supra.*

In nationwide class action cases based on state statutes, the U.S. Supreme Court has held that the substantive law of the forum state can be applied consistent with the requirements of due process where the forum state has significant contact or aggregation of contacts to the claims asserted by each member of the plaintiff class. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-822 (1985). Courts should consider whether any substantial differences exist between

varying state statutes pertaining to the conduct proscribed by the state statutes.  *See Lee v. Allstate Life Ins. Co.*, 838 N.E.2d 15, 25 (Ill.App.Ct. 2005).  In cases where both the conduct proscribed and the conduct performed are substantially the same nationwide, the substantive law of the forum state can control the litigation.  *Lee,* 838 N.E.2d at 26. The state of Illinois has significant contact with each of the named Class Plaintiffs in this case.  Each is a resident of the state, and each conducts substantial business in the state.

Class Plaintiffs have clearly and unmistakably alleged a nexus between the complained-of conduct and Consumer Protection.  A plaintiff need not allege that it was a consumer in order to state a claim under the ICFDBA.  *Pace American, Inc. v. Elixir Industries*, 2007 WL 495302 at *4 (N.D. Ill. 2007).  A plaintiff can instead plead a "nexus between the complained-of conduct and consumer protection."  *Id*.

In fact, in Defendants' own Memorandum in Support of the Consolidated Motion to Dismiss, Defendants admit Class Plaintiffs have alleged a nexus between the complained-of conduct and consumer protection.  (Def. Cons. MTD at 25, n.10.)  For the Defendants to now argue that Class Plaintiffs' claim must be dismissed due to Class Plaintiffs' failure to prove it was a "consumer" under the ICFDBA is in contradiction with their own position in their Consolidated Motion to Dismiss, as well as the well established case law on the subject.

### 2.    Class Plaintiffs are Entitled to Declaratory Relief (Count VIII)

According to the Federal Declaratory Judgment Act, a court may "declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought.*"  28 U.S.C. §2201(a) (emphasis added).  Hence, a request for declaratory relief is properly brought in a separate count.

91

3.      **Class Plaintiffs Sufficiently State a Claim for Intentional Interference with Prospective Economic Advantage (Count XII)**

To plead a claim of "Intentional Interference with Prospective Economic Advantage," Class Plaintiffs must plead an interference with a specific third party or an identifiable class of third persons. *Parkway Bank & Trust Co. v. City of Darien,* 357 N.E.2d 211 (Ill.App. 1976). An "identifiable class of third persons" is not required to be identified with specificity. *See Cook v. Winfrey*, 141 F.3d 322 (7th Cir. 1998) (holding that "The Media" was sufficient as the identifiable class of third persons). Class Plaintiffs have clearly identified a class of third persons by stating the class of "internet users/consumers." (FAC¶451).

4.      **Class Plaintiffs Sufficiently State a Claim for Unjust Enrichment (Count XIII)**

An Unjust Enrichment claim exists where the defendant procured a benefit through some type of wrongful conduct, and it would be unjust for the defendant to retain that benefit. *Partipilo v. Hallman*, 510 N.E.2d 8, 11 (Ill.App.Ct. 1987). The heightened pleading standards of Federal Rule 9(b) may be relaxed if it can be shown that the requisite factual information to successfully plead fraud is peculiarly within the Defendant's knowledge or control. *In Re Rockefeller Center Properties, Inc., Securities Litigation*, 311 F.3d 198, 216 (3rd Cir. 2002). *See also In Re Nice Systems, Ltd. Securities Litigation*, 135 F. Supp. 2d. 551, 567 (D.N.J. 2001); *In Re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1418 (3rd Cir. 1997).

Class Plaintiffs have clearly and completely laid out a scheme under which Defendants were unjustly enriched.

5.      **Class Plaintiffs Sufficiently State a Claim of Civil Conspiracy Upon Which Relief Can be Granted (Count XIV)**

92

To state a claim of Civil Conspiracy, a plaintiff must plead the existence of a combination of two or more persons for the purpose of some concerted action, either an unlawful purpose or a lawful purpose by unlawful means. *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). A Civil Conspiracy claim based on allegations of fraud is subject to the heightened pleading standards of Federal Rule 9(b). *Cumis Ins. Soc., Inc. v. Peters*, 983 F. Supp. 787, 792 (N.D. Ill. 1997). The heightened pleading standards of Federal Rule 9(b) may be relaxed if it can be shown that the requisite factual information to successfully plead fraud is peculiarly within the Defendant's knowledge or control. *In Re Rockefeller Center*, 311 F.3d at 216.

Class Plaintiffs have adequately set forth a claim for Civil Conspiracy. Paragraphs 84 through 288 of the FAC detail a scheme in which all Defendants have purposefully acted together in a manner to illegally infringe on Class Plaintiffs' trademarks in order to profit. These allegations identify who was involved, what has happened, and how the scheme has taken place.

