# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. | ) | |
| SANFILIPPO & SON, INC., BLITZ | ) | |
| REALTY GROUP, INC., and VINCENT | ) | |
| E. "BO" JACKSON, Individually and on | ) | |
| Behalf of All Others Similarly Situated, | ) | |
|     Plaintiffs, | ) | Hon. Blanche M. Manning |
| | ) | |
|     v. | ) | 07 C 3371 |
| | ) | |
| GOOGLE INC., OVERSEE.NET, | ) | |
| SEDO LLC, DOTSTER, INC., a/k/a | ) | |
| REVENUE DIRECT.COM., INTERNET | ) | |
| REIT, INC., d/b/a IREIT, INC., and | ) | |
| JOHN DOES I-X | ) | |
|     Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiffs Vulcan Golf, LLC, John B. Sanfilippo & Son, Inc. ("JBSS"), Blitz Realty

Group, Inc., and Vincent E. "Bo" Jackson, have filed a complaint styled as a class action lawsuit

against the following defendants: Google, Inc., Oversee.net, Sedo LLC, Dotster, Inc. a/k/a

revenuedirect.com, Internet Reit, Inc., d/b/a Ireit, Inc.[1], and John Does I-X.  The defendants have

filed a consolidated motion to dismiss the RICO counts as well as certain of the state law claims.

All of the defendants except Dotster have filed their own motions to dismiss various counts.  For

the reasons discussed below, the consolidated motion to dismiss the RICO counts is granted, the

consolidated motion to dismiss the unjust enrichment and civil conspiracy counts is granted, and

the individually-filed motions to dismiss are granted in part and denied in part as provided

herein.

---

[1]The plaintiffs have moved to amend paragraph 78 of the FAC to add Ireit as a "parking
company" defendant.  Because the plaintiffs assert that the omission was inadvertent, and Ireit
does not contest the motion, it is granted.

## I.    Background

According to the lengthy First Amended Complaint ("FAC") (469 paragraphs and 91 pages long–the latter counted by hand because the plaintiffs did not paginate the document), the defendants have engaged in a massive scheme to use deceptive domain names on the internet to generate billions of advertising dollars at the expense of the plaintiffs.  The specifics of the scheme are somewhat complicated, but in its most simple form, the FAC alleges that certain of the defendants register, license and/or "park"[2], among other things, domain names that are the same as or substantially and confusingly similar to the plaintiffs' distinctive trade names or marks.[3]  The defendants do this because they know that when an internet user types a domain name into the address bar on the Google web browser, there is a possibility that the user will either guess the domain name for the plaintiff (and guess wrong) or misspell the name he or she is looking for.

For example, the FAC alleges that Dotster has registered and/or otherwise controls the domain name "wwwVulcanGolf.com."  FAC ¶ 65.  This domain name is obviously very similar to the domain name "www.VulcanGolf.com," which is registered to and has been used by plaintiff Vulcan since May 1997.  According to the plaintiffs' theory, Dotster has intentionally

---

[2]The FAC identifies defendants Ireit, Oversee, Sedo, Dotster and unnamed conspirators as the "Parking Company" defendants.  FAC ¶ 78.  According to the FAC, a "parking company" is a company that "aggregates numerous domain names from individual domain registrants and contracts with an advertising service [here, Google] to license and monetize those domain names."  *Id*. at ¶ 83(w).  The FAC further defines "monetization" as "the practice of using a domain name for commercial gain by generating revenue from Internet advertising located on a webpage."  *Id*. at 83(u).

[3]For more in-depth explanations of internet searches and the domain name system, *see Bird v. Parsons,* 289 F.3d 865, 869-70 (6th Cir. 2002)*; Lockheed Martin Corp. v. Network Solutions, Inc*., 985 F. Supp. 949, 951-53 (C.D. Cal. 1997).

registered this domain name without the period after the "www" expecting that a certain number of internet users will mistype the name and will land on the webpage Dotster has created that is associated with the "incorrect" and allegedly deceptive domain name. When that happens, the defendants, having registered similar and purportedly deceptive domain names, profit if the internet user clicks on the advertising that is placed on the "deceptive" domain site. The advertising is allegedly created, sponsored, and maintained by Google which, according to the FAC, has developed "the largest single online marketing/advertising business in the world." The FAC alleges that Google "partners" with domain registrants as well as parking companies and others and consequently has "millions of domain names under its direct or indirect license, use, control, and management" including the purportedly deceptive domains. FAC ¶ 100.

Google allegedly uses sophisticated software that "processes" these domain names and assists in deciding what advertisements would be profitable on each domain. Google and the parking company defendants "collaborate in the placement of advertisements on domains and in the design/optimization of the landing pages associated with those domains." FAC ¶ 111. "To encourage Internet users to click [on the advertisements], Defendant Google, and in some instances other Parking Company Defendants, use targeting solutions that intelligently select the most relevant ads and categories for the domain names." FAC ¶ 113. When a user clicks on the advertising, Google and the parking companies and/or the domain owners receive revenue from that advertiser. The FAC also alleges that the defendants use "redirection, framing, masking, or other methods to prevent or deter even sophisticated users from identifying or confirming

Defendant Google's role."  FAC ¶ 119.[4]

In essence, then, the plaintiffs allege that Google and the other defendants have engaged in a wide-ranging scheme whereby they receive "billions of dollars in ill-gotten advertising and marketing revenue" by knowingly and intentionally registering, licensing and monetizing purportedly deceptive domain names at the expense of the plaintiff-mark owners.

Based on this general set of allegations, the plaintiffs, a putative class, have filed the instant amended complaint alleging the following fourteen counts: (1) Count I–RICO (18 U.S.C. § 1962(c)); (2) Count II–RICO (18 U.S.C. § 1962(d)); (3) Count III–Cybersquatting (18 U.S.C. § 1125(d)); (4) Count IV–Trademark Infringement (15 U.S.C. § 1114(1)); (5) Count V–False Designation of Origin (15 U.S.C. § 1125(a)); (6) Count VI–Dilution of Trademarks (15 U.S.C. § 1125(c)); (7) Count VII–Illinois Consumer Fraud and Deceptive Trade Practices Act (815 ILCS 505/2); (8) Count VIII–Declaratory Judgment; (9) Count IX–Common Law Trademark; (10) Count X–Contributory Trademark Infringement; (11) Count XI–Vicarious Trademark Infringement; (12) Count XII–Intentional Interference with Current and Prospective Economic Advantage; (13) Count XIII--Unjust Enrichment; (14) Count XIV–Civil Conspiracy.

As a group, the defendants have moved to dismiss Counts I and II, the RICO counts as well as certain state law claims.  All of the defendants except Dotster have moved separately to dismiss various other counts.

## II.     Analysis

---

[4]The FAC defines "masked redirection," "framed forwarding," and "stealth forwarding" to mean "a method or system for preventing a user's web browser from accurately reporting the true origin of the content the user is viewing.  Through such methods, a user can request one domain name and see that address in the browser's Address Bar, even as the user actually is shown content from a different destination."  FAC ¶ 83t.

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court accepts the allegations in the complaint as true, viewing all facts, as well as any inferences reasonably drawn therefrom, in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007)(citations omitted).

The Seventh Circuit has interpreted *Bell Atlantic* as follows:

> Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. To state such a claim, the complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The Supreme Court has interpreted that language to impose two easy-to-clear hurdles. First, the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) *(quoting Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) *(alteration in Bell Atlantic* ). Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level"; if they do not, the plaintiff pleads itself out of court. *Bell Atlantic*, 127 S.Ct. at 1965, 1973 n. 14.

*E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). *See also Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618-19 (7th Cir. 2007) (observing that Supreme Court in *Bell Atlantic* "retooled federal pleading standards" such that a complaint must now contain "enough facts to state a claim to relief that is plausible on its face.").

A.    Standing

Purported class plaintiffs must themselves have suffered an injury allegedly wrought by the defendant. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975) (named plaintiffs seeking to

represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."); *see also Burns v. First American Bank*, No. 04 C 7682, 2006 WL 3754820, at *4 (N.D. Ill. Dec.19, 2006)("[A] class representative who lacks standing to pursue the class claims will not satisfy the typicality and adequacy prongs of Rule 23(a)."); *Terkel v. AT & T Corp.*, 441 F. Supp. 2d 899, 920 (N.D. Ill. 2006) ("It is clear that the named plaintiffs in a class action must establish standing individually to serve as class representatives.").

In this purported class action there are several defendants. Ireit and Sedo argue that certain plaintiffs lack standing to sue because the FAC does not allege that Ireit and Sedo participated in any wrongdoing with respect to those plaintiffs' allegedly protected marks or names. According to Sedo, plaintiffs Blitz and JBSS have identified nine allegedly deceptive domain names that harmed them, none of which belonged to Sedo or had any connection to Sedo. As such, Sedo contends that Blitz and JBSS cannot establish a concrete injury in fact traceable to any conduct of Sedo and therefore do not have standing to sue Sedo. Ireit makes a similar argument as to defendants Vulcan, Blitz, and Vincent "Bo" Jackson.

In order to establish standing, the plaintiffs attempt to rely on the juridical link doctrine. Under this doctrine, a class action may "proceed where the plaintiffs as a group-named and unnamed-have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise juridically related in a manner that suggests a single resolution of the dispute would be expeditious." *Hudson,* 242 F.R.D. at 503 (citations and internal quotation marks omitted). The plaintiffs assert that they should be allowed to proceed against all of the defendants under this doctrine.

The juridical link doctrine, however, is more properly referred to as part of the class certification inquiry. *See, e.g. Moffat v. Unicare Midwest Plan Group 31451*, No. 04 C 5685, 2006 WL 897918, at *8 (N.D. Ill. Apr. 5, 2006)(noting that because class action certification had been denied, it was "questionable" whether the juridical link doctrine could apply)(*citing In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, 171 (D. Mass. 2004)(juridical link doctrine confined to class action analysis). *See also Hudson v. City of Chicago*, 242 F.R.D. 496, 502 (N.D. Ill. 2007)(in context of motion for class certification, finding juridical link analysis applicable). Class certification is not yet before the court, and any Article III standing issues are inherently intertwined with the class certification determination due to the plaintiffs' invocation of the juridical link doctrine. The court will thus postpone its analysis of the Article III standing issue as raised by Sedo and Ireit until the motion for class certification is before it. This is consistent with the Seventh Circuit's recognition that in certain circumstances, it is appropriate for the court "to consider issues of class certification prior to issues of standing." *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002)("the class certification issues are . . . logically antecedent to Article III concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing. Thus the issue about Rule 23 certification should be treated first")(*citing Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)).

