# EXHIBIT A

Dockets.Justia.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. | § | |
| SANFILIPPO & SONS, INC., | § | |
| BLITZ REALTY GROUP, INC., | § | |
| and VINCENT E. "BO" JACKSON, | § | |
| Individually and on Behalf of All | § | |
| Others Similarly Situated, | § | Civil Action No. 07 CV 3371 |
| | § | |
| Lead Plaintiffs, | § | |
| | § | Honorable Blanche M. Manning |
| v. | § | |
| | § | Magistrate Judge Geraldine Soat Brown |
| GOOGLE INC., OVERSEE.NET, | § | |
| SEDO LLC, DOTSTER, INC., AKA | § | |
| REVENUEDIRECT.COM, | § | |
| INTERNET REIT, INC. d/b/a IREIT, INC., | § | |
| and JOHN DOES I-X, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MOTION FOR PRELIMINARY INJUNCTION**

Class Plaintiffs, individually and on behalf of the putative class, file this Motion for Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.

**I.    INTRODUCTION**

1.    Defendants' ongoing and intentional use and monetization of Deceptive Domains, and associated misconduct (as set forth more fully in the First Amended Complaint (hereinafter "FAC")), has necessitated this Motion for Preliminary Injunctive Relief.  Further, Defendant Google's and Defendant Domain Sponsor's use and monetization of Deceptive Domains that are obscene and pornographic (incorporating Class Plaintiff "Bo Jackson" in the domain name) and, that contain shockingly elicit, offensive, obscene and pornographic words, images, and advertisements require immediate injunctive relief to prevent further irreparable harm to the

1

good reputation of Class Plaintiff Bo Jackson. Likewise, pornographic and obscene Domain Names that contain putative class members' Distinctive and Valuable Marks are equally injurious to their goodwill, reputations, business and personal property. Such conduct must be stopped.

2.      Since the filing of the FAC, Class Plaintiffs have both verbally (at the Rule 26 Conference and over the telephone) and in writing, demanded that Defendants cease monetization and use of Deceptive Domains that infringe upon the Class Plaintiffs' and putative class members' Distinctive and Valuable Marks. After repeated and continued ongoing violations, on October 4, 2007 Class Plaintiffs made a final warning to Defendants to once again cease use and monetization of Deceptive Domains or Class Plaintiffs would be forced to seek Court intervention. *See Attached Correspondence Between The Parties, Exhibit "A"*.

3.      In response to Class Plaintiffs' October 4, 2007 correspondence, Defendants once again made insincere agreements to cease use and monetization of Deceptive Domains that infringe upon the Distinctive and Valuable Marks belonging to Class Plaintiffs[1], apparently doing so in a calculated attempt to prevent Class Representatives from seeking this Court's intervention.

4.      However, despite repeated verbal and written assurances, Defendants have not stopped use and monetization of Deceptive Domains, but rather, they continue to brazenly taste, register, use, engage in cybersquatting, cyberpiracy, typosquatting, hijacking of traffic, monetization of Deceptive Domains and other clearly injurious and illegal conduct that damages Class Plaintiffs' and the putative class members' property and reputations. Defendants continue

---

1.      Defendants even made false representations to this Court that they had ceased use and monetization of Deceptive Domains infringing upon Class Plaintiffs' Distinctive and Valuable Marks. *See Google Motion to Dismiss, 2, 5.*

2

said conduct on an outrageous scale, with millions of violations occurring just since the filing of the FAC.

5.    Defendant Google and Defendant Domain Sponsor have placed obscene and pornographic advertisements on pornographic/obscene Deceptive Domains containing Class Plaintiff Bo Jackson's good name, including:    BoJacksonNude.com; BoJacksonSex.com; BoJacksonPorn.com; xxxbojackson.com; bojacksonxxx.com; and bojacksonsporn.com.    *See attached Exhibit "B".*

6.    Following are just a few examples of Deceptive Domains used and monetized since November 13, 2007 by the Defendants:

> BlitzRealtyGrup.com
> BoJacksonNude.com
> BoJacksonSex.com
> BoJacksonPorn.com
> buyfishernuts.com
> vulgangolf.com
> vulcingolf.com
> vulcengolf.com
> blitzrealtygrop.com
> bojacksonsporn.com
> vulkangolf.com
> bojacksonxxx.com
> xxxbojackson.com
> bojacksonpics.com

The screenshots associated with these Deceptive Domains are attached hereto as *Exhibit "B"*.

7.    To demonstrate the sheer egregiousness and deception of Defendants, Class Plaintiffs have chosen to identify Deceptive Domains registered and monetized by Defendants in the very short period since the filing of their Reply Memorandums on November 13, 2007. There are many additional examples that Class Plaintiffs can provide the Court, if desired.  Since

3

November 13, 2007, one or more of the Defendants have registered and monetized the Deceptive

Domains shown in *Exhibit "C"*.

       8.      Defendants' outrageous conduct, requiring preliminary injunctive relief, includes,

but is not limited to:

      A.    Generating revenue from obscene, elicit, offensive, and pornographic advertisements on Deceptive Domains containing Class Representative Bo Jackson's name, <u>after</u> the filing of the FAC and <u>after</u> the date Defendants represented to this Court (in their briefings in support of their motions to dismiss) that they had ceased monetizing Deceptive Domains that infringe on Class Plaintiffs' Distinctive and Valuable Marks;

      B.    Continued tasting, registration, cybersquatting, typosquatting, kiting, cyberpiracy, monetization and use of Deceptive Domains, and other conduct as alleged in more detail in the FAC, on an ongoing and continuous basis, despite representations to this Court and the Class Plaintiffs that they would and have ceased said conduct; and

      C.    Just since November 13, 2007, the date of Defendants' filing of Reply Memorandums in Support of their Motions to Dismiss, Defendants have registered and monetized **43** Deceptive Domains that blatantly infringe on Class Representatives' Distinctive and Valuable Marks and thousands of Deceptive Domains infringing on the class members' Distinctive and Valuable Marks.

       9.      The nature of the injuries being suffered by Class Plaintiffs and the putative class

(loss of goodwill, reputation, customers, confusion, dilution, etc.), in conjunction with the highly

obscene/offensive/pornographic advertisements placed on many Deceptive Domains, results in

irreparable harm and makes legal remedies inadequate, thus necessitating preliminary injunctive

relief.

## II.    <u>DECEPTIVE DOMAINS USED SINCE FILING OF COMPLAINT</u>

      10.      Each of the above Deceptive Domains share the following common

characteristics:

      i.    Parked Domains (as defined in ¶83.v. of First Amended Complaint);

    ii.  Advertising Only/Non-Content sites;

   iii.  Domain names in which Defendants have no legitimate business, legal, property, or commercial right;

   iv.  Domain Names that contain all or a significant portion of Class Plaintiffs' business or personal names; and

    v.  Each Deceptive Domain generates revenue that is used, distributed and shared by Defendants, as set forth in the Deceptive Domain Scheme alleged in the FAC.

11.    Five of the above Deceptive Domains contain highly offensive, elicit, obscene and pornographic language, images, and advertisements both in the Domain Name itself, and on the associated website: Bojacksonsex.com, Bojacksonporn.com, Bojacksonnude.com, NudeBojackson, and BoJacksonNaked.com.

## III.   <u>INJURY TO THE CLASS REPRESENTATIVES</u>

12.    Each Plaintiff owns Distinctive and Valuable Marks that they are entitled to have protected, as plead in the FAC. (FAC ¶¶22, 27, 31, 36, 66.)

13.    Defendants are, and have been, aware that Class Plaintiffs are the rightful owners of the Distinctive and Valuable Marks.

14.    Defendants knowingly disregard Class Plaintiffs' rights and interests.

15.    Class Plaintiffs are each suffering irreparable harm as a direct and proximate result of Defendants' use and monetization of Deceptive Domains that infringe their Distinctive and Valuable Marks, cyberpiracy, cybersquatting, typosquatting, tasting, kiting, hijacking/redirecting internet traffic away from Class Plaintiffs, and other such illegal conduct as set forth in more detail in the FAC.

16.    Class Plaintiff Bo Jackson has and is suffering irreparable harm to his reputation, good name, and the goodwill associated with his name by Defendants' monetization of

offensive/pornographic Deceptive Domains (containing his name) with elicit, offensive, obscene and pornographic advertisements, including but not limited to:  Teen Pornography, Gay Pornography, Ethnic Pornography (Asian, Black, etc.), "Big Tits," "XXX," "Cheap Porn," "Eva Longoria Nude." *See Exhibit "B."*

17.    Class Plaintiff Bo Jackson does not condone, authorize, or support in any way the sexual exploitation of teens, exploitation of famous people such as "Eva Longoria," exploitation of and promotion of ethnic and racial pornography/obscenities, exploitation of female or male sexuality and degradation of humans through any form of pornography, elicit, and/or obscene material.

18.    Class Plaintiff Bo Jackson did not grant any of the Defendants any rights, licenses, permission, or otherwise support, condone or accept the association of his good name with the highly offensive, obscene, pornographic and elicit material and advertisements on the Deceptive Domains containing the "Bo Jackson" name.

19.    Class Plaintiff Bo Jackson has not been compensated or received any income from the registration, use, and /or monetization of said Deceptive Domains.

20.    There is no adequate remedy at law for the injury to reputation, goodwill, distress and humiliation that Defendant Google and Defendant Domain Sponsor are currently causing Plaintiff Bo Jackson by associating his good name with shocking and offensive obscene material.

21.    All Defendants routinely generate money from use of elicit/obscene/pornographic Deceptive Domains and the placement of obscene and pornographic internet advertisements on Deceptive Domains without the consent or permission of the rightful owner.

IV.    **INJURY TO THE PUTATIVE CLASS**

22.    Like Class Representatives, each putative class member is and continues to suffer

6

irreparable harm as a direct and proximate result of Defendants' use and monetization of Deceptive Domains that infringe upon their Distinctive and Valuable Marks, cyberpiracy, cybersquatting, typosquatting, kiting, tasting, hijacking/redirecting internet traffic away from Class Plaintiffs, and other illegal conduct as set forth in more detail in the FAC.

23.    Injury and damage to goodwill, reputation, mark value, lost business, diversion of internet traffic and other such injuries can be difficult to measure, and therefore result in irreparable harm.

24.    Defendants' ongoing illegal conduct, even since the filing of the FAC, is egregious and implicates the rights and property of hundreds of thousands of putative class members.  Just a few examples follow (screenshots of said Deceptive Domains are provided in *Exhibit "D"*):

| Deceptive Domain | Defendants | Category of Mark | Class Member |
|---|---|---|---|
| BrittneySpears.info | SEDO/GOOGLE | Famous Person | Brittney Spears |
| JustinTimberlake.info | SEDO/GOOGLE | Famous Person | Justin Timberlake |
| expressfshion.com | GOOGLE | Retail Store | Express Fashion |
| applecomputers.com | GOOGLE | Software/PC Manufacturing | Apple |
| sonie.com | SEDO/GOOGLE | Electronics | Sony |
| panasoni.com | GOOGLE | Electronics | Panasonic |
| Guci.com | GOOGLE | Retail Store | Gucci |
| tmobilde.de | SEDO/GOOGLE | Wireless Provider | Tmobile |
| Wii-fitness.co.uk | SEDO/GOOGLE | Video Game Systems | Nintendo |
| Tompetty.info | SEDO/GOOGLE | Famous Person | Tom Petty |
| samscloub.com | OVERSEE | Retail Store | Sam's Club |
| tmewarnercable.com | OVERSEE | Cable Network | Time Warner |
| myspaced.com | IREIT | Social Network | Myspace |
| 2meninatruck.com | DOTSTER | Moving Company | 2 men and a truck |
| diesny.com | DOMAIN SPONSOR | Entertainment | Disney |

25.    Even at this early pre-discovery stage in this litigation, there are literally thousands of additional Deceptive Domains that Class Plaintiffs can provide the Court, if the Court so desires, that all share the following common characteristics:

    i.  Parked Domains;

    ii.  Advertising Only/Non-Content sites;

    iii. Domain names in which Defendants have no legitimate business, legal, property, or commercial right;

    iv. Domain Names that contain all or a significant portion of Class Plaintiffs' business or personal names; and

    v.  Each Deceptive Domain generates revenue that is used, distributed and shared by Defendants, as set forth in the Deceptive Domain Scheme alleged in the FAC.

## V.    **LEGAL STANDARD**

26.    Class Plaintiffs seek a preliminary injunction against all Defendants pursuant to Rule 65 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 65. A party seeking a preliminary injunction must demonstrate that it has some likelihood of success on the merits, that there is no adequate remedy at law, and that it will suffer irreparable harm if the injunction is not granted. *Am. Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 803 (7th Cir. 2002); *see also Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). The Seventh Circuit set forth the applicable standard requiring moving parties: "need only demonstrate at the preliminary injunction stage that it has a 'better than negligible' chance of succeeding on the merits so that injunctive relief would be justified." *Id.*

27.    Preliminary injunctions are appropriate when serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999); *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917 (9th Cir. 2003).

28.    Preliminary injunctions are often granted in Lanham Act cases involving trademark violations due to the inadequacy of legal remedy for such hard to quantify damages

(loss of goodwill, diversion of business, reputation, etc.). *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001) citing *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999) (where the Court explained "[u]sing another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store" (*Brookfield,* 174 F.3d, at 1064)).

