MB

**FILED**

**APRIL 14, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. | § | |
| SANFILIPPO & SON, INC., | § | |
| BLITZ REALTYGROUP, INC., | § | |
| and VINCENT E. "BO" JACKSON, | § | |
| Individually and on Behalf of All | § | |
| Others Similarly Situated, | § | Civil Action No. 07 CV 3371 |
| | § | |
| Lead Plaintiffs, | § | |
| | § | JUDGE MANNING |
| v. | § | |
| | § | |
| GOOGLE INC., OVERSEE.NET, | § | |
| SEDO LLC, DOTSTER, INC., AKA | § | |
| REVENUEDIRECT.COM, | § | |
| INTERNET REIT, INC. d/b/a IREIT, INC., | § | |
| and JOHN DOES I-X, | § | CLASS ACTION COMPLAINT |
| | § | |
| | § | |
| Defendants. | § | (DEMAND FOR JURY TRIAL) |

### SECOND AMENDED CLASS ACTION COMPLAINT IN LAW AND EQUITY

VULCAN GOLF, LLC, JOHN B. SANFILIPPO & SON, INC. ("JBSS"), BLITZ

REALTY GROUP ("BLITZ"), and VINCENT E. "BO" JACKSON ("JACKSON"), Lead

Plaintiffs, on behalf of themselves and all others similarly situated, pursuant to Rule 23 of the

Federal Rules of Civil Procedure, by and through their undersigned Counsel of Record, complain

and allege, upon information and belief, except as to those paragraphs applicable to the named

Lead Plaintiffs, which are based on personal knowledge, against Defendants GOOGLE INC.

("GOOGLE"), OVERSEE.NET ("OVERSEE"), SEDO.COM, LLC ("SEDO"), DOTSTER, INC.

(also known as) REVENUEDIRECT.COM ("DOTSTER"), and INTERNET REIT, INC., doing

Dockets.Justia.com

business as IREIT, INC. ("IREIT"), as follows:

## I.    NATURE OF THE ACTION

1. This case involves a shockingly deceptive internet-based modern day racketeering scheme ("Deceptive Domain Scheme") that is being intentionally carried out by Defendants through the use of sophisticated and proprietary technology/software that allows them to generate and transact in billions of dollars in ill-gotten advertising and marketing revenue annually from blatant and intentional violations of federal and state laws that govern the domain name system (DNS), Internet-based commercial/business practices, intellectual property and trademark rights, and related laws. In a nutshell, the scheme uses illegal domain names on the Internet to generate and transact in billions of dollars of revenue, at Lead Plaintiffs' and the putative Class Members' expense.

2. The illegal domains are referred to herein as "Deceptive Domains" and are monetized domain names that are the same or confusingly similar to Lead Plaintiffs' and the putative Class Members' venerable, valuable, protected, distinctive and famous, registered and common law names, marks, trade names, logos, famous names, and other distinctive/valuable marks ("Distinctive and Valuable Marks"). Deceptive Domains are central to Defendants' massive scheme to generate and transact in money from the knowing diversion of and monetization of Internet traffic.

3. The Deceptive Domain Scheme consists of, but is not limited to, the following actions: (1) the deliberate registration, trafficking, license, use and monetization of Deceptive Domains; (2) the deliberate hijacking, redirecting, dilution and infringement of Distinctive and Valuable Marks; (3) the deliberate creation and promotion of an illegal aftermarket for the resale

of Deceptive Domains; (4) the deliberate tasting and kiting of Deceptive Domains; (5) the deliberate cybersquatting and typosquatting; (6) the derivation, use and generation of illegally obtained money/revenue/profit from their illegal and deceptive action; (7) the investment and transaction in the money and property obtained from their illegal actions; (8) the illegal use and intentional diminution of Lead Plaintiffs' and the putative Class Members' valuable property rights and interests; and, (9) the other related actions and omissions intended to generate revenue from the unauthorized, improper, and illegal use/infringements/dilution/misappropriation of Lead Plaintiffs' and the putative Class Members' property.

4.     Defendants' scheme is being conducted through strategically contrived automated software/programs that mask the massive and intentional scale of the second-by-second, 24-hour, 7-day/week, scheme that produces ill-gotten money from Internet advertising and marketing generated by the use of Deceptive Domains that are identical to, substantially similar to, or confusingly similar to Distinctive and Valuable Marks, for their own commercial gain.

5.     Defendants use semantics software programs to understand the "meaning" of Distinctive and Valuable Marks, and what goods and services are associated with those marks, and then register/license/traffic-in/use Deceptive Domains to generate revenue from advertisers that pay for advertising, usually competitor or identical or substantially similar products/services, in blatant violation of federal and state law.  The process of generating revenue from the use of Deceptive Domains is referred to as "monetization" of domains.

6.     Defendants have the practical ability to add filtering devices to their software to block Deceptive Domains without degrading the system's ability to provide advertising on

appropriate legal and non-infringing domains, but willfully turn a blind eye, and simply refuse to implement said filtering and blocking devices.

7.      Defendant Google is integral to, controls, and directs the Deceptive Domain Scheme, in part, in the following ways:

a.      Defendant Google creates, devises, contracts for, arranges, places, collects revenue from, monitors and otherwise controls almost all of the revenue-generating, advertising and marketing involved in this lawsuit ("Google Adwords Advertising");

b.      Defendant Google contrived, created, monitors and controls the largest internet advertising network in the world ("Google Network" as defined herein) providing the exclusive mechanism by which AdWords Advertisers can "reach" three out of every four internet users in the world;

c.      Defendant Google controls and proscribes membership and participation in the Google Network;

d.      Defendant Google effectuates the illegal Deceptive Domain Scheme by controlling both the AdWords Advertisers' access to domains/sites/video/search results on the internet (that are members of the Google Network), and then in turn controlling the Google Network's access to the AdWords Advertisements.  Both must comply and agree to all terms and conditions proscribed by Defendant Google ;

e.      Defendant Google contractually restricts parking companies, domain registrants, licensees and aggregators from placing any advertising or marketing, other than Defendant Google AdWords Advertising, on their sites as a term of participation in the Google Network;

f.      Defendant Google created, within the Google Network, a hierarchical system in which all decision-making is directly or indirectly under its control,  and that requires small domain portfolio owners/licensees and aggregators to license and monetize their sites only derivatively through the parking companies (or a select few Google-approved members of the Google Network) and to share revenue with the parking companies;

g.      Defendant Google exclusively collects, deposits, and distributes the advertising revenue generated from AdWords advertisements on the Google Network.

Only Defendant Google knows exactly how much revenue is generated from which AdWords advertisements, and "where" it was generated throughout the Google Network;

h.  Defendant Google determines which parking companies, domain registrants, domain licensees, and domain aggregators can monetize domains, monetize Deceptive Domains, and/or otherwise participate in the Google Network and the Deceptive Domain Scheme;

i.  Defendant Google controls the creation, placement and revenue generated from each AdWords advertisement throughout the Google Network; and

j.  Defendant Google's proprietary software and technology is used to generate AdWords advertising content, direct and place AdWords advertising, transact in the money generated from the AdWords advertising , generate and distribute reports related to the monetization of domains/sites/video/search results in the Google Network, as well as all other aspects of the Deceptive Domain Scheme.

8.  Defendants have actual and constructive knowledge of the illegal actions alleged herein and materially contribute to the illegal actions alleged herein, by among other things, contriving, designing, inducing, encouraging, facilitating and producing the networks, functions, and programs that result in the proliferation of the infringements.

9.  Defendants receive and will continue to receive direct financial benefits from the Deceptive Domain Scheme.

10.  As a direct and proximate result of Defendants' unlawful conduct and illegal conspiracy, Lead Plaintiffs and putative Class Members have suffered injury to their businesses and property, suffered economic harm, and continue to be otherwise injured and damaged by Defendants' ongoing illegal conduct set forth herein.

11.  Lead Plaintiffs and putative Class Members also have, and will continue to have, their reputation and value of their Distinctive and Valuable Marks diminished/diluted as a direct result of Defendants' ongoing Domain Scheme and other unlawful activity alleged herein.

12.     Therefore, Lead Plaintiffs bring this Fourteen (14) Count class action complaint pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class (the "Class") of similarly situated entities and individuals against Defendants under the Lanham Act, *15 U.S.C. § 1051 et seq.;* the Anticybersquatting Consumer Protection Act, *15 U.S.C. § 1125(d)*; trademark infringement under *15 U.S.C. § 1114(1)*; false designation of origin under *15 U.S.C. § 1125(a)*; dilution under *15 U.S.C. § 1125(c)*; Racketeering Influenced Corrupt Organizations Act violations under *18 U.S.C. §1962(a), (c)* and *(d)* ("RICO"), Unjust Enrichment, and Civil Conspiracy.

## II.     <u>JURISDICTION AND VENUE</u>

13.     This Court has original federal question jurisdiction over this action.  This Complaint is brought against Defendants under the Lanham Act, *15 U.S.C. § 1051 et seq.;* the AntiCybersquatting Consumer Protection Act, *15 US.C. § 1125(d)*; trademark infringement under *15 U.S.C. § 1114(1)*; false designation of origin under *15 U.S.C. § 1125(a)*; dilution under *15 U.S.C. § 1125(c)*; Racketeering Influenced Corrupt Organizations Act violations under *18 U.S.C. §1962(a), (c)* and *(d)* ("RICO"), to recover treble damages and the costs of this suit, including reasonable attorney's fees, for injunctive and equitable relief, and for the damages sustained by Lead Plaintiffs and the members of the Class by reason of Defendants' violations of federal law as more fully set forth hereunder.

14.     This Court has jurisdiction over this action pursuant to *28 U.S.C. §§ 1331, 1337*, and *1338, 18 U.S.C. §§1961, 1962, 1964*, and other applicable federal statutes.

15.     This Court has supplemental jurisdiction over the claims in this Complaint that arise under state statutory and common law pursuant to *28 U.S.C. § 1367(a)* because the state law claims

are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

16.     This Court has *in personam* jurisdiction over each of the Defendants, as each was engaged in federal cybersquatting violations and trademark infringements that were directed at and/or caused damages to persons and entities residing in, located in, or doing business throughout the United States, including the Northern District of Illinois.

17.     This Court has *in personam* jurisdiction over each of the Defendants, as each was engaged in RICO violations, committed RICO predicate acts, was involved in a RICO conspiracy, that was directed at and/or caused damages to persons and entities residing in, located in, or doing business throughout the United States, including the Northern District of Illinois.

18.     Venue is proper in this judicial district pursuant to *15 U.S.C. § 22, 18 U.S.C. §1965(a), and 28 U.S.C. § 1391(b)* and *(c)* because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Lead Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in the Northern District of Illinois.

19.     No other forum would be more convenient for the parties and witnesses to litigate this action.

III.     **PARTIES**

    *A.     LEAD PLAINTIFFS*

       *i.  Lead Plaintiff Vulcan*

20.     Lead Plaintiff VULCAN GOLF, LLC ("Vulcan Golf"), is an Illinois Limited Liability Company with its principal place of business located at 2701 DuKane Drive, St. Charles, Illinois 60174.

21.     Vulcan Golf was founded in 1995 to design and manufacture high performance innovative game improvement golf clubs for serious and recreational golfers.

22.     Vulcan Golf owns the trademark VULCAN and trade name Vulcan Golf (collectively the "Vulcan Marks").  The Vulcan Marks were publicized as of November 1993 and have been featured on the Internet, in various forms of media advertisements and in stories published throughout the United States.

23.     Vulcan Golf offers and provides a full array of golf and related products and services under the Vulcan Marks.  Vulcan Golf uses the Vulcan Marks in connection with the provision of golf clubs, golf balls, golf lessons, custom golf club fitting and other golf accessories.

24.     The Vulcan Marks are widely known and recognized among consumers and members of the golfing community.

25.     The Vulcan Marks are unique and distinctive and, as such, designate a single source of origin.

26.     Vulcan Golf's main Internet website using the Vulcan Marks and featuring information on many of the products and services of Vulcan Golf can be accessed via the domain name "www.VulcanGolf.com" which has been registered and used since May 1997.

27.     The Vulcan Marks are valid and enforceable trademarks.  Vulcan Golf owns the following United States trademark registration for its Vulcan Marks:

Trademark: VULCAN; Registration No. 1973892; Goods and Services Int'l Class 028. US 022 023 038 050. G & S: golf clubs; First Use: November 8, 1993. Registration Date May 14, 1996

28.     Plaintiff Vulcan has been personally injured in its business and property as a direct and proximate result of the Deceptive Domain Scheme and violations set forth herein. The injury and damage suffered is economic and non-economic in nature and includes, but is not limited to: diversion of business; confusion; dilution of distinctive and valuable marks; loss of revenue; and other such related injury and damage.

*ii..*     ***Lead Plaintiff JBSS***

29.     Lead Plaintiff, John B. Sanfilippo & Sons Inc. ("JBSS"), is a Delaware Corporation with its principal place of business located at 1703 N. Randall Road, Elgin, Illinois 60123.

30.     JBSS was founded in 1991 to manufacture and distribute a full line of edible nut products.

31.     JBSS owns trademarks including "Fisher" (collectively the "JBSS Marks"). The JBSS Marks were publicized as of 1995 and have been featured on the Internet, in various forms of media advertisements and in stores published throughout the United States.

32.     JBSS offers and provides a full array of nuts and related products and services under the JBSS Marks. JBSS uses the JBSS Marks in connection with the sale of a complete product line of ingredient nuts, including pecans, almonds, walnuts, peanuts, cashews and pine nuts.

33.     The JBSS Marks are widely known and recognized among consumers.

34.     The JBSS Marks are unique and distinctive and, as such, designate a single source of origin.

35. JBSS's main Internet website using the JBSS Marks and featuring information on many of the products and services of JBSS can be accessed via the domain name "www.Fishernuts.com" which has been registered and used since at least 1995.

36. The JBSS Marks are valid and enforceable trademarks. JBSS owns the following United States trademark registration for its JBSS Marks:

> Trademark FISHER; Registration No. 1100900; First Use: 1937. Registration Date 04/11/77.

37. JBSS's primary corporate website is located at "www.FISHERNUTS.COM" and

at "www.JBSSINC.COM".

38. Plaintiff JBSS has been personally injured in its business and property as a direct and proximate result of the Deceptive Domain Scheme and violations set forth herein. The injury and damage suffered is economic and non-economic in nature and includes, but is not limited to: diversion of business; confusion; dilution of distinctive and valuable marks; loss of revenue; and other such related injury and damage.

### iii. Lead Plaintiff BLITZ

39. Lead Plaintiff Blitz is an Illinois Corporation with its principal place of business located in Geneva, Illinois 60134.

40. Blitz was founded in 2006 and engages in the real estate business. Blitz offers real estate brokerage and sales services for commercial and residential real estate. Blitz has a logo and promotes its services with flyers, signs, business cards, Internet/website, and other such related methods.

41.     Blitz maintains a website at www.blitzrealtygroup.com as an integral part of its business operations.  Blitz uses its website to display properties for sale in the local area, and to introduce its company and services to prospective and current customers.

42.     Blitz has valid, enforceable, protected and valuable legal rights to the use of the names, "Blitz", "Blitz Realty" and "Blitz Real Estate" (collectively the "Blitz Marks") in the local northern Illinois area.  Blitz has used its  names and logo since at least 2002 in commerce, for business purposes, in connection with its real estate operations located in Illinois, as well as, having been featured on the Internet, in various forms of advertisements.

43.     Blitz offers and provides a full array of real estate services under the Blitz Marks.

44.     The Blitz Marks are widely known and recognized among the community in northern Illinois.

45.     The Blitz Marks are unique and distinctive and, as such, designate a single source of origin.

46.     Blitz's main Internet website using the Blitz Marks and featuring information on many of the products and services of Blitz can be accessed via the domain name www.blitzrealtygroup.com which has been registered and used since 2006.

47.     After Blitz's Distinctive and Valuable Mark became famous, Defendants monetized Deceptive Domains (including www.blitzrealty.com) to unlawfully generate revenue from infringing/using Blitz's Distinctive and Valuable Mark.

48.  The gross and blatant intent of Defendants, Google and Oversee, to make and transact in money from directly infringing/monetizing Blitz's Distinctive and Valuable Mark, is illustrated by

their bold placement of competitor advertisements for Geneva, Illinois real estate services on the deceptive domain www.blitzrealty.com.

49.    Defendants Google and Oversee exclusively use the deceptive domain www.blitzrealty.com for monetization purposes, insofar as the only content associated with the Deceptive Domains are revenue-generating advertisements.

50.    The predatory, deceptive, and illegally infringing conduct of Defendants, Google and Oversee, toward Blitz (a small, local real estate company) demonstrates the egregious and widespread implementation of the Defendants' Deceptive Domain Scheme.

51.    Like Blitz, the Class includes tens of thousands of small businesses and commercial entities throughout the United States that have property rights in Distinctive and Valuable Marks that Defendants boldly and wantonly infringe on by their second-by-second, hour-by-hour, daily Internet scheme.

52.    Plaintiff Blitz has been personally injured in its business and property as a direct and proximate result of the Deceptive Domain Scheme and violations set forth herein.  The injury and damage suffered is economic and non-economic in nature and includes, but is not limited to, diversion of business, confusion, dilution of Distinctive and Valuable Marks,  loss of revenue, and other such related injury and damage.

### iv.  Lead Plaintiff BO JACKSON

53.    Lead Plaintiff Vincent E. "Bo" Jackson is a famous person.

54.    Bo Jackson resides in the Northern District of Illinois and is an Illinois resident.

55.    Bo Jackson was born November 30, 1962, and became famous at least on or about 1985

when he won the 1985 Heisman Trophy as the most outstanding college football player in the United States.

56. Bo Jackson was a first round draft pick (1st picked) into the National Football League ("NFL"). Bo Jackson was a multi-sport professional athlete who played both professional football and professional baseball.

57. Bo Jackson played running back for the Los Angeles Raiders NFL football team.

58. Bo Jackson played left field and designated hitter for the Kansas City Royals, the Chicago While Sox, and the California Angels of the American League in Major League Baseball.

59. Bo Jackson was the first ever athlete to be named an All-Star in two major professional sports, and is considered on information and belief to be the best "two-sport athlete" in the history of sports.

60. As a multi-sport professional football player and baseball player, Bo Jackson has been featured in numerous commercial advertisements.

61. In 1989 and 1990, Bo Jackson achieved national commercial fame through the "Bo Knows" advertising campaign (Advertising Nike, Inc. cross-training shoes that had his name).

