**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VULCAN GOLF, LLC, JOHN B. SANFILIPPPO & SONS, INC., BLITZ REALTY GROUP, INC., and VINCENTE E. "BO" JACKSON, | ) Case No. 07 CV 3371 <br> ) <br> ) <br> ) <br> ) The Honorable Blanche M. Manning |
| Plaintiffs, | ) <br> ) |
| v. | ) <br> ) |
| GOOGLE INC., | ) <br> ) |
| Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**GOOGLE'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**REDACTED PUBLIC VERSION**

# TABLE OF CONTENTS

**PAGE(S)**

TABLE OF AUTHORITIES……………………………...……………………………………ii

I.      INTRODUCTION……………………………………………………………...……1

II.     STATEMENT OF FACTS……………………………………………………………..2

        A.     Procedural History………………………………………………………...2

        B.     AdSense for Domains………………………………………………………..3

III.    ARGUMENT………………………………………………………………………...9

        A.     Google does not "register, traffic in, or use" the domain names at issue………...9

               1.     The Anticybersquatting Consumer Protection Act………………………..9

               2.     "Registers, traffics in, or uses" means precisely and narrowly what it says, as every court to consider the question has held………………...........12

               3.     Google's provision of advertising content is not registering, trafficking in, or using domain names………………………………………...…...15

                       a.     Google does not "traffic in" infringing domain names…….……16

                       b.     Google does not "use" infringing domain names………………16

IV.    CONCLUSION……………………………………………………………………..18

CERTIFICATE OF SERVICE………………………………………………………………..20

i

## TABLE OF AUTHORITIES

**CASES:**                                                                **PAGE(S)**

*American Girl, LLC v. Nameview, Inc.*, 381 F. Supp. 876 (E.D. Wis. 2005)…………....10, 11, 13

*Bihari v. Gross*, 119 F, Supp. 2d 309 (S.D.N.Y. 2000)…………………………………………14

*Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002)…………………………………………....13, 14

*Ford Motor Co. v. GreatDomains.com, Inc.*, 177 F. Supp. 2d 635
(E.D. Mich. 2001)……………………………………………………………....12, 13, 14, 16

*Hamptons Locations Inc. v. Rubens*, 2005 WL 2436209 (E.D.N.Y. 2005)…………………13, 14

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648 (N.D. Tex. 2001)…....13

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2d Cir. 2000)……….………10

*Verizon v. Navigation Catalyst Systems,* 568 F. Supp. 2d 1088 (C.D. Cal. 2008)………………14

**STATUTES:**

Anticybersquatting Consumer Protection Act, 15 U.S.C. §1125(d)……………..……1, 11, 12, 13

**OTHER AUTHORITIES**

H.R. Rep. No. 106-412………………………………………………………...…………………13, 15

S. Rep. No. 106-240 (1999)………………………………………………………….…..…10, 13

# I.    INTRODUCTION

Pursuant to this Court's order of June 23, 2009, Defendant Google Inc. hereby moves the Court for an order granting partial summary judgment in Google's favor on Plaintiffs' Fourth Cause of Action (styled "Cybersquatting").  This motion seeks the Court's decision on a question that is not subject to dispute:  whether Google "registers, traffics in, or uses" any of the domain names at issue in this case.  Google plainly does not, and thus cannot be liable under the Anticybersquatting Consumer Protection Act, 15 U.S.C. §1125(d) ("ACPA").  Google does not own or operate any of the websites at issue in this litigation.  It did not register any of them.  It has never bought, sold, rented, licensed, traded, bartered for, or done anything else with regard to any of those websites that could be called "trafficking" by any stretch of the imagination.  Neither does Google "use" any of the domains at issue; all are owned and operated only by third parties.  None of the domains is either registered to or licensed to Google, which the ACPA makes clear is an express prerequisite for "use" of a domain name.

Instead, all Google does is provide advertising content to the entities that *do* either own or operate the websites in question—entities such as the former defendants Oversee, Sedo, Dotster, and iREIT, each of whom has already been dismissed from this lawsuit.  Google no more owns or operates those websites than an advertising agency owns or operates a newspaper in which it places advertisements.