### 6. Class Plaintiffs Sufficiently State a Claim of Civil Conspiracy Upon Which Relief Can be Granted (Count XIV)

As acknowledged by IREIT in its Memorandum in Support of its Supplemental Motion to Dismiss, Class Plaintiffs have alleged that **<u>each</u>** Parking Company Defendant, including IREIT, was involved in a civil conspiracy. According to this scheme, **<u>each</u>** Parking Company Defendant, including IREIT, individually agreed with Google to share advertising revenues from the sites that Defendant owned. The combination of IREIT and Google is all that was needed to satisfy the requirement of *two or more* persons involved in the conspiracy. Even though IREIT did in fact have knowledge of the co-Defendants in the matter, and Class Plaintiffs did plead accordingly, Class Plaintiffs were not required to prove that IREIT had any knowledge of any co-Defendants in the conspiracy.

93

**7.      Even If Class Plaintiffs' Claims Under Federal Law are Dismissed, the Court Has Jurisdiction Over Its State Law Claims**

Under the Class Action Fairness Act of 2005 (28 U.S.C. §1711, <u>et seq.</u>) ("CAFA"), jurisdiction with this Court lies inasmuch as the amount in controversy is hundreds of millions of dollars and the Class consists of hundreds of thousands of geographically diverse class members from each of the fifty states.   Defendants would most certainly motion for removal under Fed.R.Civ.P. 41(b) (28 U.S.C. §1441) if class actions were filed in state court.

## VI.      <u>CONCLUSION</u>

For the foregoing reasons, Class Plaintiffs respectfully request that this Court deny all Defendants' Motions to Dismiss in their entirety.

Dated: November 5, 2007               FOOTE, MEYERS, MIELKE & FLOWERS, LLC

<u>/s/Robert M. Foote</u>
Robert Foote, Esq. #03214325
Stephen W. Fung #06289522
Foote, Meyers, Mielke & Flowers, LLC
28 North First St.
Suite 2
Geneva, IL 60134
630-232-6333

Kathleen C. Chavez, Esq. #6255735
Chavez Law Firm, P.C.
28 North First St.
Suite 2
Geneva, IL  60134
630-232-4480

William J. Harte, Esq.
Dana Pesha, Esq.
Joan M. Mannix, Esq.
William J. Harte, Ltd.
111 West Washington St.
Suite 1100

94

Chicago, Illinois  60602
312-726-5015

Benjamin G. Edelman, Esq.
Law Office of Benjamin Edelman
27a Linnaean Street
Cambridge, MA  02138
617-359-3360

ATTORNEYS FOR PLAINTIFFS

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. | § | |
| SANFILIPPO & SONS, INC. | § | |
| BLITZ REALTYGROUP, INC. | § | |
| and VINCENT  E."BO" JACKSON | § | |
| Individually and on Behalf of All | § | |
| Others Similarly Situated, | § | Civil Action No. 07 CV 3371 |
| | § | |
| Lead Plaintiffs, | § | |
| | § | JUDGE MANNING |
| v. | § | |
| | § | |
| GOOGLE INC., OVERSEE.NET, | § | |
| SEDO LLC, DOTSTER, INC., AKA | § | |
| REVENUEDIRECT.COM | § | |
| INTERNET REIT, INC. d/b/a IREIT, INC.; | § | |
| and JOHN DOES I-X, | § | CLASS ACTION COMPLAINT |
| | § | |
| | § | |
| Defendants. | § | (DEMAND FOR JURY TRIAL) |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2007, I electronically filed the foregoing document with the clerk of court for the U. S. District Court, Northern District of Illinois, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Brett A. August
baugust@pattishall.com

Michael H. Page
mhp@kvn.com

Mariah Moran
mmoran@stetlerandduffy.com
edocket@stetlerandduffy.com

Kenneth P. Held
kheld@velaw.com

Steven Borgman
sborgman@velaw.com
jwarren@velaw.com
steveborgman@gmail.com
yshumaker@velaw.com

1

Janelle M. Carter
jcarter@winston.com
ECF_CH@winston.com

Bradley L. Cohn
bcohn@pattishall.com

Alison Conlon
conlon@wildmanharrold.com
ecf-filings@wildmanharrold.com
hardt@wildmanharrold.com

Jonathan M. Cyrluk
cyrluk@stetlerandduffy.com
edocket@stetlerandduffy.com

Joseph Gratz
jgratz@kvn.com

Misty Martin
mmartin@smsm.com

Alexis Payne
aep@pattishall.com

Ronald Rothstein
rrothsstein@winston.com
ECF_CH@winston.com
mconroy@winston.com

Jeffrey Singer
jsinger@smsm.com

Scott R. Wiehle
swiehle@velaw.com

Michael R. Dockterman
dockterman@wildmanharrold.com
ecf-filings@wildmanharrold.com
eckertm@wildmanharrold.com

Joseph Duffy
jduffy@stetlerandduffy.com
bdorgan@stetlerandduffy.com
edocket@stetlerandduffy.com

William J. Harte
wharte@williamharteltd.com
mccarey@williamharteltd.com

Dana Marie Pesha
dpesha@williamharteltd.com
mccarey@williamharteltd.com

Scott Ryan Wiehle
swiehle@velaw.com

Aaron Van Oort
mavanoort@faegre.com

   I certify that I have served the foregoing document by emailing a copy to the following individuals:

Steven Atlee
SAtlee@winston.com

Vincent V. Carissimi
carissimiv@pepperlaw.com

Joanna J. Cline
clinej@pepperlaw.com

Robert J. Hickok
hickokr@pepperlaw.com

s/Robert M. Foote

2