The court notes that Ireit, in its individual motion to dismiss, seeks to dismiss numerous counts by arguing that plaintiffs Vulcan, Blitz and Jackson have not alleged and cannot prove that Ireit owns any domain names that infringe these plaintiffs' rights. The court construes these arguments as challenging those plaintiffs' standing. For the reasons just discussed, and without discussing herein each separate instance where Ireit raises the argument, the court denies this

portion of Ireit's motion to dismiss without prejudice pending resolution of the motion for class certification.

B.    Lanham Act Claims

1.    *Anticybersquatting Consumer Protection Act (ACPA)*

Defendants Ireit, Sedo, Oversee and Google have moved to dismiss the ACPA count. The court will, as necessary, address similar arguments raised by multiple defendants together.

The ACPA, 15 U.S.C. § 1125(d), was enacted in 1999 to combat cybersquatting, the "deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 267 (4th Cir. 2001) (internal quotation marks and citation omitted).  In order to state a claim under the ACPA, a plaintiff must allege that "(1) it had a distinctive or famous mark at the time the domain name was registered, (2) the defendant registered, trafficked in, or used a domain name that is identical or confusingly similar to plaintiff's mark, and (3) the defendant had a bad faith intent to profit from that mark." *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 914 (N.D. Ill. 2007)(*citing V'soske, Inc. v. Vsoske.com*, No. 00 C 6099, 2001 WL 546567, at *6 (S.D.N.Y. May 23, 2001)).

a.    Sedo and Oversee

i.    Registration

The FAC alleges that Sedo maintained a database of seven million domain names of which three million are undeveloped parked domain names.  The FAC also alleges that the Parking Company defendants (which includes Sedo and Oversee) "enter[ed] into agreements with Defendant Google and license [sic] to Defendant Google the rights to control, monitor, maintain, use and place advertising on all of the domains under the Parking Company's control,

including Deceptive Domains."

According to Sedo and Oversee, the FAC characterizes them as "parking companies" and does not allege that they are the registrant or owner of any domain names or that they register domain names. As such, Sedo and Oversee assert that the plaintiffs have failed to state a claim under the ACPA. *Bird v. Parsons*, 289 F.3d 865, 870 (6th Cir. 2002)(because there was no allegation that certain defendants "registered a domain name, ... and liability for using a domain name can only exist for the registrant or that person's authorized licensee," the complaint was properly dismissed against those defendants because it "contains no allegation that ... [those defendants] are ... licensee[s]") (citing 15 U.S.C. § 1125(d) (1)(D)).

The plaintiffs allege that "Defendants taste[5], register, license, own, traffic in, monetize and/or otherwise utilize and control Deceptive Domains that are identical and/or substantially similar to Lead Plaintiffs." FAC at ¶ 65. While the FAC does not specifically allege that Sedo or Oversee registered or owned any of the allegedly deceptive domain names, it identifies them as "parking companies." In turn, the FAC defines a "parking company" as "a company that aggregates numerous domain names from individual domain registrants and contracts with an advertising service to license and monetize those domain names." FAC at ¶ 83w. Moreover, the FAC alleges that "[a]fter Oversee/Snapnames takes control of the domain names, Oversee/Snapnames traffics in, monetizes, and/or sells the domain names using an auction system. . . ." FAC ¶ 209. It is plausible that these allegations fall under the ACPA's prohibition

---

[5]The FAC defines "domain tasting" as "the practice of domain registrants registering a domain name to assess its profitability for the display of online advertising. Via the tasting procedure, a registrant may return a domain name within five days for a full refund. Domain tasters typically return domain names that they project to be unprofitable." FAC ¶ 83m.

of "trafficking in," which is defined by the ACPA as engaging in "transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration," 15 U.S.C. § 1125(d)(1)(E). Thus, the court denies Sedo and Oversee's motion to dismiss the ACPA claim on this ground.

ii.     Auction site

Referring to the allegation above that Oversee conducts auctions, Oversee argues that as an auction site, it does not "traffic in" domain names because it does not "directly" transfer or receive a property interest in any domain names. *Ford Motor Co. v. Greatdomains, Inc.*, 177 F. Supp. 2d 635, 645 (E.D. Mich. 2001)(granting motion to dismiss against auctioneer because "[a]s an auctioneer, Great Domains does not transfer or receive for consideration the domain names that are sold over its website. Although it does provide a forum at which such transfers and receipts may take place, the property interests associated with each domain name remain with the person 'transferring' and pass directly to the person 'receiving,' thus bypassing Great Domains entirely.").

As an initial matter, the specifics of what Oversee does as an auction site (or, for that matter, in any other role) is a matter that is outside the four corners of the complaint as it has not been specifically alleged and, therefore, is not properly considered on a motion to dismiss. Moreover, as noted by the plaintiffs and as discussed above, the FAC alleges that the purported parking company defendants, of which Oversee is one, did more than just auction domain names: they also registered, licensed and sublicensed domain names, among other things. Thus, the motion to dismiss on this ground is denied. *Flentye*, 485 F. Supp. 2d at 914 ("at a minimum, Class Plaintiffs do allege that Defendants as a group registered the domain names at issue . . . , so

the court cannot say that Kathrein could not be considered the registrant or an authorized licensee.")(citation omitted).

### iii. Confusingly similar

Nor is the court persuaded at this time by Sedo's argument that none of its parked domain names are identical or confusingly similar to any of the plaintiffs' marks. For example, in footnote 4 of its motion to dismiss, Sedo contends that "vulcano" is the Italian word for dictionary and therefore "a legitimate consideration is that vulcanogolf does not relate to Vulcan Golf or its products but to volcano golf or golfing in and around volcanoes." This type of factual determination is wholly inappropriate at the motion to dismiss stage.

### iv. Bad faith intent

The same goes for Oversee's argument that the plaintiffs' allegations negate the requisite bad faith intent. Specifically, Oversee asserts that liability under the ACPA requires that the purported wrongdoer have "a bad faith intent to profit from that mark." 15 U.S.C. § 1125(d)(1)(A). According to Oversee, because the FAC alleges that the defendants have online complaint systems and procedures whereby the defendant-company will investigate any alleged illegal infringement of trademarks in connection with the registration of domain names, *see* FAC ¶ 195, the requirement of bad faith is negated and the plaintiffs have pled themselves out of court. However, the next paragraph of the FAC alleges that the complaint systems are "illusory" and "mislead" the public into believing that the defendants do not support the purported deceptive domain scheme. FAC ¶ 196.

This allegation demonstrates that a factual dispute exists as to whether the defendants' complaint procedures are sufficient to negate the bad faith intent requirement. Any arguments

about when and if any of the plaintiffs contacted or complained to Oversee about the alleged infringement of their trademarks should be raised later in the litigation, but cannot be resolved in a Rule 12(b)(6) motion to dismiss. Oversee's motion to dismiss the ACPA claim on this ground is denied.[6]

b.     Google

Google contends that the ACPA cannot apply to it because it does not own or operate any of the allegedly infringing domain names. As noted above and by the parties, the ACPA imposes liability on one who "registers, traffics in, or uses" certain types of domain names. 15 U.S.C. § 1125(d). Google then refers to the statute, which states that "[a] person shall be liable for using a domain name under subparagraph (A) only if that person is the domain registrant or that registrant's authorized licensee," and argues that because the plaintiffs do not allege that Google has registered or is operating any of the allegedly infringing domain names, it cannot be liable under the ACPA. This argument, however, ignores that one can also be liable for, as discussed above, "trafficking in" a domain name. The FAC alleges that Google pays registrants for its use of the purportedly deceptive domain names, provides domain performance reporting, participates in the tasting of domain names, uses semantics technology to analyze the meaning of domain names and select revenue maximizing advertisements and controls and maintains that advertising. Given these allegations, Google's motion to dismiss the ACPA count is denied.

_____

[6]Google also argues in a footnote, *see* Google Motion, Dkt. #101 at 12 n.9, that no bad faith intent exists on Google's part because Google had no notice of Vulcan's objections and acted promptly to disable service once it received notice. However, this argument is forfeited given that it was raised in a footnote. *E.E.O.C. v. Custom Companies, Inc.*, Nos. 02 C 3768, 03 C 2293, 2007 WL 1810495, at *4 (N.D. Ill. June 21, 2007)("[A]rguments in footnotes are waived")(*citing Moriarty ex rel. Local Union No. 727, I.B.T. Pension Trust, and the Teamsters Local No. 727 Health and Welfare Trust v. Svec*, 429 F.3d 710, 722 (7th Cir. 2005)).

2.      Trademark Infringement

Count IV of the FAC alleges trademark infringement under the Lanham Act, 15 U.S.C §

1114(1), which prohibits in relevant part the:

> use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of
> a registered mark in connection with the sale, offering for sale, distribution, or
> advertising of any goods or services on or in connection with which such use is
> likely to cause confusion, or to cause mistake, or to deceive . . . .

In order to state a claim for trademark infringement under the Lanham Act, the plaintiffs

must plead that (1) its mark is protectible, and (2) defendant's use of the mark is likely to cause

confusion among consumers.  *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir.

2001).

a.      Sedo/Oversee

i.      Protectible interest

Sedo argues that Vulcan has no standing because it has not alleged a protectible interest

in the allegedly deceptive domain name "vulcanogolf."  However, the plaintiffs allege that

Vulcan owns the Vulcan trademark and the "Vulcan Golf" tradename and that vulcanogolf.com

violates Vulcan's trademark on that name.  This is sufficient at the motion to dismiss stage.

*Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812-13 (7th Cir. 2002)(affirming

issuance of preliminary injunction based on plaintiff's Lanham Act claim where defendant used

term "Copitrack" in its metatag because "by Equitrac's placing the term Copitrack in its metatag,

consumers are diverted to its website and Equitrac reaps the goodwill Promatek developed in the

Copitrak mark.").