29.    Further, the necessity of preliminary injunctive relief is well-recognized in cybersquatting cases under the Lanham Act, 15 U.S.C. §1115(d). *See Shields v. Zuccarini,* 89 F. Supp. 2d 634, 54 U.S.P.Q.2d (BNA) 1166, 1172 (E.D. Pa. 2000), subs proceedings 2000 WL 1056400 and 2000 WL 1053884 (E.D. Pa. 2000), both aff'd 254 F.3d 476, 59 U.S.P.Q.2d 1207, 1213 (3rd Cir. 2001); *1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467, 69 U.S.P.Q.2d (BNA) 1337, 195 A.L.R. Fed. 641 (S.D. N.Y. 2003); *Northern Light Technology v. Northern Lights Club,* 97 F. Supp. 2d 96 (D. Mass. 2000), aff'd, 236 F.3d 57 (1st Cir. 2001), cert. denied, 533 U.S. 911, 121 S.Ct. 2263, 150 L. Ed. 2d 247 (2001); *Porsche Cars North America, Inc. v. Spencer*, 55 U.S.P.Q.2d (BNA) 1026, 1032, 2000 WL 641209 (E.D. Cal. 2000); *Advance Magazine Publishers Inc. v. Vogue Intern.,* 123 F. Supp. 2d 790, 801 (D. N.J. 2000); *Electronics Boutique Holdings Corp. v. Zuccarini,* 56 U.S.P.Q.2d (BNA) 1705, 2000 WL 1622760 (E.D. Pa. 2000) (where the court explained that: "It is impossible to determine the number of potential and existing customers diverted from EB's website by Mr. Zuccarini's domain misspellings. A user-friendly website is important to EB's online success. There must be as few steps, or clicks, as possible between initially accessing EB's website and the completion of the transaction, as each computer click represents a significant amount of time. Those who get lost in the advertisements

may abandon their intention to purchase from EB. Others simply may never find EB's website. These customers may not only be discouraged from shopping at EB online, but may also be discouraged from shopping at EB's outlets in person as well. Furthermore, it is impossible to calculate the loss of reputation and goodwill caused by Mr. Zuccarini's domain misspellings. …"); *DaimlerChrysler v. The Net, Inc.,* 388 F.3d 201, 203 (6th Cir. 2004), citing *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,* 202 F.3d 489, 493 (2nd Cir. 2000).

30.     Each Class Plaintiff, as well as the putative class members, will suffer irreparable injury if this Court does not require Defendants to immediately cease registration, tasting, kiting, use and monetization of the Deceptive Domains. *See Larson v. Galliher,* 2007 WL 81930 (D. Nev. 2007).

31.     **REASONABLE SUCCESS ON THE MERITS:**

A.     Defendants have registered and monetized Deceptive Domains that are identical to, or confusingly similar to, Class Plaintiffs' Distinctive and Valuable Marks, without Class Plaintiffs' consent. See 15 U.S.C. §1114(a). This Court can make a simple comparison of the name of the Deceptive Domain and Class Plaintiffs' trademarks/distinctive/valuable marks rather than an assessment of the context in which each is used or the content of the offending website. *HER, Inc. v. RE/MAX First Choice, LLC* 468 F. Supp. 2d 964 (S.D. Ohio 2007), citing *Northern Light Technology v. Northern Lights Club,* 97 F. Supp. 2d 96, 117 (D. Mass. 2000);

B.     Defendants violate 15 U.S.C. §1125(d), by their actions in (1) registering, trafficking in, or using Deceptive Domains that are identical to, or confusingly similar to, distinctive and valuable marks owned by Class Plaintiffs and/or the class; and (2) committing the acts with the bad faith intent to profit from Class Plaintiff's marks. *See Rosati's Franchise Sys., Inc. v. Rosati,* 2006 WL 163145, at *5 (N.D. Ill. 2006) (citing 15 U.S.C. §1125(d)(1)). Each of

the Deceptive Domains alleged herein are:

    i.   Parked Domains;

    ii.  Advertising Only/Non-Content sites;

    iii. Domain names in which Defendants have no legitimate business, legal, property, or commercial right;

    iv. Domain Names that contain all or a significant portion of Class Plaintiffs' business or personal names; and

    v.  Each Deceptive Domain generates revenue that is used, distributed and shared by Defendants, as set forth in the Deceptive Domain Scheme alleged in the FAC.

    C.    Defendants' use of the Deceptive Domains was done with the bad faith intent to profit in violation of 15 U.S.C. §1125(d)(1)(B)(i), in so much as Defendants had no prior use of the domain names for a bona fide offering of goods or services. See *Victoria's Secret Stores v. Artco Equipment Co., Inc.,* 194 F. Supp. 2d 704, 722 (S.D. Ohio 2002), quoting *E. & J. Gallo Winery v. Gallo Cattle Co.,* 12 U.S.P.Q.2d 1657, 1675 (E.D. Cal. 1989) ("a presumption of bad faith arises in a situation such as this where 'the senior user's trademark is famous in the marketplace and where the junior user was aware of the trademark and of its fame.... In these cases, it is inferrable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark.'");

    D.    Additionally, Defendants intend to divert consumers from Class Plaintiffs' and the Putative Class Members' online location to a site accessible under the Deceptive Domain that could harm Class Plaintiffs' and the Putative Class Members' goodwill, reputation, commercial gain, create a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site, and otherwise damage Class Plaintiffs' and the Putative Class Members' business and property;

E.    Defendants routinely offer to transfer, sell, or otherwise assign Deceptive Domains to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;    .

F.    Defendants routinely provide material and misleading false contact information when applying for registration of Deceptive Domains, and/or intentionally fail to maintain accurate contact information;

G.    Defendants engage in a widespread scheme that involves the registration, tasting, acquisition, monetization, and use of multiple domain names which the Defendants know are identical or confusingly similar to marks of others that are distinctive and valuable for the express purpose of generating advertising revenue from diverted traffic and confusion;

H.    Defendants otherwise act in a manner that demonstrates bad faith intent to commercially profit from the unauthorized use of Deceptive Domains in violation of 15 U.S.C. §1125(d)(1)(B)(i);

I.    Defendants' actions in generating, collecting, transacting in, sharing, and distributing the revenue from their unlawful conduct establishes a RICO violation;

J.    As alleged in detail in the FAC and the Motions to Dismiss, Defendants' use of the internet, electronic transmission, common electronic programs, mails and wire are among the several predicate acts that are undisputed and will form the foundation for RICO liability;

K.    The FAC contains abundant factual allegations supporting and demonstrating a high likelihood of success on each of the alleged legal claims; and

L.    The attached screenshots and specific identification of Deceptive Domains (including Defendants' concerted and intentional unauthorized use and monetization of those

12

Deceptive Domains) is sufficient to establish liability under each Count of the Complaint.

32.    **NO ADEQUATE REMEDY AT LAW EXISTS**:  The very nature of Class Plaintiffs' and the putative class members' injuries/damages makes it difficult to assess damages associated with loss of goodwill, reputation, prospective business, diverted internet traffic, etc., and, therefore, such damages are considered to have no adequate remedy at law, and to be irreparable (often involving trademark/Lanham Act claims).  *See, e.g., Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 813 (7th Cir. 2002); *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1140 (7th Cir. 1994).  Courts in this Circuit have held likewise for cybersquatting claims.  *International Profit Associates, Inc. v. Paisola*, 461 F.Supp.2d 672 (N.D. Ill. 2006).  It is obvious that there is no adequate remedy at law for Class Plaintiff Bo Jackson's unauthorized association with lewd, obscene, offensive and pornographic words, images, and advertisements.  Without question, the balance of hardships tips in favor of Class Plaintiffs and the Putative Class because the preliminary injunction will essentially merely place the infringing Deceptive Domains on "hold" or "block" the use and monetization of said domains pending trial (at most causing Defendants to lose some advertising revenue that they are not entitled to anyway), whereas failure to issue the injunction will cause Class Plaintiffs and the Class to suffer and incur continued lost goodwill, dilution, embarrassment, loss of reputation, loss of business, and related property, personal and business damage.

33.    **THE INJUNCTION WILL NOT HARM THE PUBLIC INTEREST**:  The public interest will be served by requiring Defendants to comply with the law and cease and desist making money from the illegal and unauthorized use of Class Plaintiffs' and the putative class members' property.  "The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks."

*Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.,* 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999). Notably, injunction was expressly contemplated by Congress as a remedy for trademark infringement. *See* 15 U.S.C. §1125(c)(1); *Pet Silk, Inc. v. Jackson,* 481 F. Supp. 2d 824, 834 (S.D. Tex. 2007).

34.    Class Plaintiffs understand that this litigation is in its early pre-discovery stages. However, the damage and injuries being sustained by Class Plaintiffs and the putative class members are irreparable in nature. Unfortunately, Defendants refuse to voluntarily cease said conduct and have chosen blatant disregard for the law, in order to reap the financial benefits of their misconduct.

## VI.    CONCLUSION

35.    Defendants are responsible for running their business operations legally, in a manner that complies with federal and state law. Defendants have a duty to design and maintain their programs, systems and operations in a fashion that ensures compliance with the law, respect for the property rights of other citizens, and avoids the taking and use of rights/property that does not belong to Defendants. Like any other business, the responsibility to act legally lies with Defendants. If they cannot run their businesses without myriad ongoing violations, then the internet advertising and monetization aspect of their business must cease. If Defendants are not willing to voluntarily implement the available and appropriate blocking and filtering technologies, or if they posit that such technologies cannot be reasonably employed in their respective current business models/operations, than said operations must end.

## VII.    PRAYER FOR RELIEF

WHEREAS, Defendants refuse to cease and desist their illegal conduct detailed herein and in the FAC, without Court intervention, Class Plaintiffs respectfully request that this Court

14

enter a Preliminary Injunction against all Defendants, granting relief as follows:

1.  All Defendants ordered to immediately cease and desist tasting, kiting, registration, monetization, sale, trafficking in, cybersquatting, typosquatting, cyberpiracy, and/or other use of Deceptive Domains that infringe on the Class Plaintiffs' and the Putative Class Members' Distinctive and Valuable Marks;

2.  Defendant Google ordered to provide the Court with the domain name and associated reports (traffic statistics, revenue statistics, etc.) of every domain name that has displayed Google controlled advertising, participated in its AdSense for Domains program, been used to generate revenue from advertisements, and/or has otherwise been monetized by Google;

3.  All other Defendants ordered to provide the Court with the domain name and associated reports (traffic statistics, revenue statistics, etc.) of every domain name under their ownership, license, or control that has displayed Google controlled advertisements, participated in the Google AdSense for Domains program, been used to generate revenue from internet advertisements, and/or has otherwise been monetized by one or more of the Defendants;

4.  All Defendants ordered to immediately implement Court-approved, appropriate blocking and filtering technology to prevent use and monetization of Deceptive Domains and the other illegal conduct alleged in the FAC;

5.  If one or more of the Defendants cannot implement appropriate blocking and filtering technologies, those Defendants shall be enjoined from all internet advertising and other monetization of any domains until an appropriate blocking and filtering system can be implemented and approved by the Court;

6.  Order a constructive trust over all revenue generated by any of the Defendants from the use and/or monetization of Deceptive Domains;

7.  Sanction Defendants for their blatant misrepresentations to this Court that they have stopped the registration, use, and monetization of Deceptive Domains that infringe upon Class Plaintiffs;

8.  Award reasonable attorneys' fees and costs associated with the filing of this Motion; and

9.  Award any and all such other relief as this Court deems just and appropriate.

FOOTE, MEYERS, MIELKE & FLOWERS, LLC

By: _/s/ Robert M. Foote_____
   One of Their Attorneys

15

Robert M. Foote, Esq. #03214325
Stephen W. Fung, Esq. #06289522
Mark A. Bulgarelli, Esq. #06284703
Foote, Meyers, Mielke & Flowers, LLC
28 North First St.
Suite 2
Geneva, IL 60134
630-232-6333

Kathleen C. Chavez, Esq. #06255735
Chavez Law Firm, P.C.
28 North First St.
Suite 2
Geneva, IL  60134
630-232-4480

William J. Harte, Esq.
Dana Pesha, Esq.
Joan M. Mannix, Esq.
William J. Harte, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL 60602
312-726-5015

Benjamin G. Edelman, Esq.
Law Office of Benjamin Edelman
27a Linnaean Street
Cambridge, MA 02138
617-359-3360

ATTORNEYS FOR PLAINTIFFS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. SANFILIPPO & SONS, INC., BLITZ REALTY GROUP, INC., and VINCENT E. "BO" JACKSON, Individually and on Behalf of All Others Similarly Situated, | § § § § § § | |
| | § | Civil Action No. 07 CV 3371 |
| Lead Plaintiffs, | § § | |
| | § | Honorable Blanche M. Manning |
| v. | § § | Magistrate Judge Geraldine Soat Brown |
| GOOGLE INC., OVERSEE.NET, SEDO LLC, DOTSTER, INC., AKA REVENUEDIRECT.COM, INTERNET REIT, INC. d/b/a IREIT, INC., and JOHN DOES I-X, | § § § § § § § | |
| Defendants. | § | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2008, I electronically filed the foregoing document with the clerk of court for the U. S. District Court, Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Brett A. August
baugust@pattishall.com

Michael H. Page
mhp@kvn.com

Mariah Moran
mmoran@stetlerandduffy.com
edocket@stetlerandduffy.com

Janelle M. Carter
jcarter@winston.com
ECF_CH@winston.com

Kenneth P. Held
kheld@velaw.com

Steven Borgman
sborgman@velaw.com
jwarren@velaw.com
steveborgman@gmail.com
yshumaker@velaw.com

Bradley L. Cohn
bcohn@pattishall.com

Alison Conlon
conlon@wildmanharrold.com
ecf-filings@wildmanharrold.com
hardt@wildmanharrold.com

Jonathan M. Cyrluk
cyrluk@stetlerandduffy.com
edocket@stetlerandduffy.com

Joseph Gratz
jgratz@kvn.com

Misty Martin
mmartin@smsm.com

Alexis Payne
aep@pattishall.com

Ronald Rothstein
rrothsstein@winston.com
ECF_CH@winston.com
mconroy@winston.com

Jeffrey Singer
jsinger@smsm.com

Anastasios Foukas
afoukas@smsm.com

Scott R. Wiehle
swiehle@velaw.com

Michael R. Dockterman
dockterman@wildmanharrold.com
ecf-filings@wildmanharrold.com
eckertm@wildmanharrold.com

Joseph Duffy
jduffy@stetlerandduffy.com
bdorgan@stetlerandduffy.com
edocket@stetlerandduffy.com

William J. Harte
wharte@williamharteltd.com
mccarey@williamharteltd.com

Dana Marie Pesha
dpesha@williamharteltd.com
mccarey@williamharteltd.com

Scott Ryan Wiehle
swiehle@velaw.com

Aaron Van Oort
mavanoort@faegre.com

I certify that I have served the foregoing document by emailing a copy to the following individuals:

Steven Atlee
SAtlee@winston.com

Vincent V. Carissimi
carissimiv@pepperlaw.com

Joanna J. Cline
clinej@pepperlaw.com

Robert J. Hickok
hickokr@pepperlaw.com

s/Robert M. Foote

# EXHIBIT A

**Robert Foote**

| | |
|---|---|
| **From:** | Susan Weber |
| **Sent:** | Thursday, October 04, 2007 11:13 AM |
| **To:** | mpage@kvn.com; dockterman@wildman.com; satlee@winston.com; kheld@velaw.com; jsinger@smsm.com |
| **Cc:** | Robert Foote; GKEG4@aol.com; Kathleen Chavez; Mark Bulgarelli; sarpaia@rochester.rr.com |
| **Subject:** | Re: Vulcan Golf, LLC v. Google, Inc. et al. |

Dear Counsel:

As a follow up to the e-mail sent this morning, we remind you of your duty to act diligently and use appropriate filtering and blocking technology to avoid further infringements of named Plaintiffs and the putative class members' distinctive and valuable marks (as defined in the Amended Complaint).