62. Bo Jackson has, and continues, to generate revenue from his fame (sale of memorabilia, paid advertisements, etc.).

63. Bo Jackson has a valid and enforceable legally protectable interest in his name.

64. Bo Jackson has suffered and continues to suffer injury to his person, business, and property as a direct and proximate result of the Deceptive Domain Scheme and violations set forth

herein. The injury and damage suffered is economic and non-economic in nature and includes, but is not limited to: diversion of business; confusion, damage to reputation; dilution of distinctive and valuable famous name; loss of revenue; and other such related injury and damage.

### v. *Deceptive Domains Infringing Lead Plaintiffs' Distinctive and Valuable Marks*

65.     Defendants taste, register, license, own, traffic in, monetize and/or otherwise utilize and control Deceptive Domains that are identical and/or substantially similar to Lead Plaintiffs, including but not limited to the following:

| Domain Name | Defendant(s) | Date Of Use |
|---|---|---|
| | | |
| VULCAN GOLF LLC | | |
| VolcanGolf.com | Dotster, Google | Cited in Complaint, Deleted, Re-registered and Used After Complaint Filed |
| wwwVulcanGolf.com | Dotster, Oversee.net, Google | Cited in Complaint, Deleted, Re-registered and Used After Complaint Filed |
| VulcnaGolf.com | Dotster, Google | Registered and Used After Complaint Filed |
| VulcanGolfClubs.com | Oversee.net, Google | Registered and Used After Complaint Filed, Deleted, Registered and Used After MTD Filed, Currently in use. |
| VulcanGolfTechnology.com | Oversee.net, Google | Registered and Used After Complaint Filed |
| VulconGolf.com | Oversee.net, Google | Registered and Used After Complaint Filed |
| VulganGolf.com | Dotster, Google | Registered and Used After MTD Filed |
| VulgonGolf.com | Dotster, Google | Registered and Used After MTD Filed |
| Vulcanogolf.com | Sedo, Google | Registered and Used Prior To and After Complaint Filed |
| JOHN B. SANFILIPPO & SON, INC. | | |
| wwwfishernuts.com | Dotster, Google | |
| fishersnuts.com | IREIT, Google | |

| | |
|---|---|
| fisherpeanuts.com | Dotster, Google |
| fisherpeanut.com | Dotster, Google |
| fishernutrecipes.com | Dotster, Google |
| fischernuts.com | Oversee.net, Google |
| wwwjbssinc.com | Oversee.net, Google |
| johnsanfilliposons.com | Dotster, Google |
| BO JACKSON | |
| nobojackson.com | Sedo, Google |
| aintnobojackson.com | Sedo, Google |
| BLITZ REALTY GROUP | |
| BlitzRealty.com | Oversee.net, Google |

### vi. *The Putative Class*

66.  Lead Plaintiffs bring this action on their individual behalfs and on behalf of a

class consisting of the following:

> Any and all individuals and/or entities (excluding governmental entities,
> Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates,
> agents and Defendants' co-conspirators) domiciled within the United States
> that own or are a licensee of a "Distinctive or Valuable Mark" that has been
> infringed, diluted, cybersquatted, typosquatted, and/or otherwise improperly
> used by one or more of the Defendants, as part of the Deceptive Domain
> Scheme alleged herein, during the period January 1, 2002 through the present.

### B. DEFENDANTS

### i. Named Defendants

67.  Defendant Google is a publicly held corporation that was incorporated in California

in September 1998 and reincorporated in Delaware in August 2003.  Its headquarters is located at

1600 Amphitheatre Parkway, Mountain View, California 94043.  Defendant Google's website is

located at www.Google.com.  In the year 2006, Defendant Google earned $10.6 Billion in revenue,

a large percentage of which was earned from its advertising enterprise.

68.  This Court has personal jurisdiction over Defendant Google because it conducts

substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial district, and has engaged in conduct related to the unlawful activities at issue in this action causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

69.     Defendant Oversee.net is a resident of California with its Corporate Headquarters at 818 West 7th Street, Suite 700, Los Angeles, California 90017.

70.     This Court has personal jurisdiction over Defendant Oversee because it conducts substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial district, and has engaged in conduct related to the unlawful activities at issue in this action causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

71.     Defendant Sedo, LLC, is a division of Sedo GmbH of Cologne, Germany. Defendant Sedo has it principal place of business located at:  One Broadway, 14th Floor Cambridge, Massachusetts 02142.

72.     As of February 1, 2007, Defendant Sedo actively managed a database of over 7,000,000 domain names, including at least 3,000,000 undeveloped parked domain names.

73.     This Court has personal jurisdiction over Defendant Sedo because it conducts substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial

district, and has engaged in conduct related to the unlawful activities at issue in this Complaint causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

74. Defendant Dotster is a Delaware corporation located at 8100 NE Parkway Dr., Suite 300, Vancouver, Washington 95622. Dotster acts as both a domain name registrar and also owns a large portfolio of domain names many of which are Deceptive Domains.

75. This Court has personal jurisdiction over Defendant Dotster because it conducts substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial district, and has engaged in conduct related to the unlawful activities at issue in this action causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

76. Defendant Ireit is a Delaware corporation having its principal place of business in Houston, Texas. As of May 12, 2007, Defendant Ireit owns and actively manages over 400,000 domain names many of which are Deceptive Domains.

77. This Court has personal jurisdiction over Defendant Ireit because it conducts substantial business within this district, has engaged in acts or omissions within this judicial district causing injury, has engaged in acts outside this judicial district causing injury within this judicial district, and has engaged in conduct related to the unlawful activities at issue in this action causing injury and harm in this judicial district, and/or has otherwise made or established contacts with this judicial district sufficient to permit the exercise of personal jurisdiction.

78.     Defendants Oversee, Sedo, Dotster, IREIT and unnamed co-conspirators, are referred to collectively herein as the "Parking Company" Defendants.

79.     Each Defendant has acted in concert, and is independently profiting and deriving commercial gain from the illegal conduct alleged herein.

### ii.     Unnamed Co-Conspirators

80.     On information and belief, at all relevant times, other "Parking Companies," registrants, and domain registrars, the identities of which are unknown to Lead Plaintiffs, participate in the Deceptive Domain Scheme engaging in "Domain Tasting" and "Domain Kiting," (as defined herein) referred to herein as John Does I-X (collectively, the "Co-conspirators"), willingly conspired with other Defendants in the Deceptive Domain Scheme and in their fraudulent, illegal, and deceptive actions, including but not limited to, RICO violations, and various state law violations.  All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

### iii. .   Defendants' Agents

81.     The acts alleged to have been done by Defendants were authorized, ordered or done by their directors, officers, agents, employees, subsidiaries, or representatives while actively engaged in the management of each of the Defendants' affairs, for Defendants' commercial gain on behalf of and for the benefit of Defendants, as co-conspirators, and against Lead Plaintiffs and the Class.

82.     Each of the Defendants acted for itself and by and through its local agents, who act on the Defendants' behalf.  As such, each Defendant is responsible for all acts or omissions of any

of its agents which relate to allegations contained herein.  The acts complained of herein have been within the actual or apparent authority of the Defendants, have been for their benefit, and have been ratified by Defendants.

## IV.   **DEFINITIONS**

83.     For purposes of this Complaint, the following terms will be deemed to have the following meanings:

*A.   **Deceptive Domains:*** as used in this Complaint, means: a domain that is tasted, registered, licensed, monetized, trafficked in and/or otherwise used, for commercial gain, that is identical to or confusingly similar to a Distinctive and Valuable Mark.

*B.   **Distinctive and Valuable Marks**:* as used in this Complaint, means: venerable, valuable, distinctive, famous, registered or common law trademarks, trade names, logos, famous names, corporate names, domain names,  and other such distinctive/valuable marks.

*C.   **Domain Forwarding:*** as used in this Complaint, means: configuring a website such that when a user requests that website, the user is forwarded onwards to some other site at a different domain name.

*D.   **Domain Kiting:*** as used in this Complaint, means: the practice of registering a domain name and then deleting that domain name within five (5) days of registration, for a full refund,  and then re-registering that same domain name to avoid paying the domain registration fee.

*E.   **Domain Names**:* as used in this Complaint, means:  a textual identifier registered within the Domain Name System.   A domain name comprises two or more components, each separated by a period.  The right-most component is the top-level domain, such as .com or .org.  Most domain names are registered directly within a top-level domain, e.g. google.com. Domain names consist of letters, numbers, periods, and hyphens, but no other characters.

*F.   **Domain Registrars:*** as used in this Complaint, means: an organization, such as Network Solutions, that registers domains within top-level domains.  Persons that seek a domain name can obtain one from a domain registrar.

*G.   **Domain Tasting**:*  as used in this Complaint, means: the practice of domain registrants registering a domain name to assess its profitability for the display of online advertising. Via the tasting procedure, a registrant may return a domain name within five days for a full refund.  Domain tasters typically delete domain names that they project to be unprofitable, or delete domain names to avoid the registration fee as part of the "Domain Kiting" process.

**H.    *Google AdWords Advertising/Advertisements:*** as used in this Complaint, means Adwords advertisements and any other Google controlled advertisements that are internet/electronic advertising and marketing (CPC, PPC, banner, pop-up, pay-per-impression, etc), that are designed, placed, effectuated, directed and/or otherwise controlled by Google, and that are placed/displayed/monetized through the Google Network.   Also referred to herein as "Google Advertising/Advertisements."

**I.    *Google AdWords Network:*** as used in this Complaint, means: the thousands of advertisers worldwide that contract with and/or pay Google for the placement/display of AdWords advertisements throughout the Google Network.   Also referred to herein as "Google AdWords Advertisers."

**J.    *Google Network:*** as used in this Complaint, means: the large group of websites and other products, such as email programs and blogs, who have partnered with Google to display AdWords. http://adwords.google.com/support/bin/answer.py?answer=6104&ctx=sibling    It is the association of individuals/entities that collectively provide the internet advertising network whereby AdWords advertisements are displayed and monetized.   The Google Network consists of: (1) Defendant Google, (2) the Parking Company Defendants; (3) Google Search Network (America Online, CompuServe, Netscape, AT&T Worldnet, EarthLink, Sympatico, and others); (4) Google Content site partners (New York Post Online Edition, Mac Publishing (includes Macworld.com, JavaWorld,LinuxWorld), HowStuffWorks, and others), (5) Google AdSense Network (Parking Company Defendants, Domain Aggregators, Domain Registrants, and other third party website owners, blog sites, domain registrants, licensees and aggregators that enter into agreements with Defendant Google for the monetization, of domains under their license/control/ownership. Defendant Google in describing this  "Google Network" on its website, affirms as follows: *"Search and content sites, and on other products and blogs. The Google Network is the largest advertising network available online, reaching over 86% of Internet users worldwide."* http://adwords.google.com/support/bin/answer.py?answer=6119

**K.  *Google AdSense Network:*** as used in this Complaint, means the individuals/entities that participate in Google AdSense.  The Google AdSense Network consists of:

> **i. *AdSense For Content:*** as used in this Complaint means:   AdSense Network partners that contract with Google to allow AdWords Advertisements to be placed/displayed on domains/webpages under their ownership, license, registration, and or other  control. As explained by Defendant Google on its website:  "The Google content network comprises hundreds of thousands of high-quality websites, news pages, and blogs that partner with Google to display targeted AdWords ads. When you choose to advertise on the content network, you can expand your marketing reach to targeted audiences--and potential customers--visiting these sites every day. There's no larger network for contextual advertising in the world."   It

includes, but is not limited to the following individuals/entities:



https://adwords.google.com/select/afc.html

***ii.   AdSense for Domains:*** as used in this Complaint means: AdSense Network partners that contract with Google to allow AdWords Advertisements to be placed/displayed on parked domains/webpages under their ownership, license, registration, and or other control, based on the meaning of the "domain names" Defendant Google explains on its website: AdSense for domains allows domain name registrars and large domain name holders to unlock the value in their parked page inventory. AdSense for domains delivers targeted, conceptually related advertisements to parked domain pages by using Google's semantic technology to analyze and understand the meaning of the domain names. Our program uses ads from the Google AdWords network, which is comprised of thousands of advertisers worldwide and is growing larger everyday. Google AdSense for domains targets web sites in over 25 languages, and has fully localized segmentation technology in over 10 languages. http://www.google.com/domainpark/index.html

***iii.   AdSense for Search:*** as used in this Complaint means: AdSense Network partners that contract with Google to allow AdWords Advertisements to be placed/displayed in their associated search results. As Defendant Google explains on its website, the: "(g)lobal search network which includes, but is not limited to, Google Product Search and Google Groups and the following entities:



http://adwords.google.com/support/bin/answer.py?answer=6119

***iv.AdSense for Mobile:*** as used in this Complaint means: AdSense Network partners that contract with Google to allow AdWords Advertisements to be placed/displayed on mobile webpages under their ownership, license, registration, and or other control.

***v.AdSense for Video:*** as used in this Complaint means: AdSense Network partners

that contract with Google to allow AdWords Advertisements to be placed/displayed within video streams under their ownership, license, registration, and or other control.

**L.  Google Adsense Program:** as used in this Complaint, means: the technology, systems, and processes that Google developed, formulated, controls and uses to operate the displaying of Google AdWords advertisements on the domains/sites in the Google Adsense program, including but not limited to the Google Adsense Program, AdSense for Search, AdSense for Mobile, AdSense for Domains and Adsense for Content Programs (collectively referred to herein as "Google AdSense").

**M.  Masked Redirection / Framed Forwarding / Stealth Forwarding:** as used in this Complaint, means: a method or system for preventing a user's web browser from accurately reporting the true origin of the content the user is viewing.  Through such methods, a user can request one domain name and see that address in the browser's Address Bar, even as the user actually is shown content from a different destination.

**N.  Monetize / monetization:** as used in this Complaint, means: the practice of using a domain/website for commercial gain by generating revenue from internet advertising placed/displayed/associated with said domain/website.

**O.  Parked Domains:** as used in this Complaint, means: a domain which is undeveloped and contains little or no content, except for revenue generating advertisements.

**P.  Parking Companies:** as used in this Complaint, mean: a company that aggregates and licenses numerous domain names, develops and monetizes domains/websites with revenue generating advertisements, and contracts with Defendant Google for participation in the Google Network and to monetize all domains/websites under its license, ownership, registration, and/or other control.


V.    **BACKGROUND ALLEGATIONS**

84.    Internet users are well-accustomed to "domain names" which identify computers on the Internet and the websites available on those computers.  To reach a website a user types that site's domain name into the user's web browser.

85.    Each domain name must be unique, even if it differs from another domain name by only one character (*e.g.*, "vulcangolf.com" is different from "volcangolf.com" or "wwwvulcangolf.com").

86.     A domain name can be registered to only one entity, the "domain registrant."

87.     A domain registrant must pay an annual fee to a registrar for the domain name.

88.     As described by Network Solutions, one of the preeminent domain registration companies:

> A domain name is really just your address on the Internet. It's where people can find you, and it serves as your online identity. Businesses typically register domain names with their company name and sometimes also register their product names. Individuals often register family names or names that have a personal interest to them.
>
> Domain names have two parts: the label and the extension, or top-level domain, separated by a 'dot.' In NetworkSolutions.com, 'NetworkSolutions' is the label and 'com' is the top-level domain.

89.     A significant number of domain names are inadvertently misspelled by internet users, creating a large market for "typo" domain names that exploit and monetize typo traffic at the mark holder's expense. This practice, known as typosquatting, is estimated to cost mark holders millions of dollars each year in lost revenues and fraud.

**A.      General Background--Defendant GOOGLE**

**i.       Defendant Google's Operations**

90.     Defendant Google creates, develops, sponsors, promotes, maintains, manages, and directs the largest single online marketing/advertising business in the world.

91.     In 2004, 2005, and 2006, Defendant Google generated approximately 99% of its annual revenue from its AdWords advertisers (See 2006 Google 10K at 20, 38 and 40).

92.     Much of the AdWords advertiser revenue is generated from "cost-per-click/pay-per-

click (CPC/PPC)" advertising wherein the AdWords advertiser pays for each "click" on a particular advertisement displayed on the Google Network.  Aggregate paid clicks on Google Network sites increased by 65% from year-end 2005 through year end 2006  (*See* 2006 Google 10K at 43).

      ii.     ***Defendant Google's AdWords Program and the AdSense Network***

93.     Defendant Google utilizes its power and control over the AdWords Program, in conjunction with its power and control over the Google Network, in effectuating the Deceptive Domain Scheme described herein.

94.     Defendant Google's AdWords Program is an automated auction-based advertising program that places advertisements throughout the Google Network.

95.     Since approximately January 2002, Google AdWords advertisers have paid Defendant Google for advertisements on a CPC/PPC  basis. ( *See* 2006  Google 10K at 38).   That is, AdWords advertisers pay Defendant Google each time an AdWords advertisement is clicked.

96.     Defendant Google offers AdWords advertisers a number of other types of Internet advertising and marketing options, with varying payment optio*ns, for advertisements placed throughout the Google Network.*

97.     In order to attract AdWords advertisers, thus exponentially increasing revenue, Defendant Google has to be able to offer an appealing internet "reach, " which is measured by how many internet users it is capable of reaching. Defendant Google can only offer that reach through utilization of the Google Network.

98.     Defendant Google's strategic creation and control over the Google Network allows it to maximize revenue by offering AdWords advertisers access to its extensive  Google Network of

domains/sites/video/search results on which advertisements can be displayed to internet users.

### iii.    *Google AdSense for Domains Network*

99.    The Google Network is comprised of a number of persons and programs, including the Google AdSense for Domains Network. Google created, designed and implemented the Google Adsense For Domains Program for the purpose of dramatically increasing AdWords advertising revenue by monetizing "parked, non-content" sites that exclusively contain Defendant Google CPC/PPC advertisements.  Defendant Google AdSense for Domains is only for undeveloped/parked domains.

100.    When an internet user arrives at a domain/site participating in the AdSense® for Domains Network, Defendant Google is almost certain to generate AdWords advertising revenue because every link on the landing page is a revenue generating CPC/PPC link.

101.    Defendant Google's AdSense Program is the most successful revenue-generating program within the Google Network for generating AdWords advertising revenue.  Defendant Google has millions of domains under its direct or indirect license, use, control, and management, including Deceptive Domains, through its AdSense for Domains program.

102. Defendant Google approves and controls the participation of every domain in the Google Network, including the Google AdSense for Domains program, via a number of different written agreements.   Defendant Google requires, as a term of participation in the Google Network, that each participant make Defendant Google the authorized licensee of every domain/site that will be participating in the Google Network.