As this Court is aware, this is by no means the only defect in Plaintiffs' far-ranging Complaint.  Plaintiffs' RICO claims have already been dismissed, and class certification has been denied.  There are myriad other problems with Plaintiffs' ACPA claims (chief among them being an inability to demonstrate the requisite bad faith on Google's part, in light of Google's comprehensive trademark protection policies).  Plaintiffs' other claims similarly suffer from multiple, fatal flaws.  But those issues are fact intensive, and less easily disposed of as a matter of law.  Accordingly, in this motion we seek adjudication of a single, simple question which cleanly disposes of Plaintiffs' ACPA claim:  whether Google is a proper defendant to that claim.  The equally simple, indisputable and dispositive answer is "no."

## II.      STATEMENT OF FACTS

### A.      Procedural History

This matter was originally filed in June, 2007 as a putative class action by Vulcan Golf LLC against Google and four entities Vulcan styled "Parking Company Defendants" ("PCDs"): Dotster, Oversee, Sedo, and iREIT.  The 121 page Complaint alleged multiple causes of action for trademark infringement, RICO violations, cybersquatting, and violations of Illinois consumer protection laws.  The Complaint was subsequently amended to add three additional Plaintiffs: Blitz Realty Group, Inc., John B. Sanfilippo and Son Inc., and Vincent "Bo" Jackson.

Subsequent law and motion practice resulted in this Court twice dismissing, the second time with prejudice, the RICO claims, and then denying class certification.  The four PCDs were thereafter dismissed pursuant to settlements, leaving the case in its current posture:  individual trademark, ACPA, and state law consumer claims by the four named Plaintiffs[1] against Google as the sole remaining defendant.

The gravamen of Plaintiffs' complaint is that each of the four PCDs engaged in "cybersquatting" by either registering or operating a series of websites with names alleged to be confusingly similar to Plaintiffs' purported trademarks.  Those websites contained advertisements and search results provided to the PCD by Google, in response to an automated request from the PCD, as part of Google's AdSense for Domains ("AFD") product.  If the user then clicked on one of those advertisements, the payment from the advertiser was shared by Google, the PCD, and the owner of the domain name (which could be, but often was not, the PCD).  Plaintiffs' Complaint alleges that this conduct infringes Plaintiffs' rights.

---

[1] One of the Plaintiffs appears not to exist, although there has been no notice to the Court or to Google concerning its changed status.  Blitz Realty Group, Inc. ceased operations and dissolved on February 27, 2009.  Page Decl. Ex. A-1 (page from the Illinois Secretary of State's website reflecting the dissolution of Blitz Realty).

**B.      AdSense for Domains**

Google created and provides the well-known Google search engine, Google Maps, Google Chrome, Google News, Google Book Search, and literally dozens of other internet-based products, virtually all of which are offered free of charge.  Google's income is derived almost entirely from advertising, and Google is the recognized world leader in developing context-based advertising systems:  i.e., systems which deliver the most relevant advertising results possible to the user, based on input from the user.  The best known example of this is the Sponsored Links displayed alongside Google Search results, which are based on Google's automated, proprietary algorithms that match an advertiser's chosen keywords to the user's chosen search terms.

Google's related AFD product is designed to provide relevant search results and advertisements to website owners, who typically display those results on websites that have been registered but not yet developed.[2]  In the past, typing the URL of such undeveloped domains would result in either an error message or (if the owner had created such a page) a placeholder page saying the site was "under construction" or the like.  AFD allows the website owner to instead display a page containing search results and advertisements relevant to the URL entered by the user, just as Google Search displays results relevant to the search term entered by the user.[3]

Thus, for example, an entrepreneur might register promising website names (such as "bankruptcy.net"), hoping to later resell some of them at a profit.[4]  Similarly, a company might register names for possible future divisions or products, such as a financial services company registering names like nationalcitybank.com.[5]  (In point of fact, this particular domain name is owned by M&I Bank, the largest bank in Wisconsin, and was parked with Sedo.)[6]  Rather than leave a domain name unused, the registrant can instead "park" that name with a company such as

---

[2] Koppula Decl. ¶ 2-3.

[3] *Id.* ¶ 4.

[4] *Id.* ¶ 4.

[5] *See id.* ¶ 14 & Ex. B-1.

[6] *Id.* ¶ 14; *see* http://whois.domaintools.com/nationalcitybank.com.