Sedo also contends that the use of the prefix "vulcan" in another domain name does not

infringe its trademark because the term "vulcan" is too common to trademark.  *Amerimax Real*

*Estate Partners, Inc. v. RE/MAX Intern., Inc.*, 05 C 5300, 2006 WL 2794934, at *5 (N.D. Ill. Sept. 26, 2006)(granting plaintiff's request for declaratory judgment that its use of "max" does not infringe RE/MAX's trademark because "max" is too common to be protectible and because there is no likelihood of confusion). However, as noted by the plaintiffs, the *Amerimax* court did not analyze any of the fact-specific factors to determine whether a likelihood of confusion exists. *Smith Fiberglass Products, Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir. 1993)(listing seven factors a court is to consider when determining whether a likelihood of confusion exists). This court is simply not willing to engage in such an inquiry on the term "vulcan" at the motion to dismiss stage. *See Educational Tours, Inc. v. Hemisphere Travel, Inc.*, No. 04 C 0559, 2004 WL 887417, at *2 (N.D. Ill. Apr. 26, 2004)("Defendants' argument that 'Educational Tours' is generic and thus unprotectable fails because it is procedurally inappropriate at this stage of the litigation.").

ii.     "Use" of a trademark

Sedo and Oversee assert that they have not "used" the plaintiffs' marks as required by the language of the Lanham Act.[7] Specifically, they contend that as a domain parking company, they

---

[7]To the extent that the parties are arguing that there has been no "trademark use" (*see, e.g.*, Oversee Motion to Dismiss at 6), the court notes that one well-known treatise on trademark law has opined that there is no separate requirement of "trademark use" under the Lanham Act:

> It is sometimes argued that before there can be an infringing use in violation of the Lanham Act, the accused use must be "use as a trademark." That is, the argument is made that as part of its prima facie case of infringement, the trademark owner must prove that the defendant is making use of the accused designation "as a trademark." The problem with this characterization is that the Lanham Act nowhere explicitly states that "use as a trademark" is required for an accused use to be an infringement. The statutory requirement of "trademark use" is indirect and implicit in the requirement that there be a likelihood of confusion for infringement to occur.

do not own, register, or operate any of the allegedly infringing domain names.  According to

Sedo, it "is merely a facilitator providing a marketplace for the parking of domain names" and

thus, it cannot have "used" the domain names at issue.  *Lockheed Martin Corp. v. Network*

*Solutions, Inc.*, 985 F. Supp. 949, 957 (C.D. Cal. 1997)(because defendant's "acceptance of

domain name registrations is connected only with the names' technical function on the Internet to

designate a set of computers" and defendant "is not using the SKUNK WORKS mark in

connection with the sale, distribution or advertising of goods and services," no "use" of the

domain name occurred with respect to the Lanham Act).  *See also 1-800 Contacts, Inc. v.*

*WhenU.Com, Inc.*, 414 F.3d 400 (2d. Cir. 2005)(where plaintiff alleged that "[the defendant] was

infringing [the plaintiff's] trademarks, . . . by causing pop-up ads of [the plaintiff's] competitors

to appear on a []user's desktop when the []user has accessed [the plaintiff's] website", the court

reversed grant of a preliminary injunction concluding in part that "[the defendant] is using [the

plaintiff's] website address precisely because it is a website address, rather than because it bears

any resemblance to 1-800's trademark" and the defendant used the mark in its own directory,

which was not accessible to user)*; Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002)(affirming

---

. . .

> It is my view that there is no separate statutory requirement of "trademark use." A
> requirement of trademark use is implicit in the requirement that there be a
> likelihood of confusion for infringement to occur. Thus, "trademark use" is not a
> separate element of plaintiff's case, but is only one aspect of the likelihood of
> confusion requirement for infringement.

4 McCarthy on Trademarks and Unfair Competition § 23:11.50 (4th ed.)(footnotes omitted).
Thus, to the extent that the defendants' arguments could be construed as one arguing a lack of
"trademark use," the necessary factual determination regarding likelihood of confusion is not
well-suited for disposition on a motion to dismiss.

dismissal of trademark infringement and unfair competition claims against domain name registrar and auction company for domain names because no "use" as required under the relevant statutory provisions); *Academy of Motion Picture Arts and Sciences v. Network Solutions, Inc.*, 989 F. Supp. 1276, 1279 (C.D. Cal. 1997)("mere registration of a domain name does not constitute a commercial use").

According to Sedo, which seeks to analogize itself with NSI in the *Lockheed* case, it "simply serves as a marketplace for domain name owners to list their domain names, and if the domain owner so chooses, Sedo can link the domain owner to advertisements offered by Google." Sedo Motion to Dismiss at 9. Oversee makes a similar argument. In the *Lockheed* case, the court noted that NSI simply registered domain names without further activity by NSI. *Lockheed*, 985 F. Supp. at 957. Here, however, the plaintiffs allege that the "Parking Company Defendants intentionally and knowingly register Deceptive Domains through the use of proprietary methods/tools by which they can determine the domain names that Internet users are attempting to access, but which domain names have not been registered by any entity, and they then register these recurring mishits or mistypes." FAC at ¶ 158. In addition, the FAC alleges that the "Parking Company Defendants cause popups or popunder advertisements on the Deceptive Domains and receive money for each popup or popunder displayed, in furtherance of the Deceptive Domain Scheme alleged." *Id.* at 161. Thus, pursuant to the allegations of the complaint, Sedo did more than "perform[] the automated, ministerial function of registering and cataloguing domain names," as it argues in its reply. *See Lockheed*, 985 F. Supp. at 957 ("[S]omething more than the registration of the name is required before the use of a domain name is infringing."). The same can be said for Oversee and the court declines Oversee's

invitation to have it make legal determinations on a complicated set of facts that have yet to be determined.[8]

The court notes that Sedo and Oversee's reliance on *Lockheed* and *1-800 Contacts* is misplaced given that these cases were decided after a full evidentiary presentation to the court. Ultimately, Sedo and Oversee's position would require this court to go outside the pleadings to determine exactly what role they play in the complex world of domain name ownership, use, registration, and monetization. This the court will not do. The plaintiffs have alleged that Sedo and the other Parking Defendants transacted in and improperly profited from domain names that are deceptively similar to the plaintiffs' trademarks. Such statements sufficiently allege the "use" of a domain name to allow the infringement claims against Sedo and Oversee to move forward on this issue.

In the interest of completeness, the court notes that "use" has been interpreted broadly in other cases involving the internet and domain names. *See, e.g., People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 365 (4th Cir. 2001)("[the defendant] need only have prevented users from obtaining or using PETA's goods or services, or need only have connected the website to other's goods or services" to plead "use"); *Buying for the Home, LLC v. Humble*

---

[8]In this regard, the court notes that Oversee asserts in its motion to dismiss that:

> Even if Plaintiffs' allegations that Oversee entered into an agreement with (1) domain registrants for the right to control, maintain, and place advertising on their domains and (2) Google to license the right to control, maintain, and place advertising on the domains in Oversee's control . . . could be taken as true, such actions do not constitute "use" as required by the Lanham Act.

Oversee Motion to Dismiss at 6. As discussed above, however, the FAC alleges facts that are not entirely analogous to those of the cases relied upon by the defendants. Moreover, the defendants' characterizations of the FAC's allegations is not the only way to read the FAC. Thus, this court declines to make a definitive finding as a matter of law that the allegations do not state a claim for relief.

*Abode, LLC,* 459 F. Supp. 2d 310*, 320-323 (D. N.J. 2006)(concluding that plaintiff satisfied

"use" requirement of the Lanham Act "in that Plaintiff's mark was allegedly used to trigger

commercial advertising which included a link to Defendants' furniture retailing website" and as

such, "the [plaintiff's] mark was used to provide a computer user with direct access (*i.e.*, a link)

to Defendants' website through which the user could make furniture purchases")*; 800-JR Cigar,

Inc. v. GoTo.com*, 437 F. Supp. 2d 273 (D. N.J. 2006)(on summary judgment, concluding that

search engine defendant "used" the plaintiffs' trademarks as required by the Lanham Act where

defendants "[1.] accept[ed] bids from those competitors of JR desiring to pay for prominence in

search results [thus] . . . trad[ing] on the value of the marks. . . . [2.] rank[ed] its paid advertisers

before any 'natural' listings in a search results list . . . . [and 3.] identifie[d] those of [the

plaintiff's] marks which are effective search terms and market[ed] them to [the plaintiff's

competitors]"); *Google v. American Blind and Wallpaper Factory, Inc*., No. C 03-05340 JF,

2005 WL 832398, at *5 (N.D. Cal. March 30, 2005)(after considering prior cases on "use" issue,

denying motion to dismiss the trademark claims stating that "in light of the uncertain state of the

law, the Court does not find Defendants' arguments sufficient to warrant dismissal of American

Blind's counterclaims and third-party claims at the pleading stage."); *Government Employees

Insurance Company v. Google, Inc.,* 330 F. Supp. 2d 700, 703-04 (E.D. Va. 2004)(in suit

alleging trademark infringement against operators of internet search engines which, among other

things, sold advertising linked to plaintiff's trademarks, concluding that plaintiff had pled

sufficient facts from which alleged trademark "use" where the "complaint clearly alleges that

defendants use plaintiff's trademarks to sell advertising, and then link that advertising to the

results of searches" or, in other words, "that defendants have unlawfully used [the plaintiff's]

trademarks by allowing advertisers to bid on the trademarks and pay defendants to be linked to the trademarks"); *OBH, Inc. v. Spotlight Magazine, Inc*., 86 F. Supp. 2d 176, 186 (W.D.N.Y. 2000)("defendants' use of the mark is 'in connection with' the distribution or advertising of services, because it is likely to prevent or hinder Internet users from accessing plaintiffs' services on plaintiffs' own web site" . . . . in that "[p]rospective users of plaintiffs' services who mistakenly access defendants' web site may fail to continue to search for plaintiffs' web site due to confusion or frustration.")(internal citations omitted).

The FAC sufficiently pleads facts such that it is plausible that there was "use in commerce" and "in connection with the sale, offering for sale, distribution, or advertising of goods and services." As already noted, given the complex nature of the allegations in the FAC, the court simply cannot make a definitive ruling on the "use" issue without engaging in fact-finding, which is inappropriate at this stage of the litigation. *See Rescuecom Corp. v. Computer Troubleshooters, USA, Inc*., 464 F. Supp. 2d 1263, 1266-67 (N.D. Ga. 2005)(denying motion to dismiss on "use" issue of Lanham Act claim in similar context to the instant case stating that "[t]he Court's limited understanding of the matter suggests that this dispute does not seamlessly mesh with traditional Lanham analysis and that the transposition will require more factual development of the record than has been done at this early stage of the proceedings").