As stated in the e-mail, your commercial use of deceptive domains has willfully continued even after the filing of our original complaint, amended complaint, and verbal and written notice.

It is not our duty to monitor your companies and prevent your illegal conduct. It is your duty to take all steps necessary to stop this egregious conduct. If further infringements occur, we will have no option but to seek the Court's assistance on this matter. Thank you very much for your cooperation.

Sincerely,


Robert M. Foote


FOOTE, MEYERS, MIELKE & FLOWERS, LLC
28 North First Street
Suite 2
Geneva, IL 60134
(630) 232-6333
(630) 845-8982

# EXHIBIT B







































http://chefsnaturals.com/ - Microsoft Internet Explorer

Back • Search Favorites

Address chefsnaturals.com    Links »

## Chefsnaturals.com
find something interesting

### Find what you're looking for

- Prairie Naturals
- Mrs May's Naturals
- Large Naturals
- Atk Naturals
- Spectrum Naturals
- Hillhouse Naturals
- Novaform Naturals
- Remeis Naturals
- Productes Naturals
- Jergens Naturals

**Recommended Links**
Mrs Mays Naturals, Liquid Naturals, Super Naturals

Search    Enter Keyword    Go

**Start your search here**    Go

**Today's most Visited links**
Prairie Products
Source Naturals Hyaluronic Acid
Source Naturals
Solgar Vitamins

**Popular Destination**

R Lipoic Acid          Dietan Supplements
Nutritional Supplements   Coenzyme Q10
Nordic Naturals        Alpha Lipoic
Nordic Natural         Travel

About Us

start    http://chefsnaturals...    5:57 PM













**Vulcanputters.com**
*What you need, when you need it*

*Hot*
- Putter
- Golf Club
- Put
- Putt
- Gutters
- Golf Ball
- Golf Shop
- Cutters
- Loan

*Popular*
- Golf Bag
- Discount Golf Clubs
- Tea
- Golf Equipment
- Golf
- Canes

**Vulcanputters.com favorites:** Golf Equipment | Golf | Canes | Golf Gift | Used Golf Club | Golf Shoe







































**Jobsjbssinc.com**
find something interesting

**Find what you're looking for**

* Irrigation Jobs
* Rainbird Irrigation
* Career Jobs
* Irrigation Sprinklers
* Hunter Irrigation
* Irrigation Engineering
* Engineering Jobs
* Toro Irrigation
* London Jobs
* Water Jobs

Start your search here    Go

**Today's most Visited links**

Orbit Irrigation
Irrigation Sprinkler Systems
Irrigation Computer
Computer Jobs

**Popular Destination**

Environmental Jobs         Graduate Jobs
Hunter Jobs                Irrigation Design
Aerospace Jobs             Fire Jobs
Sprinkler System Irrigation   Valve Jobs

About Us

**Recommended Links**
Sprinkler Irrigation, Rain Bird Irrigation, Head Jobs

Search   Enter Keyword   Go





# EXHIBIT C

| Defendant | Deceptive Domain |
|---|---|
| OVERSEE.NET/GOOGLE | NudeBoJackson.com<br>BoJacksonNaked.com<br>bltizrealtygrouphomes.com<br>fishernutsgiftbaskets.com<br>vulcanputters.com<br>wwwevonsnuts.com<br>wwwvulcongolf.com<br>bojackson.net<br>bojacksonelitesports.com |
| Unnamed Parking Company/Google (Google has already notified this parking company using the domain and name servers cnomy.com for other domains in the complaint) | BlitzRealtyGeneva.com<br>BlitzRealtyGroupIllinois.com<br>BlitzRealtyGrup.com<br>BoJacksonNude.com<br>BoJacksonSex.com<br>BoJacksonPorn.com<br>NakedBoJackson.com<br>bojacksonjersies.com<br>bojacksonposters.com<br>bojacksonshirts.com<br>chefsnaturals.com<br>fisherchefsnaturals.com<br>fishernutsonline.com<br>jbssincc.com<br>saladbuddies.com<br>buyfishernuts.com<br>evvonsnuts.com<br>fisherflavortree.com<br>fisherfusions.com<br>fishernutscompany.com<br>fishernutsjobs.com<br>jobsfishernuts.com<br>jobsjbssinc.com<br>johnbsanfilliposandsons.com<br>orderfishernuts.com<br>vulgangolf.com<br>salladbuddies.com<br>saladbuddies.com<br>vulcingolf.com<br>vulcengolf.com<br>buyevonsnuts.com<br>blitzrealtygrop.com<br>bojacksonpics.com |
| SEDO/GOOGLE | Jbssi8nc.com |

# EXHIBIT D

















**Welcome to tompetty.info**

**Related Searches**
- Tom Petty
- Wild Flower
- Kiss Concert Ticket
- Tom Petty The Heartbreakers
- Tom Petty Ticket
- Tom Petty Concert
- Tool
- Breeders
- Nickelback
- Evanescence
- Green Day
- Revolution
- Millionaire
- Message Bottle
- Gwen Stefani

**Indie Music Recordings**
Tool
Breeders
Green Day
Gwen Stefani
Cross Canadian Ragweed

**Jazz Tickets**
Chris Botti
Pat Metheny
Manhattan Transfer
Jazz Ticket
Jimmy Smith

**Langston Hughes**
Hughes
Langston Hughes
Langston Hughes Biography
Langston Hughes Poem
Poem By Langston Hughes

**Classical Music Tickets**
Ballet
BPO
Classical
Rachmaninoff
HSO

**Country Music Tickets**
Tim Mcgraw
Faith Hill
Brooks and Dunn
Shania Twain
Trace Adkins

**Hard Rock and Metal Recordings**
Heart
Metallica
Blink 182
Ozzfest
Motley Crue

**Search:**                          [Search]

CTRL-D to Bookmark This Page | Link This Link To Your Home Button

Terms Of Use



**Samscloub.com**
What you need, when you need it

| Hot | Popular |
| --- | --- |
| Computers | Flat Screen/dvd Combo |
| Jewelry | Discount Shopping |
| Online Shopping | Cell Phones |
| Tires | Computer |
| Shopping | |
| Car Insurance | |
| Psp | |
| New Cars | |
| Fkat | |

Samscloub.com favorites: Computer











# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. SANFILIPPO & SONS, INC., BLITZ REALTY GROUP, INC., and VINCENT E. "BO" JACKSON, Individually and on Behalf of All Others Similarly Situated, | § § § § § § | |
| | § | Civil Action No. 07 CV 3371 |
| Lead Plaintiffs, | § § § | |
| | § | Honorable Blanche M. Manning |
| v. | § § | Magistrate Judge Geraldine Soat Brown |
| GOOGLE INC., OVERSEE.NET, SEDO LLC, DOTSTER, INC., AKA REVENUEDIRECT.COM, INTERNET REIT, INC. d/b/a IREIT, INC., and JOHN DOES I-X, | § § § § § § § | |
| Defendants. | § | |

## SUPPLEMENT TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Class Plaintiffs respectfully submit this Supplement to Plaintiffs' Motion for Preliminary Injunctive Relief, and in so doing states as follows:

1.      This supplementary filing is necessitated by Defendants' outrageous conduct since the filing of the original Motion for Preliminary Injunctive Relief, which includes: (1) New registrations, tasting, monetization and other use of Deceptive Domains belonging to and/or infringing on Class Plaintiffs' Distinctive and Valuable Marks, (2) Continued use and monetization of Deceptive Domains identified in the Motion for Preliminary Injunctive Relief and correspondence from Class Counsel; and (3) New monetization with *pornographic* advertisements of Deceptive Domains infringing upon Class Plaintiff JBSS. Defendants have blatantly and willfully engaged in the ongoing unauthorized use and monetization, despite

1

repeated notice and the January 3, 2008 filing of the Motion for Preliminary Injunctive relief.

**a. Pornographic Monetization**

2.      Defendant Google continues to brazenly disregard their obligations to comport with the law.  Even after the filing of the Motion for Injunctive Relief, they chose to *expand* their monetization of Deceptive Domains with pornographic advertisements beyond Class Plaintiff Bo Jackson to Class Plaintiff JBSS (Fisher Nuts parent company).  Defendant Google monetized the Deceptive Domain www.foshernuts.com (just 1 character deviation from Class Plaintiff JBSS's website www.fishernuts.com) with pornography advertisements.   *Copy of Screenshots are attached hereto as Exhibit A.*

3.      Defendant Google willfully and intentionally generated revenue from the use and monetization (with pornography ads) of the Deceptive Domain www.foshernuts.com, in blatant disregard for the reputation, goodwill, or interests of Class Plaintiff JBSS.

4.      As with Class Plaintiff Bo Jackson, Class Plaintiff JBSS has and is suffering irreparable harm to its reputation, good name, and the goodwill associated with its company by Defendants' monetization of Deceptive Domains with said explicit, offensive, obscene and pornographic advertisements.

5.      Class Plaintiff JBSS does not condone the degradation of humans through any form of pornography, explicit, and/or obscene material.  Class Plaintiff JBSS's Fisher Nuts is in the wholesome business of selling nut products nationwide.  Association with pornography, in any manner, is injurious to its business and reputation.

6.      Class Plaintiff JBSS did not grant any of the Defendants any rights, licenses, permission, or otherwise support, condone or accept the association of its products, good name, goodwill, companies, or other business property and assets with the highly offensive, obscene,

pornographic and explicit material and advertisements on monetized Deceptive Domains containing pornography ads.

7.      Class Plaintiff JBSS has not been compensated or received any income from the advertisements and obscenities associated with pornography ads on Deceptive Domains.

8.      There is no adequate remedy at law for the injury to reputation, goodwill, business, and property that Defendants are causing Plaintiff JBSS by associating its good name with shocking and offensive obscene material.

9.      Defendant Google routinely generates revenue from obscene and pornographic internet advertisements placed on Deceptive Domains without the consent or permission of the rightful owner.  Its actions against Class Plaintiffs Bo Jackson and JBSS are illustrative of its common and substantially similar misconduct toward millions of putative class members.

10.      Without immediate Court intervention, Defendant Google's continued blatant misconduct and disregard for the rights of Class Plaintiffs and the putative class members will unfortunately continue.  In fact, Defendant Google's most recent new monetization with pornographic ads of www.foshernuts.com is demonstrative of its intentions to continue and expand its unauthorized and illegal conduct.

**b.  Deceptive Domains Still In Use and New Deceptive Domains**

11.      Defendants continue to use Deceptive Domains contained in the Motion for Injunctive Relief even after the January 3, 2008 filing of the Motion.