103. Defendant Google uses a Google Services Agreement and GSA Order Form Terms and

Conditions, as well as other written instruments to contract with the Parking Company Defendants and other Google Network members. Each Parking Company Defendant has entered into a substantially similar agreement with Defendant Google, however said Agreements are not publicly available and are under the exclusive possession and control of Defendants in this action. However, one Parking Company Agreement, which is substantially similar and uses the standard template agreement, is the publicly available agreement between Defendant Google and the Parking Company, NameMedia, Inc, ("NameMedia Agreement"), which can be found at http://www.sec.gov/Archives/edgar/data/1391323/000095013507007513/b64222a1exv10w10.htm

Each Parking Company Defendant has entered into agreements with Defendant Google that contain the following identical and/or substantially similar provisions as found in the in the NameMedia Agreement:

6.2. **Operation of AFD Services.** For any and all AFD Queries received by Customer from End Users, Customer shall (without editing, modifying or filtering such AFD Queries individually or in the aggregate) send such AFD Queries to Google via the AFD Protocol. Without limiting the foregoing, in order to be deemed a "Valid Domain Query", each such Domain Query sent to Google (a) must be from a Valid IP Address; (b) must contain a Client ID; (c) must include [***] and [***]; and (d) must be [***] in conformance with the [***] and other requirements of this Agreement. ***Upon Google's receipt of a Valid Domain Query as described above, Google will transmit to Customer an AFD Results Set, via Google's network interface using the AFD Data Protocol. Customer shall then display, in each instance, the entire AFD Results Set that corresponds to such Domain Query, without editing, filtering, reordering, truncating or otherwise modifying such AFD Results Set. Google will not be responsible for receiving any AFD Queries directly from End Users or any other third party, for transmission of data between Customer and Google's network interface, or for displaying any applicable AFD Results Set(s) to End Users. Google may, at its sole discretion, cease or suspend delivery of Paid Results in response to any Domain Query transmitted by Customer hereunder and will endeavor to provide notice of cessation or suspension to Customer where reasonably practical. All Landing Pages and AFD Results Pages will be hosted and served to End Users by Customer on the Sites in accordance herewith.***

**6.4.1. <u>Third Party Sites</u>.** Notwithstanding the terms to the contrary contained in the GSA, Customer may additionally transmit AFD Queries to Google hereunder which originate not from Authorized Names, but from End Users accessing Third Party Sites. For the purposes of this Section, a **"Third Party"** is either (a) a Registrant (as defined in the GSA) or *<u>(b) an entity duly, expressly and exclusively authorized by each of the Registrant(s) of a URL, through a valid and fully enforceable written or click-through agreement with each such Registrant, to permit Customer, and in turn Google, to use the URLs in performing the Services, that has entered into a fully enforceable written or click-through agreement with Customer to provide advertising, search results, and/or hyperlinked keyword or category listings in connection with URLs owned or parked with the Third Party ("Third Party Sites").</u>* As used in the Order Form and GSA. Authorized Name shall be deemed to include Third Party Sites. Customer shall implement a separate tracking ID, as specified by Google, for Queries originating from Third Party Sites. (emphasis added)

104.     Defendant Google knows, condones, and ratifies the use and monetization of parked domains with AdWords advertisements,  in its Google AdSense for Domains program, that are Deceptive Domains, as defined herein.  Defendant Google places AdWords advertisements, on Domains in the AdSense for Domains program, based upon the meaning of the domain name.  As explained by Defendant Google:  "AdSense for domains delivers targeted, conceptually related advertisements to parked domain pages by using Google's semantic technology to analyze and understand the meaning of the domain names." http://www.google.com/domainpark/

105.     Defendant Google provides a number of tools, instructions and other directives that enable partners in the Adsense for Domains Network to redirect internet traffic from the domain names they own and/or control to Defendant Google's AdSense for Domains Program, where Defendant Google causes revenue generating AdWords advertisements to resolve.

106.     Defendant Google processes all domain names in the Google Network, including but

not limited to those participating in the AdSense for Domains Program, using Defendant Google's sophisticated semantic technology.

107.  Defendant Google's semantic technology analyzes and understands the meaning of each domain names, including determining what "internet users" will likely be looking for when they type in said domain.

108.  Defendant Google also generates the HTML code and/or XML feed used to display the AdWords advertisements throughout the Google Network.  .

109.  HTML refers to "*Hypertext Markup Language*," a language used for the creation of web pages.

110.  Defendant Google's HTML contains paying Defendant Google advertisers, such as pay-per click advertisers, and related ad categories, which when clicked on bring up more Defendant Google advertisers.

111.  Defendant Google and other Google Network Members, including but not limited to the Parking Company Defendants, collaborate in the placement of AdWords advertisements on domains/sites and in the design/optimization of the landing pages associated with those domains/sites.

112.  When an internet user clicks on one of the AdWords ads, Defendant Google, and one or more various other Google Network participants, including but not limited to Parking Company Defendants and/or another third parties, may share in the revenue Defendant Google collects from the AdWords advertiser.

113.  To encourage Internet users to click, Defendant Google, and in some instances other

Parking Company Defendants, use technologically advanced targeting solutions that intelligently select the most relevant AdWords ads and/or advertising categories for a specific domain/site.

114.     Defendant Google's semantic technology and targeting solutions increase the click through rate (CTR), and therefore the total revenue generated.

115.     Defendant Google may augment its semantic technology with manual and automated optimization techniques.

116.     Defendant Google utilizes software and other technology to provide comprehensive online per-domain reporting to help Google Network members to  analyze their portfolios and improve overall performance, such as: which Google Network member licensed the domain to Defendant Google; how many page views each domain gets;  how much money each domain generates from clicks on the ads; and, how many unique users each domain gets.

117.     Defendant Google represents to Google Network Members that they will maximize revenue from parked domains through participation in Defendant Google's AdSense for Domains Program.    More    specifically,    Defendant    Google    expressly    promises owners/licensees/aggregators/parking companies that Google will provide sage advice to optimize revenue from parked domains.

118.     The Google Network redirects internet traffic using "masked" (also known as "stealth") redirection which hides the destination URL.

119.     Defendants use redirection, framing, masking, or other methods to prevent or deter even sophisticated users from identifying or confirming their actions in and/or participation in the Deceptive Domain Scheme.

120.    When using masked redirection, the actual Defendant Google destination URL is concealed from the user who continues to only see the domain name which the user typed in the address bar.

121.    Defendant Google processes the Deceptive Domain traffic through several Google domain names, including, but not limited to: googlesyndication.com; appliedsemantics.com; oingo.com, apps5.oingo.com; and, domains.googlesyndication.com.

122.    On an ongoing basis, Defendant Google reviews and monitors every domain/site in the Google Network and that shows AdWords advertisements.

123.    Defendant Google exclusively manages relationships and communications with the AdWords advertisers.

124.    Defendant Google contracts, bills, collects, and distributes all revenue generated from AdWords advertisements on the Google Network.

125.    In most instances, Defendant Google distributes, divides, and/or otherwise shares the revenue generated from AdWords Advertisements displayed throughout the Google Network, with one or more person in the Google Network.  Defendant Google shares in the revenue from every AdWord Advertisement displayed anywhere on the Google Network. All other Google Network members only share revenue from certain AdWord Advertisements that relate to said Google Network member.

126.    Only Defendant Google is allowed to change any of the advertising data Defendant Google provides via the HTML page (if the domain is hosted by Defendant Google) or XML feed to the Google Network.

127.    Defendant Google has the control, authority, and ability to block any Google Network domain/site/video/search result from displaying an AdWords advertisement.

128.    Defendant Google and all of the Parking Company Defendants knowingly monetize and utilize Deceptive Domains for commercial gain.

129.    All Defendants knowingly generate, and then transact in, revenue generated from monetization of Deceptive Domains.

**B.      General Background -The Parking Company Defendants**

130.    For purposes of this Complaint, Defendants Oversee, Sedo, IREIT and Dotster are referred to collectively as the "Parking Company Defendants."

131.    Each Parking Company Defendant is in the business of, registering domains, licensing domains, parking domains, monetizing domains, aggregating domains, auctioning/reselling domains, brokering domains and/or coordinating, facilitating and/or offering solutions for monetization of domains, with many of those domain names being Deceptive Domains.

132.    Each Parking Company Defendant has knowingly and intentionally engaged in the Deceptive Domain Scheme, as set forth herein, and has derived commercial gain from its participation.

133.    Defendant Google and the Parking Company Defendants contrived, participated in, and implemented a scheme where small domain portfolio owners cannot directly participate in Defendant Google's AdSense for Domains Network, but are required to utilize a parking aggregator, such as one of the Parking Company Defendants.

134.    Defendant Google and the Parking Company Defendants enter into contracts, licenses, and other agreements where Defendant Google authorizing the Parking Company Defendants participation in the Google Network in exchange for a share or all revenue derived from AdWords advertisements displayed on domains/sites under the Parking Company Defendants' license, registration, ownership and/or other control.

135.    The Parking Company Defendants enter into license agreements with other third party domain registrants and website owners for the license and rights to control, monitor, maintain, use and place advertising on the third party domains, including Deceptive Domains.

136.    Every domain/site in the Google Network is under the direct license of Defendant Google, the Parking Company Defendants, and/or other Google Network Member.

137.    Defendant Parking Companies enter into agreements with Defendant Google and license to Defendant Google the rights to control, monitor, maintain, use and place advertising on all of the domains under the Parking Company's control, including Deceptive Domains.

138. Defendant Google requires "exclusivity" and "loyalty" from the Parking Company Defendants, and the other participants in the Google Network.

139.    Once the Parking Company Defendants license a domain, the following generally occurs:

    a.    The Parking Company Defendant redirects the domains through to Defendant Google;

    b.    Defendant Google processes the domains through the Defendant Google AdSense for Domains Program, utilizes semantics and other proprietary programs/software to analyze the meaning of the domain names, analyzes the Internet traffic to said domain (identity of, volume, etc.), and identifies/selects revenue maximizing advertisements from the Defendant Google AdWords

<blockquote>program to be placed on the domains;</blockquote>

c.  Defendant Google then returns the results to the domains via XML feed;

d.  Defendant Google and the Parking Company Defendants then share the revenue generated at each domain from advertising;

e.  Defendant Google provides each Parking Company Defendant with complete statistics on each domain name, including revenue, clicks and visitors per day;

f.  The Parking Company Defendants share revenue with the third party domain registrants; and

g.  The Parking Company Defendants provide the third party domain registrants with activity reports for each domain.

140.  The Parking Company Defendants, as well as Defendant Google, each has access to semantics software and other technologies that allow them to identify Deceptive Domains.

141.  All Defendants knowingly refuse to identify or attempt to identify Deceptive Domains and/or to utilize software and technology available to identify Deceptive Domains.

142.  All Defendants intentionally taste, kite,  register, and otherwise assist domain registrants in procuring Deceptive Domains for the express purpose of monetization in the Google Network with AdWords advertisements.

143.  The Parking Company Defendants typically instruct third party domain registrants to do URL forwarding using frames, a practice commonly known as "framed forwarding, masking, or stealth." Such forwarding further impedes identification of the parties responsible for the Deceptive Domain.

144.  All Defendants actively traffic in, uses and/or licenses Deceptive Domains, in furtherance of the Deceptive Domain Scheme alleged herein.

145.    The Parking Company Defendants intentionally and knowingly register Deceptive Domains, through the use of proprietary methods/tools by which they can determine the domain names that internet users are attempting to access, but which domain names have not been registered by any entity, and they then register these recurring mishits or mistypes.

146.    All Defendants engage in typosquatting, in furtherance of the Deceptive Domain Scheme alleged herein.

147.    All Defendants engage in cybersquatting and cyberpiracy, in furtherance of the Deceptive Domain Scheme, alleged herein.

148.    All Defendants cause popups or popunder advertisements on the Deceptive Domains and receive money for each popup or popunder displayed, in furtherance of the Deceptive Domain Scheme alleged herein.

149.    Defendant Google has a close relationship with the Parking Company Defendants and sends representatives to attend, and sponsor, conferences put on by Parking Company Defendants, and uses said conferences to meet and further their conspiracy.

150.    Defendant Google and the Parking Company Defendants participate in trade organizations and informal associations in furtherance of their conspiracy.

151.    Defendant Google acts as a "Featured Sponsor" for invitation-only conferences attended by Parking Company Defendants and individuals who own Deceptive Domains, and Defendants use said to meet and further their conspiracy.

## VI.    THE DECEPTIVE DOMAIN SCHEME

152.    All Defendants conspired to commercially profit/gain and transact in money derived

from the Deceptive Domain Scheme, set forth in detail in the allegations herein, including, but not limited to, the following:

    a.    Intentionally and deceptively tasting, kiting, registering, licensing, monetizing and utilizing Deceptive Domains that are identical or confusingly similar to or dilutive of the Lead Plaintiffs' and other members of the Class's Distinctive and Valuable Marks;

    b.    Intentionally and deceptively redirecting Internet traffic to Defendants' Deceptive Domains that contain "pay-per-click/cost-per-click" (herein "PPC" or "CPC") or similar HTML links/advertising;

    c.    Utilization of semantics programs, algorithms, statistical tools, and other software designed and intended to maximize revenue by "intelligent placement" of Internet advertisements on Deceptive Domains, as well as identifying and facilitating revenue maximizing Internet traffic redirection;

    d.    Redirection of Internet traffic to paid HTML links/advertising, and away from the legal and rightful owners of Distinctive and Valuable Marks;

    e.    Defendants' use of false and misleading WhoIs domain registration data in an attempt to conceal their identities and wrongful conduct;

    f.    Defendants' knowing and intentional use of Lead Plaintiffs' and the Class' Distinctive and Valuable Marks for the purpose of Defendants' own commercial gain;

    g.    Defendants' knowing creation of an illegal domain aftermarket for Deceptive Domains;

    h.    Intentionally and knowingly causing confusion, dilution and misuse/misappropriation of Lead Plaintiffs' and other members of the Class' Distinctive and Valuable Marks; and

    i.    Intentionally conspiring to generate, collect, distribute, and otherwise transact in illegally gained money.

153. Each of the named Defendants, and the other unnamed Co-conspirators, knowingly and intentionally engage in the Deceptive Domain Scheme set forth herein for the purpose of directly profiting and unjustly obtaining revenue/money/commercial profit/gain, that they could not

otherwise obtain, but for the illegal and criminal acts of infringement, dilution, diminution, misuse, misappropriation, unauthorized association, and other unauthorized use of Lead Plaintiffs' and the Class' Distinctive and Valuable Marks.

154.    Defendants' common purpose in registering, licensing, using, and monetizing Deceptive Domains, and otherwise engaging in the Deceptive Domain Scheme alleged herein, is to profit from the confusion between the Deceptive Domains and the Lead Plaintiffs' and the Class' Distinctive and Valuable Marks.

155.    Defendants have a primary financial interest in the exploitation of Plaintiffs' and the Class Members' distinctive and valuable marks.

156.    Defendants are the primary beneficiaries of the infringements and illegal conduct alleged herein.

157.    Defendants facilitate, encourage, promote, allow, enable and otherwise permit the illegal conduct alleged herein, in the course of their businesses and through the operation of the RICO Enterprise.

158.    Defendants maintain the right, power and ability to control, edit, alter, modify and maintain the software used in the Deceptive Domain Scheme.

159.    Defendants fail to exercise their policing obligations to the fullest extent, fail to utilize and implement available filtering and blocking technologies, and otherwise have engaged in a pattern of direct and intentional misconduct, or willful blindness of their actions related to the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein.

160.    Defendants control and participate in the supply of the illegal revenue-generating

services, mechanisms, technology and programs necessary to engage in the Deceptive Domain Scheme, through which the Defendants and third parties infringe the Distinctive and Valuable Marks of Lead Plaintiffs and the Class.

161.    Each Defendant, through its participation in the Deceptive Domain Scheme alleged herein, has directly engaged in and/or aided and abetted in the illegal conduct alleged herein.

### A.    Use, License, Registration and Monetization of Deceptive Domains

162.    Defendants have knowingly and intentionally manipulated the Internet domain name system for illegal commercial gain by tasting, kiting, registering, using, trafficking in or licensing Deceptive Domains, including, but not limited to, mistyped domain names (i.e., wwwvulcangolf.com) and misspelled domain names (i.e., volcangolf.com).

163.    Defendants are each the authorized licensee of one or more of the Deceptive Domains utilized in the Deceptive Domain Scheme, as alleged herein.

164.    Defendant Google and the Parking Company Defendants all directly, knowingly, and intentionally monetize Deceptive Domains, for their own commercial profit/gain.

165.    Defendants monetize the Deceptive Domains by allowing their participation in the Google Network (i.e., various AdSense Programs), and by causing Deceptive Domains to display AdWords advertisements. For example, Defendant Google knowingly and intentionally allows tens of thousands of blatantly infringing "www" domain names into the Defendant Google AdSense for Domains Network.  A "www" domain name is a domain name that starts with www but omits the period (".") that separates "www" from the remainder of the domain name.

166.    The sole purpose of registering a "www" Deceptive Domain is to capture the Internet

users who forget to type the period ("." ) between the "www" and the domain name. A user who types in "wwwvulcangolf.com" is attempting to reach "www.vulcangolf.com" but forgot to type the period ("." ) between "www" and "vulcangolf.com."

167.  "www" Deceptive Domains are obvious and easy to identify as illegal trademark infringements. Nonetheless, Defendants register, use, traffic in, and license infringing "www" Deceptive Domains.

168.  The use of "www" Deceptive Domains to forward unsuspecting users to different websites was specifically addressed and identified by Congress as a deceptive practice when it passed the ACPA.

169.  Another example of how Defendants monetize blatantly infringing Deceptive Domains is through the monetization of  "com" domain names.

170.  Like the "www" Deceptive Domains, the "com" Deceptive Domains capture the Internet users who forget to type the period ( "." ) between a domain name and the "com" suffix. The following is a small sample of "com" Deceptive Domains:

> bedbathandbeyondcom.com; chevycom.com; chryslercom.com; cocacolacom.com; discovercreditcardcom.com; disneylandcom.com; disneyworldcom.com; ebaumsworldcom.com; espncom.com; fordmotorscom.com; geicocom.com; homedepotcom.com; ibmcom.com; ikeacom.com; jetbluecom.com; jcpennycom.com; kohlscom.com; kmartcom.com; mcdonaldscom.com; musiciansfriendcom.com; nascarcom.com; oldnavycom.com; pizzahutcom.com; randcom.com; saabcom.com; scottradecom.com; travelocitycom.com; usairwayscom.com; volkswagencom.com; xangacom.com.

171.  All of the aforementioned "com" Deceptive Domains have been monetized by Defendant Google through the Defendant Google AdSense for Domains Program in furtherance of

the Deceptive Domain Scheme as alleged herein, and are just a few examples of the many Deceptive Domains that generate revenue from AdWords advertisements displayed throughout the Google Network.