Sedo.[7]  Under a typical parking arrangement, the registrant continues to own the domain name, but "points" anyone typing that domain name into a browser to a web page hosted by Sedo.[8]

In our example, a user (perhaps seeking sites offering banking services) types nationalcitybank.com into her browser.  The browser forwards that URL to a central Domain Name Server ("DNS").[9]  The registrant has previously parked that domain with Sedo by giving the DNS system an IP address for nationalcitybank.com (such as 205.178.190.53) that points to a server operated by Sedo.[10]  The DNS server looks up the IP address, and directs the user's request to Sedo's server.[11]

When Sedo receives the request, it in turn makes a request to Google for advertising content.[12]  The webpage that the user will eventually receive does not yet exist:  Sedo may have created a portion of it as a form, but the Google-supplied content is not yet there.  Sedo must first make a request for that content via AFD.

Google receives and responds to millions of AFD content requests a day from its AFD customers, sometimes referred to as "AFD partners."[13]  Those customers include companies such as the former Parking Company Defendants.  Google refers to its AFD customers that host domains owned by others as Third Party Hosts, or "3PHs."[14]  Typical AFD partners either host domains registered and owned by others, or domains the AFD partner itself owns, or both.[15]

Each AFD request contains several pieces of information, based upon which Google's systems decide what content to send back to the originator.  ████████████████████
████████████████████████████████████████████ ██ ███████████████

---

[7] Koppula Decl. ¶ 4.

[8] *Id.*

[9] *Id.* ¶ 7.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.* ¶ 3 & 15.

[14] *Id.* ¶ 3.

[15] *Id.*

[16] *Id.* ¶ 8.



[18] *Id.*

[19] *Id.* ¶ 9.

[20] *Id.* ¶ 10.

[21] *Id*. ¶ 9.

[22] *Id.*¶ 13.

[23] *Id.*

[24] *Id.* ¶ 12 & Ex. C (setting forth the protocol by which AFD partners request and receive advertising content from Google in the form of XML).



Once the original user receives the HTML page from the AFD partner, she might or might not click on one of the Sponsored Links she sees.  If she does, the advertiser who placed that ad will be billed a few cents (an amount determined by complex auction-style algorithms), and that revenue will be split between Google and the AFD partner.[29]  The AFD partner, in turn,

---

[25] *Id.*

[26] ████████████████████████████████████████████
████████████████████████████

[27] Koppula Decl. ¶ 17 & Ex. C-1.

[28] *Id.* ¶ 9.

[29] *Id.* ¶ 2.

will presumably share its share of the revenue with the domain registrant. (We say "presumably" because Google is not a party to, or privy to, any contract between the AFD partner and the domain owner.)

Until Google receives a given AFD request, it has no knowledge of what domain names are owned by or parked with any of its partners; it learns that information only as it comes in the AFD request.[30]  In the course of any month, Google receives AFD requests containing millions of unique domain names.[31]  Google does not own or operate any of the domains that receive AFD content:  indeed, Google's AFD partners usually don't own them either.  Google has never registered any of the domain names at issue, and plays no role in the registration of any of those domains.[32]  Google has no role in selecting the names of those domains.  Google does not host any of those domains.  Google is not involved in any transaction regarding ownership or control of those domains in any way.  None of the domain names has ever pointed to an IP address owned or operated by Google.  Google's advertising content is requested by the AFD partner, in the quantity and format specified by the AFD partner.  Google, in short, has had only one relationship with the domains at issue in this case: when requested, Google sent advertising content to the operators of those domains.[33]

Although Google has no role in or control over the selection of any of the tens of millions of domain names that have received AFD content over time, Google nonetheless has implemented a comprehensive trademark protection policy for AFD.[34]  That policy is very simple:  any time any trademark holder asks, Google will place any domain name on its "fail list."  Each time an AFD request is received, Google checks the fail list.[35]  If the domain name

---

[30] *Id.* ¶ 6.

[31] *Id.* ¶ 5.

[32] *Id.* ¶ 6.  A list of all domain names registered to Google appears as Exhibit F to the Declaration of Michael H. Page in Support of Google's Motion for Partial Summary Judgment ("Page Decl.), filed concurrently herewith.

[33] Koppula Decl. ¶ 2-6.

[34] *Id.* ¶ 16.