### iii.    Likelihood of Confusion

Sedo next contends that there is no likelihood of confusion among consumers because there is no confusion as to the origin of the respective products. According to Sedo, because the plaintiffs do not allege that Sedo is selling or offering services on the "deceptive domain" website or that Sedo listed their marks on the deceptive domain websites, there is no likelihood

of confusion. Sedo also argues that there can be no initial interest confusion on the part of web browsers, particularly when the marks at issue are a commonly used English word (i.e., "vulcan" and "golf"). However, the court declines to make such a determination as a matter of law given that the "likelihood of confusion" is a fact-specific inquiry best left for decision after discovery. In that vein, the court notes that the case relied upon by Sedo and Oversee in support of their motion to dismiss on this issue, *Holiday Inns, Inc. v. 800 Reservation*, Inc., 86 F.3d 619 (6th Cir. 1996), was decided after evidence was presented at a preliminary injunction hearing.

Oversee also makes an argument relating to likelihood of confusion. Specifically, Oversee contends that the plaintiffs have failed to allege that Oversee caused any confusion; thus, according to Oversee, one need not consider whether there has been a likelihood of confusion. Oversee contends that "Plaintiffs do not and cannot allege that Oversee promoted the challenged domains, placed Plaintiffs' protected marks in metatags or in any other manner acted *affirmatively* in directing Plaintiffs' protected marks to the challenged domains." Oversee's Reply in Support of Motion to Dismiss at 8 (emphasis in original). However, the court declines to conclude at this juncture that these are the only ways in which Oversee could have caused a likelihood of confusion. By invoking the "cannot allege" language, Oversee necessarily asks the court to consider facts outside of the pleadings. Indeed, as noted above, in support of this argument, Oversee relies on the *Holiday Inns* case, which was decided on an appeal from a motion for a preliminary injunction after a full evidentiary hearing before the district court. The plaintiffs need not prove their case at this point in time, they need only adequately plead sufficient facts such that their claim is "plausible" and puts the defendants on notice of the claims against them such that the defendants can respond.

Finally, Sedo argues that Jackson in particular has failed to state a trademark claim against it. To the extent that this argument is based on other arguments already addressed (including no likelihood of confusion), those arguments are rejected for the same reasons discussed above. This leaves Sedo's claim that Jackson cannot state a trademark claim because he has failed to adequately allege that he has a protectible mark. The plaintiffs respond[9] by pointing to allegations that "Bo Jackson has a valid and enforceable legally protectible interest in his name," FAC ¶ 63. But the FAC does not allege that he has a registered mark. Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), expressly protects against infringement of a "registered mark." Because Jackson fails to allege that he owns a registered mark, the claim under section 32 of the Lanham Act is dismissed as to Jackson. *See Best Vacuum, Inc. v. Ian Design, Inc*., No. 04 C 2249, 2005 WL 1185817, at *2 (N.D. Ill. Jan. 18, 2005)("Because Plaintiff does not have a registered mark, and because Section 32 of the Lanham Act protects only registered marks[,] Plaintiff's action under Section 32 of the Lanham Act has no likelihood of success.").

  c.  Google

    i.  Failure to allege knowledge

Google seeks to dismiss the direct and contributory infringement claims (counts IV and X) on the ground that the plaintiffs do not allege that Google either knew of the purportedly infringing nature of the domain names nor had reason to know of the infringing nature of the domain names. However, the FAC alleges that Google was aware of the allegedly infringing

---

[9]The court notes that while the plaintiffs do not appear to respond to this argument in the trademark infringement section of their response, they do discuss Jackson's "protectible interest" in the ACPA section of their brief, *see* Plaintiffs' Response at 20. Thus, the court does not find that the plaintiffs have forfeited any argument regarding this issue, as suggested by Sedo.

nature of the purportedly deceptive domains.  FAC ¶ 222 ("Even after the filing of this lawsuit

and notice by Lead Plaintiffs' Counsel, Defendants intentionally and blatantly continue to engage

in the Deceptive Domain Scheme and the other illegal action alleged herein . . . ."); FAC 222a(i)

("After the Complaint was filed, wwwVulcanGolf.com and VolcanGolf.com were deleted by the

original registrants."); FAC ¶ 222a(ii) ("Almost immediately thereafter, wwwVulcanGolf.com

and VolcanGolf.com were *re-registered, relicensed, and redirected to* Defendant Google

Adsense for Domains . . . ")(emphasis in origianl); FAC ¶ 222a(iii) ("Despite the fact that

Defendant Google was aware of Vulcan's Marks, Defendant Google chose to allow the domains

wwwvulcangolf.com and volcangolf.com to remain in the Google Adsense for Domains

Program"); FAC ¶ 222b ("Defendant Google knowingly and intentionally continues to license,

traffic in, monetize, and/or use Deceptive Domains that have been part of FTC actions."); FAC ¶

222c ("Defendant Google knowingly and intentionally continues to license, traffic in [,]

monetize, and/or use Deceptive Domains that have previously been held by various courts to be

infringing domains and violations of the ACPA.").  Other allegations of knowledge need not be

addressed here as they are laid out on page 54 of the plaintiffs' response to the motions to

dismiss.  This basis for dismissal is unavailing.

### ii.    Innocent Infringer

Google's next argument relies upon the innocent infringer limitation as provided in 15

U.S.C. § 1114(2)(B), which states:

> Where the infringement or violation complained of is contained in or is part of
> paid advertising matter in a newspaper, magazine, or other similar periodical or in
> an electronic communication as defined in section 2510(12) of Title 18, the
> remedies of the owner of the right infringed or person bringing the action under
> section 1125(a) of this title as against the publisher or distributor of such
> newspaper, magazine, or other similar periodical or electronic communication

> *shall be limited to an injunction against the presentation of such advertising matter in future issues of such newspapers, magazines, or other similar periodicals or in future transmissions of such electronic communications. The limitations of this subparagraph shall apply only to innocent infringers and innocent violators.*

15 U.S.C. § 1114(2)(B)(emphasis added). Google's argument goes as follows: because it is at most an innocent infringer, only injunctive relief is available against it and because it has already, of its own volition, permanently excluded all of the allegedly infringing domains listed in the FAC, Google has already granted the plaintiffs the injunctive relief they seek, therefore, this claim against Google is moot. The one obvious problem with this argument is that it requires the court to consider facts outside of the four corners of the FAC (i.e., that Google has already excluded the allegedly infringing domains from its advertising program), which is improper on a motion to dismiss. Accordingly, this basis for dismissal is rejected.

3. False Designation of Origin

The plaintiffs have also alleged a claim for false designation of origin claim against the defendants under 15 U.S.C. § 1125(a). This section provides as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

a.    Sedo

Sedo relies on its arguments made with respect to infringement in support of its motion to dismiss the false designation of origin claim.  *H-D Michigan, Inc. v. Top Quality Service, Inc.*, 496 F.3d 755, 759 (7th Cir. 2007)("[T]o prove a claim pursuant to 15 U.S.C. § 1125(a), a plaintiff must show (1) that its trademark may be protected and (2) that the relevant group of buyers is likely to confuse the alleged infringer's products or services with those of plaintiff.")(citation omitted).  However, since the court is not dismissing those claims for the reasons stated above, it declines to dismiss the false designation of origin claim for the same reasons.

b.    Oversee[10]

According to Oversee, the plaintiffs have not adequately alleged that Oversee used a false designation of origin in connection with goods or services.  However, since the arguments were unavailing for the infringement claims, they are also unavailing for the false designation of origin claim.

c.    Google

Google argues that the false designation of origin claim fails because the plaintiffs do not allege that Google uses the domain names "on or in connection with any goods or services." According to Google, the FAC only alleges that Google "processes the domain name and returns either a formatted HTML webpage for each domain that contains the Defendant Google Advertisements and related ad categories, or an XML feed containing the Defendant Google Advertisements."  Motion at 14 (*quoting* FAC ¶ 120).  Google contends that the FAC fails to allege that Google "uses" the domain name because it does not allege that the webpage that

---

[10]The court notes that Oversee fails to address this argument in its reply brief.

Google purportedly "returns" to the internet user upon his her keyword search contains the allegedly deceptive domain names. Thus, it argues that because the FAC fails to allege that Google used a false designation of origin or false description or representation in connection with goods or services, its false designation of origin claim must fail. Google fails to cite any case law in support of its argument and the court declines to do Google's work for it. For that reason, and for the reasons discussed above in section II.B.2(b)(ii), the court rejects Google's position that the plaintiffs have failed to state a claim for false designation of origin.

Moreover, to the extent that Google relies upon facts not pled in the FAC, *see* Google Motion to Dismiss, Dkt. #101 at 13 ("The facts as pleaded in the First Amended Complaint show that Google does not label any advertising with any Vulcan Golf, Fisher Nuts, Blitz Realty, or Bo Jackson designation. The allegedly infringing domain names, such as vulgongolf.com and wwwjbssinc.com, were not provided by Google and are not used as labels for goods and services"), such facts are not properly considered at this point in the litigation.

4.     Trademark Dilution

The plaintiffs also allege a class claim of trademark dilution under 15 U.S.C. § 1125(c), which provides:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

a.     Famous

Sedo asserts that Vulcan has "failed to allege" that it is famous and that Vulcan and

Jackson are not famous. Thus, it concludes that no dilution has occurred. Oversee and Google also contend that the plaintiffs do not adequately allege that the marks were famous, but discuss the plaintiffs generally and do not gear their arguments towards specific plaintiffs.