12.      Defendants further register, taste, kite, monetize and otherwise use New Deceptive Domains subsequent to the January 3, 2008 filing of the Motion for Injunctive Relief, including but not limited to:

3

| Domain Name | Parking Company | Date Registered |
|---|---|---|
| vulcaingolf.com | Google/Unnamed | Jan. 10, 2008 |
| wwwblitzrealtygroup.com | Google/Unnamed | Jan. 12, 2008 |
| blitzrealtygroupagents.com | Google/Unnamed | Jan. 12, 2008 |
| Fihsernuts.com | Google/Unnamed | Jan. 15, 2008 |
| jbssiinc.com | Google/Unnamed | Jan. 15, 2008 |
| bojacksoncars.com | Google/Unnamed | Jan. 15, 2008 |
| Fisherntus.com | Google/Unnamed | Jan. 15, 2008 |
| fisshernuts.com | Google/DomainSponsor | Jan. 20, 2008 |
| fisherrnuts.com | Google/DomainSponsor | Jan. 20, 2008 |
| bojacksoncleats.com | Google/Unnamed | Jan. 19, 2008 |
| Fishernurs.com | Google/DomainSponsor | Jan. 20, 2008 |
| foshernuts.com<br>foshernuts.com | Google/DomainSponsor<br>Google/Unnamed<br>*note foshernuts.com was used at 2 parking companies Domainsponsor first and then an unnamed parking company for porn ads | Jan. 20, 2008 |
| Vulcangolfgifts.com | Google/DomainSponsor | Jan. 20, 2008 |
| bojacksontrainershoe.com | Google/Sedo | Jan. 24, 2008 |
| Bitzrealtygroup.com | Google/Unnamed | Jan. 23, 2008 |
| bojacksonfootballs.com | Google/Unnamed | Jan. 22, 2008 |
| bojacksonbaseballcamp.com | Google/Unnamed | Jan. 21, 2008 |
| bojacksonfootballcamp.com | Google/Unnamed | Jan. 22, 2008 |
| bojacksonsfootballcamp.com | Google/Unnamed | Jan. 21, 2008 |
| boojackson.com | Google/Unnamed | Jan. 23, 2008 |
| fishernutssales.com | Google/DomainSponsor | Jan. 19, 2008 |
| fisherspeanuts.com | Google/DomainSponsor | Jan. 18, 2008 |
| fishernuuts.com | Google/Unnamed | Jan. 24, 2008 |
| mailfishernuts.com | Google/Unnamed | Jan. 23, 2008 |

## c. Continued Tasting and Kiting of Deceptive Domains

13.    Defendant Google and the other Defendants continue to "taste," "kite," use and monetize tasted domains. Tasting and kiting of domains is a process where Defendant Google and the other Defendants exploit the Add Grace Period ("AGP" is the five day period from registration of a domain where certain registrars can delete a domain at no cost) by registering millions of temporary sites and then monetizing those sites with advertisements.

4

14.     A large majority of the "tasted" and "kited" domains are Deceptive Domains that infringe upon Class Plaintiffs and the putative class members' Distinctive and Valuable marks. For example, www.bojacksontrainershoe.com is a Deceptive Domain that Defendant Sedo tasted and, in conjunction with Defendant Google, monetized and shared the resultant revenue.

15.     Tasting and kiting allow Defendants to generate revenue (largely from the unauthorized use and monetization of Deceptive Domains) without paying for the Deceptive Domain or maintaining the Deceptive Domain past the AGP period (5 days). By deleting the name during the five day period, Defendants willfully attempt to conceal their connection to the illegal use and monetization of Deceptive Domains.

16.     As part of the Deceptive Domain Scheme set forth in the First Amended Complaint ("FAC"), Defendants engage in a domain tasting cycle where the exact same Deceptive Domains are repeatedly tasted, monetized, and deleted. The tasting cycle perpetuates the deception and fraud, and involves generally Defendants' actions to:  register domains, monetize the registered domains for the 5 day AGP period, delete the domains during the AGP period, reregister the exact same domains, remonetize the exact same domains, and again delete the exact same domains during the AGP period. The cycle is ongoing and occurs with respect to millions of domains. Defendants routinely generate revenue and transact in the revenue from said tasting cycle.

17.     Defendants generate millions of dollars during each five day period from monetizing tasted domains, many of which are Deceptive Domains. Defendants are using tasting as a lucrative revenue generating component of the Deceptive Domain Scheme set forth in Class Plaintiffs' First Amended Complaint.

18.    Despite Class Plaintiffs' FAC, Motion for Preliminary Injunctive Relief, and requests by Class Counsel to Defendants, Defendants persist in tasting Deceptive Domains. Illustrative of Defendants' ongoing tasting is the list of New Deceptive Domains just since January 3, 2008 set forth in the Chart in Paragraph 11 herein.

19.    Class Plaintiffs have requested that Defendants cease use and monetization of tasted domains, cease use and monetization of Deceptive Domains, and have provided Defendants with lists and examples of such.  Nevertheless, Defendants continue to use and monetize tasted domains even after Class Plaintiffs' filing of this action, notice to Defendants, and the filing of the Motion for Preliminary Injunctive Relief.

20.    Defendants continued conduct even since the filing of the Motion for Preliminary Injunctive Relief, demonstrates that they are committed to continued use and monetization of tasted domains.

21.    Defendants should be enjoined from monetizing domains during the five (5) day Add Grace Period ("AGP").  Specifically, Defendants should be enjoined from placing advertisements, or generating revenue from advertisements, on Deceptive Domains that are less than five days old.

**d. Conclusion**

22.    In addition to the above lists of Deceptive Domains directly related to Class Plaintiffs, Defendants are continuing to transact in revenue generated from use and monetization of millions of Deceptive Domains adversely impacting all class members.

23.    Defendants' continued refusal to block Deceptive Domains from their respective systems, continued monetization and transaction in revenue derived from Deceptive Domains,

6

and Defendants' unwillingness to take reasonable action to prevent further violations demonstrates the willfulness of their conduct and necessity for injunctive relief.

24.    Defendants each have an affirmative duty to operate their respective businesses legally. If Defendants cannot engage in a particular business activity without violating the law, then said business activity must cease. In this instance, if Defendants cannot engage in the business of "internet advertising" without the blatant and widespread exploitation, use and monetization of Deceptive Domains that belong to/infringe upon the rights and property of Class Plaintiffs and the putative class, then Defendants have no option but to stop internet advertising. Defendants bear the duty and obligation to run their businesses legally and with respect for the rights and property of other businesses, individuals, and entities.

WHEREFORE, Class Plaintiffs respectfully request that this Court enter a Preliminary Injunction against all Defendants, granting relief as follows:

a. Enjoining Defendants from placement of advertising on, use, monetization, and/or conduct resulting in the generation of revenue on domains less than five (5) days old;

b. All Defendants ordered to immediately cease and desist tasting, registration, monetization, sale, trafficking in, or other use of Deceptive Domains that infringe on the Class Representatives' and the Putative Class Members' Distinctive and Valuable Marks;

c. Defendant Google ordered to provide the Court with the domain name and associated reports (traffic statistics, revenue statistics, etc.) of every domain name (including "tasted domains") that has displayed Google controlled advertising, participated in its AdSense for Domains program, or otherwise been used to generate revenue from advertisements;

d. All other Defendants ordered to provide the Court with the domain name and associated reports (traffic statistics, revenue statistics, etc.) of every domain name that they have tasted, kited, are under their ownership, license, or control, or that they have received any revenue from the displayed of Google controlled advertisements, participated in the Google AdSense for Domains program, or has otherwise been used to generate revenue from internet advertisements;

7

e. All Defendants ordered to immediately implement Court-approved, appropriate blocking and filtering technology to prevent use and monetization of Deceptive Domains;

f. If one or more of the Defendants cannot implement appropriate blocking and filtering technologies, enjoin those Defendants from all internet advertising until an appropriate blocking and filtering system can be implemented;

g. Order a constructive trust over all revenue generated by any of the Defendants from the monetization of Deceptive Domains;

h. Sanction Defendants for their blatant misrepresentations to this Court that they have stopped the registration, use, and monetization of Deceptive Domains that infringe upon Class Plaintiffs;

i. Award reasonable attorneys' fees and costs for the filing of this Motion; and

j. Award any and all such other relief as this Court deems just and appropriate.


Respectfully Submitted,

By: /s/ Robert M. Foote
One of Their Attorneys


Robert M. Foote, Esq. #03214325
Stephen W. Fung, Esq. #06289522
Mark A. Bulgarelli, Esq. #06284703
Foote, Meyers, Mielke & Flowers, LLC
28 North First St.
Suite 2
Geneva, IL 60134
630-232-6333

Kathleen C. Chavez, Esq. #06255735
Chavez Law Firm, P.C.
28 North First St.
Suite 2
Geneva, IL  60134
630-232-4480

William J. Harte, Esq.
Dana Pesha, Esq.
Joan M. Mannix, Esq.

8

William J. Harte, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL 60602
312-726-5015

Benjamin G. Edelman, Esq.
Law Office of Benjamin Edelman
27a Linnaean Street
Cambridge, MA 02138
617-359-3360

ATTORNEYS FOR PLAINTIFFS

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. | § | |
| SANFILIPPO & SONS, INC., | § | |
| BLITZ REALTY GROUP, INC., | § | |
| and VINCENT E. "BO" JACKSON, | § | |
| Individually and on Behalf of All | § | |
| Others Similarly Situated, | § | Civil Action No. 07 CV 3371 |
| | § | |
| Lead Plaintiffs, | § | |
| | § | Honorable Blanche M. Manning |
| v. | § | |
| | § | Magistrate Judge Geraldine Soat Brown |
| GOOGLE INC., OVERSEE.NET, | § | |
| SEDO LLC, DOTSTER, INC., AKA | § | |
| REVENUEDIRECT.COM, | § | |
| INTERNET REIT, INC. d/b/a IREIT, INC., | § | |
| and JOHN DOES I-X, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2008, I electronically filed the foregoing document with the clerk of court for the U. S. District Court, Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Brett A. August
baugust@pattishall.com

Michael H. Page
mhp@kvn.com

Mariah Moran
mmoran@stetleranddufly.com
edocket@stetleranddufly.com

Janelle M. Carter
jcarter@winston.com
ECF_CH@winston.com

Kenneth P. Held
kheld@velaw.com

Steven Borgman
sborgman@velaw.com
jwarren@velaw.com
steveborgman@gmail.com
yshumaker@velaw.com

Bradley L. Cohn
bcohn@pattishall.com

Alison Conlon
conlon@wildmanharrold.com
ecf-filings@wildmanharrold.com
hardt@wildmanharrold.com

Joseph Gratz
jgratz@kvn.com

Alexis Payne
aep@pattishall.com

Jeffrey Singer
jsinger@smsm.com

Anastasios Foukas
afoukas@smsm.com

Michael R. Dockterman
dockterman@wildmanharrold.com
ecf-filings@wildmanharrold.com
eckertm@wildmanharrold.com

William J. Harte
wharte@williamharteltd.com
mccarey@williamharteltd.com

Scott Ryan Wiehle
swiehle@velaw.com

Jonathan M. Cyrluk
cyrluk@stetlerandduffy.com
edocket@stetlerandduffy.com

Misty Martin
mmartin@smsm.com

Ronald Rothstein
rrothsstein@winston.com
ECF_CH@winston.com
mconroy@winston.com

Scott R. Wiehle
swiehle@velaw.com

Joseph Duffy
jduffy@stetlerandduffy.com
bdorgan@stetlerandduffy.com
edocket@stetlerandduffy.com

Dana Marie Pesha
dpesha@williamharteltd.com
mccarey@williamharteltd.com

Aaron Van Oort
mavanoort@faegre.com

I certify that I have served the foregoing document by emailing a copy to the following individuals:

Steven Atlee
SAtlee@winston.com

Joanna J. Cline
clinej@pepperlaw.com

Vincent V. Carissimi
carissimiv@pepperlaw.com

Robert J. Hickok
hickokr@pepperlaw.com

s/Robert M. Foote

# EXHIBIT A











# EXHIBIT C

# GNSO Issues Report on Domain Tasting

## STATUS OF THIS DOCUMENT

This is the revised and final version of the Issues Report on Domain Tasting produced by ICANN staff and originally submitted to the GNSO Council on 29 May, 2007. Details of factual corrections made to the 29 May version are in Annex 3 of this document. This revised and final report was submitted to the GNSO Council on 14 June, 2007.

## SUMMARY

This report is submitted to the GNSO Council in response to a request received from the At-Large Advisory Committee for an Issues Report on Domain Tasting.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 1 of 39

# TABLE OF CONTENTS

# 1   EXECUTIVE SUMMARY                                3

# 2   OBJECTIVE                                        7

# 3   BACKGROUND                                      14

# 4   DISCUSSION OF POSSIBLE DIRECTIONS               26

# 5   STAFF RECOMMENDATION                            28

# ANNEX 1 - GLOSSARY OF TERMS                         31

# ANNEX 2 – ALAC REQUEST FOR ISSUES REPORT ON DOMAIN TASTING                                       33

# ANNEX 3 – CORRECTIONS TO ISSUES REPORT             38

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 2 of 39

# 1    Executive summary

## 1.1    Definitions

### Add Grace Period (AGP)

A Grace Period refers to a specified number of calendar days following a Registry operation in which a domain action may be reversed and a credit may be issued to a registrar. AGP is typically the five day period following the initial registration of a domain name. AGP appears as a contractual term in some, but not all gTLD registry agreements.[1]

AGP allows for the correction of typos and other errors by registrants. Once a domain name is deleted by the registry at this stage, it is immediately available for registration by any registrant through any registrar.

When a domain name is registered through an ICANN accredited registrar, that registrar may cancel the domain name at any time during the first five calendar days of the registration and receive a full credit for the registration fee from the registry.

**Domain Tasting –** Domain tasting is a monetisation practice employed by registrants to use the add-grace period to register domain names in order to test their profitability. During this period, registrants conduct a cost-benefit analysis to determine if the tested domain names return enough traffic to offset the registration fee paid to the registry over the course of the registration period (e.g., currently $6 US for a .NAME domain name).

---

[1] Reference to an add grace period appears in the following gTLD registry agreements: .BIZ (http://www.icann.org/tlds/agreements/biz/appendix-07-08dec06.htm) .COM (http://www.icann.org/tlds/agreements/verisign/appendix-07-01mar06.htm), .INFO (http://www.icann.org/tlds/agreements/info/appendix-07-08dec06.htm), .NAME (http://www.icann.org/tlds/agreements/name/registry-agmt-appc-5-02jul01.htm), .NET (http://www.icann.org/tlds/agreements/net/appendix7.html), .ORG (http://www.icann.org/tlds/agreements/org/appendix-07-08dec06.htm), and .PRO (http://www.icann.org/tlds/agreements/pro/registry-agmt-appc-30sep04.htm#C.10).

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 3 of 39

## 1.2    Background

▪ The AGP did not arise from an ICANN policy process.  AGP was instituted by registries with the agreement of registrars and introduced into the registry contracts for .BIZ, .COM, .INFO, .NAME, .NET, .ORG and .PRO.