172.    Defendants further monetizes blatantly infringing Deceptive Domains through the monetization of "http" domain names.

173.    Like the "www" and the "com" Deceptive Domains, the "http" Deceptive Domains capture the Internet users who forget to type the period (".") between "http" and the domain name when trying to access websites of Lead Plaintiffs and the Class.

174.    The following is a small sample of "http" Deceptive Domains that have been monetized by Defendant Google:

> httpaarp.com, httpabc.com; httpabcgames.com; httpabckids.com; httpabcnews.com; httpamericanexpress.com; httpamsouthbank.com; httpautotrader.com; httpbankofamerica.com; httpbellsouth.com; httpbestbuy.com; httpblackplanet.com; httpbordersbooks.com; httpbratz.com; httpcareerbuilder.com; httpcapitalone.com; httpcapitolone.com; httpcarmax.com; httpcartonnetwork.com; httpcartoonetwork.com; httpcartoonnetwork.com; httpchevrolet.com; httpchevy.com; httpcircuitcity.com; httpcisco.com; httpciti.com; httpcitibank.com; httpciticard.com and httpciticards.com.

175.    Defendants know that registering misspellings and typographical variations of websites is deceptive and in violation of the ACPA and other state and federal laws.

176.    Defendant Google's Webmaster Guidelines, located at http://www.Google.com/support/webmasters/bin/answer.py?answer=35769, specifically criticize the use of misspellings, by stating in pertinent part:

> *"Quality guidelines...These quality guidelines cover the most common forms of deceptive or manipulative behavior, but Google may respond negatively to other misleading practices not listed here (e.g. tricking users by*

*registering misspellings of well-known websites)."*

In practice, Defendant Google widely ignores its supposed guidelines.

177.    Contrary to the guidelines referenced in the preceding paragraph, Defendant Google actively monetizes Deceptive Domains for commercial profit/gain.

**B.      *Domain Redirection and Concealment***

178.    In furtherance of the Deceptive Domain Scheme, Defendants engage in Domain Redirection.

179.    Domain Redirection refers to the practice of redirecting an Internet user who types in a domain name to a completely different domain name or URL without the user's knowledge or authorization.

180.    Defendant Google knows and authorizes the Defendant Parking Companies and other Google Network members to utilize masked Domain Redirection techniques to hide Defendant Google's relationship with the Deceptive Domains.

181.    Defendants intentionally utilize masked redirects to prevent internet users from recognizing Defendant Google's role in placing, charging, and tracking a domain's advertising.

**C.      *Defendants' Illusory Online Complaint System and Deceptive Public Statements***

182.    All of the named Defendants deceptively purport to have "online complaint" systems and procedures in which a Distinctive and Valuable Mark owner can complain to the Defendants when their Distinctive and Valuable Mark has been unlawfully infringed by another website.

183.    Defendants, in furtherance of their deception and of the Deceptive Domain Scheme,

audaciously suggest that Lead Plaintiffs and Class Members submit to the Defendants' devised, maintained and imposed illusory "on-line complaint" systems that effectively make Defendants the final adjudicators of their own illegal conduct, thus perpetuating the viability of their Deceptive Domain Scheme and further misleading the public into believing that the named Defendants do not support Deceptive Domains.

184.     None of the named Defendants utilize any software or filtering technologies to prevent infringements or the proliferation, use, and/or monetization of Deceptive Domains.

### D.     *Defendants Engage in Domain Tasting and Kiting*

185.     Domain Tasting and kiting facilitate trademark infringements, dilution, and abuse.

186.     Defendants know that Domain Tasting and Kiting of Deceptive Domains is improper and facilitates trademark infringement.

187.     Defendants attempt to conceal their actions concerning Domain Tasting and Kiting.

188.     Defendant Google actively, knowingly, and intentionally participates in and facilitates Domain Tasting because domain names acquired by domain tasters such as the Parking Company Defendants are tested for revenue by redirecting and analyzing the domain names through Defendant Google Programs to determine their revenue potential.

189.  Defendant Google routinely monetizes domains that are less than five (5) days old (are within the five (5) day grace period following registration of a domain).

190.     Defendant Google is fully aware that the domain names it licenses, uses and traffics in are part of the Domain Tasting and kiting process.

191. For example, the Defendants registered and tested the following Deceptive Domains and sent them to Defendant Google's AdSense for Domains Program:

> vulcangolfcalderaz440.com; vulcangolfcalderaz440sale.com; vulcangolfclub.com; vulcangolfclubs.com; vulcangolfllc.com; vulcangolfqpointeironsirons.com; vulcangolfstorelocation.com; vulcangolftechnology.com; vulcangolfwoody.com; vulcangolfz3hybridironsirons.com; volcangolfclubs.com and volcangolfshop.com.

### E. Illegal Aftermarket for Buying and Selling Deceptive Domains

192. By monetizing Deceptive Domains, Defendants have created an illegal aftermarket for the buying and selling of Deceptive Domains.

193. Deceptive Domains have recently sold for remarkable sums: mypsace.com sold for approximately $35,000; myspac.com sold for approximately $31,000; ebumsworld.com sold for approximately $27,000; and statefram.com sold for approximately $9,000.

194. Using the statistics provided by Parking Company Defendants and Defendant Google, sellers of Deceptive Domains state in detail which Parking Company Defendant is licensing the Deceptive Domains, how much the Deceptive Domains make, how many visitors each Deceptive Domain gets, and how much the seller wants for the Deceptive Domain.

195. The statistics provided by Defendants also enable buyers to evaluate the purchase price of illegal Deceptive Domains, based on Defendants' own statistical revenue projections based on Defendants' monetization of the Deceptive Domains.

196. Defendant Oversee purchased the expired domain auction service Snapnames.com ("Snapnames") and uses it to monetize expiring deceptive domains.

197.    After Oversee/Snapnames takes control of the domain name, Oversee/Snapnames traffics in, monetizes, and/or sells the domain names using an auction system.  The auction lasts for three days.  During the three-day auction, Oversee/Snapnames and Defendant Google use the domain names.

198.    Defendant Oversee used Snapnames to monetize Vulcan Deceptive Domains after this action was filed.

## VII.    DEFENDANTS' USE OF THE DISTINCTIVE AND VALUABLE MARKS BELONGING TO LEAD PLAINTIFFS AND THE CLASS

199.    Lead Plaintiffs and the Class own Distinctive and Valuable Marks.

200.    Lead Plaintiffs and the other members of the Class use their Distinctive and Valuable Marks in connection with their commercial activities, many of which are contained as domain names within the URLs they use in electronic online/Internet commerce.

201.    At the time Lead Plaintiffs and the Class registered their domain names, said Distinctive and Valuable Marks were protected/protectable, and/or famous.

202.    Lead Plaintiffs and the Class did not provide authorization to Defendants to use their Distinctive and Valuable Marks, domain names, or colorable imitations/confusingly similar domain names or marks in the Deceptive Domain Scheme.

203.    Defendants are making commercial use of Lead Plaintiffs' and the Class' Distinctive and Valuable Marks without authorization, license, or permission. Defendants have actual and/or constructive knowledge that they are infringing Lead Plaintiffs' and the Class' Distinctive and Valuable Marks.

204.     Defendants' use and monetization of the Deceptive Domains began after the Lead Plaintiffs' and Class' Distinctive and Valuable Marks became valuable, famous, protected, protectable, and/or distinctive.

205.     Defendants' use of the Deceptive Domains presents a likelihood of dilution of the distinctive value of the Lead Plaintiffs' and Class' Distinctive and Valuable Marks.

206.     Each named Defendant has participated in the Deceptive Domain Scheme, as detailed, with the knowledge and intent to commercially profit therefrom.

207.     Each named Defendant knows that its participation in the Deceptive Domain Scheme, and other illegal actions as alleged herein, directly and proximately injure and damage Lead Plaintiffs and the Class in their property, person, reputation, business, and/or otherwise.

208.     Defendants cause new browser windows with more advertising links to open up when users attempt to leave the Deceptive Domains in an attempt to increase the revenue, click throughs, and confusion generated from the Deceptive Domains.

209.     When Internet users click on one or more of the displayed HTML links or popup or popunder AdWords advertisements on the websites at the Deceptive Domains, Defendants receive payment, or otherwise obtain commercial gain, from one or more AdWords advertisers, search engines, or affiliate programs.

210.     Even after the filing of this lawsuit and notice by Lead Plaintiffs' Counsel, Defendants intentionally and blatantly continue to engage in the Deceptive Domain Scheme and the other illegal action alleged herein, including but not limited to:

> a.       Defendants knowingly register, taste, kite, license monetize and otherwise use  Deceptive Domains, including:

i.  After the Complaint was filed, wwwVulcanGolf.com and VolcanGolf.com were deleted by the original registrants.

ii.  Almost immediately thereafter, wwwVulcanGolf.com and VolcanGolf.com were *re-registered, relicensed, and redirected to* Defendant Google Adsense for Domains displaying Defendant Google Adwords Ads for commercial gain by Defendant Google and Oversee, despite formal notice.

iii.  Despite the fact that Defendant Google was aware of Vulcan's Marks, Defendant Google chose to allow the domains wwwvulcangolf.com and volcangolf.com to remain in the Google Adsense for Domains Program.

iv.  In fact, Defendant Google licensed and allowed even more domains that infringed the Vulcan Marks into the Adsense for Domains Program after the complaint was filed, including: VulcnaGolf.com; VulcanGolfClubs.com; VulcanGolfTechnology.com; and, VulconGolf.com.

v.  On August 7, 2007, Counsel for the Parties conducted an in-person Rule 26 Conference, where Lead Plaintiffs' Counsel put on an extensive power point presentation setting forth the "post-complaint" illegal conduct.

vi.  Defendants all agreed to block the Vulcan Deceptive Domains.

vii.  Despite those assurances to block Vulcan Deceptive Domains, VulcanGolfClubs.com was deleted and reregistered and redirected to the Defendant Google which immediately began monetizing the Deceptive Domain. As of September 11, 2007, VulcanGolfClubs.com still is displaying Defendant Google Adwords Advertisers.

viii.  Then, VulganGolf.com and VulgonGolf.com were newly registered, licensed and redirected to Defendant Google and immediately monetized through its Adsense for Domains via a direct Defendant Google feed.

b.  Defendant Google knowingly and intentionally continues to license, traffic in, monetize and/or use Deceptive Domains that have been part of FTC actions.

c.        Defendant Google knowingly and intentionally continues to license, traffic in monetize and/or use Deceptive Domains that have previously been held by various courts to be infringing domains and violations of the ACPA.

d.        Use of uniform, common, automated programs to commonly effectuate the Deceptive Domain Scheme and to injure and damage Lead Plaintiffs and the Class, as set forth herein.

e.        Defendants continue to transact in money derived from the Deceptive Domain Scheme, including but not limited to: obtaining, collecting, depositing, withdrawing, and sharing illegally and criminally obtained money derived from the monetization of Deceptive Domain, the Deceptive Domain Scheme, and as otherwise alleged herein.

211.    As a direct and proximate result of the Deceptive Domain Scheme and related unlawful conduct, as alleged herein, Lead Plaintiffs and the Class have each suffered economic injury and damage to its business and property. These injuries include: lost sales, lost customers, disruption and interference with business operations, and interference with prospective business/economic advantage, etc. These injuries also include confusion and dilution of Distinctive and Valuable Marks, injury to property, and injury to business/personal reputation.

## VIII.   RICO ALLEGATIONS

212.    Each Defendant is a "person" within the meaning of the "Racketeering Influenced Corrupt Organization Act" *18 U.S.C. §1961(3)* ("RICO").

### A. RICO Enterprise

213.    As referred to herein, the "RICO Enterprise," as defined by *18 U.S.C. §1961(4),* is the "Google Network" which is the organized and structured group of persons that have joined together for the common purpose of providing internet advertising, marketing and promotional

services to Defendant Google AdWords Advertisers, as set forth herein. It is the association of persons that collectively provide the internet advertising network whereby AdWords advertisements are displayed and monetized on domains/sites on the internet.

214. Defendant Google describes the "Google Network" as "the large group of websites and other products, such as email programs and blogs, who have partnered with Google to display AdWords ads. http://adwords.google.com/support/bin/answer.py?answer=6104&ctx=sibling The Google Network participants are: (1) Defendant Google, (2) the Parking Company Defendants; (3) Google Search Network (America Online, CompuServe, Netscape, AT&T Worldnet, EarthLink, Sympatico, and others); (4) Google Content site partners (New York Post Online Edition, Mac Publishing (includes Macworld.com, JavaWorld,LinuxWorld), HowStuffWorks, and others), (5) Google AdSense Network (Parking Company Defendants, Domain Aggregators, Domain Registrants, and other third party website owners, blog sites, domain registrants, licensees and aggregators that enter into agreements with Defendant Google for the monetization, of domains under their license/control/ownership.

215. The RICO Enterprise is an ongoing structure of persons associated with time, joined in purpose, and organized in a manner amenable to hierarchial or consensual decisionmaking and whose activities affect, interstate and foreign commerce. As set forth herein, the RICO Enterprise has a defined structure, framework, and organization conducive to making decision. Written rules, polices, procedures, contracts, licenses, and other agreements operate to establish a defined mechanism to control the affairs of the RICO Enterprise on an ongoing basis

216. Defendant Google is aware of the exact identity of each and every participant in

the RICO Enterprise, because it approves and controls the membership in and participation in the Google Network and the RICO Enterprise.

217.    According to Defendant Google, the RICO Enterprise (as defined herein) is the largest internet advertising network in the world, as it explains on its website: "There's no larger network for contextual advertising in the world." https://adwords.google.com/select/afc.html.

218.    Defendant Google, in describing this "Google Network" on its website, affirms as follows: *"The Google Network is the largest advertising network available online, reaching over 86% of Internet users worldwide."* http://adwords.google.com/support/bin/answer.py?answer=6119

219.    Defendant Google further describes, on its website, the "Reach" of its network:

The Google content network reaches over 75% of unique internet users in more than 20 languages and over 100 countries. As a result, if you advertise on both the Google search network and the *Google content network, you have the potential to reach three of every four unique internet users on Earth.*

| Country | Unique Reach |
|---------|--------------|
| Germany | 89% |
| Japan | 86% |
| France | 79% |
| United Kingdom | 75% |
| United States | 76% |
| Global | 75% |
| Source: comScore Networks machine-based panel | |

https://adwords.google.com/select/afc.html

220.   The RICO Enterprise was created and has continually been in existence from on or around January 2002 through the present.

### B.  RICO Enterprise and Defendants are Distinct

221.   Each Defendant is a duly authorized corporation that has an identity distinct from the RICO Enterprise.

222.   The RICO Enterprise alleged herein is not a separate legal entity or a subdivision/affiliate of any Defendant, individual and/or entity, rather the RICO Enterprise is a distinct association-in-fact made up of a discrete, yet numerous, set of  persons, joined in the common purpose of obtaining maximum economic and commercial gain by providing internet advertising and marketing services to AdWords Advertisers.

223.   While each Defendant participates in, participates in the conduct of the affairs of, and is a member and part of the RICO Enterprise, it also has an existence separate and distinct from the RICO Enterprise.  Each Defendant engages in other independent commercial activities separate and apart from the RICO Enterprise. For example, one or more of the Parking Company Defendants independently provide domain sales and auction services (for commercial gain) that are not in any manner related to the RICO Enterprise.

224.   The RICO Enterprise operates with the purpose and goal to derive commercial gain from the provision of internet marketing and advertising services to Defendant Google's AdWords Advertisers.

225.   The RICO Enterprise is an association-in-fact that that has an existence that can be defined apart from commission of predicate acts constituting a "pattern of racketeering

activity," and has an existence beyond that which is necessary to merely commit each of acts charged as predicate offenses.

### C. Structure and Roles of Participants in the RICO Enterprise

226.    Each participant/member of the RICO Enterprise is crucial to its functions and operation, as generally summarized below:

     a. Defendant Google:   Provides access to the revenue generating AdWords Advertisers and organizes, controls, monitors participation in and otherwise operates the RICO Enterprise;

     b. Google Network:   Participate in the RICO Enterprise for the purpose of generating revenue from services provided in connection with AdWords Advertisements placed/displayed on domains/sites/video/search results under their license, control and/or ownership.

227.    Without the Google Network, the RICO Enterprise could not exist because Defendant Google would not have access to the millions of domains/sites/video/search results that enable them to attract and control the billion dollar plus per year AdWords Advertiser program which "monetizes" the RICO Enterprise.    The Google Network provides the domains/sites/video/search results upon which Google "places/displays/associates" the revenue generating AdWords advertisements that Defendant Google alleges reaches in excess of 3 out of every 4 internet users in the world.

228.    Without Defendant Google, the RICO Enterprise could not exist, because the remaining members (Google Enterprise) would not have access to Defendant Google's AdWords Advertisements that provide the exclusive source of revenue.

### D. Defendant Google is the Central, Controlling Person

229.     Defendant Google contrived, organized, developed, monitors, and maintains the

RICO Enterprise, including but not limited to membership and participation in the RICO

Enterprise.

230.     Participation/Membership in the Google Network is conditional and subject to

Defendant Google's consent and Google Network participant/member's contractual adherence to

Google's rules, regulations, terms and conditions, which in part include but are not limited to the

following:

| AdSense Program Policies | https://www.google.com/adsense/support/bin/answer.py?answer=48182 |
| AdSense for Mobile Content Program Policies | https://www.google.com/adsense/support/bin/answer.py?answer=71600 |
| AdSense For Video Program Policies | https://www.google.com/adsense/support/bin/answer.py?answer=73987 |
| Google AdSenseOnline Standard Terms and Conditions | https://www.google.com/adsense/terms |
| Google Webmaster Guidelines | http://www.google.com/support/webmasters/bin/answer.py?answer=35769 |
| Landing Page and Site Quality Guidelines | https://adwords.google.com/support/bin/answer.py?answer=46675&hl=en |
| Parking Company Agreements/ Contracts with Defendant Google | Not Published on Website.  Said written agreements, contracts, and associated documents are in the possession of Defendants and not available to Plaintiffs without discovery.  Example of typical Parking Company Agreement (which is generally based on the standard template) can be found at: http://www.sec.gov/Archives/edgar/data/1391323/00009501 3507007513/b64222a1exv10w10.htm |
| Search Partner Agreements/ Contracts with | Not Published on Website.  Said written agreements, contracts, and associated documents are in the possession of Defendants and not available to Plaintiffs without discovery. |

| Defendant Google | |
|---|---|
| Third Party AdSense for Domains Partners, and other Third Party Partner agreements | Not Published on Website. Said written agreements, contracts, and associated documents are in the possession of Defendants and not available to Plaintiffs without discovery. |

231.    One express example of Defendant Google's control over participation in the Google Network is found in Paragraph #1 of Defendant Google's AdSense Terms and Conditions, which sets forth, in pertinent part:

**1.       Program Participation**. Participation in the Program is subject to Google's prior approval and Your continued compliance with the Program Policies ("*Program Policies*"), located at https://www.google.com/adsense/policies, and/or such other URL as Google may provide from time to time. Google reserves the right to refuse participation to any applicant or participant at any time in its sole discretion.

https://www.google.com/adsense/localized-terms

232.    As a practical matter, Defendant Google controls membership and participation in the Google Network, and RICO Enterprise, because Google can simply refuse to allow AdWords Advertisements to be placed/displayed/associated with a domain/site/video/search result. Defendant Google controls each and every AdWords Advertisement.