[35] *Id.*

contained in the AFD request is on the fail list, Google does not return any results to the AFD partner.[36]  Plaintiffs in this case have never availed themselves of Google's trademark policy, despite repeated invitation.[37]  Nonetheless, each time Plaintiffs have identified any domain name they contend they have rights to, Google has promptly added it to the fail list.[38]

Google's contracts with each of the PCDs confirm Google's limited role as a provider of advertising content to the third parties who host parked websites.  We can continue with the example of nationalcitybank.com, which is parked through Sedo.  As is true of each AFD partner, Google's relationship with Sedo is governed by a Google Services Agreement.[39] ██████

████████████████████████████████████████████████████████████
███████████████████████████████████ █████████████████████████
███████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
██████████████████ █████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████ █
████████████████████████████████████████
████████████████████████████████ █████████████████████████
██████████████████████████████████████
████████████████████████████████████████████████
██████

---

[36] *Id.*

[37] Page Decl. ¶ 7.

[38] Page Decl. ¶ 8.

[39] *See* Page Decl. Ex. B.

[40] Page Decl. Ex. B-28 ¶ 3.5(a)(i).

[41] *Id.* at B-3 ¶ 1.1 ████████████████████ & B-23 ¶ 3.1(a) ███████████████████████████

[42] *Id.* at B-20 ¶ 1.1 ██████████████████████

[43] *Id.* at B-34 ¶ 5.2.



## III.    ARGUMENT

**A.    Google does not "register, traffic in, or use" the domain names at issue.**

**1.    The Anticybersquatting Consumer Protection Act**

In 1999, Congress passed the ACPA to address the practice of "cybersquatting."  As the internet grew in popularity, it became increasingly important that companies establish websites, and most companies naturally sought to do so under their own brand names (such as ford.com for Ford, sears.com for Sears, and the like).  The domain registration system, however, was first-come, first-served:  anyone could register, for a nominal fee, any domain name.  A thriving

---

[44] Page Decl. Ex. C (Oversee), Ex. D (iREIT), Ex. E (Dotster).

[45] Dotster no longer parks domains, having sold that division of their business, known as RevenueDirect, to Sedo.  *See* Press Release, *Sedo Acquires RevenueDirect from Dotster*, *at* http://www.sedo.com/links/showhtml.php3?Id=2320&language=us (Feb. 25, 2009).

[46] Page Decl. Ex. E-3 ¶ 5(B).

[47] Page Decl. Ex. E-7 ¶ 1.3.

practice sprang up, wherein speculators would buy up whatever familiar names were available, and then seek to resell them to businesses which had failed to win the race to the registrar.

The unique nature of domain names gave inherent leverage to the first registrant. Multiple parties can register the same trademark ("United" for an airline, a moving company, and healthcare), and multiple stores can display the same name. But domain names are addresses, and there can only be one place to which each one points, just as there can be only one place a particular phone number or mailing address points. If a cybersquatter registered "ford.com," Ford had only two choices: repurchase the domain from the cybersquatter at an extortionate premium, or pick a different and less desirable name.[48]

To combat this practice, Congress enacted the ACPA in November of 1999. The ACPA is a tightly focused statute, establishing specific liability for the practice of buying up domain names and then either reselling them at extortionist rates to persons with legitimate trademark rights to the names, or operating them in competition with the mark holder. *See, e.g., Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 493 (2d Cir. 2000). According to the Senate Report on the bill:

> The purpose of the bill is to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by **prohibiting the bad-faith and abusive registration** of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as ''cybersquatting.''

S. Rep. No. 106-240 (1999) (emphasis added). Thus, Congress's goal was to promote, rather than hamper, a vibrant market in online commerce by placing liability on the shoulders of those who register, own, or operate infringing domain names—not by burdening those who merely provide services to the general internet community. *See, e.g., American Girl, LLC v. Nameview,*

---

[48] The Uniform Dispute Resolution Policy for domain names, which would have permitted Ford to bring an arbitration against a cybersquatter seeking transfer of the domain name, went into effect in December, 1999, shortly after the enactment of the ACPA. *See* Internet Corporation for Assigned Names and Numbers, *Timeline for the Formulation and Implementation of the Uniform Domain-Name Dispute-Resolution Policy, at* http://www.icann.org/en/udrp/udrp-schedule.htm (2002).

*Inc.*, 381 F. Supp. 876, 881 (E.D. Wis. 2005).

The ACPA provides, in relevant part:

§ 1125(d) Cyberpiracy prevention

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that-

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

The ACPA further provides express limitations on the terms "uses" and "traffics in":

[§1125(d)(1)](D) A person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.

[§1125(d)(1)] (E) As used in this paragraph, the term "traffics in" refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration.