Contrary to the defendants' arguments, the FAC alleges that: "[a]t the time that the Lead Plaintiffs and the members of the Class registered their domain names, the Distinctive and Valuable Marks were distinctive, protected/protectible, and/or famous . . . . based on, among other things, the inherent distinctiveness and federal registration of the Distinctive and Valuable Marks, and the extensive nationwide use, advertising, promotion, and recognition of the Distinctive and Valuable Marks." FAC ¶¶ 377-78. In addition, the FAC contains specific allegations as to the named plaintiffs' marks regarding their purported "famous" designation. *See, e.g.*, FAC ¶ 31 ("JBSS owns trademarks including 'Fisher' . . . . The JBSS Marks were publicized as of 1995 and have been featured on the Internet, in various forms of media advertisements and in stores published throughout the United States"); FAC ¶ 23 ("Vulcan Golf offers and provides a full array of golf and related products and services under the Vulcan Marks. Vulcan Golf uses the Vulcan Marks in connection with the provision of golf clubs, golf balls, golf lessons, custom golf club fitting and other golf accessories") and ¶ 26 ("Vulcan Golf's main Internet website using the Vulcan Marks and featuring information on many of the products and services of Vulcan Golf can be accessed via the domain name 'www.VulcanGolf.com' which has been registered and used since May 1997"); FAC ¶ 55 ("Bo Jackson was born November 30, 1962, and became famous at least on or about 1985 when he won the 1985 Heisman Trophy as the most outstanding college football player in the United States") and ¶ 61 ("In 1989 and 1990, Bo Jackson achieved national commercial fame through the 'Bo Knows' advertising campaign . .

. .").

Further, to the extent that Sedo argues that Vulcan and Jackson are not famous as a matter

of law, the Act goes on to state that:

> For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
>> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>> (iii) The extent of actual recognition of the mark.
>> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).

Given the factual inquiry necessary to determine whether a trademark is "famous" for

purposes of this Act, the court declines to make such a determination on a motion to dismiss with

respect to the plaintiffs Bo Jackson, Vulcan Golf and JBSS. To the extent that Google argues

that the dilution claim fails because the FAC does not allege that each of the marks is famous and

does not plead facts in support, this argument is rejected for the reasons just discussed with the

following exception.

Specifically, as noted by Google and Oversee, the FAC alleges facts as to plaintiff Blitz

Realty that pleads Blitz out of court with respect to this claim. Specifically, the FAC alleges that

Blitz Realty Group is a "small, local real estate company" whose marks are "widely known and

recognized among the community in Northern Illinois." FAC ¶¶ 44, 50. This runs contrary to

the statutory requirement that the mark be "widely recognized by the general consuming public

of the United States. . . ." As such, Google and Oversee's motion to dismiss Blitz's false designation of origin claim is granted.

b.      "Use" of a trademark

Sedo also argues that there can be no dilution as it did not "use" the mark as required by the Act. Specifically, it contends that procurement of a domain name does not constitute use in commerce, and simply because "the domain owners 'parked' their page with Sedo, along with 6,999,997 domain names is simply not enough to create any liability on behalf of Sedo." For the same reasons already discussed in section II.B.2(b)(ii), this argument is rejected as a basis to dismiss the dilution claim at this stage of the litigation.

c.      Insufficient allegations of blurring/tarnishment

Finally, Sedo argues that the plaintiffs have not alleged facts in support of their dilution claim that their marks will likely suffer blurring and be tarnished. Under § 1125(c)(2)(B) and (C), "dilution by blurring" is defined as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark" whereas "dilution by tarnishment" is defined as "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." The plaintiffs allege that the defendants have engaged in a scheme to profit from the plaintiffs' trademarks by creating webpages associated with domain names that are similar to the plaintiffs' names or marks. These webpages contain advertising from which the defendants profit. According to the plaintiffs, because internet users could mistakenly assume that the defendants' webpages are associated with the plaintiffs and the plaintiffs do not have the ability to control the association of their marks, dilution has occurred. As such, plaintiffs allege that the defendants "use of the

Deceptive Domains presents a likelihood of dilution of the distinctive value" of their marks.

FAC at ¶ 217. Because the FAC contains allegations sufficient to allege dilution, the motion to

dismiss is denied.

      C.      <u>State Law Claims</u>[11]

          1.    *Illinois Consumer Fraud and Deceptive Business Practices Act (Illinois Consumer Fraud Act) and the Illinois Uniform Deceptive Trade Practices Act*

              a.    Acts Prohibited Outside Illinois

The defendants, both individually and together, raise numerous arguments in support of

their motions to dismiss the Illinois Consumer Fraud Act count. Because the court finds that one

issue raised by Ireit requires dismissal of the count as currently pled, the court will address this

issue first. In addition, in the interest of completeness, the other challenges to the sufficiency of

---

[11]The court notes that in addition to filing separate briefs on the various state law claims, the defendants have also filed a consolidated motion to dismiss the same state law claims. From what the court can tell, there has been duplication of arguments, which the defendants assured the court would not occur. Moreover, at least one argument made in the individual briefs actually contradicts an argument made in the consolidated brief. With respect to the Illinois Consumer Fraud Act claim, in the consolidated motion to dismiss, which was signed by all of the defendants, they concede in a footnote that "[d]efendants do not move for dismissal on this separate ground [of failure to allege that they are consumers], however, because Plaintiffs appear to have arguably alleged a nexus between the complained-of conduct and consumer protection." Consolidated Motion, Dkt. #99 at 25 n.10. However, Sedo argues in its individual brief that the plaintiffs have, indeed, failed to allege that they are consumers. Such contradictions are not acceptable. If a party signs on to all arguments made in a consolidated motion, it cannot turn around and make a contrary argument in its individual motion. Not only is this intellectually disingenuous, but it leads to additional work for the court. The court expects that all future briefs will avoid these problems so that the court can analyze the parties' contentions in an orderly and efficient manner.

On a different note, to the extent that any of the defendants seek to have the state law claims dismissed on the ground that no federal law claims remain pending and therefore supplemental jurisdiction is lacking, that request is denied because certain federal law causes of action remain pending.

the count will also be addressed in the event that the plaintiffs choose to replead this count.

As to the issue that requires dismissal, Ireit argues that the plaintiffs fail to plead any "jurisdictional nexus" to Illinois. The Consumer Fraud Act does not apply to "fraudulent transactions which take place outside Illinois." *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d 801, 850 (Ill. 2005). As a matter of statutory interpretation, the Illinois Supreme Court has held that "a plaintiff may pursue a private cause of action under the Consumer Fraud Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Id.* at 854. The Illinois Supreme Court further "recognize[d] that there is no single formula or bright-line test for determining whether a transaction occurs within this state" and that "each case must be decided on its own facts." *Id.*

In *Avery*, the Illinois Supreme Court addressed whether a class of insureds, who were challenging the defendant's practice of using non-OEM crash parts to repair policyholders' cars, could sue under the Consumer Fraud Act. It concluded that because the "overwhelming majority of circumstances relating to the disputed transactions in this case–State Farm's claims practices–occurred outside of Illinois for the out-of-state plaintiffs[,]" they "have no cognizable cause of action under the Consumer Fraud Act." *Id.*

Obviously, at this stage of the proceedings, any in-depth factual inquiry is inappropriate. Rather, the court must look to whether the allegations of the FAC are factually sufficient such that one could plausibly conclude that the circumstances that relate to the disputed transaction (i.e., the alleged deceptive domain scheme) occurred primarily and substantially in Illinois. Ireit argues that the FAC fails on this front because Ireit is not based in Illinois and no relevant transaction occurred in Illinois.

While the plaintiffs contend that Illinois has "significant contacts" with each of the named class plaintiffs because each is a resident of the state and each conducts substantial business in this state, the plaintiffs point to no allegations that plausibly suggest that the purported deceptive domain scheme occurred primarily and substantially in Illinois. Accordingly, Ireit's motion to dismiss the Consumer Fraud Act claim on this count is granted and the plaintiffs are given 21 days to replead. Although not raised by all of the defendants, the court finds that dismissal on this ground is equally applicable to all defendants.

b.      Pleading with Specificity

All of the defendants assert that the plaintiffs have failed to allege with particularity their Consumer Fraud Act count as required by Fed. R. Civ. P. 9(b).[12]  Courts in this district have generally held that claims under the Consumer Fraud Act are subject to the heightened pleading requirements of Rule 9(b).  *Costa v. Mauro Chevrolet, Inc.*, 390 F. Supp. 2d 720, 731 (N.D. Ill. 2005) ("A complaint alleging a violation of the Illinois [Consumer] Fraud Act must be pled with the same particularity and specificity as that required under common law fraud under Rule 9(b).")(*citing Murry v. Am. Mortg., Banc, Inc.*, No. 03 C 5811, 2004 WL 1474584, *6 (N.D. Ill. June 29, 2004) *(citing Gallagher Corp. v. Mass. Mut. Life Ins. Co.*, 940 F. Supp. 176, 180 (N.D. Ill. 1996)); *see also Daniels v. Bursey*, 313 F. Supp. 2d 790, 801 (N.D. Ill. 2004).

However, at least one court in this district has concluded that the heightened pleading requirements under Rule 9(b) need not be satisfied if the plaintiff is not alleging fraud.  *See Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1233-34 (N.D. Ill. 2005) (stating that

---

[12]This argument appears not only in the consolidated motion to dismiss filed by all of the defendants but also, improperly and repetitively, in Sedo's separate motion to dismiss.

because plaintiff expressly disavowed any fraud claim and indicated that his Consumer Fraud Act claim was based only on conduct prohibited by § 2 the Uniform Deceptive Practices Act (which is incorporated into the Consumer Fraud Act), such as business activities that create "confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services," as well as "any other conduct which similarly creates a likelihood of confusion or misunderstanding," pleading with particularity was not required).

In the first instance, the court notes that this count as pled is not a model of clarity. It appears, based on the allegations of the FAC, that the plaintiffs are only alleging unfair trade practices under the Deceptive Trade Practices Act (as incorporated into the Consumer Fraud Act), which reads in relevant part that "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: . . . causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another . . . ." 815 ILCS 510/2(a)(3). *See* FAC at ¶ 394 ("By means of the actions alleged above, Defendants have advertised to the public that the Defendants' infringing Deceptive Domains and the websites located at the Deceptive Domains are related to, or are an official website of, Lead Plaintiffs and/or the Class."); ¶ 400 ("Defendants' illegal actions alleged herein create a likelihood of confusion or of misunderstanding as to affiliation, connection, association, or certification of the infringing Deceptive Domains with Lead Plaintiffs and the Class."); and ¶ 402 ("Defendants have knowingly, intentionally, and deliberately engaged in conduct that creates a likelihood of confusion or misunderstanding.").