▪ The original intent of the AGP was to allow registrars to recover fees to registries if domain names were mistyped during registration.

▪ In response to customer (i.e. registrar and registrant) concerns, and in cooperation with ICANN staff, Network Solutions (now VeriSign) implemented the AGP for .com, .net and .org within the first year of the original ICANN agreement for those gTLDs in 1999, but the agreement was never amended to include this requirement.

▪ When the .com,[2] .net[3] and .org[4] registry agreements were re-executed in 2001, the AGP requirement was included along with other grace period[5] provisions.

▪ When the first, new gTLDs were approved in November, 2000, the AGP requirement was included in the associated registry agreements.[6]

▪ Data in the public domain shows that most domain tasting is done via a small proportion of registrars and that a majority of AGP names are immediately dropped.

▪ The .ORG monthly report for January, 2007[7] shows that five registrars deleted 1,773,910 (99.4%) of domain names within the AGP, retaining only 10,862 domain names following the AGP.

▪ The combined .COM and .NET monthly report for January, 2007[8] shows that the top ten registrars engaged in domain tasting accounted for 95% of all deleted .COM and .NET domain names. These registrars deleted 45,450,897

---

[2] Archived 2001 .COM agreement:  http://www.icann.org/tlds/agreements/verisign/com-index-25may01.htm
[3] Archived 2001 .NET agreement:  http://www.icann.org/tlds/agreements/verisign/net-index.htm
[4] Archived 2001 .ORG agreement http://www.icann.org/tlds/agreements/verisign/org-index.htm
[5] Sample Grace Period provisions in 2001 .ORG agreement:
http://www.icann.org/tlds/agreements/verisign/registry-agmt-appc-16apr01.htm#3
[6] The new gTLDs created in the 2000 round were .AERO, .BIZ, .COOP, .INFO, .MUSEUM, .NAME, and .PRO.
[7] http://www.icann.org/tlds/monthly-reports/org/pir-200701.pdf
[8] http://www.icann.org/tlds/monthly-reports/com-net/verisign-200701.pdf

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 4 of 39

domain names out of 47,824,131 total deletes. The top four registrars engaged
in domain tasting deleted 35,357,564 domain names, or 74% of all deletes.

## 1.3     Possible directions for ICANN community

- A GNSO policy development process is one of several mechanisms the
  ICANN community could use to consider domain tasting. Other mechanisms
  include:

  - the ICANN budget process,
  - registry contractual changes or negotiations, or
  - the process for consideration of new registry services.

  In order to inform the ICANN community of possible directions that may be
  taken, Section 4.2 of this report describes these mechanisms in more detail.,.

## 1.4     Staff recommendation

- The issues surrounding domain tasting have generated significant discussion
  among several constituencies and stakeholders and would benefit from
  review as part of a structured discussion.  However the GNSO may choose to
  proceed, staff notes that the completion of concrete fact-finding and research
  will be critical in informing the community's deliberations.

- In determining whether the issue is within the scope of the ICANN policy
  process and the scope of the GNSO, staff and the General Counsel's office
  have considered the following factors:

  1. Whether the issue is within the scope of ICANN's mission
  statement,
  2. Whether the issue is broadly applicable to multiple situations or
  organisations,
  3. Whether the issue is likely to have lasting value or applicability,
  albeit with the need for occasional updates,
  4. Whether the issue will establish a guide or framework for future
  decision-making,

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 5 of 39

5. Whether the issue implicates or affects an existing ICANN policy.

- Based on the above, the General Counsel finds that the proposed issue is within scope of the ICANN policy process and within the scope of the GNSO.

- Staff recommends that the Council begin a policy development process, including further fact-finding and research and the consideration of other mechanisms to address the issue. Staff resources would be made available to support these research activities and objectives. To assist the community with its decision-making process, ICANN staff would welcome guidance on specific directions for further research.

## 1.5    Next steps

- The GNSO Council will meet on 7 June, 2007 and is expected to acknowledge receipt of this report and decide on the next action to take.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 6 of 39

# 2    Objective

1.    This report is submitted in response to the At-Large Advisory Committee's request for an 'Issues Report on Domain Tasting' which was sent to the GNSO Council on 9 May, 2007 (http://gnso.icann.org/mailing-lists/archives/council/msg03474.html).

2.    In this context, and in compliance with ICANN Bylaw requirements:

     a. The proposed issue raised for consideration; domain tasting

     b. The identity of the party submitting the issue:

     The party submitting the issue is the At-Large Advisory Committee (ALAC)[9], whose role (as defined in the ICANN Bylaws) is to consider and provide advice on the activities of ICANN, insofar as they relate to the interests of individual Internet users.  The ALAC indicated in its request that it had the support of the Commercial and Business Users[10] and Intellectual Property[11] constituencies, as well as qualified support from the gTLD Registries constituency[12].  Since GNSO constituencies cannot on their own request an Issues Report, the ALAC is the party submitting the issue for purposes of this report.

     c. How that party is affected by the issue; the ALAC represents the interests of individual Internet users. ALAC raised five consequences of the existing policy that affect Internet users: destabilisation of the domain name system, creation of consumer confusion, increased costs and burdens to legitimate registrants, and, facilitation of trademark abuse and facilitation of criminal

---

[9] http://alac.icann.org/
[10] http://gnso.icann.org/commercial-and-business/
[11] http://gnso.icann.org/intellectual-property/
[12] http://gnso.icann.org/gtld-registries/

Issues Report on Domain Tasting
Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 7 of 39

activity. (The full text of the ALAC request for an issues report is in Annex 2 of this report.)

These areas are discussed below:

## Stability of the DNS

The ALAC communication notes that the operational load on the registry systems caused by domain tasting may cause instability in the gTLD namespace or the entire DNS.

ICANN's first Core Value is "preserving and enhancing the operational stability, reliability, security, and global interoperability of the Internet," and an examination of the actual impact of domain tasting on DNS stability should inform the policy discussion.

On 28 March 2006, PIR, the registry operator for the .ORG top-level domain, published an article titled "Impact on Automated Domain Registrations ('Domain Tasting') on .ORG Registrants"[13]. According to the PIR article, "PIR is concerned about the potential impact of Domain Tasting on the stability and security of the Internet and is working on some initiatives to better manage issues that arise as a result of such activities." (PIR later made a request through the RSEP process to address certain aspects of AGP. The PIR request was approved by the ICANN Board of Directors in November 2006[14].)

The Security and Stability Advisory Committee (SSAC)[15] issued an Advisory in June 2006 entitled "Renewal Considerations for Domain Name Registrants"[16] which sought to make registrants aware of marketplace

---

[13] http://www.circleid.com/posts/impact_of_automated_domain_registration_tasting/
[14] http://www.icann.org/minutes/resolutions-22nov06.htm.
[15] http://www.icann.org/committees/security/
[16] http://www.icann.org/committees/security/renewal-advisory-29jun06.pdf

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

                                                                            Page 8 of 39

activities (including domain tasting) that might affect them in the renewal phase.  Inputs to an investigation of stability issues might include data offered by registry operators and others and further study by the SSAC.

Registry operators to date have not taken a uniform position on the technical impact of domain tasting activity.  Steve Crocker of the SSAC has reported that VeriSign responded to a communication that tasting activities do not affect nor threaten the stability of their operations; however, VeriSign has made no official statement on this.  In a 2006 letter to the SSAC, PIR stated that:  "PIR is concerned about the potential impact of Domain Tasting on the stability and security of the Internet and is working on some initiatives to better manage issues that arise as a result of such activities."[17]

## Consumer experience

The ALAC communication notes that consumers may be confused as a result of domain tasting. Consumers trying to register names whose availability changes quickly due to domain tasting activity may be confused because the names seem to appear and disappear.

Existing registrants may also find that their expired names are registered by others much faster than occurred in the past, making registrants significantly more likely to lose a name whose registration they have failed to maintain. A 2006 report by ICANN's Security and Stability Advisory Committee[18] noted that domain name tasting is one of the risks and threats involved for registrants who allow names to expire; reputational harm, commercial considerations, domain name brokering in the after-market, domain traffic monetisation and domain name tasting.[19]

---

[17] http://www.icann.org/correspondence/viltz-to-crocker-26mar06.pdf
[18] http://www.icann.org/committees/security/
[19] SSAC Advisory SAC0010: Renewal Considerations for Domain Name Registrants, June 2006, http://www.icann.org/committees/security/renewal-advisory-29jun06.pdf.

Issues Report on Domain Tasting
Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

                                                                    Page 9 of 39

Some Internet users may report a lower quality of experience when encountering a high volume of parked pages or advertising-related links in response to search queries. However, some Internet users prefer to encounter parked pages with possibly relevant content or links than a "page not found" response. Some large Internet service providers and popular browsers already redirect unregistered names[20], so that the elimination of domain tasting practices by registrants would result in the substantially same experience as users now encounter with parked names.

The ALAC suggests that if users encounter continual negative experiences in trying to register domain names or use the domain name system (DNS), the result is a general undermining of confidence in the DNS. Some users have raised concerns that the practice of domain tasting reduces the number of available names to, for example, potential business owners who would use a name to describe their business rather than extract advertising revenue from Internet traffic.

## Costs

The ALAC communication lists a possible consequence of domain tasting as "increased costs and burdens to legitimate registrants." The request does not define who is considered to be a "legitimate" registrant. However, an examination of the respective costs associated with domain tasting might be useful.

The parties involved in domain tasting have invested the amount of the registration fees, which is then refunded on names deleted within the add grace period, depending on the practice of their registrar. While there is presently no data on financial impact, registrars may find that confusion associated with tasting activities results in higher support costs for them.

---

[20] E.g. recent versions of Internet Explorer direct users to a page on the Microsoft website rather than serve up a 'file not found' when a user types in an incorrect URL.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 10 of 39

The ALAC request notes that "tasted" names may be in conflict with other registered names, resulting in businesses or non-commercial entities assuming monitoring costs and the need to purchase additional defensive registrations.  The ALAC also points out that registry costs may be increased due to the operational load from the volume of add and delete transactions.

Domain tasting may also be a source of revenue for registries and registrars, which may offset or exceed the costs involved in maintaining the registry operations or registrar support systems.  It is also possible that having more names registered and renewed may be financially beneficial to registries and/or registrars.

## Trademarks

The ALAC communication notes that automated programs are able to find and register "typographical permutations" of a trademark.  Policies such as the UDRP[21] exist to provide recourse for those who believe their trademarks are being infringed.  However, existing dispute resolution mechanisms may not be sufficiently timely or cost-effective for trademark holders to use in dealing with all infringement or typo-squatting activity that may occur as a result of domain tasting.  The short timeframes involved in addition, deletion, and re-registration of domain names may mean that some registrants are profiting from short-term use of trademark variations, making it difficult for trademark holders to effectively use the UDRP.

A recent statement from the World Intellectual Property Organisation (WIPO)[22] drew attention to domain tasting as one of several factors that have given rise to the mass registration of domain names, with registrations "often anonymously undertaken on a serial basis without particular attention to third-

---

[21] http://www.icann.org/dndr/udrp/policy.htm.
[22] http://www.wipo.int/portal/en/news/2007/article_0010.html.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 11 of 39

party intellectual property rights." (Further discussion of the WIPO concerns is in Section 3.7.)

## Criminal Activity

The ALAC communication notes that names being added and deleted also makes it more difficult for law enforcement to access records and pursue cases of criminal activity, and that the capability to do domain tasting also enables activities such as phishing or pharming.

Phishing is defined as the practice of creating a replica of an existing webpage to fool a user into submitting personal, financial or password data. Pharming is the practice of redirecting a website's traffic from the legitimate website to a bogus website for the purpose of stealing personal, financial or other data.

However, ICANN's role and responsibilities do not extend to Internet content. The use of registered domain names is not within scope of ICANN policy and how domain tasting facilitates such behaviour will require further research.

## Other effects

Domain tasting is an existing business model used by certain registrants. Further research may need to look at competition aspects and determine whether the downstream adjustments to any changes to current AGP practices will have other negative consequences. To the extent that the GNSO determines that any of the above consequences exist and are harmful, the GNSO could consider the consequences that may result in the domain marketplace.

ICANN's Core Values also include "Respecting the creativity, innovation, and flow of information made possible by the Internet by limiting ICANN's activities to those matters within ICANN's mission requiring or significantly

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 12 of 39

benefiting from global coordination," and "Where feasible and appropriate, depending on market mechanisms to promote and sustain a competitive environment." In consideration of consumer-related aspects of domain tasting, the GNSO should bear in mind ICANN's limited role.

d. Support for the issue to initiate the PDP;

The ALAC request for an issues report and subsequent policy development process indicated that it was supported explicitly by the Commercial and Business Users and the Intellectual Property constituencies of the GNSO.

The request also included a statement from the gTLD Registries constituency with qualified support for a "properly framed issues report on the above, including the soliciting of feedback on the utilisation of the five day AGP itself, recommended changes, the effects of such a change, and how any changes would be handled under the provisions in the existing gTLD registry contracts relating to consensus policies and to the contractual obligations of support for the five day grace period within many registry agreements." The gTLD Registries constituency noted that "it is also important to recognize in the Issues Report that the Registrar Accreditation Agreement with ICANN have provisions relating to consensus policies that also need to be examined. That would have an impact on the RAAs (Registrar Accreditation Agreement)."

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 13 of 39

# 3    Background

## 3.1    Process background

- On 13 January, 2005, the GNSO Council resolved "to request the ICANN staff manager to write an issues report (as specified in annex A to the ICANN by-laws) on the "Problems caused by contention for domain names made available by a gTLD registry ", so that Council can subsequently decide if a policy development process would be appropriate". Staff resources were insufficient at that time to respond to this request.  When staff resources were increased, from February / March 2005 onwards, the GNSO Council agreed in successive GNSO Operating Plans to de-prioritise this issue.