233.    A Google Network member/participant, including any of the Parking Company Defendants, as separate and distinct persons, can refuse to participate in the RICO Enterprise/Google Network.

234.    Although the Parking Company Defendants (and a limited number of Google approved persons) can license with third parties so that the third party domains/sites can participate in the Google Network derivatively (through the Parking Company participation), at all times, said participation is through licenses and agreements that derive from and are dependent upon adherence to the terms, conditions, responsibilities and rights of the Parking Company Defendants.

235.    The Parking Company Defendants can only derivatively deny participation in the Google Network, to third parties.   The third parties can still participate through either an alternative Parking Company (and/or other Google-authorized person) or through direct permission, license, contract, and/or other agreement with Defendant Google.

236.    Each Google Network member/participant, including but not limited to the Parking Company Defendants, have, either directly or indirectly, entered into contractual agreements, licenses, and other express agreements with Defendant Google, that govern the terms, conditions, rights, and responsibilities associated with participation in the AdSense Network/Google Network, and specifically its agreement to allow AdWords Advertisements to be placed/displayed/associated with domains/sites/video/search results under its license, control and/or ownership, as well as its participation in the RICO Enterprise.

237.    As Defendant Google affirmatively states on its website, that it maintains control over the Google Network, RICO Enterprise,  domains/sites, stating: "All web sites and products are reviewed and monitored according to Google's rigorous standards, so as the network grows,

your AdWords ads will continue to appear only on high-quality sites and products" and further promising that:

- All ads are reviewed before appearing across the Google Network, so you may see your ad appear on Google first. If you edit a previously reviewed ad, your ad will be re-reviewed before it shows again on the Google Network.

- To ensure overall quality, all sites are carefully reviewed before being allowed in the Google Network.

http://adwords.google.com/support/bin/answer.py?answer=6104&ctx=sibling

238.   Defendant Google controls the collection of all revenue derived from the RICO Enterprise, as well as payments and monies to members of the RICO Enterprise, arising from or in relationship to the operations of the RICO Enterprise (i.e., distribution derived from AdWords advertisements).

### E.  Operation and Participation in the Conduct of the affairs of the RICO Enterprise

239.    Defendant Google and the Parking Company Defendants are persons that knowingly and willfully conspire to and/or conduct and/or participate, directly and/or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

240.    Each participant in the RICO Enterprise advances, permits, and/or participates in the unlawful conduct of the RICO Enterprise in one or more ways, including but not limited to the following :

  a.   Defendant Google organizes, selects and controls membership in, promulgates terms and conditions of participation in, enters into express agreements/contracts with all members, designs and controls all technology, and

  b.   Google Network tastes domains, registers domains, aggregates domains, licenses domains and sites, contracts/associates with Domain and site owners/

registrants for the monetization of domains, engages in optimization and hosting, assist in the marketing, development and optimization of domains/sites under their control (such as landing page design), assist in the procurement, collection and distribution of advertising/marketing revenue throughout the Enterprise, and/or otherwise participate in the operations of the RICO Enterprise subject to the terms and conditions mandated by Defendant Google.

241.    Not every operation and action of the RICO enterprise is illegal, for example, AdWords advertisements are frequently placed/displayed/associated with legitimate domains/sites/video/search results and in compliance with all applicable local, state and federal laws.

242.    Defendants, however, have conducted the affairs of the RICO Enterprise with the deliberate intent of obtaining commercial gain from the Deceptive Domain Scheme.

243.    In order to monetize Deceptive Domains, infringe and dilute Distinctive and Valuable Marks, engage in cybersquatting, engage in cyberpiracy, engage in typosquatting, transact in money derived from the illegal transactions and otherwise engage in the illegal conduct alleged herein against Lead Plaintiffs and the Class, Defendants needed a system that would allow Defendants to develop, monitor, calculate, divert and otherwise control a large segment of the online/Internet electronic commerce, marketing, promotions, sales, and advertising market.  The RICO Enterprise provides Defendants with that vehicle.

244.    Defendants, exert control over, and otherwise operate and conduct the affairs of the  RICO Enterprise through a pattern of racketeering by, among other things, engaging in the following:

a.    Defendants deliberately and knowingly conspire to control, capture, direct, and manipulate internet traffic away from legitimate domains/sites and

toward Deceptive Domains that display one or more of the revenue generating AdWords advertisements;

b. Defendants deliberately and knowingly utilize an internationally expansive online/Internet marketing and advertising network to attract and derive payment from AdWords advertisers;

c. Defendants deliberately and knowingly contrive and implement the Deceptive Domain Scheme to increase market share and profitability well-beyond that which could legally be achieved without the monetization of Deceptive Domains;

d. Defendants use legitimate advertising conduct of the RICO Enterprise as a subterfuge to solicit and attract AdWords advertisers to "cost-per-click" and "pay-per-click" advertising, without advising the AdWords advertisers that some or all of their advertisements will be used to monetize illegal Deceptive Domains;

e. Defendants actively utilize technology (including redirect and masking techniques) to conceal their actions in setting up, maintaining, monetizing and otherwise profiting and controlling Deceptive Domains in direct violation of federal and state law;

f. Defendants actively use a series of contracts, licenses, agreements, sublicenses, and other legal documents to conceal the relationships, participation and control by Defendants of Deceptive Domains, as well as other misconduct associated with the Deceptive Domain Scheme.

g. Defendants use the RICO Enterprise to deprive Lead Plaintiffs and the Class of valuable property;

h. Defendants utilize the RICO Enterprise to distribute money obtained from illegal and criminal activity;

i. Defendants utilize the RICO Enterprise to traffic in counterfeit goods or services;

j. Defendants utilize the RICO Enterprise to launder illegal internet traffic in furtherance of the Deceptive Domain Scheme;

k . Defendants use the Adsense for domains program to monetize Deceptive Domains with Adwords advertisements;

l.      Defendant Google actively conceals and makes affirmative misrepresentations about participation of the AdSense for Domains program in the Google Network (including monetization of Deceptive Domains with AdWords advertisements), to solicit AdWords advertisers and to encourage them to place and pay for AdWords advertisements under the false pretenses that the advertisements are appearing on legitimate, high quality sites, when in fact the AdWords advertisements are frequently appearing on illegitimate Deceptive Domains that are used exclusively for the purpose of generating economic gain for Defendant Google, the Parking Company Defendants and/or another member of the AdSense for Domains program;

m.      Each of the Parking Company Defendants take direct action to participate in and conceal (i.e., through masking, redirecting, hijacking internet traffic, using false WhoIs information, sublicenses, and otherwise) the monetization of Deceptive Domains within the Google Network;

n.      Defendant Google uses the Google Network in furtherance of the Deceptive Domain Scheme by, among other things, making false representations on its website, in e-mails, contracts, agreements, and otherwise, regarding: the members of the Google Network, the scope of operations and functions of the Google Network, the control over the Google Network, the actual policies and practices governing the Google Network, the utilization and monetization of Deceptive Domains in the Google Network, and the revenue generated and shared as a result of the monetization of Deceptive Domains in the Google Network;

o.      All Defendants have deliberately and intentionally used the legitimate functions and operations of the RICO Enterprise for the purpose of concealing the illegal conduct and affairs of the RICO Enterprise and for the purpose of increasing the profitability of the illegal conduct, through increased AdWord advertiser payments and placement of ads, under false pretenses, including (i)Defendants' statements that the Google Network is the "world's largest" network, (ii) touting expansive Internet Reach,(iii) affirmatively misrepresenting that AdWords advertisements will only appear on high quality/legitimate websites, (iv) intentionally concealing the monetization of said AdWords advertisements on the sham Deceptive Domains that are simply used to generate advertising revenue for one or more of the Defendants, (v) concealing from and refusing to disclose to AdWords advertisers that the "clicks" they are paying for are actually from AdWords advertisements placed on the sham Deceptive Domains and furthering that deception by sending AdWords advertisers deceptive reports/invoices that conceal the domain source of billed clicks (conceal clicks from Deceptive Domains) by simply reporting billed clicks under a catch-all category called "Domain Ads" that

fails to identify the domain source of the click (despite Defendants detailed records and reports of domain source and of domain-by-domain advertising clicks/performance), such as:



| Domain | Impressions | Clicks ▲ | CTR |
|---|---|---|---|
| myspace.com | 2,902,009 | 159 | 0.01% |
| Domain ads | 2,633 | 117 | 4.44% |
| about.com | 9,684 | 107 | 1.10% |

*Which parked domains?*

    p.       Defendants use the RICO Enterprise to conspire and to carry out their conspiracy to engage in a practice of cybersquatting, cyberpiracy, and typosquatting as prohibited by *15 U.S.C. § 1125*;

    q.       Defendants use the RICO Enterprise to dilute trademarks in violation of *15 U.S.C. § 1051;* and

    r.       Defendants use the RICO Enterprise to enter into side agreements with Defendant Parking Companies and Deceptive Domain name registrants/owners/licensees, and concealed said agreements from Lead Plaintiffs, the Class, and the public.

245.    As set forth above, the RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage. Not all members of the RICO Enterprise are defendants in this action.

### F. Hierarchial Structure of the RICO Enterprise

246.    Defendant Google is the central actor in the RICO Enterprise and controls the conduct and operation of the affairs of the Enterprise, as alleged herein.

247.    The Parking Company Defendants derivatively control a portion of the RICO Enterprise (third parties under license/contract/agreement with the Parking Company Defendants), subject to Defendant Google's terms and conditions, as well as each conspire with, agree to and ratify Defendant Google's legal and illegal actions in control of/operation of the

RICO Enterprise, and have acted/assisted Defendant Google in the conduct and operation of the RICO Enterprise by deliberately and willfully engaging in numerous affirmative acts, including intentional acts in furtherance of the Deceptive Domain Scheme alleged herein.

248. Through rules, regulations, licenses, contracts and other terms and conditions, imposed by Defendant Google, participation in and operation of the RICO Enterprise is governed by a defined structure and written terms. One of which provides Defendant Google with a complete grant of authority to control membership and participation in the RICO Enterprise and to control the precise provision of, timing of, content of, and revenue generated from any and all AdWords Advertisements that are monetized throughout the Google Network.

249. In order to access the advertising reach of the RICO Enterprise, persons must contractually agree to participate on terms and conditions promulgated, governed and controlled by Defendant Google.

250. Defendant Google allows a limited and carefully selected number of individuals and entities, including but not limited to the Parking Company Defendants, to sub-contract with third parties (i.e., domain registrants) for derivative participation. However, said participation is controlled through broad contractual terms, licenses and sub-licenses, and other such agreements between the Parking Companies and Defendant Google.

251. Defendant Google and the Parking Company Defendants use the structure of the Enterprise, the written agreements, licenses, sublicenses and other related rules/terms to control all aspects of the affairs of the RICO Enterprise and to carry out the Deceptive Domain Scheme alleged herein.

252. Defendant Google is the only person in the RICO Enterprise that has complete knowledge and control of all of the following:

a. Identity of every individual and/or entity participating in the RICO Enterprise;

b. Contractual terms of each participant in the RICO Enterprise;

c. All advertisements, of any kind, displayed or used throughout the RICO Enterprise;

d. The location/placement of, timing of, and revenue generated in relation to each advertisement displayed through the operation of the RICO Enterprise;

e. Total revenue generated from the operation of the RICO Enterprise;

f. Disbursements made to members of the RICO Enterprise in connection with the operations of the RICO Enterprise; and

g. Software, hardware, and technology used to operate the RICO Enterprise.

253. The RICO Enterprise is subject to a set structure, rules, terms, goals, purpose and hierarchial decision-making, generally as follows:

a. Defendant Google controls all membership in and participation in the RICO Enterprise. Defendant Google promulgates and enforces all rules, terms, and conditions of participation in the Enterprise through direct or indirect Agreements, licenses, sublicenses, and contracts;

b. Parking Company Defendants, and other Google Network Members, are granted limited discretion and are ultimately subject to the decision-making of Defendant Google;

c. Defendant Google permits, on a limited basis, certain selected members of the RICO Enterprise (including but not limited to the Parking Company Defendants) to directly contract with third parties (i.e., domain owners) for participation in the RICO Enterprise, however requires that they obtain from the third parties an express written grant of full license, ownership and control of the third party interests and participation in the RICO Enterprise. Defendant Google controls the third parties through control of the Parking Company Defendants; and

d. The chart below generally describes the RICO Enterprise hierarchy:



**Defendant Google**

**Google Network Members**
(including but not limited to Parking Company Defendants)

**Third Parties**
(i.e., domain registrants, website owners, etc. that are derivatively
Participating through the Parking Company Defendants and/or a
Google-Approved Person)

### G.    *Predicate Acts*

254.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under *18 U.S.C. §1341* (relating to mail fraud) and *18 U.S.C. §1343* (relating to wire fraud); *18 U.S.C. §1952* (relating to racketeering); *18 U.S.C. §1957* (related to engaging in monetary transactions in property derived from specified unlawful activity); and *18 U.S.C. §2320* (relating to trafficking in goods or services bearing counterfeit marks).

255.    As set forth herein, each Defendant has engaged, and continues to engage on a daily and repeated basis, since at least January 2002, within each and every State in the United States, in racketeering activity violating each of these laws to effectuate their Deceptive Domain Scheme.

256.    Defendants' business operations are all or substantially Internet-based, and therefore are substantially and materially conducted through e-mail, websites, Internet traffic,

wire communications, and other electronic means.

257.    Defendants largely effectuated the Deceptive Domain Scheme, alleged herein, through utilization of e-mail, instant messaging, electronic messaging, wire, e-commerce, electronic technology, digital technology, websites, electronic tools, and other electronic media.

258.    For the purpose of executing and/or attempting to execute the herein described Deceptive Domain Scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of *18 U.S.C. §1341*, placed in post offices and/or in authorized repositories matters and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matters and things from the Postal Service or commercial interstate carriers, including but not limited to contracts, invoices, correspondence, and payments.

259.    For the purpose of executing and/or attempting to execute the above described Deceptive Domain Scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, also in violation of *18 U.S.C. §1343*, transmitted and received by wire, matters and things which include but are not limited to contracts, invoices, correspondence, disbursements, and payments.

260.    The matters and things sent by Defendants via the postal service, commercial carrier, wire, e-mail, or other interstate electronic media include, related to the Deceptive Domain Scheme, but are not limited to, *inter alia*:

    a.    contracts by and between Defendants, as well as between one or more Defendants and a third party;

    b.    licensing agreements and other agreements between domain registrants and Defendants;

c.  licensing and other agreements by and between Defendants;

d.  acknowledgments, acceptances, disclosures and disclaimers by and between Defendants, as well as between one or more Defendants and a third party;

e.  correspondence, payments, invoices, contracts/agreements, and other such documents, data and information by and between Defendant Google AdWords advertisers;

f.  invoices and payments by and between Defendants, as well as with third parties, relating to AdWords advertisements monetized on the Google Network and/or otherwise related to the operation of the RICO Enterprise;

g.  reports, analysis, and related documents on internet traffic, click-through-rates, revenue generated, and other statistical and performance reporting, related to AdWords advertisements monetized on the Google Network, by and between each Defendant, as well as between one or more Defendants and a third party;

h.  other communications, correspondence, and documents related to monetization of Deceptive Domains on the Google Network, and/or otherwise related to the Deceptive Domain Scheme, by and between Defendants, as well as between one or more Defendants and a third party;

i.  communications by one or more of the Defendants, with Internet users, related to Deceptive Domains and/or in furtherance of the Deceptive Domain Scheme;

j.  wire transfer, checks/drafts, money orders, and/or payments by electronic funds transfer (EFT) of money derived from or related to the Deceptive Domain Scheme; and

k.  otherwise on an ongoing, repeated and regular basis, Defendants use telephone, wire, e-mail, postal service, and common carrier to transmit in interstate commerce other documents, data, matters, and things in furtherance of or necessary to effectuate the Deceptive Domain Scheme, such as invoices, contracts, reports, payments, revenue shares, certificates, and other related communications.

261.  On a daily, ongoing, repeated, and regular basis, Defendants use e-mail,

facsimile, telephone, wire, and/or mail to communicate with each other in furtherance of the

Deceptive Domain Scheme.

262. On a daily, ongoing, repeated, and regular basis, Defendant Google uses e-mail, facsimile, telephone, wire, and/or mail to solicit advertisers to participate in the AdWords program and solutions, in furtherance of the Deceptive Domain Scheme.

263. On a daily, ongoing, repeated, and regular basis, Defendant Google causes to be displayed on its website all or some of its rules, regulations, policies, terms and conditions, agreements, contracts, licenses, and other documents governing membership in and participation in the Google Network.

264. On a daily, ongoing repeated, and regular basis, Defendant Google uses e-mail, facsimile, telephone, wire, and/or mail to solicit persons to participate in the Google Network and to license domains/sites for monetization with AdWords program, in furtherance of the Deceptive Domain Scheme.

265. On a daily, ongoing, repeated, and regular basis, AdWords advertisers pay Defendant Google, to place/display Adwords advertisements on the Google Network, by wire, mail, or electronic funds transfer, in furtherance of the Deceptive Domain Scheme.

266. On a daily, ongoing, repeated, and regular basis, Defendant Google uses the internet, wire, and other automated technologies to send, place, display, show and otherwise monetize sites/domains, including but not limited to Deceptive Domains, with AdWords advertisements throughout the Google Network.

267.  On an ongoing, repeated, and regular basis, Defendants use e-mail, facsimile, and/or mail to negotiate and execute contracts, licenses, and other agreements in furtherance of the Deceptive Domain Scheme.