The ACPA is not a general-purpose internet trademark statute:  the Lanham Act already serves that purpose.  Rather, it is a narrow addition to the Lanham Act, designed to address a particular harm, and reaching specifically and only those who seek to profit by buying, holding, and reselling domain names consisting of the trademarks of others.

11

2.      **"Registers, traffics in, or uses" means precisely and narrowly what it says, as every court to consider the question has held.**

Since the passage of the ACPA, numerous litigants have sought—as Plaintiffs do here—to expand the reach of the ACPA beyond those who buy and sell domains.  Litigants have sought to include the registration services that assign and administer the domain names, auction sites where the registrants can offer domains for sale, hosting services where allegedly infringing domains are parked, and websites that use allegedly infringing domain names in their text.  The courts have uniformly rejected such efforts, and have uniformly held that the ACPA reaches only those who actually register, operate, offer to sell, or sell infringing domains.

For example, in *Ford Motor Co. v. GreatDomains.com, Inc.*, 177 F. Supp. 2d 635, 645 (E.D. Mich. 2001), Ford brought ACPA claims against a number of individuals who bought and sold Ford-related domain names, as well as GreatDomains.  GreatDomains was an online auction site, where individuals could buy and sell domain names.  GreatDomains would then receive a portion of the sale price as commission, and also provided ancillary services such as appraising domain names and making offers for domains that had not yet been listed for sale.

The court held that GreatDomains did not register the domains itself, and that, because it was not the domain name registrant, it did not use the domain either.  The court thus concentrated on whether GreatDomains' intimate involvement in the auction of the domains constituted "trafficking" in the domain names.  The court concluded it did not:

> The phrase "traffics in" is defined in the ACPA as "refer[ring] to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration."  15 U.S.C. § 1125(d)(1)(E).  The specific terms listed in this definition are susceptible to broad interpretation and, moreover, are merely illustrative. Nonetheless, the concluding catch-all phrase "any other transfer ... or receipt in exchange for consideration" provides the context in which they must be understood. Specifically, the language "any other transfer ... or receipt" clarifies that the defining terms are all ways in which a domain name may be transferred or received. The key words-"transfer" and "receipt"- both denote some level of ownership or control passing between the person transferring and the person receiving. **Thus relying upon the plain meaning of the statute, the court concludes that the phrase "traffics in" contemplates a direct transfer or receipt of ownership interest in a domain**

**name to or from the defendant.**

*Id.* at 644-45 (emphasis added).

In so holding, the court noted that the ACPA's factors for determining bad faith were relevant only to persons actually owning the domain names, and thus that the reach of the statute must be as well:

> The court believes that if Congress had intended to extend the anticybersquatting law to auction, banking, or other similar auxiliary service providers, it would have set forth factors that meaningfully could be applied in determining whether such entities had acted in bad faith.

*Id.* at 645; *see also Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648 (N.D. Tex. 2001) ("none of the conditions and conduct listed would be applicable to a person functioning solely as a registrar or registry of domain names"). As the *GreatDomains* court emphasized, "subjecting ancillary service providers . . . to liability under the statute would significantly hinder the case-by-case analysis intended in 'balanc[ing] the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of others' marks.' S. Rep No. 106-140, at 13; H.R. Rep. No. 106-412, at 10." *GreatDomains* at 645.

Other courts have uniformly read "traffics" as limited to the actual acquisition or transfer of title for consideration. *See*, *e.g.*, *Hamptons Locations Inc. v. Rubens*, 2005 WL 2436209 (E.D.N.Y. 2005) ("traffics" in contemplates "a direct transfer or receipt of ownership interest in a domain name to or from the defendant"); *American Girl, LLC v. Nameview, Inc.*, 381 F. Supp. 876, 881 (E.D. Wis. 2005) (domain name registrar not liable under ACPA for registering allegedly infringing domain). And in a case nearly identical to the now-dismissed claims against the Parking Company Defendants here, the court in *Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002) affirmed that neither Afternic (which operated a domain auction site) nor Dotster (which both served as registrar for and hosted the allegedly infringing domain) could be liable for trafficking in domain names. The Sixth Circuit, rejecting arguments that ancillary services such as auctioning and hosting could constitute "trafficking," agreed that "traffics in" is limited to those who "purchase, sell, or otherwise participate in any transaction involving the 'transfer for

13

consideration' or 'receipt in exchange for consideration' of [the] domain name." *Id.* at 881.