The court understands the plaintiffs to be disavowing a claim of fraud. Response at 89 ("Contrary to Defendants' arguments, the statutes cover much more than fraudulent practices

(which under some circumstances may require special pleading).").  As the court has construed the claim then, the heightened pleading requirements do not apply and this basis for dismissal is rejected.  However, if this is not the case (i.e., the plaintiffs are indeed raising a Consumer Fraud Act claim based on fraud), they are directed to file an amended pleading within 21 days of the date of entry of this order which clarifies that they are seeking relief based on fraud and complies with Rule 9(b).

As a final matter on this count, the court notes that it cannot make heads or tails of the plaintiffs' argument that fraud need not be pled with specificity because "the Seventh Circuit found trademark violations to be actionable under the Federal Trade Commission Act" and that "[t]herefore, by the express statutory language of the ICFDBA, the misleading use of trade names in actionable under the Act and there is no requirement to plead the specificity of common law fraud."  Plaintiffs' Response at 90.  The defendants are not asserting that the plaintiffs cannot bring the claim under the Act, they are arguing that it was not properly pled.  Regardless, the court need not attempt to discern the plaintiffs' argument on this front as it has already construed the FAC as not alleging fraud and, therefore, not requiring heightened pleading.

c.     Consumer Nexus Test

Sedo also contends that the Consumer Fraud Act claim should be dismissed because the plaintiffs fail to allege that they are consumers.  However, in order to state a claim under the Consumer Fraud Act, "the plaintiff must either allege it was a consumer of the defendant *or* allege a nexus with Illinois consumers."  *Gold v. Golden G.T., LLC*, No. 05 C 288, 2005 WL 2465815, at *4 (N.D. Ill. Oct. 4, 2005)(citation omitted)(emphasis added).  Sedo does not assert that the plaintiffs have failed to allege a nexus with Illinois consumers.  Indeed, the court notes

that Sedo fails entirely to address this aspect of its motion to dismiss in its reply brief.

In any event, even if the court were to construe Sedo's argument as challenging the consumer nexus, it fails. "To plead a consumer nexus successfully, a plaintiff need only allege that the conduct complained of 'involves trade practices directed to the market generally or otherwise implicates consumer protection concerns.'" *Gold v. Golden G.T., LLC*, No. 05 C 288, 2005 WL 2465815, at *4 (citation omitted). "[B]usinesses have standing to sue under the Consumer Fraud Act to redress competitive injury they suffer when other businesses deceive customers." *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.*, 657 F. Supp. 1486 (N.D. Ill. 1987)(cause of action stated under Consumer Fraud Act where plaintiff alleged that defendant made misrepresentations "in the marketplace and to actual and/or prospective customers"). In this case, the plaintiffs have adequately pled a consumer nexus by alleging that the defendants have engaged in a scheme that is at least in part intended to deceive internet users.

d.      Lanham Act

Sedo and Google also argue that because the plaintiffs have failed to state a claim under the Lanham Act, they have consequently failed to state claims under the Consumer Fraud Act. However, because the court has not dismissed the Lanham Act claims, this basis for dismissal of the Consumer Fraud Act claim is rejected.

e.      Material Misrepresentation

The consolidated motion to dismiss also argues that the plaintiffs have failed to allege a material misrepresentation. According to the defendants, because the plaintiffs allege that the purportedly deceptive domains redirect users to sites that include advertisements for the plaintiffs' direct competitors, "no internet user could conceivably believe that Plaintiffs would

sponsor a web site running advertisements for their direct competitors," and therefore any deception cannot be material. The court sees this as a spin-off of the "no likelihood of confusion" argument the defendants asserted with the Lanham Act claims, which is an inherently fact-based inquiry inappropriate on a motion to dismiss. To the extent that the defendants are asking the court to hold that internet users, as a matter of law, could not be deceived by the purported diversion to a deceptive domain, the court declines to so find.

2.      Declaratory Judgment

The plaintiffs allege a claim for declaratory judgment pursuant to 28 U.S.C. §§ 2201-02 that the defendants actions have violated the state and federal statutes set forth in the FAC. According to the plaintiffs, "[s]uch a declaration would serve a useful purpose by terminating and affording relief from uncertainty, insecurity and controversy that has been created as a result of Defendants' Deceptive Domain Scheme. . . ." FAC ¶ 413. The defendants assert in their consolidated motion to dismiss that the claim is redundant of the relief sought in the substantive counts themselves, and therefore, because the claim for declaratory relief serves no useful purpose, it should be dismissed. *Amari v. Radio Spirits, Inc.*, 219 F. Supp. 2d 942, 943-945 (N.D. Ill. 2002)(after discussing relevant factors, dismissing declaratory judgment action brought by plaintiff because the substantive issues would be resolved in other case pending before the court in which the plaintiff was named a defendant).

"It is well settled that the federal courts have discretion to decline to hear a declaratory judgment action, even though it is within their jurisdiction." *Tempco Elec. Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987)(citations omitted). Here, the plaintiffs acknowledge that the declaratory judgment count fails to add anything that will not be

decided by the other pending counts. Accordingly, the motion to dismiss the declaratory judgment count is granted.[13] *Amari*, 219 F. Supp. 2d at 944 ("All of the issues in the declaratory judgment claim will be resolved by the substantive action, so the declaratory judgment serves no useful purpose.")(citations omitted).

### 3. Common Law Trademark Infringement

Ireit and Sedo argue that because the plaintiffs have failed to state a claim under the Lanham Act, they have consequently failed to state a claim for common law trademark infringement. However, because the court has not dismissed the Lanham Act claims, this basis for dismissal of the common law trademark infringement Act claim is rejected.

### 4. Contributory Infringement

Sedo claims that Vulcan and Jackson have failed to properly allege a claim for contributory trademark infringement. Oversee makes the same argument as to all of the plaintiffs. In order to prove contributory infringement, "a plaintiff must demonstrate that a defendant: (1) intentionally induced a third party to infringe the plaintiff's mark; or (2) supplied a product to a third party with actual or constructive knowledge that the product was being used to directly infringe the mark." *Monotype Imaging, Inc. v. Bitstream, Inc.*, 03 C 4349, 2005 WL 936882, at *3 (N.D. Ill. Apr. 21, 2005)(citations omitted). "Contributory infringement therefore requires proof of direct infringement by a third party, as well as defendants' intent and knowledge of the wrongful activities of its distributors." *Id.* (citation omitted).

---

[13]Ireit further argues that plaintiffs Vulcan, Blitz and Jackson are not entitled to declaratory relief under Count VIII because the plaintiffs fail to adequately plead any claims against Ireit under Counts I through VII of the FAC and thus, in the absence of any cognizable claim against Ireit, there is no "actual controversy" as required by the Act. The court rejects this argument as it has not dismissed all of the plaintiffs' claims.

Another court faced with similar claims stated the following with respect to the plaintiff's contributory infringement claim:

> Overture argues for dismissal of the contributory infringement count on the grounds that GEICO has not pled either intentional inducement to infringe, or that defendant continued to supply a product while having actual or constructive knowledge of infringement. GEICO has alleged that Overture encourages advertisers to bid on trademarked words, and monitors and controls the allegedly infringing third-party advertisements. Although Overture argues that its monitoring is intended to prevent, not encourage, trademark infringement, that argument raises a disputed fact that cannot be resolved by a motion to dismiss. The claim that Overture monitors and controls the third-party advertisements is sufficient to plead the actual or constructive knowledge required to allege contributory infringement.

*GEICO v. Google, Inc.*, 330 F. Supp. 2d 700, 704 (E.D. Va. 2003)(internal citations omitted).

*See also Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992)(stating that test articulated in *Inwood Laboratories Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982), also applies to contributory liability in relationship between landlord and licensor and that test is "'if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.'").

Here, the plaintiffs allege that:

> The Parking Company Defendants intentionally taste, register, and otherwise assist Domain registrants in procuring Deceptive Domains for the express purpose of monetization with Defendant Google advertisements; (FAC ¶ 155)

> The Parking Company Defendants enter into license agreements with the Domain registrants for the license and rights to control, monitor, maintain, use and place advertising on their domains, including Deceptive Domains; (FAC ¶ 148)

> Defendant Google, Parking Company Defendants and/or the Domain registrants enter into agreements where Defendant Google and the Parking Company

Defendants share advertising/marketing revenue generated on parked domains; (FAC ¶ 147);

The Parking Company Defendants cause popups or popunder advertisements on the Deceptive Domains and receive money for each popup or popunder displayed, in furtherance of the Deceptive Domain Scheme alleged herein. FAC ¶ 160

In addition, the plaintiffs allege that the "[d]efendants induce, cause, and/or materially contribute to the Deceptive Domain Scheme and other unlawful conduct alleged herein" and list statements or actions that the defendants use to "direct" or "promote" the Deceptive Domain Scheme. FAC ¶¶ 431-32. As such, the court rejects Sedo and Oversee's argument that the plaintiffs have not sufficiently alleged that the defendants intentionally induced another to infringe on a trademark. Specifically, the court finds that the plaintiffs have sufficiently pled a claim for contributory infringement to the extent that the FAC alleges that the defendants "intentionally induced a third party to infringe the plaintiff's mark."

Oversee also asserts that the plaintiffs fail to sufficiently allege the second element of a contributory infringement claim, that is that it "continues to supply a product knowing that the recipient is using the product to engage in trademark infringement." However, contrary to Oversee's implication that both elements must be satisfied, the contributory infringement test is an "either/or" test. Because the court has found that the plaintiffs have alleged that the defendants intentionally induced another to infringe a trademark, that is all that is necessary to allow the claim to move forward.

5.     Vicarious Infringement

a.     Sedo

Sedo contends that Vulcan and Jackson have failed to allege a claim of vicarious trademark infringement. Liability for vicarious trademark infringement "requires a finding that

the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." *Hard Rock Cafe Licensing Corp.,* 955 F.2d at 1150 (citation omitted). According to Sedo, the plaintiffs have not alleged any facts that Sedo and the domain owners who use its service can bind one another in a transaction or exercise joint ownership over anything.