- Public workshops on the domain name marketplace and domain name monetisation were conducted at ICANN meetings in Marrakech, Morocco (27 June 2006)[23], Sao Paulo, Brazil (6 December 2006)[24] and Lisbon, Portugal (25 March 2007)[25][26].

- On 9 May, 2007, Alan Greenberg, the At-Large Advisory Committee (ALAC) Liaison to the GNSO Council, notified the GNSO Council that the ALAC had formally requested the ICANN staff to prepare an Issues Report on Domain Tasting[27].

- For the purposes of this Issues Report, ICANN staff has assumed, based on the ALAC's communication, that ALAC wishes the GNSO to consider whether policies should be developed that would limit or proscribe domain tasting behaviour.

## 3.2    Issue Background

---

[23] http://www.icann.org/meetings/marrakech/captioning-dn-27jun06.htm
[24] http://www.icann.org/meetings/saopaulo/captioning-dnmarket-06dec06.htm
[25] http://www.icann.org/meetings/lisbon/transcript-tutorial-secondary-25mar07.htm
[26] http://www.icann.org/meetings/lisbon/transcript-tutorial-expiring-25mar07.htm
[27] http://gnso.icann.org/mailing-lists/archives/council/msg03474.html

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 14 of 39

- Domain tasting is defined in the ALAC's request as "the systematic exploitation of the five day AGP to gain access to domain names without cost." Domain Tasting can also be characterised as a practice used by registrants that uses the add-grace period to register domain names in order to test their profitability. During the five day period, registrants conduct a cost-benefit analysis (using traffic monitoring, pay-per-click or other advertising models) to determine if the tested domain names may return enough revenue to offset the registration fee paid to the registry over the course of the registration period (e.g., currently $6 US for a .NAME domain name).

- A Grace Period refers to a specified number of calendar days following a Registry operation in which a domain action may be reversed and a credit may be issued to a registrar.

- AGP is typically the five-day period following the initial registration of a domain name. If, for any reason, a domain name is deleted during this period, the registrar will be fully credited for the amount of the new registration fee by the applicable registry. Once a domain name is deleted by the registry at this stage, it is immediately available for subsequent registration by any registrant through any registrar.[28]

- The language describing the AGP in the ICANN contract with the .BIZ registry is as follows:

    *"The Add Grace Period is a specified number of calendar days following the initial registration of a domain. The current value of the Add Grace Period for all registrars is five calendar days. If a Delete, Renew, or Transfer operation occurs within the five calendar days, the following rules apply:*

---

[28] Reference to an add grace period appears in the following gTLD registry agreements: .BIZ (http://www.icann.org/tlds/agreements/biz/appendix-07-08dec06.htm) .COM (http://www.icann.org/tlds/agreements/verisign/appendix-07-01mar06.htm), .INFO (http://www.icann.org/tlds/agreements/info/appendix-07-08dec06.htm), .NAME (http://www.icann.org/tlds/agreements/name/registry-agmt-appc-5-02jul01.htm), .NET (http://www.icann.org/tlds/agreements/net/appendix7.html), .ORG (http://www.icann.org/tlds/agreements/org/appendix-07-08dec06.htm), and .PRO (http://www.icann.org/tlds/agreements/pro/registry-agmt-appc-30sep04.htm#C.10).

Issues Report on Domain Tasting
Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 15 of 39

*Renew:*

*If a domain is extended within the Add Grace Period, the account of the sponsoring Registrar at the time of the extension will be charged for the initial add plus the number of years the registration is extended. The expiration date of the domain is extended by the number of years, up to a total of ten years, as specified by the registrar's requested Renew operation.*

*Transfer (other than ICANN-approved bulk transfer):*

*Transfers under the Registry-Registrar Agreement may not occur during the Add Grace Period or at any other time within the first 60 days after the initial registration. Enforcement is the responsibility of the Registrar sponsoring the domain name registration and is currently enforced by the SRS.*

*Bulk Transfer (with ICANN approval):*

*Bulk transfers with ICANN approval may be made during the Add Grace Period. The expiration dates of transferred registrations are not affected. The losing Registrar's account is charged for the initial add.*

*Delete:*

*If a domain is deleted within the Add Grace Period, the sponsoring Registrar at the time of the deletion is credited for the amount of the registration; provided, however, that Registry Operator shall have the right to charge Registrars a fee as set forth in its Registry-Registrar Agreement for disproportionate deletes during the Add Grace Period. The domain is deleted from the Registry database and is immediately available for registration by any Registrar. See Section 3.2 for a description of overlapping grace period exceptions."*[29]

---

[29] See http://www.icann.org/tlds/agreements/biz/appendix-07-08dec06.htm. This contract language is typical of gTLDs with AGP.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 16 of 39

- AGP is described in the various registry agreements as a documented component of registry specifications; it is not the subject of an ICANN consensus policy. AGP is described in the Functional Specifications included in all current un-sponsored Registry Agreements (.BIZ, .COM, .INFO, .NAME, .NET, .ORG, .PRO).[30]

- Regarding the historic background of the AGP, Chuck Gomes of VeriSign stated during ICANN's June 2006 meeting that AGP was instituted at the agreement of registrars and the registry[31]:

    "What we discovered several months later in responses from our customers, which at that time were mostly test bed registrars…is that registrants would sometimes make a typo and there was no recovery for the registry fee under that scenario. So we actually proposed to registrars at that time and to ICANN that we be able to introduce that grace period. It was not part of the first contract for com, net and org. In the renegotiation that occurred in 2001, it was incorporated as part of the contract. So there really was no policy development process. The initial intent was for typos and to allow [a] mechanism to deal with that." [32]

- Domain tasting appear to be primarily an issue for .COM registrations, although domain tasting also occurs in other gTLDs such as.NET and .ORG, and is also emerging in some ccTLDs.

- Published data regarding .COM, .NET and .ORG show that most tasting of names in these domains is done via a small proportion of registrars, and also that a majority of tasted names are dropped.

---

[30] References to an add grace period appears in the following gTLD registry agreements: .BIZ (http://www.icann.org/tlds/agreements/biz/appendix-07-08dec06.htm) .COM (http://www.icann.org/tlds/agreements/verisign/appendix-01mar06.htm), .INFO (http://www.icann.org/tlds/agreements/info/appendix-07-08dec06.htm), .NAME (http://www.icann.org/tlds/agreements/name/registry-agmt-appc-5-02jul01.htm), .NET (http://www.icann.org/tlds/agreements/net/appendix7.html), .ORG (http://www.icann.org/tlds/agreements/org/appendix-07-08dec06.htm), and .PRO (http://www.icann.org/tlds/agreements/pro/registry-agmt-appc-30sep04.htm#C.10).

[31] At the time AGP was introduced, there was only one gTLD registry; Network Solutions.

[32] http://www.icann.org/meetings/marrakech/captioning-dn-27jun06.htm.

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

- The January 2007 monthly report[33] of PIR, the registry for .ORG, shows that five registrars deleted 1,773,910 domain names within AGP, and retained only 10,862 domain names, i.e. they deleted 99.4% of all registrations within the AGP.

- The January 2007 monthly report[34] of VeriSign, the registry for .COM and .NET, showed that the top ten registrars engaged in domain tasting accounted for 95% of all deleted .COM and .NET domain names during January 2007. These registrars deleted 45,450,897 domain names out of 47,824,131 total deletes. The top four registrars engaged in tasting deleted 35,357,564 domain names, or 74% of all deletes.

- In September 2006 PIR submitted a proposal for a five-cent excess-deletion fee to be applied on a per registrar basis to registrars performing deletions above a threshold of 90% during the AGP.[35] This request was made through the Registry Service Evaluation Policy (RSEP)[36], a consensus policy developed by the GNSO. The PIR request was approved by the ICANN Board of Directors in November 2006[37].

- PIR noted in its proposal that "the abuse of the add-grace period is restricted to a few registrars who are engaged in domain tasting on a larger scale than the vast majority of registrars. While the back-end provider for PIR (Afilias) is confident that it currently has the technical capacity to handle any burdens caused by the high percentage of add-grace period transactions being experienced, this situation could change if a large number of additional registrars were engaged in the same practices. Imposing a fee at this time should help limit the risk that could accompany a large surge of add-grace period transactions."[38]

---

[33] http://www.icann.org/tlds/monthly-reports/org/pir-200701.pdf
[34] http://www.icann.org/tlds/monthly-reports/com-net/verisign-200701.pdf
[35] http://www.icann.org/registries/rsep/PIR_request.pdf.
[36] http://www.icann.org/registries/rsep/rsep.html
[37] http://www.icann.org/minutes/resolutions-22nov06.htm.
[38] http://www.icann.org/registries/rsep/PIR_request.pdf, page 12.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 18 of 39

- In a 21 November 2006 letter from former PIR CEO, Ed Viltz, to Vint Cerf, Chairman of the ICANN Board, regarding the PIR excess deletion fee proposal, Mr. Viltz stated:

  > "The PIR Proposal makes it abundantly clear that it is not intended to address the phenomenon known as "domain tasting", nor is it intended to resolve all the problems that have arisen in connection with the 5-day add-grace period. PIR has not taken a position pro or con on domain tasting. Furthermore, it may well be that there are reasons to amend, improve or even abolish the 5-day add-grace period, but the PIR Proposal does not address these.

  > The PIR proposal is a straightforward attempt to deal with a problem that has arisen from certain abuses of the 5-day add-grace period in the experience of PIR. It is not offered to the Internet community as an endorsement of domain tasting or as a model for other registries (although PIR would have no objection to its adoption by other registries)."[39]

- PIR is implementing the excess deletion fee on 26 May, 2007. This means the July, 2007 invoice to registrars will assess the excess deletion fee on activity during the month of June 2007). As this practice has not yet begun, there is no data currently available on the effect of a fee on domain tasting in the .ORG TLD. This data will be useful in the future for determining the impact of registry efforts to address the level of domain tasting within individual TLDs.

---

[39] http://www.icann.org/correspondence/viltz-to-cerf-21nov06.htm.

Issues Report on Domain Tasting
Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 19 of 39

### 3.3 Life cycle of a domain name

The diagram below depicts the AGP phase as part of the registration cycle of a domain name:



Some registrar activity post-expiration may not be reflected in the life cycle chart above.

### 3.4 Uses of the Add Grace Period

- <u>Typos, mis-registrations, consumer fraud</u>

  AGP allows for the correction of typos and other errors by registrants, which may be of benefit to them. Registrars have a variety of practices regarding refunds to registrants in these circumstances.

- AGP can also be used by registrars to correct system errors. For example, if names are erroneously added at the registry, the fees can be refunded to the registrar if the names are deleted during the AGP. AGP may help registrars recover some losses from failed payment transactions or fraud cases, although many of these types of scenarios extend beyond the first five days of registration.

### 3.5 Domain Tasting

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 20 of 39

- o AGP can also be used by registrants to facilitate large-scale addition and deletion of domain names in order to test market value of names. As noted above, this practice is referred to as "domain tasting."

- o A variety of tools can be used by domain holders during the "tasting" period to assess the market value of a domain name and to generate revenue. During this period, the name may resolve to a 'parking page' that contains advertising and/or links determined to be relevant to the name or to certain associated search terms, for which the registrant has made pay-per-click arrangements with advertisers.[40]

- o Some general sources on how domain name monetization works and a short history of the practice are available in the footnotes.[41]

- o Domain parking is a practice used by registrars, individual registrants and Internet advertising publishers to monetize type-in traffic. Type-in traffic refers to Internet users who visit a web-page by typing its URL directly into their browser rather than by clicking on a link from another page such as a search engine result page. Proponents of domain parking say it uses domain names to deliver relevant advertising and enhanced search options instead of serving Internet users with an error page often referred to as a '404 file not found'.[42] .

---

[40] Further information about the Pay Per Click (PPC) advertising model is available here; http://en.wikipedia.org/wiki/Pay_per_click.

[41] A selection of articles on the domain name monetisation business: CircleID, "How Domain Traffic Testing/Tasting Works"; http://www.circleid.com/posts/how_domain_name_tasting_works/. CircleID, "The Parked Domain Monetization Business", http://www.circleid.com/posts/the_parked_domain_monetization_business/, Wall Street Journal; "Thanks to Web Ads, Some FindNew Money in Domain Names", http://online.wsj.com/public/article/SB113200310765396752-FYV6dsiIRS0N1fsiVu_bLf_5nl8_20061116.html?mod=rss_free . A CircleID article on this history of domain name tasting, The Closing Window: A Historical Analysis of Domain Tasting", is here; http://www.circleid.com/posts/historical_analysis_domain_tasting/, CircleID,"How Domain Traffic Testing/Tasting Works," http://www.circleid.com/posts/how_domain_name_tasting_works/, "Getting the Drop on Domain Name Abuse," BusinessWeek, 5 June 2006, http://www.businessweek.com/technology/content/jun2006/tc20060605_633379.htm, and 'In Bad Taste', http://www.circleid.com/posts/print/domain_in_bad_taste/..

[42] For more information on what a '404 File not Found' is, visit http://en.wikipedia.org/wiki/HTTP_404 .

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

                                                                     Page 21 of 39

- o Pay-per-click (PPC) is a technique in which advertisers bid on "keywords" that they believe their target market would type in the search bar when they are looking for a particular type of product or service.

- o ICANN's previous workshops on the domain marketplace and secondary market have included discussion of domain monetisation, the role of search engines and AGP deletions (see http://www.icann.org/meetings/marrakech/dn-workshop-27jun06.htm), domain tasting and AGP (http://www.icann.org/meetings/saopaulo/domain-names-marketplace-06dec06.htm), and the domain name secondary market (http://www.icann.org/meetings/lisbon/agenda-tutorial-secondary-25mar07.htm).