268.  On a daily, ongoing, repeated, and regular basis, Defendants use the Internet and other electronic solutions to redirect internet traffic, monetize domains/sites,  and otherwise commercially profit from the illegal and unauthorized use of Lead Plaintiffs' and the Class Members' Distinctive and Valuable Marks, and to otherwise effectuate the Deceptive Domain Scheme alleged herein.

269.  On an ongoing, repeated, and regular basis, Defendants use electronic funds transfer, wire transfer, and/or the mail to divide, allocate, and otherwise share and transact in the money derived from the Deceptive Domain scheme.

270.  On an ongoing, repeated, and regular basis, Defendants, either alone, together and/or in conjunction with domain registrants/third parties, use wire, telephone, e-mail and the internet to taste, kite, register, license, monetize and use domains, including but not limited to Deceptive Domains.

271. On an ongoing, repeated, and regular basis, Defendants use telephone, wire, e-mail, and the internet to register false WhoIs information; and

272.  On an ongoing, repeated, and regular basis Defendants engaged in the

acts of racketeering, since at least January 2002, within each and every State in the United States, in violation of *18 U.S.C. §1952* (relating to racketeering).

273. On an ongoing, repeated, and regular basis, Defendants used the internet, websites,

wire transfers, banks, depository institutions, other electronic forums, U.S. Mail, mail carriers, and corporations and individuals, in interstate commerce, for the express and intended purpose of distributing the proceeds of their unlawful activity in violation of *18 U.S.C. §1957* and Deceptive Domain Scheme.

274. On an ongoing, repeated, and regular basis, Defendants otherwise traveled and acted in interstate commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management establishment, or carrying on of illegal actions and violations of *18 U.S.C.§1957.*

275. Defendants engaged in the following acts, since at least January 2002, on an ongoing and repeated basis, within each and every State in the United States, in violation of *18 U.S.C. §1957* (related to engaging in monetary transactions in property derived from specified unlawful activity):

a. Falsely and fraudulently causing illegally derived property of another to be utilized and transported between the various states, as well as internationally, in furtherance of the Deceptive Domain Scheme alleged herein;

b. Defendants knowingly engage in monetary transactions (deposits, money transfers, withdrawals, distributions, exchange, etc.) in criminally derived property in values in excess of Ten Thousand Dollars ($10,000.00);

c. Defendants engage in monetary transactions involving the deposit, transfer, sharing, withdrawals, collections, and exchange of money collected from cyber squatting, typo squatting, advertisements placed on Deceptive Domains, and other related criminal activities engaged in as part of the Deceptive Domain Scheme, as alleged herein;

d. The criminally derived money is in excess of $1 Billion annually; and

e. One example is as follows:

i. Defendants use mail, wire, and the internet, in interstate

commerce by and between the various states and internationally, to illegally obtain and use property belonging to Lead Plaintiffs and the Putative Class (i.e., taste/kite/register Deceptive Domains, license Deceptive Domains, monetize Deceptive Domains);

ii.  Defendants then bill for, invoice, collect, transfer and transmit, in interstate commerce by and between the various states and internationally, through wire transfer, checks, and electronic deposits, money derived from AdWords advertisers in connection with Defendants illegal monetization, control and use in interstate commerce of property belonging to Lead Plaintiffs and the Class (trademarks, domains, Deceptive Domains, internet traffic, goodwill, etc.).

f.       Otherwise engage in money transactions and in property derived from criminal activity as alleged herein.

276.   Defendants engage in the following acts, since at least January 2002, on an ongoing and repeated basis, within each and every State in the United States, in violation *of 18 U.S.C. §2320* (relating to trafficking in goods or services bearing counterfeit marks):

a.       Actions of Defendants in effectuating the Deceptive Domain Scheme, as alleged herein, constitute knowingly trafficking in goods or services bearing counterfeit marks;

b.       For example, Defendants actions in knowingly registering, using, placing AdWords advertising, reselling for monetization, and otherwise monetizing Deceptive Domains is an act constituting the trafficking in domains and other goods or services bearing counterfeit marks; and

c.       Otherwise engaging in the trafficking in goods or services bearing counterfeit marks, as part of the Deceptive Domain Scheme, as alleged herein.

277.   Defendants' racketeering activities, violations of the law, other actions, misrepresentations, acts of concealment, and failures to disclose are knowing and intentional, and made for the purpose of wrongfully obtaining, using and distributing money and property

through the illegal use for commercial gain of Deceptive Domains, as set forth herein.

### H.     Pattern of Racketeering Activity

278.     Each Defendant has engaged in a "pattern of racketeering activity," as defined by *18 U.S.C. § 1961(5)*, by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of *18 U.S.C. §1341* (relating to mail fraud) and *18 U.S.C. §1343* (relating to wire fraud); *18 U.S.C. §1952* (relating to racketeering); *18 U.S.C. §1957* (related to engaging in monetary transactions in property derived from specified unlawful activity); and *18 U.S.C. §2320* (relating to trafficking in goods or services bearing counterfeit marks), as described herein, within the past ten years.   In fact, Defendants have committed thousands of acts of racketeering activity.

279.     Each act of racketeering activity is related, has a similar purpose, involves the same or similar participants and method of commission, has similar results and impacts similar victims, including Lead Plaintiffs and the Class Members.

280.     At all relevant times herein, each Defendant participates in, conducts, directs, and facilitates the affairs of the RICO Enterprise and act in furtherance of the Deceptive Domain Scheme alleged herein.

281.     These multiple acts of racketeering activity, which Defendants commit and/or conspire to or aid in the commission of, are related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in *18 U.S.C. § 1961(5)*.

282.     The pattern of multiple acts of racketeering activity, as alleged herein, was continuous and related over a period of over three years.

### I.    Interstate Trade and Commerce

283.    The online/Internet electronic commerce marketing and advertising market generated an estimated $130.3 Billion in 2006.

284.    Throughout the Class Period (as herein defined), there was a continuous and uninterrupted flow of transactions in furtherance of the Deceptive Domain Scheme, by Defendants, in interstate commerce throughout the United States and internationally.

285.    Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce between Defendants and damaging Lead Plaintiffs and Class Members who were located in states other than the states in which Defendants are located, and had a direct, substantial, and reasonably foreseeable effect upon interstate commerce.

### J.    Acts in Furtherance of Conspiracy

286.    Defendants conspired to generate, transact in, and distribute ill-gotten and criminally derived revenue, profit, and money through effectuation of the Deceptive Domain Scheme, alleged herein.

287.    Defendant Google actively developed and solicited participation in the Deceptive Domain Scheme.

288.    Defendants conspired to participate in and conduct the affairs of the RICO Enterprise through a pattern of racketeering activity for the purpose of obtaining ill-gotten revenue from the Deceptive Domain Scheme.

289.    The method by which Defendants agreed and conspired to effectuate the Deceptive Domain Scheme is set forth herein, and includes, but is not limited to:

a. Agreeing to membership in and participation in the RICO Enterprise ("Google Network") on the terms, conditions, and rules proscribed by Defendant Google;

b. Agreeing to use the Google Network to generate revenue from the monetization of Deceptive Domains with AdWords advertisements and to otherwise effectuate the Deceptive Domain Scheme;

c. Agreeing that Defendant Google maintain control over the creation, selection, placement, and display of all AdWords advertisements displayed/placed throughout the Google Network;

d. Parking Company Defendants agreeing to provide Defendant Google with Deceptive Domains for monetization in the Google Network;

e. Parking Company Defendants agreeing with Defendant Google to further the conspiracy, and effectuate the Deceptive Domain Scheme, by entering into contracts, licenses, and related agreements with third parties to monetize said third party domains/sites with AdWords advertisements and to realize other such derivative participation of third party domains/sites in the Google Network;

f. Intentionally and deceptively tasting, kiting, registering, licensing, monetizing and utilizing Deceptive Domains that are identical or confusingly similar to or dilutive of the Lead Plaintiffs' and other members of the Class' Distinctive and Valuable Marks;

g. Not utilizing available blocking, filtering and other technologies to prevent the tasting, kiting, license, monetization and other use of Deceptive Domains;

h. Diverting internet traffic away from Lead Plaintiff and the class members, and to the parked Deceptive Domains in the Google Network containing AdWords advertisements;

i. Defendants' use of semantics programs, algorithms, and other intellectual electronic programs designed and intended to maximize revenue from the placement of AdWords advertisements on Deceptive Domains in the Google Network;

j. Using software to capture slight misspellings or keystroke errors to identify Deceptive Domains, and to capture and redirect internet traffic to Deceptive Domains and away from the Internet user's intended site, thus diverting traffic away from Lead Plaintiffs' and the Class' valuable marks

and causing confusion, dilution, and misuse/misappropriation of Lead Plaintiffs' and other members of the Class' Distinctive and Valuable Marks;

k.   Defendants' use of and transmission/submission of false and misleading WhoIs domain registration data in an attempt to conceal their participation in the Deceptive Domain Scheme;

l.   Defendants' efforts to conceal the Deceptive Domain Scheme by using, on the internet, encryption and/or disabling the "View Source" functions at the Deceptive Domains;

m.   Agreeing to engage in the predicate acts alleged herein;

n.   Agreeing to receive, accept, and transmit necessary data, documents, correspondence, and money, related to the Deceptive Domain Scheme, via e-mail, electronic transfer, wire, telephone, facsimile, postal service, and/or common carrier in furtherance of the illegal conduct alleged herein; and

o.   Agreeing to engage in other acts in furtherance of the illegal conspiracy and Deceptive Domain Scheme alleged herein.

290.   The above-described practices are unreasonable and unlawful, and result in violations of RICO, other criminal statutes alleged herein, cybersquatting, typosquatting, cyber-piracy, unlawful interference with current and prospective economic advantage.

291.   Defendants' concerted actions in furtherance of the conspiracy as alleged herein, are knowing, intentional, and taken in bad faith.

292.   One or more of the Defendants hosted, or participated in the hosting, of a website at each of the Deceptive Domains monetized on the Google Network which displayed HTML links featuring AdWords advertisements for goods and services, many of which are directly competitive with those sold or provided in connection with Lead Plaintiffs' Marks or Distinctive and Valuable Marks belonging to the Class.

293. Defendants do not have any intellectual property rights or any other rights in Lead Plaintiffs' and the class members' Distinctive and Valuable Marks. None of the Deceptive Domains consist of the legal name of the Defendants, or a name that is otherwise commonly used to identify the Defendants.

294. None of the Defendants have made any prior use of any of the Deceptive Domains in connection with the *bona fide* offering of any goods or services.

295. All of the Deceptive Domains are being used by the Defendants for commercial gain. All of the Deceptive Domains are being intentionally used, in bad faith, as part of Defendants Deceptive Domain Scheme.

### K. Injury/Harm to Lead Plaintiffs, the Class, and the General Public

296. Lead Plaintiffs and the Class have suffered injury to their business and property as a direct and proximate result of Defendants' illegal actions, as alleged herein. The injuries to the business and property of Lead Plaintiffs and the Class include, but are not limited to:

    a. Damage to property;

    b. Damage to value of domain;

    c. Diversion of business;

    d. Dilution of the Distinctive and Valuable Marks;

    e. Infringement of Distinctive and Valuable Marks;

    f. Lost profits/revenue;

    g. Lost sales;

    h. Lost customers;

    i. Lost market share;

j.      Lost reputation;

k.      Confusion of goods/services;

l.      Lost goodwill; and

m.      Other such injury and damage directly and proximately caused by Defendants' illegal actions alleged herein.

297.    Lead Plaintiffs and the Class were all injured in a similar fashion by the Defendants' predicate acts in violation of RICO.

298.    The injury and harm suffered by the Lead Plaintiffs, and the Class, as alleged herein, was directly caused by, and was the direct result of, the Defendants' violations of *18 U.S.C. §1962(a)(b)(c)* and/or *(d)*.

299.    Defendants' Deceptive Domain Scheme, which includes, but is not limited to, the unauthorized registration and/or use of the Deceptive Domains, is likely to cause confusion, mistake, and deception as to the source or origin of the Deceptive Domains, and is likely to falsely suggest a sponsorship, connection, license, or association of Defendants, and the Deceptive Domains with Lead Plaintiffs and the Class.

300.    Defendants' activities have irreparably harmed and, if not enjoined, will continue to irreparably harm Lead Plaintiffs and the Class and the long-used and federally registered trademarks and the Distinctive and Valuable Marks belonging to Lead Plaintiffs and the Class.

301.    Defendants' activities have irreparably harmed, and if not enjoined, will continue to irreparably harm the general public, which has an inherent interest in being free from confusion, mistake, deception, confusion as to the source, affiliation, association, or sponsorship of goods or services.

302.     Trademark infringement and unfair competition laws are designed and intended to protect the public from exactly such confusion and deception.

303.     Defendants' bad actions, constituting violations of those laws, directly cause injury to the public and circumvent the very important trademark safeguards that the laws are designed to protect and promote.

## IX.     THE  ANTICYBERSQUATTING CONSUMER PROTECTION ACT

304.     In 1999, Congress passed the Anticybersquatting Consumer Protection Act ("ACPA" or "Act"), *15 U.S.C.A. § 1125(d)*, to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners.

305.     Congress enacted the ACPA to include not only individuals and companies who register domain names, but rather, to apply equally to three classes of persons/entities:   (1) registrants of the Deceptive Domains; (2) anyone who "uses" the domain name which is defined as the registrant or the "authorized licensee" of the registrants of the Deceptive Domains; and (3) anyone who "traffics in" Deceptive Domains, which refers to anyone involved in any transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration, whether or not the person is the registrant of the Deceptive Domain.

306.     Congress drafted the ACPA to prevent the use, licensing, pledging, trafficking in, or any other exchange of consideration for the use of the infringing domain names.

307.     The Deceptive Domain Scheme and other illegal activities of Defendants constitutes the very conduct which Congress declared to be illegal and in which Defendants

brazenly engage.

308.     Congress provided clear examples of some of the specific types of improper domain names and activities that had been brought to its attention and which were included within the scope of the ACPA, activities in which the Defendants have engaged, and are continuing to engage in violation of the ACPA.

> As stated by Senator Hatch:
>
> *The Committee also heard numerous examples of online bad actors using domain names to engage in unfair competition. For example, one domain name registrant used the name ''wwwcarpoint.com,'' without a period following the ''www,'' to drive consumers who are looking for Microsoft's popular Carpoint car buying service to a competitor's site offering similar service.''* From August 5, 1999 CONGRESSIONAL RECORD — SENATE S10515

309.     "WWW" Deceptive Domains were clearly targeted by Congress and declared to be illegal by the ACPA.  The only reason for these "www" domains is to capture and redirect users looking for the original, legitimate websites.

310.     *15 USC § 1125(d)* applies to registrants who engage in cybersquatting and typosquatting by registering Deceptive Domains and using them for commercial gain.  *15 USC § 1125(d)* applies equally to persons who are the "registrant's authorized licensee," whether or not the person is the registrant of the Deceptive Domain.  *15 USC § 1125(d)* applies equally to a person who "traffics in" (as defined in *15 USC § 1125 (d)(1)(E)*) Deceptive Domains, whether or not the person is the registrant of the Deceptive Domain.

311.     All of the Defendants are authorized licensees of domains and Deceptive Domains.  All Defendants license and sub-license domains, including Deceptive Domains, either

through express or implied, direct or indirect licenses. For example, but not limited to:

  a.  ActiveAudience (a parking company that contracts with Defendant Google to monetize the ActiveAudience aggregated domains with Defendant Google Ads through the Adsense For Domains parking programs), contracts with Domain registrants in their license agreements as follows: "You [domain owner] hereby grant ActiveAudience a revocable license to display, at ActiveAudience's option, content on Your Parked Domains for the duration of this Agreement."

  b.  Gold Key (a parking company that contracts with Defendant Google to monetize the Gold Key aggregated domains with Defendant Google Ads through the Adsense For Domains parking programs), contracts with Domain registrants with following express provision: "You [domain owner] hereby grant GoldKey a revocable license to display, at GoldKey's option, content on Your Parked Domains for the duration of this Agreement."

  c.  In addition, each above-referenced contract contains the following provision: "Sublicensing and Assignment....GoldKey [and Active Audience] may assign its rights and duties under this Agreement to any party at any time without notice to You [domain owner]."

312.    The Defendants acts as alleged herein constitute trafficking in Deceptive Domains, in violation of the ACPA.

313.    The Defendants acts as alleged herein constitute cyberpiracy, cybersquatting, and/or typosquatting, in violation of the ACPA.

314.    The Defendants acts as alleged herein otherwise violate the ACPA.

X.    **CLASS ACTION ALLEGATIONS**

315.    Lead Plaintiffs bring this action against Defendants on their own behalf and pursuant to Rules 23(a), 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of the following class:

  Any and all individuals and/or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates,

agents and Defendants' co-conspirators) domiciled within the United States that own or are a licensee of a "distinctive or valuable mark" that has been infringed, diluted, cybersquatted, typosquatted, and/or otherwise improperly used by one or more of the Defendants, as part of the Deceptive Domain Scheme alleged herein, during the period January 1, 2002 through the present.

316.    Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or are a parent or subsidiary of, or any entity that is controlled by Defendants and any of its officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

317.    The Class Period is January 1, 2002, through the date of filing of this Complaint (the "Class Period").

318.    There are millions of geographically dispersed putative members of the Class. Accordingly, the Class is so numerous that joinder of all members is impracticable.

319.    The Class is ascertainable, as the names and addresses of all Class Members can be identified in business records maintained by Defendants.

320.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class.

321.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other Class Members.

322.    Lead Plaintiffs are represented by counsel experienced and competent in the prosecution of complex class action litigation.