Similarly, courts have uniformly understood that to "use" a domain name means to use it *as a domain name*:  i.e., to operate a domain with that name.   This conclusion flows logically from the express language of the statute, which provides that only the registrant, or one to whom the registrant has licensed the domain name, can "use" the domain name.

Thus, for example, in *Bihari v. Gross*, 119 F, Supp. 2d 309 (S.D.N.Y. 2000), the plaintiff claimed violations of the ACPA as a result of defendant having registered allegedly infringing domain names and by using plaintiff's name as a metatag on defendant's website.  In rejecting the latter claim, the *Bihari* court made clear that use under the ACPA is limited to use *as a domain name*:  "Although no court has expressly stated that the ACPA does not apply to metatags, the plain meaning of the statute and its legislative history make this conclusion apparent." *Id.* at 316 (citation omitted).

Just as with "traffics," courts are clear that ancillary services such as hosting, auctioning, or otherwise supporting the website owner does not constitute "use" of the domain name.  Thus in *Bird v. Parsons*, the court lost no time in rejecting claims of use against Dotster and Internic, holding that such claims could be stated only against the registrant, not the parking company. *Compare Verizon v. Navigation Catalyst Systems,* 568 F. Supp. 2d 1088 (C.D. Cal. 2008) (operating website reserved for registration by defendant itself is use by defendant).  And in *GreatDomains*, the court rejected claims that GreatDomains "used" the domain names it auctioned for the individual defendants, limiting "use" to the actual registrants.

Other courts also have declined to extend "use" beyond the actual registrant and operator of the domain to others.  In *Hamptons Locations*, 2005 WL 2436209 at 8, a competitor brought suit against a husband and wife architecture company, and their son, alleging that they had registered and operated a confusingly similar domain.  The court found sufficient allegations that the son had in fact registered the domain, but dismissed ACPA claims against the parents, on the ground that, although the domain was being used in connection with their business, they had not registered the domain, and their son had not licensed it to them.

The legislative history of the ACPA bolsters this conclusion.  While the text of the statute does not define the term "authorized licensee," the House of Representatives Report on the bill states: "Paragraph 1(D) further clarifies that a use of a domain name shall be limited to a use of the domain name by the registrant or his or her authorized licensee. This provision limits the right to use the domain name as a means to infringe on another's other bona fide trademark rights."  H. R. Rep. No. 106-412 at 13-14 (1999), *available at* http://frwebgate.access.gpo.gov/cgibin/getdoc.cgi?dbname=106_cong_reports&docid=f:hr412.106.pdf.  This legislative history shows that an "authorized licensee" must be one who is licensed to use a domain name "as a means to infringe on another's . . . bona fide trademark rights."

By its plain terms, the ACPA limits "use" to the registrant or one who licenses the domain name from the registrant.  In contrast to the caselaw discussed above, we are aware of no reported case extending "use" to apply to anyone—host, registrar, auctioneer, advertiser, or anyone else—other than the actual registrant.

### 3.  Google's provision of advertising content is not registering, trafficking in, or using domain names.

The undisputed facts in this case compel a finding that Google does not register, traffic in, or use any of the domain names at issue in this case, and thus cannot be liable under the ACPA.  There is no allegation that Google registered any allegedly infringing domain names, and Google has not done so.[49]  Rather, Plaintiffs allegations are that others—either the Parking Company Defendants or their customers—register and operate the domains at issue.  *See* Third Amended Complaint at ¶¶ 130-137.  Plaintiffs' ACPA claims must thus rest (if at all) on a claim that Google either "traffics in" or "uses" the domains at issue.

It is difficult to discern from Plaintiffs' prolix complaint which theory Plaintiffs urge, as the Complaint contains no allegation that Google was involved in any way with the acquisition or transfer of any domain names, and no allegation that Google itself operated or hosted any of

---

[49] *See* Page Decl. Ex. F (list of all domains registered by Google).

the domains.  Instead, Plaintiffs allege a laundry list of ancillary services allegedly provided by
Google, including operating the Google system, selecting advertising to be placed on websites,
collecting advertising revenue, deciding who can do business with Google, and the like.  *See*
Third Amended Complaint at ¶¶ 7 a-j.  None of these allegations come anywhere near a claim
that Google either traffics in or uses the allegedly infringing domain names, because as an
undisputed factual matter Google does not.