However, as already noted above, the FAC alleges that:

> The Parking Company Defendants intentionally taste, register, and otherwise assist Domain registrants in procuring Deceptive Domains for the express purpose of monetization with Defendant Google advertisements  (FAC ¶ 155);

> The Parking Company Defendants enter into license agreements with the Domain registrants for the license and rights to control, monitor, maintain, use and place advertising on their domains, including Deceptive Domains (FAC ¶ 148);

> Defendant Google, Parking Company Defendants and/or the Domain registrants enter into agreements where Defendant Google and the Parking Company Defendants share advertising/marketing revenue generated on parked domains (FAC ¶ 147);

> Defendant Parking Companies enter into agreements with Defendant Google and license to Defendant Google the rights to control, monitor, maintain, use and place advertising on all of the domains under the Parking Company's control, including Deceptive Domains. (FAC ¶ 149).

These allegations are sufficient to support a claim that the alleged infringers at least have an "apparent or actual partnership" or have the "authority to bind one another."  As such, the motion to dismiss on this basis is denied.

> b.    Google

Google also avails itself of the *Hard Rock* case asserting that the "theory of vicarious trademark infringement liability pleaded in the First Amended Complaint was expressly rejected

by the Seventh Circuit." Specifically, Google refers to the "right and ability to supervise standard," taken from the copyright violation context, which was advocated by the plaintiff in *Hard Rock* but rejected by the Seventh Circuit.

As described above, the *Hard Rock* court initially stated that liability for vicarious trademark infringement "requires a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." *Hard Rock*, 955 F.2d at 1150. In the immediate next sentence, however, the *Hard Rock* court noted that "[t]he case before us does not fit into the joint tortfeasor model, and *Hard Rock* does not argue that it does." *Id.* The *Hard Rock* court then went on to discuss (and reject) the alternative "right to supervise" standard relied by the plaintiff in that case.

Here, the plaintiffs do not appear to be seeking relief based on the "right to supervise" doctrine. Instead, as already stated above, the allegations in the FAC are sufficient to state a claim that the alleged infringers at least have an "apparent or actual partnership" or have the "authority to bind one another" as required by the rule articulated by the Seventh Circuit. Thus, Google's reliance on the Seventh Circuit's rejection of the "right to supervise" standard is misplaced and the court rejects this basis for dismissal of the vicarious trademark infringement claim against Google.

> 6. Intentional Interference with Current and Prospective Economic Advantage[14]

The defendants argue in the consolidated motion to dismiss that the intentional

---

[14]Sedo and Oversee do not individually move to dismiss this or any of the remaining state law counts.

interference with current economic advantage claim is properly construed as a claim for intentional interference with contract. To plead a claim based on intentional interference with contract, the plaintiff must allege: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages." *Voelker v. Porsche Cars North America, Inc.*, 353 F.3d 516 (7th Cir. 2003)(citation omitted).

According to the defendants, the claim must be dismissed because the plaintiffs fail to allege the existence of a valid and enforceable contract. The plaintiffs do not even address this argument in their response, which frames this claim solely as one for intentional interference with prospective economic advantage. Thus, the court construes the claim to be so limited. To the extent that the plaintiffs were attempting to assert a tortious interference with contract claim, however, it is dismissed for failure to allege the existence of a contract.

As to the intentional interference with prospective economic advantage claim, all defendants argue that the plaintiffs must allege a business expectancy with a specific third party as well as particular action by the defendant directed towards that third party, and that the plaintiffs have failed to so plead. The defendants also contend that the allegation that the plaintiffs would have done business with a third-party class of "internet users/consumers" is too conclusory and does not raise the plaintiffs' right to relief above the speculative level.

The court does not agree. As noted by the plaintiffs, identification of general classes of third parties (here, internet users) can be sufficient. *Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998)(citations omitted). The plaintiffs allege that their websites and/or information about their

products or services can be accessed over the internet and that they are suffering lost revenue due to diversion of business, confusion, damage to reputation and dilution of their distinctive and valuable famous names and marks.  *See, e.g.*, FAC ¶ 22, 26, 28, 31, 35, 37, 38.  Admittedly, a third-party class of internet users could be quite large, as noted by the defendants.  However, contrary to the defendants' argument, based on the plaintiffs' allegations, the plaintiffs have some reasonable expectation of entering into a valid business relationship with some group of internet users/consumers.  The court is simply not willing at the motion to dismiss stage to definitively state that such a showing, while likely a daunting task, is impossible such that the plaintiffs cannot state a claim.  The supporting allegations are sufficient to raise their right to relief above the speculative level.

Apparently acknowledging the validity of the plaintiffs' position regarding the third-party class allegation, Ireit in its reply brief makes no mention of the purported need to identify a specific third party and argues instead that: (a) the plaintiffs fail to allege that Ireit had any knowledge that the websites that allegedly harmed the plaintiffs existed and (b) the plaintiffs do not plead any facts to support any contention that Ireit owned or was in any way involved with any website that directed consumers away from Vulcan, Blitz or Jackson's websites.  However, these arguments were improperly raised for the first time in its reply brief and, therefore, are forfeited.  *Amerson v. Farrey*, 492 F.3d 848, 852 (7th Cir. 2007) ("Arguments raised for the first time in a reply brief are waived."); *DiChristofano v. Neiman Marcus Group, Inc*., No. 07 C 2250, 2007 WL 3231424, at *5 (N.D. Ill. Oct. 30, 2007).

7.     Unjust Enrichment[15] and Civil Conspiracy

The plaintiffs also allege state law claims for unjust enrichment and civil conspiracy. "Under Illinois law, a civil conspiracy is defined as: '(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.'" *Foodcomm Intern. v. Barry*, 463 F. Supp. 2d 818, 830 (N.D. Ill. 2006)(citation omitted). "A plaintiff may recover under the theory of unjust enrichment if the defendant unjustly retained a benefit to plaintiff's detriment, and defendant's retention of the benefit violates the fundamental principles of justice, equity and good conscience." *Fortech, L.L.C. v. R.W. Dunteman Co., Inc.*, 852 N.E.2d 451 (Ill. App. Ct. 2006)(citations and internal quotation marks omitted). In their consolidated motion to dismiss, the defendants assert that because these claims are based on fraud, they are subject to the heightened pleading requirements of Rule 9(b), which the plaintiffs have not satisfied.

As an initial matter, the court notes that the plaintiffs do less than a half-hearted job of defending the allegations of these claims. Specifically, the plaintiffs do not challenge that the counts are subject to heightened pleading. Instead, without elaboration, they argue that the Rule 9(b) standards may be relaxed if it is shown that the requisite factual information is peculiarly within the defendant's knowledge or control. However, the plaintiffs do not even attempt to

---

[15]In its individual reply brief, Sedo has a section entitled "Plaintiffs have failed to adequately state a claim for unjust enrichment." This section is totally devoted to a general discussion of the heightened pleading requirements of Rule 9(b). However, Sedo did not raise any argument with respect to the unjust enrichment count in its opening brief; thus, any argument as to the unjust enrichment count raised for the first time in its reply brief has been forfeited. *Amerson,* 492 F.3d at 852 ("Arguments raised for the first time in a reply brief are waived.").

make such a showing in their response to the motion to dismiss these counts. Nor do they

incorporate other sections of their briefs that could support their argument or assist the court in

analyzing these arguments.[16] The plaintiffs shirk their responsibility to properly defend the

allegations of their various counts at their own peril, as the court certainly is not going to do it for

them.

The plaintiffs also conclusorily assert that "Class Plaintiffs have clearly and completely

laid out a scheme under which Defendants were unjustly enriched," Response at 92, with no

explanation or supporting argument whatsoever. However, to the extent that the plaintiffs are

trying to assert that their allegations satisfy Rule 9(b), they make no effort to point to the actual

allegations which purportedly satisfy the heightened pleading standard. The plaintiffs'

conclusory statements without specific citations to the FAC are woefully inadequate when the

court is faced with a 469-paragraph FAC. Accordingly, because the allegations as pled in the

civil conspiracy and unjust enrichment counts do not comply with Rule 9(b), and the court is left

to guess as to which specific allegations are incorporated into these counts such that they could

comply with Rule 9(b), the motion to dismiss these two counts is granted.

D.     Consolidated Motion to Dismiss RICO counts

---

[16]For example, the plaintiffs raise this same argument (i.e., lack of access to necessary information) in response to the defendants' contention that the plaintiffs have failed in their RICO count to plead mail and wire fraud with particularity under Rule 9(b). However, the plaintiffs' position is as unsupported in that section of the response as it is in with respect to the unjust enrichment and civil conspiracy claims. More importantly, however, the plaintiffs do not refer to the RICO section in defense of their state law claims. It is not this court's job to hunt through the plaintiffs' 95-page response brief (or for that matter, the over-450 previous paragraphs of the FAC that are "incorporated" in the unjust enrichment and civil conspiracy claims "as if fully set forth herein") in order to locate facts or allegations that could support the plaintiffs' position. And, in any event, the Rule 9(b) analysis as it applies to a RICO versus a non-RICO state law claim may or may not be interchangeable.

The first two counts of the FAC seek relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et. seq.  Count I pleads a claim under 18 U.S.C. 1962(c), while Count II is a claim under 18 U.S.C. § 1962(d).  The court addresses the motion to dismiss each of these counts in turn.

          1.      § 1962(c)

Under the federal RICO statute, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ." 18 U.S.C. § 1962(c).  Under section 1962(c), a plaintiff must allege a defendant's (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Lachmund v. ADM Investor Servs., Inc*., 191 F.3d 777 (7th Cir. 1999).

The defendants first contend that the plaintiffs have failed to plead an enterprise under § 1962(c).  As to the "enterprise," the plaintiffs allege an association-in-fact enterprise with the following members: (1) Defendant Google; (2) the Parking Company Defendants; (3) all AdWords Participants/Advertisers; (4) all Adsense Participants/Publishers; (5) all other individuals and entities participating in Defendant Google's Adsense and Adwords Networks and/or the Defendant Google Advertising Network; (6) Defendant Google Search Partners; and (7) other un-named Co-conspirator Defendants that agreed to and engaged in the unlawful actions described herein.

The court notes, however, that in a footnote in their response brief, the plaintiffs state that:

> As Defendants note, paragraph 225 of the FAC also alleges that the Enterprise includes advertisers and publishers that participate in Google's Adsense and

Adwords Networks. Defendants focus on the reference to these entities in this paragraph to raise the specter of an unwieldy enterprise consisting of millions of participants. . . . However, as the rest of the FAC makes clear, these other entities utilize the Enterprise, which functions as a necessary mechanism to bring together entities who wish to advertise on the Internet, and entities that wish to allow advertisements to be placed on their websites. To the extent that the Court deems it necessary, Class Plaintiffs can readily amend the FAC to make this clarification.