- o The secondary market in domain names (the market for previously registered domain names) was discussed in detail during the Lisbon workshop (see http://www.icann.org/meetings/lisbon/presentation-secondary-schumacher-25mar07.pdf, http://www.icann.org/meetings/lisbon/presentation-secondary-snap-25mar07.pdf, and http://www.icann.org/meetings/lisbon/presentation-secondary-frakes-25mar07.pdf). Secondary market domain names may be domain names offered for sale by the current registrant or a subsequent registrant.

- o It should be noted that domain tasting is only one mechanism which registrants might use for the purpose of gauging traffic on domain names. A variety of other tools and services are also available in the market to perform similar functions. A number of businesses in the domain name industry offer these services.

- o While statistics should be obtained independently to inform the discussion, it appears that domain tasting practices in the .COM registry result in approximately 95% of all registered names being deleted within the AGP. It also appears that registrants who register names strictly for tasting delete over 99% of registrations during the AGP.

## 3.6        Domain Kiting

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 22 of 39

Registrants may also use the AGP for continual registration, deletion, and re-registration of the same names in order to avoid paying the registration fees. This practice is sometimes referred to as "domain kiting."  This term has been mistakenly used as being synonymous with domain tasting, but it refers to multiple and often consecutive tasting of the same domain name. ICANN staff has received anecdotal reports that this type of activity is occurring, but does not currently have data to demonstrate definitively that domain kiting occurs or to what extent.

The anecdotal reports received by the ICANN staff would indicate that:

1. Very few registrants engage in kiting;
2. Those registrars who facilitate kiting are discovered and warned by the registry to cease the behaviour;
3. Kiting practices cannot enable a registrant to "keep" a single domain name.  Any name is available to be taken in the drop pool by another registrant. The activity is only practicable if attempting to maintain a number of names – some would be lost at each drop.

### 3.7      Previous discussions on this issue

o   Discussions of domain tasting behaviour in the ICANN community to date have revealed a range of views.
In addition to various informal public discussions, ICANN has held a series of workshops on domain marketplace issues at its international public meetings. A session in Sao Paulo, Brazil, in December 2006 focused primarily on marketplace activities during the five-day add grace period.[43]

o   A workshop in Marrakech, Morocco in June 2006 featured an educational session on domain monetisation activities, their impacts, and policy

---

[43] http://www.icann.org/meetings/saopaulo/captioning-dnmarket-06dec06.htm.

Issues Report on Domain Tasting
Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 23 of 39

implications.[44]  Most recently, tutorials were held in Lisbon, Portugal in March of this year on the expiring names and secondary markets.[45]

o   In a public comment forum regarding the proposed excess-delete fee in the .ORG registry[46], Caroline Chicoine of the Intellectual Property constituency expressed personal concern [and referenced INTA[47] concerns] about domain tasting. Ms. Chicoine said domain tasting was an abusive registration practice that has become a serious problem as it has rapidly expanded since 2004, and called for ICANN to take a pro-active approach to solving this problem.

o   A recent statement from the World Intellectual Property Organisation (WIPO)[48] reported a 25% increase in cyber-squatting[49] disputes in 2006 over the previous year.  The statement linked this increase to various developments in the registration market, including domain tasting:

> …the evolution of the domain name registration system is causing growing concern for trademark owners, in particular some of the effects of the use of computer software to automatically register expired domain names and their 'parking' on pay-per-click portal sites, the option to register names free-of-charge for a five-day 'tasting' period, the proliferation of new registrars, and the establishment of new generic Top Level Domains (gTLDs).  The combined result of these developments is to create greater opportunities for the mass, often anonymous, registration of domain names without specific consideration of third-party intellectual property rights.

o   In the same public comment forum[50], Phil Corwin of the Internet Commerce Association expressed support for the .ORG registry's proposed approach of charging a fee for excess-deletes rather than banning the practice outright.

---

[44] http://www.icann.org/meetings/marrakech/captioning-dn-27jun06.htm.
[45] http://www.icann.org/meetings/lisbon/transcript-tutorial-secondary-25mar07.htm;
http://www.icann.org/meetings/lisbon/transcript-tutorial-expiring-25mar07.htm.
[46] http://forum.icann.org/lists/registryservice/msg00001.html.
[47] INTA stands for the International Trademark Association, http://inta.org/
[48] http://www.wipo.int/portal/en/news/2007/article_0010.html.
[49] See glossary of terms for a definition of cyber-squatting.
[50] http://forum.icann.org/lists/registryservice/msg00000.html.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 24 of 39

Mr. Corwin opposed "expansion of the rights of trademark holders to the detriment of the equally legitimate rights of domain name owners who have risked considerable capital and labor to develop their DNs [domain names] as valuable properties monetised through the provision of content and associated advertising."

o   Nominet, the ccTLD for .UK, has taken action to curb domain tasting. On 7 August 2006, Nominet announced a limit on the number of registrations in .UK that can be deleted by registrars.[51]

o   An 18 May 2007 article in eWeek[52] by Larry Seltzer states that "stopping domain tasting in particular would show some serious good faith [by ICANN]." He also mentions that VeriSign could impose a re-stocking fee on domain tasters. (Note, this is not currently permitted in the .COM registry agreement. To provide this service, VeriSign would have to submit a request to ICANN through the Registry Services Evaluation Policy[53]).

o   A 22 May 2007 article in Business2.0 provides further detail on a domain name investor who has used domain tasting as a business model to develop one of the largest privately-held domain name portfolios.[54]

### 3.8    Community Consultation

For some time, ICANN staff has been engaged in consultations with registry operators, registrars, and other constituencies about ways that domain tasting might be addressed. Recently, staff has been involved in focused discussions with VeriSign on possible options, including potential contract amendments to address domain tasting and its effects.  VeriSign has stated that it will come back to staff on this issue following internal analysis, and has made a commitment to continue discussions on the issue.  Staff expects these discussions to continue, independently of a policy development process within the GNSO.  Staff would expect to discuss any viable options arising out of this process with the community through the Registry Services Evaluation Process.

---

[51] http://www.nominet.org.uk/digitalAssets/8783_DomainTasting.pdf
[52] http://www.eweek.com/article2/0,1895,2133111,00.asp
[53] http://www.icann.org/registries/rsep/rsep.html.
[54] http://money.cnn.com/magazines/business2/business2_archive/2007/06/01/100050989/index.htm?postversion=2007052214

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 25 of 39

# 4     Discussion of possible directions

It should be noted that the GNSO policy development process is one of several ways that domain tasting might be addressed within the ICANN community.  This section describes the various mechanisms for addressing this issue in order to inform the ICANN community of possible directions that may be taken.

## 4.1     GNSO Policy Development Process

As stated in the staff recommendations (see Section 5 and Executive Summary in Section 1), ICANN staff support the initiation of a policy development process on this topic as one possible mechanism for considering this topic.  A policy recommendation on this issue could impose new requirements, or institute new prohibitions applicable to contracted parties, which ICANN staff would then implement and enforce through its contracts with registries and/or registrars.

## 4.2     ICANN Budget Process

As part of ICANN budgets beginning with FY2004-05, registrars were levied a transactional fee for each "Add" transaction performed at the registry.  The budget was implemented so that that domains deleted within the add or auto-renew grace periods would not be charged a transaction fee to match the registry agreement(s) requirement that registries not charge registrars for those registrations.  Registrars are therefore not billed the transactional fee for names that are deleted within AGP; they pay the transactional fee only for names that are kept.  If the transaction fee were charged to registrars on all "Add" transactions, rather than only those which passed through grace period, this would presumably curtail some domain tasting activity.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 26 of 39

ICANN's budget for Fiscal Year 2007-08[55] contains the following restrictions regarding registrar eligibility for partial forgiveness of the standard per-registrar variable fee based on activity during the Add Grace Period:

> Depending on registrar size and activity, some registrars will continue to be eligible for "forgiveness" of two-thirds of the standard per-registrar variable fee. The criteria for eligibility for partial forgiveness will be as follows: the registrar must have fewer than 350,000 gTLD names under its management, the registrar must not have more than 200 attempted adds per successful net add in any registry, and it must not have more than five percent (5%) of added names deleted during the add-grace period from any registry that offers an add-grace period.

Within the public comment and approval process for the ICANN budget, new provisions which address domain tasting could be instituted. Specific comments submitted during consideration of the ICANN budget related to domain tasting could be incorporated by the Finance Committee and ICANN Board before the final budget is approved. Consultations will occur during the ICANN meeting in San Juan, and following those consultations the budget will be presented to the ICANN Board for consideration on 29 June 2007.

### 4.3     Contract Negotiations or New Registry Services

Additionally, many of the gTLD registries have contractual provisions which enable them to address the issue of domain tasting on an individual basis.

In September 2006 PIR submitted a proposal for a five-cent excess-deletion fee to registrars performing deletions above a certain threshold during AGP.[56]  This request was made through the Registry Service Evaluation Policy (RSEP), a consensus policy developed by the GNSO. The PIR request was approved by the ICANN Board of Directors in November 2006[57]. ICANN staff then proceeded to work with PIR to make the necessary contractual changes to PIR's registry agreement with ICANN.  (The discussion in section 3 above of

---

[55] http://www.icann.org/financials/proposed-budget-fy07-08-17may07.pdf.
[56] http://www.icann.org/registries/rsep/PIR_request.pdf.
[57] http://www.icann.org/minutes/resolutions-22nov06.htm.
Issues Report on Domain Tasting
Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Caroline Chicoine of the Intellectual Property Constituency and Phil Corwin of the Internet Commerce Association was in response to public comments regarding the PIR request.)

Registries may also submit proposed contract changes to ICANN to address activity within their own particular TLDs. To date, no other registries have initiated a proposal for a new registry service through the RSEP process[58].

# 5    Staff recommendation

The issues surrounding domain tasting have generated significant discussion among several constituencies and stakeholders and would benefit from review as part of a structured discussion.  However the GNSO may choose to proceed, staff notes that the completion of concrete fact-finding and research will be critical in informing the community's deliberations.

In determining whether the issue is within the scope of the ICANN policy process and the scope of the GNSO, staff and the General Counsel's office have considered the following factors:

**Whether the issue is within the scope of ICANN's mission statement**

The ICANN Bylaws state that:

"The mission of The Internet Corporation for Assigned Names and Numbers ("ICANN") is to coordinate, at the overall level, the global Internet's systems of unique identifiers, and in particular to ensure the stable and secure operation of the Internet's unique identifier systems. In particular, ICANN:

1. Coordinates the allocation and assignment of the three sets of unique identifiers for the Internet, which are

      a. Domain names (forming a system referred to as "DNS");

      b. Internet protocol ("IP") addresses and autonomous system ("AS") numbers; and,

      c. Protocol port and parameter numbers.

---

[58] http://www.icann.org/registries/rsep/rsep.html

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 28 of 39

2. Coordinates the operation and evolution of the DNS root name server system.

3. Coordinates policy development reasonably and appropriately related to these technical functions."[59]

Domain tasting activities involve the allocation and assignment of domain names. ICANN is also responsible for policy development reasonably and appropriately related to these technical functions. Under items 1a and 3 above, the issue is within the scope of ICANN's mission statement. As domain tasting activities concern gTLDs, the issue is within the scope of the GNSO to address.

**Whether the issue is broadly applicable to multiple situations or organisations**

A consideration of the issues surrounding domain tasting would be broadly applicable to multiple situations or organisations, including each existing gTLD under contract with ICANN, each of 800+ accredited registrars, and a diversity of existing and potential registrants. Note however that a consensus policy resulting from the policy development process would only be applicable to contracted parties (registries and registrars).

**Whether the issue is likely to have lasting value or applicability, albeit with the need for occasional updates**

Completion of policy development work on issues surrounding domain tasting would affect future gTLDs, future registrars, and potential business or non-commercial entities which have not as yet entered the market.

**Whether the issue will establish a guide or framework for future decision-making**

The outcome of a policy development process will have lasting value as precedent, although the particular circumstances of the market will continue to evolve, and will thus establish a framework for future decision-making on related issues.

**Whether the issue implicates or affects an existing ICANN policy**

---

[59] ICANN Bylaws, Article 1, Section 1: http://icann.org/general/bylaws.htm#I

Issues Report on Domain Tasting
Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 29 of 39

The issue does not implicate or affect an existing ICANN policy.  A list of consensus policies is available at http://www.icann.org/general/consensus-policies.htm.

Based on the above, the General Counsel finds that the proposed issue is within scope of the ICANN policy process and within the scope of the GNSO.

Staff recommends that the Council move forward on a policy development process, including further fact-finding and research to provide data to assist policy development and illuminate potential policy options.  Staff resources can be made available to support these research activities and objectives.

Questions that might productively be addressed as part of fact-finding include:

- Who benefits from domain tasting, and who is harmed?
- Who would benefit from cessation of the practice and who would be harmed?
- How are registry operators being affected by domain tasting?
- How are registrars being affected by domain tasting?
- How are registrants being affected by domain tasting?  Are there different categories of registrants affected differently?
- What enforceable rules could be applied toward domain tasting activity?
- What would be the impact (positive or negative) of establishing limitations, guidelines or restrictions on registrars' use of the AGP?
- What would be the impact (positive or negative) on registries, registrars, and registrants of eliminating the AGP?

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 30 of 39

# Annex 1 - Glossary of terms

**Add grace period (AGP)**

A Grace Period refers to a specified number of calendar days following a Registry operation in which a domain action may be reversed and, as appropriate, a credit may be issued to a registrar. The Add-Grace Period is typically the five day period following the initial registration of a domain name.

**Domain tasting**

A monetisation practice employed by registrants to use the AGP to register domain names in order to test their profitability. During this period, registrants conduct a cost-benefit analysis to see if the tested domain names return enough traffic to offset the registration fee paid to the registry over the course of the registration period (e.g., currently $6 US for a .NAME domain name).