323.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members.  Such common questions include, but are not limited to the following:

a.      Whether one or more of the Defendants' actions as alleged herein violate the ACPA, *15 U.S.C. § 1125(d)*;

b.      Whether one or more of the Defendants' actions, as alleged herein, constitute violations of RICO, *18 U.S.C. §1962(a),(c)* and *(d)*;

c.      Whether one or more of the Defendants' actions as alleged herein violate Lanham Act, *15 U.S.C. § 1051* et seq.;

d.      Whether one or more of the Defendants' actions, as alleged herein, constitute trademark infringement under *15 U.S.C. § 1114(1)*;

e.      Whether one or more of the Defendants' actions, as alleged herein, constitute violations of false designation of origin under *15 U.S.C. § 1125(a)*;

f.      Whether one or more of the Defendants' actions, as alleged herein, constitute dilution under *15 U.S.C. § 1125(c)*;

g.      Whether one or more of the Defendants' actions, as alleged herein, constitute contributory, vicarious, statutory, and/or common law trademark infringement;

h.      Whether one or more of the Defendants' actions, as alleged herein, constitutes Intentional Interference With Current and Prospective Economic Advantage;

i.      Whether any of the Defendants committed or are responsible for the acts alleged herein;

j.      Whether any of the Defendants' actions are continuing in nature;

k.      Whether any of the Defendants engaged in a pattern of racketeering activity;

l.      Whether the alleged Enterprise is an enterprise within the meaning of *18 U.S. C. 1961(4)*;

m.    Whether any of the Defendants conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity in violation of *18 U.S.C. 1962(c)*;

n.    Whether Defendants' overt and/or predicate acts in violation of *18 U.S.C. 1962(c)* proximately cause injury to Lead Plaintiffs' and Class Members' business or property;

o.    Whether Defendants fraudulently concealed their Deceptive Domain Scheme and other unlawful activities alleged herein;

p.    Whether Defendants derived income from the Deceptive Domain Scheme and the pattern of racketeering activity associated therewith and used said income in the establishment or operation of the Enterprise which affects interstate commerce in violation of 18 U.S.C §1962(a);

q.    Whether Lead Plaintiffs and the Class are entitled to declaratory and/or injunctive relief to rectify the alleged violations of law and, if so, what is the appropriate nature of the equitable and injunctive relief to which Lead Plaintiffs and the Class may be entitled;

r.    Whether any of the Defendants' conduct is willful and/or intentional;

s.    Whether any of the Defendants directed, controlled, or agreed to facilitate the perpetration of the Deceptive Domain Scheme being perpetrated by the RICO Enterprise;

t.    The duration of the conspiracy alleged in this Complaint, and the nature and character of the acts performed by any of the Defendants in furtherance of the conspiracy;

u.    Whether the conduct of any of the Defendants, as alleged in this Complaint, caused damages to the Lead Plaintiffs or to the other members of the Class;

v.    The appropriate measure of damages sustained by Lead Plaintiffs and other members of the Class; and

w.    Whether Defendants were unjustly enriched as a result of their Deceptive Domain Scheme and other unlawful conduct, as alleged herein.

324.    Lead Plaintiffs' claims are typical of the claims of the Class Members because they originate from the same illegal and confiscatory practices of Defendants, and because

Defendants have acted in the same way toward Lead Plaintiff and the Class.

325.    Defendants' operations are Internet-based/automated and technology-based. Defendants' actions toward the Class are identical or substantially similar, and arise out of a common course of illegal conduct, because Defendants effectuate the Deceptive Domain Scheme, and all of the actions alleged herein, through the use of a common, systemic, uniform, electronic and largely automated process that cause injury and damage to Lead Plaintiffs and the Class in a common and consistent manner.

326.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiffs are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class litigation, and have no interests antagonistic to or in conflict with those of the Class.  As such, Lead Plaintiffs are adequate Class representatives.

327.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the Class.

328.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs alleged herein.   There will be no difficulty in the management of this action as a class action.

329.    This action is maintainable as a class action under Rule 23(b)(2), since the unlawful actions of Defendants, as alleged herein, have been taken on grounds equally applicable

to all members of the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class and subclasses as a whole.

330.     Alternatively, this action is maintainable as a class action under Rule 23(b)(1), as the prosecution of separate actions by or against individual members of the class would create a risk of:  (a) inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for the party opposing the class; or (b) adjudications with respect to individual members of the class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

331.     Alternatively, this action is maintainable as a class action under Rule 23(b)(3), as common questions of law and fact described above predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

332.     All allegations and claims are plead in the alternative to the extent required for proper construction under applicable state or federal law.

## XI.     **LEGAL CLAIMS**

### COUNT ONE: RICO VIOLATIONS
### Violation of 18 U.S.C. § 1962(a)

333.     Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

334.     This Count is brought by Lead Plaintiffs in their individual and representative

capacities, against all Defendants.

335.     This claim for relief arises under 18 U.S.C. § 1962(a), which makes it unlawful for a person to receive income from a pattern of racketeering activity, in which such person has participated as a principal as defined by 18 U.S.C § 2, and use or invest such income, directly or indirectly, in the establishment or operation of any enterprise which affects interstate commerce.

336.     The acts set forth herein constitute a pattern of racketeering activity pursuant to *18 U.S.C. § 1961(5).*

337.     Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purposes, as set forth herein.  Defendants did so as principals as defined by 18 U.S.C. §2 in  that defendants committed violations of the federal laws as set forth herein or aided and abetted the violations of the federal laws as set forth herein.

338.     Defendants, as principals, received income from the pattern of racketeering activity alleged herein and have used or invested such income, directly or indirectly, in the establishment or operation of the Enterprise in violation of 18 U.S.C. § 1962(a).

339.     As a direct and proximate result, Lead Plaintiffs and the Class Members have been injured in their business or property by the predicate acts which make up the Defendants' patterns of racketeering activity through the Enterprise.

340.     As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of *18 U.S.C.§ 1962(c) and (d)*, Lead Plaintiffs and the Class have been injured in their business and property, by having their Distinctive and

Valuable Marks infringed and diluted, their economic relationships interfered with, their reputation and affiliations misrepresented, and otherwise as alleged more fully herein.

341. Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief

## COUNT TWO: RICO VIOLATIONS
### Violation of 18 U.S.C. § 1962(c)

342. Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

343. This Count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

344. This claim for relief alleges that Defendants have violated *18 U.S.C. §1962(c)* by conducting, or participating directly or indirectly in the conduct of the Enterprise's affairs through a pattern of racketeering.

345. The acts set forth herein constitute a pattern of racketeering activity pursuant to *18 U.S.C. § 1961(5)*.

346. Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purposes, as set forth herein.

347. Pursuant to and in furtherance of their Deceptive Domain Scheme, Defendants committed multiple related acts of racketeering and activity, as described herein.

348. As a direct and proximate result, Lead Plaintiffs and the Class Members have

been injured in their business or property by the predicate acts which make up the Defendants' patterns of racketeering activity through the Enterprise.

349.     As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of *18 U.S.C.§ 1962(d)*, Lead Plaintiffs and the Class have been injured in their business and property, by having their Distinctive and Valuable Marks infringed and diluted, their economic relationships interfered with, their reputation and affiliations misrepresented, and otherwise as alleged more fully herein.

350.     Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT THREE:  RICO VIOLATIONS
### Violation of 18 U.S.C. § 1962(d)

351.     Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

352.     This Count is brought by Lead Plaintiffs in their individual and representative capacities, against all Defendants.

353.     This claim for relief arises under *18 U.S.C. §1962(d)*, which makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

354.     Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common Deceptive Domain Scheme and conspiracy.

355.     Each Defendant and members of the conspiracy, with knowledge and intent,

agreed to the overall objective of the conspiracy, agreed to commit acts of unfair competition, false advertising, dilution, Distinctive and Valuable Mark infringement, and other such illegal acts as contained herein to obtain unfair enrichment and benefit at the expense of Lead Plaintiffs and the Class, and Defendants actually committed such acts.

356. For the Deceptive Domain Scheme described above to be successful, each Defendant and other members of the conspiracy had to agree to further the conspiracy.

357. Defendants' conspiracy to damage Lead Plaintiffs and the Class through the Deceptive Domain Scheme described above violates *18 U.S.C. §1962(d)*.

358. Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, including numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of *18 U.S.C. §1962(c)*.

359. Each of the Defendants intended to further the endeavors of the RICO Enterprise and adopted the goals of the RICO Enterprise that fraudulently used the mail or wire to commit the Deceptive Domain Scheme and related illegal activities alleged herein.

360. Each of the Defendants received income, directly or indirectly, as a principal as defined by 18 U.S.C §2, from a pattern of racketeering activity and have used or invested such income in the establishment or operation of the RICO Enterprise in violation of 18 U.S.C. §1962(a).

361. As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of *18 U.S.C.§ 1962(d)*, Lead Plaintiffs and the Class

have been injured in their business and property, by having their Distinctive and Valuable Marks infringed and diluted, their economic relationships interfered with, their reputation and affiliations misrepresented, and otherwise as alleged more fully herein.

362. Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT FOUR: CYBERSQUATTING
### Violation of 15 U.S.C. § 1125(d)

363. Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

364. This Count is brought by Lead Plaintiffs, in their individual and representative capacities, against all Defendants.

365. Defendants registered, trafficked in, or used the infringing Deceptive Domains for commercial gain.

366. The Lead Plaintiffs' Distinctive and Valuable Marks and the Distinctive and Valuable Marks of the Class are distinctive, famous, venerable, valuable, and or federally registered at the USPTO at the time Defendants registered and used the infringing Deceptive Domains.

367. The infringing Deceptive Domains are identical or confusingly similar to the Lead Plaintiffs' Distinctive and Valuable Marks and the Distinctive and Valuable Marks of the Class.

368. Defendants registered, trafficked in, or used the infringing Deceptive Domains in bad faith and with the intent to profit from the goodwill long established by Lead Plaintiffs in

their Distinctive and Valuable Marks and the Distinctive and Valuable Marks of the Class.

369.    Defendants do not have any intellectual property rights or any other rights in the Lead Plaintiffs' Distinctive and Valuable Marks or the Distinctive and Valuable Marks of the Class.

370.    None of the infringing Deceptive Domains consist of the legal name of the Defendants, or a name that is otherwise commonly used to identify the Defendants.

371.    None of the Defendants have made any prior use of any of the infringing Deceptive Domains in connection with the *bona fide* offering of any goods or services.

372.    None of the Defendants have made any bona fide fair use of the Lead Plaintiffs' Distinctive and Valuable Marks or the Distinctive and Valuable Marks of the Class on a website accessible under any of the infringing Deceptive Domains.

373.    Defendants registered, used, and/or trafficked in the infringing Deceptive Domains to divert consumers attempting to reach Lead Plaintiffs' and the Class' websites to websites accessible under the infringing Deceptive Domains for Defendants' commercial gain.

374.    Defendants registered and used the infringing Deceptive Domains to divert consumers from Lead Plaintiffs' and the Class' websites to websites accessible from the infringing Deceptive Domains.  Defendants thereby create a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Deceptive Domain websites.

375.    Defendants offered to transfer, sell, or otherwise assign the infringing Deceptive Domains for financial gain without having used, or having an intent to use, the infringing Deceptive Domains in the bona fide offering of any goods or services.

376. Defendants intentionally provided material and misleading false contact information for some of the infringing Deceptive Domains.

377. Defendants have registered multiple Deceptive Domains which Defendants knew were identical or confusingly similar to the protected and Distinctive and Valuable Marks of Lead Plaintiffs and the Class that were distinctive at the time of the registration and continue to be distinctive, to the confusingly similar infringing Deceptive Domains.

378. Defendants' registration, trafficking in, or use of the infringing Deceptive Domains constitutes cybersquatting in violation of *15 U.S.C. § 1125(d)*, entitling Lead Plaintiffs and the Class to relief.

379. By reason of Defendants' acts alleged herein, Lead Plaintiffs' and the Class' remedy at law is not adequate to compensate them for the injuries inflicted by Defendants. Accordingly, Lead Plaintiffs and the Class are entitled to preliminary and permanent injunctive relief pursuant to *15 U.S.C. § 1116.*

380. By reason of Defendants' acts alleged herein, Lead Plaintiffs and the Class are entitled to recover Defendants' profits, actual damages and the costs of the action, or statutory damages under *15 U.S.C. § 1117*, on election by Lead Plaintiffs and the Class, in an amount of One Hundred Thousand Dollars ($100,000) per Deceptive Domain name infringement. Further, this is an exceptional case making Lead Plaintiffs eligible for an award of attorneys' fees under *15 U.S.C. § 1117.*

381. Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT FIVE: TRADEMARK INFRINGEMENT
### Violation of 15 U.S.C. § 1114(1)

382.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

383.    This Count is brought by Lead Plaintiffs in their individual and representative capacities, against all Defendants.

384.    Defendants' use in commerce of the Lead Plaintiffs' and the Class' Distinctive and Valuable Marks and the infringing Deceptive Domains and the websites and popup and popunder advertisements displayed at the infringing Deceptive Domains, is likely to cause confusion, mistake, and deception.

385.    Defendants' use of the Lead Plaintiffs' and the Class' Distinctive and Valuable Marks and the infringing Deceptive Domains is likely to cause initial interest confusion among the general public.

386.    Defendants knowingly provided material false contact information in registering and maintaining the infringing Deceptive Domains.

387.    The above-described acts of Defendants constitute trademark infringement in violation of *15 U.S.C. § 1114(1)*, entitling Lead Plaintiffs to relief.

388.    Defendants have unfairly profited from the infringing actions alleged herein.

389.    By reason of Defendants' acts, Lead Plaintiffs and the Class have suffered damage to the goodwill associated with the Lead Plaintiffs and Class' Distinctive and Valuable Marks.

390.    Defendants' activities have irreparably harmed and, if not enjoined, will continue

to irreparably harm Lead Plaintiffs and the Class and their long-used Distinctive and Valuable Marks.

391.     Defendants' activities have irreparably harmed, and if not enjoined, will continue to irreparably harm, the general public.  The general public has an interest in being free from confusion, mistake, and deception.

392.     By reason of Defendants' acts, Lead Plaintiffs' and the Class' remedy at law is not adequate to compensate them for the injuries inflicted by Defendants.  Accordingly, Lead Plaintiffs and the Class are entitled to preliminary and permanent injunctive relief pursuant to *15 U.S.C. §1116.*

393.     By reason of Defendants' willful acts, Lead Plaintiffs and the Class are entitled to damages, and that those damages be trebled under *15 U.S.C. § 1117.*

394.     This is an exceptional case, making Lead Plaintiffs and the Class eligible for an award of attorneys' fees under *15 U.S .C. § 1117.*

395.     Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

**COUNT SIX:  FALSE DESIGNATION OF ORIGIN**
**Violation of 15 U.S.C. § 1125(a)**

396.     Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

397.     This Count is brought by Lead Plaintiffs, in their individual and representative capacities, against all Defendants.

398. Defendants' use in commerce of the Distinctive and Valuable Marks and the infringing Deceptive Domains, as alleged herein.

399. The infringing Deceptive Domains are likely to cause confusion, or to cause mistake, or to deceive the relevant public that the Deceptive Domains and the websites and pop up and pop under advertisements displayed at the Deceptive Domains are authorized, sponsored or approved by, or are affiliated with, Lead Plaintiffs or with members of the Class.

400. Defendants' use of the confusingly similar and infringing Deceptive Domains is likely to cause confusion among the general public.

401. Defendants knowingly provided material false contact information in registering, using, trafficking in, and/or maintaining the infringing Deceptive Domains.

402. The above-described acts of Defendants constitute trademark infringement of Lead Plaintiffs' and the Class' Distinctive and Valuable Marks and false designation of origin in violation of *15 U.S.C. § 1125(a)*, entitling Lead Plaintiffs and the Class to relief.

403. Defendants have unfairly profited from the actions alleged herein.

404. By reason of Defendants' acts alleged herein, Lead Plaintiffs and the Class have suffered damage to the goodwill associated with their Distinctive and Valuable Marks.

405. Defendants' activities have irreparably harmed and, if not enjoined, will continue to irreparably harm Lead Plaintiffs and the Class, and their long-used Distinctive and Valuable Marks.

406. Defendants' activities have irreparably harmed, and if not enjoined, will continue to irreparably harm the general public, who has an interest in being free from confusion, mistake,

and deception.

407. By reason of Defendants' acts alleged herein, Lead Plaintiffs' and the Class' remedy law is not adequate to compensate them for the injuries inflicted by Defendants. Accordingly, Lead Plaintiffs and the Class are entitled to preliminary and permanent injunctive relief pursuant to *15 U.S.C. § 1116.*

408. By reason of Defendants' willful acts, Lead Plaintiffs and the Class are entitled to damages, and those damages should be trebled under *15 U.S .C. § 1117.*

409. This is an exceptional case making Lead Plaintiffs and the Class eligible for an award of attorneys' fees under *15 U.S.C. § 1117.*

410. Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT SEVEN: DILUTION
### Violation of 15 U.S.C. § 1125(c)

411. Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

412. This Count is brought by Lead Plaintiffs in their individual and representative capacities, against all Defendants.

413. Lead Plaintiffs and the other members of the Class own Distinctive and Valuable Marks use in connection with their commercial activities and which are contained as domain names within the URLs they use in Internet commerce. At the time that the Lead Plaintiffs and the members of the Class registered their domain names, the Distinctive and Valuable Marks

were distinctive, protected/protectible, and/or famous.

414.    Lead Plaintiffs' and the Class' Distinctive and Valuable Marks are valuable and protected marks under *15 U.S.C. § 1125(c)*, and were so before Defendants' infringement of the Distinctive and Valuable Marks by the use of the infringing Deceptive Domains in commerce, based on, among other things, the inherent distinctiveness and federal registration of the Distinctive and Valuable Marks and the extensive, and exclusive nationwide use, advertising, promotion, and recognition of the Distinctive and Valuable Marks.

415.    Defendants' infringement of the Distinctive and Valuable Marks (and/or confusingly similar marks) and use of the infringing Deceptive Domains in commerce is likely to cause dilution by blurring or dilution by tarnishment of the Lead Plaintiffs' and Class' Distinctive and Valuable Marks.

416.    Defendants knowingly provided material false contact information in registering and maintaining the infringing Deceptive Domains.

417.    The above-described acts of Defendants constitute dilution by blurring and dilution by tarnishment in violation of *15 US.C. § 1125(c)*, entitling Lead Plaintiffs and the Class to relief.

418.    Defendants have unfairly profited from their unlawful actions alleged herein.

419.    By reason of Defendants' acts, Lead Plaintiffs and the Class have suffered damage to the goodwill associated with their Distinctive and Valuable Marks and have suffered irreparable harm.

420.    By reason of Defendants' acts, Lead Plaintiffs' and the Class' remedy at law is not

adequate to compensate them for the injuries inflicted by Defendants. Accordingly, Lead Plaintiffs and the Class are entitled to preliminary and permanent injunctive relief pursuant to *15 US.C. § 1116*.

421. By reason of Defendants' willful acts, Lead Plaintiffs and the Class are entitled to damages, and those damages should be trebled under *15 U.S.C. § 1117*.

422. This is an exceptional case-making Lead Plaintiffs and the Class eligible for an award of attorneys' fees under *15 US.C. § 1117*.

423. Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT EIGHT: FOR DECLARATORY JUDGMENT
## ON BEHALF OF THE CLASS

424. Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

425. This Count is brought by both Lead Plaintiffs individually, and in their representative capacity on behalf of the Class, against all Defendants.