**a.    Google does not "traffic in" infringing domain names.**

Google has no involvement whatsoever in the selection, registration, acquisition, or sale
of any of the domains.[50]  Google merely provides advertising content to domains owned and
operated by others.  Because "the phrase 'traffics in' contemplates a direct transfer or receipt of
ownership interest in a domain name to or from the defendant," *GreatDomains*, 177 F. Supp. 2d
at 645, Google's provision of advertising content cannot constitute trafficking in domain names.
Indeed, Google's relationship to the domain names is much more attenuated than that of the
defendant in *GreatDomains*.  Where GreatDomains was not a trafficker even where its auction
service directly facilitated the buying and selling of domain names, Google plays no role
whatsoever in any transfer of domain name ownership.

**b.    Google does not "use" infringing domain names.**

Neither can Google be held to "use" any of the domains at issue:  as set forth above, to
use a domain name under the ACPA means to operate a website at that domain name.  And as
the undisputed evidence shows, Google has never operated any of the websites at issue in this
case.

Google does, of course, use a number of domain names, chief among them "google.com."
Google also uses other domain names, such as "blogger.com" for the Blogger blog hosting

---

[50] Koppula Decl. ¶ 6.

16

service and "youtube.com" for the YouTube video hosting service.  But it is absurd to say that Google "uses" the domain of every web site on which a Google-provided advertisement appears.  Although Google AdSense ads appear on nytimes.com, Google does not "use" the domain name nytimes.com; the New York Times does.  Although Google AdSense ads appear on chicagotribune.com, Google does not "use" the domain name chicagotribune.com; the Chicago Tribune does.  By the same token, Google does not "use" the domain name nationalcitybank.com, even though the AFD partner who operates that website has, like the New York Times and the Chicago Tribune, chosen to put Google AdSense ads on its site.

Congress could not have been clearer in its intent to narrowly circumscribe the term "use," expressly limiting "use" to the registrant of the domain name or its licensee.  The extension to licensees is both reasonable and necessary, as otherwise one person could register a domain, and then turn it over by license to be operated by another, thus leaving the actual operator of the website outside of the statute's reach.  It appears, however, that Plaintiffs will ask this Court to expand the concept of "licensing" a domain name beyond all recognition.  Plaintiffs' complaint is replete with amorphous references to "licenses" to Google, coupled with quotations from an unrelated license from a nonparty to a nonparty.  *See* Third Amended Complaint ¶ 311.

But the undisputed facts show that Google is not the licensee of any of the domain names at issue here.  Quite to the contrary: ███████████████████████████
███████████████████████████████████████████████████████
███████████████████████████ █████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████

---

[51] *See* Page Decl. Ex. B-3 ¶ 1.1 ███████████████████ & B-23 ¶ 3.1(a) ███████████
███████████████████████████



Google does not use and has never used any of the domain names at issue in this case. Instead, the domain names are chosen and operated by each AFD partner or its customers, and they are the registrants or authorized licensees who the statute makes liable for infringing domain names.  Having now extracted settlement monies from each AFD partner, fully compensating them for any loss they have suffered, Plaintiffs now seek additional money from Google, who merely provides advertisements in response to requests from the AFD partner.  This role is far removed from the "bad-faith and abusive registration" of domain names that the ACPA was intended to combat.  In short, Google does not "use" domain names in providing the AFD service because it does no more than provide advertisements on request to third parties who host websites.

## IV.    CONCLUSION

Google does not register, traffic in, or use any of the domain names at issue, and thus cannot be liable under the ACPA.  Accordingly, Google asks this Court to enter judgment in Google's favor on Plaintiffs' Fourth Cause of Action.


Dated:  July 23, 2009                              Respectfully submitted,

                                                  GOOGLE INC.

---
[52] Page Decl. Ex. B-34 ¶ 5.2.

By:/s/ Michael H. Page
One of  its Attorneys

Joseph J. Duffy
Jonathan M. Cyrluk
Mariah E. Moran
Stetler & Duffy, Ltd.
11 South LaSalle Street
Suite 1200
Chicago, Illinois 60603

Michael H. Page
Joseph C. Gratz
Durie Tangri Page Lemley Roberts & Kent LLP
332 Pine St., Suite 200
San Francisco, California 94104

## CERTIFICATE OF SERVICE

I, Michael Page, an attorney, certify under penalty of perjury that I caused a copy of the forgoing document to be served on all counsel of record via PDF and U.S. Mail this 23rd day of July, 2009.

/s/ Michael H. Page
One of the Attorneys for **Google Inc.**