Response to Motions to Consolidated Motion to Dismiss at 63 n.31. It is not at all clear to the court what the plaintiffs are trying to say in this footnote, but the court construes it to mean that these additional entities are not part of the enterprise.[17] This distinction becomes important for the reason described below.

An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "While a RICO enterprise can be formal or informal, some type of organizational structure is required." *Stachon v. United Consumers Club, Inc*., 229 F.3d 673 (7th Cir. 2000). Indeed, the "hallmark of an enterprise is 'structure.'" *United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir. 1994)(citation omitted). Specifically, a RICO enterprise must have "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision making." *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990)(citations omitted). Further, there must be "an organization with a structure and goals separate from the predicate acts themselves." *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991). "Thus, in order to adequately plead a claim under § 1962(c), the complaint must identify an '"association in fact" that is meaningfully different in the RICO

---

[17]While not clear from the footnote, the court assumes that the plaintiffs intended to include in its clarification the "unnamed coconspirators" who are allegedly part of the enterprise.

context from the units that go to make it up." *Williams v. Ford Motor Company*, 11 F. Supp. 2d 983, 986 (N.D. Ill. 1998)(citation omitted).

To be liable under § 1962(c), a "person" must be "separate and distinct from the enterprise." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 646 (7th Cir. 1995). *See also Williams,* 11 F. Supp. 2d at 986 ("It is well-settled in this circuit that liability under § 1962(c) requires that the RICO person or defendant be separate and distinct from the enterprise.")(citation omitted). "[T]he 'non-identity' or 'distinctiveness' requirement as been described as the 'relatively uncontroversial premise that, for purposes of section 1962(c), a corporation cannot be both the 'enterprise' and the 'person' conducting or participating in the affairs of that 'enterprise.'" *Richmond,* 52 F.3d at 646 n.11 (citations omitted). The plaintiffs allege that each defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

In this case, the plaintiffs have failed to allege "persons" that are distinct or separate from the "enterprise." Indeed, after taking away the other members of the enterprise, as the plaintiffs assert they will do, *see* explanation above, then the alleged "persons" (identified as the defendants) and the "enterprise" are one and the same.

Even if the plaintiffs did not intend to exclude the other entities from their definition of the enterprise, they are not properly included for the same reason discussed in *Richmond v. Nationwide Cassel L.P.*, 847 F. Supp. 88, 93 (N.D. Ill. 1994), *aff'd*, 52 F.3d 640, 643-44 (7th Cir. 1995)(concluding that the plaintiff "clearly flunks the . . . separateness test . . . "). In *Richmond*, the plaintiff named three defendants as well as other entities who "have been for a number of years, associated in fact on an ongoing basis for the purpose of conducting business in selling and financing automobiles, related intangible products, (warranties, service contracts, credit life

insurance, credit health and accident insurance), as well as other goods and services." *Id*. at 91. The district court, however, noted that "[a]part from the three named defendants, none of the other affiliate entities referred to in the Complaint . . . is alleged to be hooked up (in terms of the 'conduct of their affairs') with the allegedly fraudulent conduct that is said to have defrauded [plaintiff] and the other class members." *Id.* at 92. The court went on to note that "[i]n terms that are relevant to the current analysis, then, it is just as though Richmond had named Cassel, Nationwide and NAC as the target 'persons' and only an association in fact" made up of those three alone as the purported 'enterprise.'" *Id.* at 92-93.

Here, the plaintiffs offer to amend the complaint to make clear that the other entities (i.e., all AdWords Participants/Advertisers; all Adsense Participants/Publishers; all other individuals and entities participating in Defendant Google's Adsense and Adwords Networks and/or the Defendant Google Advertising Network; Defendant Google Search Partners, unnamed co-conspirators), merely "utilize" (itself a vague term) the enterprise. To the extent that the plaintiffs' statement can be read to mean that these entities are still allegedly members of the enterprise, the FAC, as in *Richmond*, makes no allegations as to how these other entities participated in the alleged deceptive domain scheme. *See Richmond*, 52 F.3d at 645 (finding no enterprise alleged in part because "[n]ot one of the non-defendant entities, supposedly constituent parts of the 'enterprise,' is described as playing a role in the [purported deceptive scheme].").  As such, these other entities are not properly included in the enterprise. Consequently, the "persons" identified by the plaintiffs (i.e, each of the defendants) are the same as the "enterprise," and the separate and distinct requirement has not been met. *Id. at* 643-44 ("The district court concluded that the three defendants were both the target 'persons' and the 'association in fact' that made up

the purported 'enterprise,' and thus were in no way separate."). *Williams,* F. Supp. 2d at 988

("The same is true of *Richmond*, and the Second Circuit cases upon which it relied, where the

RICO person was essentially indistinguishable from the RICO enterprise."); *cf. Vega v. Contract*

*Cleaning Maintenance*, No. 03 C 9103, 2004 2358274, at *14 (N.D. Ill. Oct. 18, 2004)(finding

separate and distinct requirement met because "[n]owhere in the complaint do Plaintiffs allege

that CCS or CCM were both a person and an enterprise in the same claim under § 1962(c).")

　　If the court accepts the plaintiffs' invitation to find that the other entities are properly

included as members of the enterprise, the purported enterprise becomes even less-defined, with

no limits or restrictions.  As noted by the defendants, the aforementioned group could potentially

include millions of entities and individuals.  But, "[s]uch a nebulous, open-ended description of

the enterprise does not sufficiently identify this essential element [i.e., enterprise] of the RICO

offense."  *Richmond*, 52 F.3d at 645.  *See also Stachon*, 229 F.3d at 676 (concluding no

enterprise existed due to "[a]ppellants' vague allegations of a RICO enterprise made up of a

string of participants, known and unknown, lacking any distinct existence and structure."); *In Re*

*Managed Care Litigation*, 135 F. Supp. 2d 1253, 1261-62 (S.D. Fla. 2001)("a group of

commercial third-party entities *apparently unrelated to each other* who contract on a regular

basis with some or all of the Defendants" does not sufficiently allege an enterprise)(emphasis in

original); *Blue Cross and Blue Shield of Alabama v. Caremark*, No. 98 C 1285, 1999 WL

966434, at *8 (N.D. Ill. Sept. 30, 1999) (concluding that alleged "enterprise comprised of

Caremark and the various persons and entities with which Caremark entered into financial

arrangements. . . . fail[ed] to allege how this large and geographically diverse group of almost

3,000 independent physicians and entities acted in concert with one another with the common

purpose of defrauding Plaintiffs.").

Indeed, while the FAC includes extensive allegations about the business operations of each of the defendants, it fails to allege any "organizational structure," or any type of "hierarchical or consensual decision-making." *Stachon*, 229 F.3d at 678. The court agrees with the defendants that the facts of *Stachon* are similar to those presented here. In *Stachon*, the plaintiffs alleged that the defendants, United Consumer Club, Inc. ("UCC"), a consumer purchasing club, and its executives, had violated RICO. The court concluded that the plaintiffs had failed to allege an enterprise, stating as follows:

> [T]hat UCC, over its 21-year existence, contracted with numerous manufacturers, suppliers, and members fails to establish an "ongoing structure." Plaintiffs offer nothing to demonstrate that the changing, *unnamed* manufacturers, suppliers, and members function with UCC as a continuing unit or as an ongoing structure. . . .

*Stachon*, 98 C 7020, 1999 WL 971284, at *3 (N.D. Ill. Oct. 21, 1999), *aff'd*, 229 F.3d 673 (7th Cir. 2000). In finding no structure, the district court in *Stachon* went on to note that:

> Further, Plaintiffs offer nothing to show that the alleged "enterprise" is more than UCC simply contracting with members and suppliers. . . . Plaintiffs provide, and the court finds, *no case law to support that a purchasing club's (or any corporation's) ordinary business dealings with past and present manufacturers, suppliers, or members constitute a structure.* . . .
>
> Each Individual Defendant, manufacturer, supplier, and member enters into agreements for their own benefit. But nothing within these ordinary business relationships mirrors a hierarchical organization, nor do these relationships foster consensual decision making in pursuit of the enterprise's alleged purpose. . . .

*Id*. (citations omitted)(emphasis added).

Similarly, here, the FAC merely sets out, admittedly in significant detail, how each of the defendants conducts its own business operations, including their professional contractual relationships. However, "liability depends on showing that the defendants conducted or

participated in the conduct of the '*enterprise*'s affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). In this case, the allegations do not support a finding that a hierarchical structure existed outside the defendants' normal business relationships. *Richmond*, 52 F.3d at 645. ("[t]his complaint clearly alleges only that the defendants perpetrating the fraud on Ms. Richmond were conducting their own (and each other's) affairs.").

Because the court has concluded that the plaintiffs have failed to allege an enterprise, it need not address the defendants' other bases of dismissal for the RICO counts. The plaintiffs are granted 21 days to replead the RICO count.

>    2.      § 1962(d)

To state a claim under § 1962(d), the plaintiff must allege "(1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). However, because the plaintiffs have failed to establish a violation of § 1962(c), their § 1962(d) claim based on the same facts must also fail. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000) (relying on *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1026 (7th Cir. 1992)). Therefore, Count II is dismissed.

## III.     Conclusion

For the reasons stated above, the motions to dismiss [98-1] are granted in part and denied in part. Specifically: (a) the consolidated motion to dismiss the RICO counts is granted; (b) the consolidated motion to dismiss the civil conspiracy and unjust enrichment counts is granted; (c)

Ireit's motion to dismiss the Consumer Fraud Act count is granted with respect to all defendants; (c) Sedo's motion to dismiss the trademark infringement claim under Section 32 of the Lanham Act is granted as to Jackson with respect to all defendants; (d) Google and Oversee's motions to dismiss the trademark dilution claim as to Blitz Realty is granted with respect to all defendants. The plaintiffs are given 21 days to replead all dismissed counts provided they can do so within the confines of Fed. R. Civ. P. 11.

In the meantime, the court deems it appropriate to begin briefing on the motion for class certification. The court instructs the parties to meet and confer regarding a briefing schedule and to file with the clerk a joint proposed briefing schedule no later than April 2, 2008.

ENTER:

**Date:** March 20, 2008

_Blanche M. Manning_

**Blanche M. Manning**
**United States District Judge**