**Domain kiting**

A form of domain tasting which involves continual registration, deletion, and re-registration of the same names in order to avoid paying the registration fees. This practice is sometimes referred to as "domain kiting." This term has been mistakenly used as being synonymous with domain tasting, but it refers to multiple and often consecutive tasting of the same domain name that avoids paying the registration fee. N.B. there is no guarantee that a registrant who allows a name to drop at the end of the AGP will be successful in re-registering it as other registrants may also compete for the same name.

**Phishing**

The practice of creating a replica of an existing webpage to fool a user into submitting personal, financial or password data.

**Pharming**

Re-directing a website's traffic from the legitimate website to a bogus website for the purpose of stealing personal, financial or other data.

Issues Report on Domain Tasting
Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 31 of 39

**Type-in traffic**

"Type-in traffic is a term describing visitors landing at a web site by entering a word or phrase (with no spaces or a hyphen in place of a space) in the web browser's address bar (and adding .com or any other gTLD or ccTLD extension)(Presently); rather than following a hyperlink from another web page, using a browser bookmark, or a search-box search."[60]

**Typo-squatting**

The practice of registering misspellings of known terms as domain names in order to attract type-in traffic.

**UDRP**

The Uniform Domain Name Dispute Resolution Policy;

http://www.icann.org/dndr/udrp/policy.htm.

---

[60] This is the Wikipedia definition of type-in traffic. Further information is available at http://en.wikipedia.org/wiki/Type_in_traffic

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 32 of 39

# Annex 2 – ALAC Request for Issues Report on Domain Tasting

This annex reproduces in full the request for an issues report sent by the At-Large Advisory Committee to the GNSO Council:

## Request for Issues Report on Domain Tasting

The **At-Large Advisory Committee**, with the support and involvement of the GNSO **Commercial and Business Users and Intellectual Property Constituencies**, requests the creation of an Issues Report on Domain Tasting. In addition, the gTLD **Registries Constituency** submitted a brief statement that is attached.

Domain Tasting is the systematic exploitation of the 5-day Add Grace Period to gain access to domain names without cost. The AGP is a contractual clause in the registry agreements between ICANN and the operators of the unsponsored gTLD registries which allows for a full refund of domain charges if the name is deleted within 5 days of the add/registration. As a result, a registrant has full use of a domain name for up to 5 days at no net cost to them (other than the potential lost interest on the fee paid and then refunded).

The original intent of the AGP was to allow the no-cost cancellation of a domain registration when registrants or registrars mistyped or misspelled domain names during the registration process.  However, it is now widely employed for the completely different purpose of Domain Tasting, providing domain names at no cost allowing the tracking and calculating the amount of revenue generated while the name is parked at a monetization page during the AGP.  Furthermore, nothing in the AGP or otherwise prohibits the same registrant or a possibly related registrant from immediately re-registering the name after it is dropped at the end of the five day grace period. Due to virtually instantaneous updating of the zone file, the registrant can get almost continuous use of a name at no net cost (a procedure known as Domain Kiting).

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 33 of 39

Since 2001, the number of domains that are deleted within the AGP has increased exponentially.  It is now estimated by some that between 2 and 4 million domain names are tied up in domain tasting or kiting every day. For a typical large registrar, the number of deletes is perhaps one percent of their total holdings. For some registrars, the number of deletes per month is regularly ten times the number of stable domain names that they hold. Clearly, typing mistakes on the part of the registrant cannot account for all of these AGP deletes.

Names to be registered for Domain Tasting can generally come from several sources:

- Variations of existing names taking advantage of spelling mistakes (typo-squatting), company name/abbreviation confusion and gTLD/ccTLD confusion. Defensive registrations eliminate some of such names, but cannot realistically catch them all.
- Names not renewed by previous owners.
- Domain names composed of a recently registered second-level domains with other TLDs.

A typical individual user of the Internet (the very users that the ALAC has a responsibility to represent), does not know about arcane domain name policy, transport mechanisms, registrars, registries or even ICANN. They view the "Internet" as a holistic combination of the physical network, the policies and practices that make it work, and their user interface, typically a web browser. They expect that when they type in a URL, it will either get them to the web site that they planned to visit, or issue an error message. One of the effects of the exploitation of the AGP is that increasingly, this is not the case. Allowing this to continue to the benefit of domain tasters who use domains names without cost is a violation of the public trust placed in ICANN.

**Consequences of Domain Tasting**

Possible consequences of Domain Tasting include:

1. **Destabilization of the Domain Name System –** The tremendous volume and rate of registrations and deletions associated with tasting and kiting is described as placing

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 34 of 39

operational loads on Registry systems that are orders of magnitude above steady-state operations. Such incessant, systematic stress on registry systems could cause instability in the gTLD namespace or, worse, the entire domain name system.

2. **Creation of consumer confusion** – The high number of domain names estimated to be tied up in domain tasting and kiting every day (2-4 million) can result in consumer confusion and undermine confidence in the Domain Name System as domains repeatedly alternate between availability and registration for 5 day periods and legitimate users are prevented from registering their desired domain names. This user confusion is increased by the transient nature of many of the names, where they are there one day, but gone the next.

3. **Increased costs and burdens to legitimate registrants** – The ability to control (at no cost) domain names that are potentially in conflict with other registered names increases the effective cost of a domain name to its owner through increased defensive registrations and staff resources needed to monitor such potential conflicts. Registry costs must also be increased due to the volume of adds and deletes.

4. **Facilitation of Trademark Abuse -** Automated registration systems permit registration of virtually every typographical permutation of a trademark in order to test for traffic, facilitating trademark infringement on a massive level.  Further, by the time the trademark owner discovers that a domain name identical or similar to its trademark has been registered, it is often too late for the trademark owner to act as the domain name has already been deleted along with the Whois data.

5. **Facilitation of Criminal Activity** – Due to the transient nature of AGP-deleted registrations, it is difficult for law enforcement to trace the registrant of tasted domains, which makes these domains ideal candidates for phishing, pharming, and other forms of internet fraud.

**Relevance to ICANN's Mission**

According to ICANN's bylaws, ICANN's mission is to "coordinate, at the overall level, the global Internet's systems of unique identifiers, and in particular to ensure the stable and

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 35 of 39

secure operation of the Internet's unique identifier systems." The ICANN Bylaws list 11 core values that should guide ICANN's decisions and actions in furtherance of its mission.

Domain tasting implicates the following core values listed in the ICANN bylaws:

1. **Preserving and enhancing the operational stability, reliability, security, and global interoperability of the Internet** - as stated above, the increased number of registrations and deletions associated with add/drop schemes may place unexpected and uncontrollable operational loads on Registry systems which could cause instability in the gTLD namespace or even the entire domain name system.

5,6. **Where feasible and appropriate, depending on market mechanisms to promote and sustain a competitive environment; Introducing and promoting competition in the registration of domain names where practicable and beneficial in the public interest** – It is estimated that the majority of add/drop registrations may be carried out by as few as 18 registrars out of approximately 600 accredited registrars. If this is in fact the case, a small number of registrars are tying up millions of domain names that could be registered by the remaining 600 registrars, inhibiting effective competition.

7. **Employing open and transparent policy development mechanisms that (i) promote well-informed decisions based on expert advice, and (ii) ensure that those entities most affected can assist in the policy development process** – Considering the possible consequences of the continued existence of the AGP and the interest this issue has generated amongst numerous internet communities, it seems clear that should a PDP be initiated, both experts and the entities most affected by Domain Tasting will be eager to participate.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 36 of 39

## Statement from the gTLD Registries Constituency

Thanks for forwarding this note to the gTLD Registries Constituency regarding feedback on the subject of Domain Tasting - specifically the utilization of the 5 day (or 120 hour) Add Grace Period during which a domain may be deleted for a full credit of registry charges.

The gTLD Registries Constituency supports your efforts for a properly framed Issues report on the above, including the soliciting of feedback on the utilization of the 5 day Add Grace Period itself, recommended changes, the effects of such a change, and how any changes would be handled under the provisions in the existing gTLD Registry contracts relating to "Consensus Policies" and to the contractual obligations of support for the five day grace period within many registry agreements.

In addition, it is also important to recognize in the Issues Report that the Registrar Accreditation Agreements with ICANN have provisions relating to "Consensus Policies" that also need to be examined. That would have an impact on the Registrar Accreditation Agreements.

Again, we would like to thank you for your solicitation of our initial feedback and look forward to further examining this issue with the ALAC and the GNSO.

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 37 of 39

# Annex 3 – Corrections to Issues Report

This final and revised version of the Issues Report is a revision following input received from GNSO Council member, Chuck Gomes (Registry Constituency) pointing out factual errors or omissions. To ensure a complete record, Chuck Gomes' email to the GNSO Council is reproduced below:

**From:** Gomes, Chuck
**Sent:** Tuesday, May 29, 2007 10:02 PM
**To:** Maria Farrell; Council GNSO
**Subject:** RE: [council] Issues Report on Domain Tasting

Thanks Maria and all of the staff who worked together to produce this report.  I have a few comments that, although not material with regard to the staff recommendations in the report, I think are important for all to understand as the report is considered.

Section 1.1 Definitions Add Grace Period (AGP)
 Please note that the following statement in the 3rd paragraph is misleading: "When a name is deleted by the registry during this period, money on deposit with the registry is refunded to the registrar."  First of all, at least with regard to .com and .net registrations but likely with other gTLDs as well, it is very rare for a registrar to have 'money on deposit' with the registry.  This is an important point for at least two reasons: 1) some people think that registries benefit financially from new registrations that are deleted in the 5-day add-grace period (AGP) and that is simply not true; 2) refunds are not required because it is simply a matter of crediting a registrars account - there is no exchange of money, only adjustments to credit limits that are back upped by instruments such as letters of credit.

Section 1.2  Background
 Whereas the general information provided in this section seems fine, there are a few details that are missing:

- In response to customer (registrar and registrant) concerns and in cooperation with ICANN staff, Network Solutions (now VeriSign) implemented the AGP for .com, .net and .org within the first year of the original ICANN agreement for those gTLDs, but the agreement was never amended to include the requirement.

- When the .com, .net and .org registry agreements were re-executed in 2001, the AGP requirement was included along with other grace period provisions.
- When the first gTLDs were added, the AGP requirement was included in the associated registry agreements.

Section 3.2  Issue Background

- The 6th bullet starts out, ". . . Chuck Gomes of VeriSign stated during ICANN's June 2006 meeting that AGP was instituted at the agreement of registrars and registries: . . . "  It's a minor point, but there was only one registry at that time.

Chuck Gomes

---

**From:** owner-council@gnso.icann.org [mailto:owner-council@gnso.icann.org] **On Behalf Of** Maria Farrell

**Sent:** Tuesday, May 29, 2007 11:55 AM

**To:** 'Council GNSO'

**Subject:** [council] Issues Report on Domain Tasting

Dear Council members,

 Attached is the Issues Report on Domain Name Tasting requested by the At-Large Advisory Committee on 9 May (http://gnso.icann.org/mailing-lists/archives/council/msg03474.html).

 Best regards,

 Maria Farrell

Issues Report on Domain Tasting

Authors: Maria Farrell, maria.farrell@icann.org, Karen Lentz, Karen.lentz@icann.org, Patrick Jones, Patrick.jones@icann.org

Page 39 of 39

# EXHIBIT D

# ICANN Board Recommends Action on Domain Tasting

Suggested fee change would effectively eliminate tasting

*29 January 2008*

**MARINA DEL REY, Calif.:** The Internet Corporation for Assigned Names and Numbers is looking to effectively end domain tasting with a proposal to start charging the annual ICANN fee on registrar domain registrations.

Domain tasting is the use of the Add Grace Period to test the profitability of a domain name registration. The AGP is a five-day period following the initial registration of a domain name when the registration may be deleted and a credit can be issued to a registrar.

"Domain tasting has been an issue for the Internet community and ICANN is offering this proposal as a way to stop tasting," said Dr Paul Twomey, ICANN's President and CEO. "Charging the ICANN fee as soon as a domain name is registered would close the loophole used by tasters to test a domain name's profitability for free."

AGP was originally introduced by registries so registrars could avoid costs if a domain name was mistyped or misspelled during the registration process. It is part of the .com, .net, .org, .info, .name, .pro, and .biz registry contracts.

Tasting has been a serious challenge for the Internet community and has grown exponentially since 2004. In January 2007 the top 10 domain tasters accounted for 95% of all deleted .com and .net domain names — or 45,450,897 domain names out of 47,824,131 total deletes.

The proposal will be part of the ICANN budget process for the fiscal year starting 1 July 2008. The early draft version of that budget will be released for and discussed at ICANN's New Delhi meeting later this month. After public discussions of this proposal and other budget issues, the proposed budget will be released for addition discussions by 17 May 2008 and be voted on at the board meeting to be held during the ICANN meeting in Paris in June. ICANN accredited registrars representing two-thirds of fees collected will be asked to approve the proposal.

"This idea came from the ICANN community and we think it is a viable solution the Internet community has been seeking," Dr Twomey added.

**About ICANN:**

ICANN is responsible for the global coordination of the Internet's system of unique identifiers like domain names (like .org, .museum and country codes like .uk) and the addresses used in a variety of Internet protocols that help computers reach each other over the Internet. Careful management of these resources is vital to the Internet's operation, so ICANN's global stakeholders meet regularly to develop policies that ensure the Internet's ongoing security and stability. ICANN is an internationally organized, public benefit non-profit company. For more information please visit: www.icann.org .

**Media Contacts:**
Jason Keenan
Media Adviser, ICANN
Ph: +1 310 382 4004
E: jason.keenan@icann.org

International: Andrew Robertson
Edelman (London)
Ph: +44 7921 588 770
E: andrew.robertson@edelman.com