426. Lead Plaintiffs and the Class Members are entitled to declaratory judgment that, by the acts alleged herein, Defendants have violated and continue to violate, Section 43(a) of the Lanham Act, *15 U.S.C. § 1051 et seq*.; the Anticybersquatting Consumer Protection Act, *15 U.S.C. § 1125(d)*; the RICO Statute, *18 U.S.C. § 1962 (a), (c)* and *(d)*; and other federal and state laws as set forth herein, and have been, and continue to be, unjustly enriched all to the detriment of Lead Plaintiffs and the Class.

427. Pursuant to *28 U.S.C. §§ 2201-2202*, this Court is empowered to, and should,

declare that Defendants' activities have violated the federal and state statutory and/or common laws set forth above.

428.    Such a declaration would serve a useful purpose by terminating and affording relief from uncertainty, insecurity and controversy that has been created as a result of Defendants' Deceptive Domain Scheme and other illegal actions as alleged herein.

429.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT NINE:  COMMON LAW TRADEMARK VIOLATION

430.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

431.    This count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

432.    Each and every state recognizes a cause of action for breach of common law trademark rights.

433.    Lead Plaintiffs and the Class have protected and/or protectible common law trademark rights in their Distinctive and Valuable Marks.

434.    Lead Plaintiffs and the Class utilize their Distinctive and Valuable Marks in the course of commerce and in conjunction with their legitimate business operations.

435.    Defendants' Deceptive Domain Scheme and unlawful conduct, as alleged herein, infringes, dilutes, interferes with and otherwise harms Lead Plaintiffs' and the Class Members'

common law trademark rights in their Distinctive and Valuable Marks.

436. Defendants' common law trademark violations have directly and proximately caused injury and damage and continue to cause injury and damage to Lead Plaintiffs and to the Class by, among other things, causing them to lose control of their business reputation, causing confusion, diverting customers and sales, and otherwise causing significant commercial loss.

437. Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT TEN:  CONTRIBUTORY TRADEMARK INFRINGEMENT

438. Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

439. This Count is brought by Lead Plaintiffs, individually and in their representative capacity against all Defendants.

440. Contributory infringement occurs when a defendant either intentionally induces a third party to infringe the person's mark, or supplies a service or product to a third party with actual or constructive knowledge that the service or product is being used to infringe the person's mark.

441. Defendants have actual knowledge, or have reason to know, of the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein.

442. Defendants supply the illegal revenue-generating services, mechanisms, technology and programs necessary to engage in the Deceptive Domain Scheme, through which the Defendants and third parties infringe the Distinctive and Valuable Marks of Lead Plaintiffs

and the Class.

443.     Defendants knowingly conspired to engage in the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein.

444.     Defendants, on an ongoing basis, knowingly and voluntarily continue to engage in the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein, in order to obtain revenue and profit, and commercial gain, despite knowledge that their activities are in direct violation of applicable state and federal law.

445.     Defendants induce, cause, and/or materially contribute to the Deceptive Domain Scheme and other unlawful conduct alleged herein.

446.     Statements or actions by Defendants directed to promoting and controlling the Deceptive Domain Scheme and other unlawful conduct alleged herein, include, but are not limited to the following:

a.     Defendant Google states that it monitors the domains and utilizes tools to maximize placement of "pay-per-click/cost-per-click" advertising on the Deceptive Domains based on the meaning of the domain name and other language and semantics programs;

b.     Defendant Google creates, designs, maintains, monitors, changes, and otherwise controls the HTML web page associated with each Deceptive Domain in Google's advertising network;

c.     Defendant Google controls which advertisements appear on each of the Deceptive Domain's HTML web pages;

d.     Defendant Google generates substantial revenue from Deceptive Domains that show Google advertising;

e.     Defendant Google collects the advertising revenue from its advertisers;

f.     Defendant Google disperses the revenue generated from the Deceptive Domains;

g.      Defendant Google pays Parking Companies and domain name registrants for the licenses to use the Deceptive Domains;

h.      Defendant Google actively seeks, solicits, and promotes advertising for placement on the Deceptive Domains;

i.      Defendant Google controls and directs the Internet traffic from the Deceptive Domains through the Defendant Google advertising system through acts of cybersquatting, typosquatting, cyberpiracy, and as otherwise alleged herein;

j.      Defendant Google maintains records of each domain showing Defendant Google advertising and provides reports specific to each such domain; and

k.      Defendant Google pays each of it partners based on how much each Deceptive Domain generates in advertising revenue.

447.    All other Defendants participate with Defendant Google in one or more of the above-referenced illegal actions in furtherance of the Deceptive Domain Scheme.

448.    Defendants' actions as alleged herein constitute Contributory Infringement.

449.    Defendants' Contributory Trademark Infringement has directly and proximately injured and damaged and continues to injure and damage Lead Plaintiffs and the Class by, among other things, causing them to lose control of their business reputation, causing confusion, diverting customers and sales, and otherwise causing significant commercial loss.

450.    Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

**COUNT ELEVEN:  VICARIOUS TRADEMARK INFRINGEMENT**

451.    Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

452. This Count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

453. Vicarious infringement occurs when a defendant controls, directs, facilitates, encourages, promotes, allows, enables, or otherwise permits a third party to infringe a mark, and receives the benefit therefrom.

454. Defendants facilitate, encourage, promote, allow, enable and otherwise permit direct infringements, and the other illegal conduct alleged herein, in the course of their businesses.

455. Defendants maintain the right, power and ability to control, edit, alter, modify and maintain the software used to effectuate the infringements and in the Deceptive Domain Scheme.

456. Defendants fail to exercise their policing obligations to the fullest extent, fail to utilize and implement available filtering technologies, and otherwise have engaged in a pattern of direct and intentional misconduct, or willful blindness of their actions related to the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein.

457. Defendants control and participate in the supply of the illegal revenue-generating services, mechanisms, technology and programs necessary to engage in the Deceptive Domain Scheme, through which the Defendants and third parties infringe the Distinctive and Valuable Marks of Lead Plaintiffs and the Class.

458. Defendants knowingly conspired to engage in the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein. Defendants, on an ongoing basis, knowingly and voluntarily continue to engage in the Deceptive Domain Scheme, infringing activities, and other unlawful conduct alleged herein, in order to obtain revenue and profit, and

commercial gain, despite knowledge that their activities are in direct violation of applicable state and federal law.

459.     Defendants have the primary financial interest in the exploitation of Lead Plaintiffs' and the Class Members' Distinctive and Valuable Marks.  Defendants are the primary beneficiaries of the infringements and illegal conduct alleged herein.

460.     Defendants induce, cause, and/or vicariously engage in the Deceptive Domain Scheme and other unlawful conduct, as alleged more fully herein above

461.     Defendants' actions as alleged herein constitute vicarious infringement.

462.     Defendants' vicarious infringements have directly and proximately injured and damaged and continues to injure and damage Lead Plaintiffs and the Class by, among other things, causing them to lose control of their business reputation, causing confusion, diverting customers and sales, and otherwise causing significant commercial loss.

463.     Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

**COUNT TWELVE:**
**INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

464.     Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

465.     This Count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

466.     A current and prospective economic relationship exists between the Lead

Plaintiffs/Class Members and third party Internet users/consumers and that such relationship, if not interfered with, provides the probability and likelihood of future economic benefit to the Lead Plaintiffs and the Class Members.

467. The entire Internet advertising market and business is premised on the buying power of the Internet users.

468. Defendants know and understand the existence of the relationship between the Lead Plaintiffs/Class Members and third party Internet consumers that is directly established, premised and created by the Distinctive and Valuable Marks of the Lead Plaintiffs and the Class.

469. Defendants intentionally register, use and traffic in Deceptive Domains with the direct intent of luring and diverting Internet user traffic away from Lead Plaintiffs/Class Members and redirecting said Internet consumer traffic for commercial gain to Defendants.

470. The actions of Defendants are intended to, and do disrupt, misappropriate, divert, and otherwise interfere with Lead Plaintiffs'/Class Members' current and prospective economic relationships with Internet users. By diverting Internet consumer traffic away from Lead Plaintiffs and the Class Members, Defendants cause actual disruption of the relationship between the Lead Plaintiffs/Class Members and Internet users.

471. Defendants' interference and bad actions, as alleged herein, directly and proximately caused injury and damage to Lead Plaintiffs and the Class Members.

472. Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT THIRTEEN:
## UNJUST ENRICHMENT

473.     Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

474.     This Count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

475.     This Count is brought in the alternative to any contract and statutory claims.

476.     By the Deceptive Domain Scheme and the conduct as alleged in paragraphs 1-11, 152-211, and 260, Defendants unjustly derived a benefit from Lead Plaintiffs and the Class in the form of higher payments, increased advertising click revenue, increased market share, and other economic and related benefits and commercial gain, to which Defendants had no right or entitlement.  The benefits to Defendants were conferred as a result of Defendants' deception, misconduct, and material misrepresentations involving the Distinctive and Valuable Marks of Lead Plaintiffs and the Class.

477.     It would be unjust to allow the Defendants to retain the said benefit by virtue of their conduct as alleged in paragraphs 1-11, 152-211, and 260, thereby enriching them, without compensating the Lead Plaintiffs and the Class.

478.     Accordingly, Lead Plaintiffs and the Class are entitled to monetary damages, legal relief, equitable relief and/or otherwise more fully described in the Prayer for Relief.

## COUNT FOURTEEN:
## CIVIL CONSPIRACY

479.     Lead Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully

set forth herein.

480.     This Count is brought by Lead Plaintiffs in their individual and representative capacities against all Defendants.

481.     As set forth in paragraphs 1-11, 152-211, and 260, each of Defendants knowingly and voluntarily agreed, combined and conspired, as set forth herein, to engage in the Deceptive Domain Scheme and to transact in money derived from said scheme.

482.     Each Defendant committed overt unlawful direct and indirect acts, aided and abetted, assisted, planned, encouraged and otherwise facilitated acts and omissions for the knowing and intentional purpose of furthering the conspiracy, as alleged herein.

483.     Each Defendant did in fact knowingly and voluntarily participate in the conspiracy, concerted action, performance of acts in furtherance of the Deceptive Domain Scheme, transacted in money derived from said scheme, and otherwise knowingly took action to effectuate the purposes of their conspiracy.

484.     Defendants' conspiracy, and actions as alleged herein, have directly and proximately cause injury and damage to Lead Plaintiffs and the Class Members.

## XII.    <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Lead Plaintiffs, individually and on behalf of the Class, respectfully request judgment as follows:

1.     The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

2.     The Court certify the Class as follows:

Any and all individuals and/or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' Co-conspirators) domiciled within the United States that own or are a licensee of a "Distinctive or Valuable Mark" that has been infringed, diluted, cybersquatted, typosquatted, and/or otherwise improperly used by one or more of the Defendants, as part of the Deceptive Domain Scheme alleged herein, during the period January 1, 2002 through the present.

3.      The Court adjudge, appropriate and appoint Lead Plaintiffs as Class Representatives for the Class;

4.      The Court adjudge, appropriate and appoint Lead Plaintiffs' Counsel of record as Class Counsel for the Class;

5.      The Court adjudge and decree that Defendants violated the rights of Lead Plaintiffs and the Class in their Distinctive and Valuable Marks in violation of *15 U.S.C. § 1125(a), (c)* and *(d)*;

6.      The Court adjudge and decree that Defendants infringed the rights of Lead Plaintiffs and the Class in their Distinctive and Valuable Marks in violation of *15 U.S.C. § 1114(1);*

7.      The Court adjudge and decree that Defendants' conduct alleged herein violates Sections 1962(a), (c) and (d) of RICO and breached Defendants' contractual obligation of good faith and fair dealing;

8.      The Court adjudge and decree that Defendants' conduct alleged herein infringed the rights of Lead Plaintiffs and the Class in their Distinctive and Valuable Marks in violation of the common law;

9. The Court adjudge and decree that Defendants be ordered to transfer every Deceptive Domain to the rightful owner of the Distinctive and Valuable Marks;

10. The Court adjudge and decree that Defendants, their agents, representatives, employees, assigns and suppliers, and all persons acting in concert or privity with them, be preliminarily and permanently enjoined from the following activities:

    a. Registering, using, or trafficking in any manner, in any domain name that incorporates, in whole or in part, the Distinctive and Valuable Marks or any name, mark or designation confusingly similar thereto ("Deceptive Domains");

    b. Using any of the Lead Plaintiffs' and Class' Distinctive and Valuable Marks, or any other name, mark, designation or depiction in a manner that is likely to cause confusion ("Deceptive Domains") regarding whether Defendants are affiliated or associated with or sponsored by Lead Plaintiffs and/or the Class;

    c. Registering any domain name using an automated process that is intended to create (or which could result in the creation of) Deceptive Domains;

    d. Registering or maintaining any domain name without complete and accurate contact information, including a Defendant's full legal name as the registrant; and

    e. Engaging in the Distinctive and Valuable Mark infringement, Distinctive and Valuable Mark dilution, unfair competition, false designation of origin, passing off, false advertising, against Lead Plaintiffs and/or any Class Member;

    f. Engaging in typosquatting;

    g. Engaging in cybersquatting;

    h. Engaging in cyberpiracy;

    i. Engaging in Domain Tasting based on the Distinctive and Valuable Marks;

    j. Engaging in the misuse of semantics, statistical analysis, filtering, and other technologies;

k. Engaging in or misappropriation of Lead Plaintiffs' and/or any of the Class Members' Distinctive and Valuable Mark rights;

l. Engaging in any other act, practice, or conduct set forth in the Deceptive Domain Scheme and unlawful acts complained of herein; and

m. Assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to above.

11. The Court adjudge and decree that Defendants be ordered to engage in corrective advertising to the extent necessary to correct any consumer confusion, misperceptions or dilution resulting from Defendants' Deceptive Domain Scheme and the unlawful acts complained of above;

12. The Court adjudge and decree that Defendants be ordered to account to Lead Plaintiffs and the Class for, and disgorge, all profits they have derived by reason of the Deceptive Domain Scheme and unlawful acts complained of herein;

13. The Court adjudge and decree that Defendants be ordered to pay damages, punitive damages, and/or treble damages under applicable statutes;

14. The Court adjudge and decree that Defendants, jointly and severally, be ordered to pay statutory damages under *15 U.S.C. § 1117(d)*, on election by Lead Plaintiffs and the Class, in an amount of One Hundred Thousand Dollars ($100,000) per domain name infringement;

15. The Court adjudge and decree that Defendants be ordered to pay Lead Plaintiffs' reasonable attorney fees, prejudgment interest, and costs of this action;

16. The Court adjudge and decree that Defendants be ordered to file with the Court and serve upon Lead Plaintiffs a written report under oath setting forth in detail the manner and

form in which Defendants have complied with the injunction and judgment within thirty (30) days after the service of the injunction and judgment upon Defendants; and

17. That Lead Plaintiffs and the Class be awarded any and other such relief as may be appropriate.

## XIII. <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: <u>April 9, 2008</u>        FOOTE, MEYERS, MIELKE & FLOWERS, LLC


/s/Robert M. Foote
Robert Foote, Esq. (#03214325)
Stephen W. Fung, Esq. (#06289522)
Mark A. Bulgarelli, Esq. (#06284703)
Foote, Meyers, Mielke & Flowers, LLC
28 North First St., Suite 2
Geneva, IL 60134
Tel. No.: (630) 232-6333

Kathleen C. Chavez, Esq. (#6255735)
Chavez Law Firm, P.C.
28 North First St., Suite 2
Geneva, IL 60134

William J. Harte, Esq.
Dana Pesha, Esq.
William J. Harte, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL 60602

Benjamin G. Edelman, Esq.
Law Office of Benjamin Edelman
27a Linnaean Street
Cambridge, MA 02138
Tel. No.: (617) 359-3360

Bryan L Clobes, Esq.
Cafferty Faucher, LLP
1717 Arch Street
Suite 3610
Philadelphia, PA 19103

Nyran Rose Pearson, Esq.
Dominic J. Rizzi, Esq.
Cafferty Faucher LLP
30 North LaSalle Street
Suite 3200
Chicago, IL 60602

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. | § | |
| SANFILIPPO & SONS, INC. | § | |
| BLITZ REALTYGROUP, INC. | § | |
| and VINCENT E."BO" JACSKON | § | |
| Individually and on Behalf of All | § | |
| Others Similarly Situated, | § | Civil Action No. 07 CV 3371 |
| | § | |
| Lead Plaintiffs, | § | |
| | § | JUDGE MANNING |
| v. | § | |
| | § | |
| GOOGLE INC., OVERSEE.NET, | § | |
| SEDO LLC, DOTSTER, INC., AKA | § | |
| REVENUEDIRECT.COM | § | |
| INTERNET REIT, INC. d/b/a IREIT, INC.; | § | |
| and JOHN DOES I-X, | § | CLASS ACTION COMPLAINT |
| | § | |
| Defendants. | § | (DEMAND FOR JURY TRIAL) |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 9, 2008, I electronically filed the foregoing document with the clerk of court for the U. S. District Court, Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Brett A. August
baugust@pattishall.com

Michael H. Page
mhp@kvn.com

Mariah Moran
mmoran@stetleranduffy.com
edocket@stetleranduffy.com

Janelle M. Carter

Kenneth P. Held
kheld@velaw.com

Steven Borgman
sborgman@velaw.com
jwarren@velaw.com
steveborgman@gmail.com
yshumaker@velaw.com

Bradley L. Cohn

jcarter@winston.com
ECF_CH@winston.com

bcohn@pattishall.com

Alison Conlon
conlon@wildmanharrold.com
ecf-filings@wildmanharrold.com
hardt@wildmanharrold.com

Jonathan M. Cyrluk
cyrluk@stetleranduffy.com
edocket@stetleranduffy.com

Joseph Gratz
jgratz@kvn.com

Misty Martin
mmartin@smsm.com

Alexis Payne
aep@pattishall.com

Ronald Rothstein
rrothsstein@winston.com
ECF_CH@winston.com
mconroy@winston.com

Jeffrey Singer
jsinger@smsm.com

Scott R. Wiehle
swiehle@velaw.com

Michael R. Dockterman
dockterman@wildmanharrold.com
ecf-filings@wildmanharrold.com
eckertm@wildmanharrold.com

Joseph Duffy
jduffy@stetleranduffy.com
bdorgan@stetleranduffy.com
edocket@stetleranduffy.com

William J. Harte
wharte@williamharteltd.com
mccarey@williamharteltd.com

Dana Marie Pesha
dpesha@williamharteltd.com
mccarey@williamharteltd.com

Scott Ryan Wiehle
swiehle@velaw.com

I certify that I have served the foregoing document by emailing a copy to the following individuals:

Steven Atlee
SAtlee@winston.com

Vincent V. Carissimi
carissimiv@pepperlaw.com

Joanna J. Cline
clinej@pepperlaw.com

Robert J. Hickok
hickokr@pepperlaw.com

s/Robert M. Foote