**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VULCAN GOLF, LLC, JOHN B.** | ) | |
| **SANFILIPPO & SONS, INC., BLITZ** | ) | |
| **REALTY GROUP, INC., and** | ) | **Case No. 07-CV-3371** |
| **VINCENTE E."BO" JACKSON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Hon. Judge Blanche M. Manning** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GOOGLE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO DEFENDANT GOOGLE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## Table of Contents

I.     **Introduction** .................................................................................................1

II.    **Summary Judgment Standards** ......................................................................1

III.   **Argument** ......................................................................................................2

   A.   Google's "Use" of AFD Domains in Prohibited
        by the ACPA ...........................................................................................2

   B.   Google's "Uses" the Domain Names under
        The ACPA ................................................................................................4

        i.    The Google Licenses Specifically Indicate
              Google's "Use" of the Infringing Domains .........................................4

        ii.   Google's AFD Necessarily Requires "Use" of AFD Domains .............5

        iii.  Google Controlled, Designed and Programmed
              Landing Page Templates for AFD Pages................................................6

        iv.   AFD Landing Pages Were Hosted on Google-Owned
              Servers at Google-Owned IP Addresses ................................................8

        v.    Google Tracks Page Views, Queries, and
              Revenue for Each Domain Under its Management ..............................9

        vi.   Google Manually Selects Keywords to "Transform"
              Advertising Selection, Including on Domains Google
              Knew Were Infringing .........................................................................9

   C.   Case Law Confirms that Google
        "Uses" AFD Domains under the ACPA ....................................................10

   D.   Google Also "Traffics" in AFD Domains .................................................12

   E.   Google's Trademark Enforcement Policy Is Largely Illusory...................13

   F.   Google Has Often and Repeatedly
        Received Lists of Partners' Domains.......................................................16

IV.    **Conclusion** ..................................................................................................17

## INDEX OF AUTHORITIES

**CASES:**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)...........................................1

*Bird v. Parsons*, 289 F.3d 865 (6th Cir.2002) ...........................................................10, 11

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ...............1

*Fisher v. Transco Services-Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir.1992)...........1

*Ford Motor Co. v. Great Domains Inc.,*
177 F.Supp.2d 635 (E.D. Mich. 2001)..........................................................10, 11, 12, 13

*Fryer v. Brown*, 2005 WL 1677940 (W.D. Wash 2005) ....................................................3

*Verizon California Inc. v. Navigation Catalyst Systems, Inc.,*
568 F.Supp.2d 1088 (C.D. Cal. 2008) ...................................................................3, 10, 11

*Verizon California Inc. v. Onlinenic, Inc.,*
2009 WL 2706393, *10 (N.D.Cal.,2009)..................................................................... 11

*Solid Host, NL v. Namecheap, Inc.,*
F.Supp.2d, 2009 WL 2225726, (C.D. Cal.2009) ...........................................................12

**STATUTES:**

15 U.S.C.A §1125(d)(1)(B)(i)(V)..................................................................................13

15 U.S.C. § 1125(d)(1)(D)..............................................................................................11

## I. __INTRODUCTION__

In this Court's order of March 20, 2008, this Court denied Google's Motion to Dismiss Plaintiffs' claims under the Anticybersquatting Consumer Protection Act ("ACPA") because the Plaintiffs sufficiently alleged that through various actions, Google trafficked in and/or used the Deceptive Domain Names in the AFD Network. (Dct. #145 at 12). Now Google asks this Court to determine as matter of law that it not liable under the ACPA because "[i]t has never bought, sold, rented, licenses, traded, bartered for, or done anything else with regard to any of those websites that could be called 'trafficking' by any stretch of the imagination." Google also proclaims it does not 'use' any of the domains at issue. See Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment, p 1. (hereinafter "Google Memo"). The facts belie Google's position.

Google's own documents confirm Google's far-reaching use and robust control of the infringing domains. Through its contracts with AFD program partners, Google has been an express licensee of infringing domains. Furthermore, as part of the AFD program Google exercises exclusive control of, traffics in, and uses the infringing domains with the sole intent of maximizing revenue. As set forth in detail herein, Google with no sense of shame has attempted "to regulate the business" and rationalizes its massive typosquatting scheme as a necessary evil. It is clear Google uses and traffics in the infringing domains and is liable under the ACPA. At a minimum, there are genuine issues of material fact regarding Google's use of and trafficking in the domains which require the denial of Google's Motion for Summary Judgment.

## II. __SUMMARY JUDGMENT STANDARDS__

A movant is entitled to summary judgment under Rule 56 only when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court considers the record as a whole and must draw all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services-Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir.1992). A court's role is not to evaluate the weight of the evidence or determine the truth of the matter, but instead is to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. 248*

## III.   ARGUMENT

### A.   Google's "Use" of AFD Domains is Prohibited by the ACPA.

Google begins with an argument that its conduct is outside the boundaries of the ACPA because the Act is (purportedly) only designed to combat the practice of registering domain names and reselling them at extortionist rates. Google's narrow construction of the ACPA is not supported by Congressional intent or case law. While Plaintiffs do not dispute that extortionist tactics were one of the primary reasons the ACPA was adopted, Congress also recognized there were other forms of cybersquatting, such as typosquatting and use of squatting domains to show advertisements, that were equally abhorrent and also needed to be prevented.

While debating the ACPA, members of Congress discussed the problem created by the registration of domains which differed only slightly from a trademark or famous name, such that these domains receive substantial traffic from internet users. Congress specifically discussed domains that bear a striking resemblance to the domains the Plaintiffs complain of in the case. For example, Congressional debates discussed wwwcarpoint.com without a period following the "www", "dosney.com" a misspelling of "Disney.com" and similar typos including attphonecard.com, attcallingcard.com, dellspares.com, and bellatlantics.com. 145 Cong. Rec. S10515 (1999).  Congress understood the Internet gave rise to a new type of infringement, and Congress intended the ACPA to prevent and punish those who attempted to financially gain from others' valuable trademarks and personal names regardless of whether they attempted to sell the domains or used them to generate revenue. For example, in discussing the types of conduct the ACPA was designed to deter, Congress specifically identified two types of "online bad actors":

> *In some cases these bad actors register* the well-known marks of others as domain names with the intent to extract sizeable payments from the rightful trademark owner in exchange for relinquishing the rights to the name in cyberspace. *In others they use the domain name to divert unsuspecting Internet users to their own sites,* which are often pornographic sites or competitors' sites that prey on consumer confusion.

*Id*. at 20008 (emphasis added).

2

Congress was not merely concerned with the diversion to sites promoting pornography or competitors. Rather, Congress also sought to prevent online bad actors from using infringing domains to divert Internet users to their own sites for the display of advertising. Congress specifically confirmed the impropriety of using squatting domains to show ads, decrying sites that "attract eyeballs to sites that price online advertising according to the number of `hits' the site receives." 145 Cong. Rec. H29269 (1999). Though Google ordinarily sells its advertising by the click rather than by the hit, Congress' fully intended to prevent others from wrongfully profiting from the use of legitimate trademark holders valuable marks. Congress' intent to prevent such conduct is evident from the record.

Case law confirms that ACPA liability extends to those who use domains to generate revenue from advertising and it is not limited to the selling of domains extortionist rates.  See *Shields v. Zuccarini*, 254 F.3d 476, 484 (3rd Cir. 2001) (holding ACPA was designed to prohibit typosquatting which generated advertising revenue); *Verizon California Inc. v. Navigation Catalyst Systems, Inc.*, 568 F.Supp.2d 1088 (C.D. Cal. 2008); Andy Johnson-Laird, *Looking Forward, Legislating Backward?*, 4 J. SMALL & EMERGING BUS. L. 95, 101 (2000) (explaining typosquatting as the "register [ing] [of] mistyped variants of popular domain names to catch the electronic crumbs dropped by careless web surfers"); *Fryer v. Brown*, 2005 WL 1677940 (W.D. Wash 2005).

Google's arrogant proclamation in its employee handbook for Adsense for Domains Hires advises employees that Google has decided to ███████████████████████████ of cybersquatting and typosquatting.[1] However, that role is left to Congress, and Congress has declared the types of conduct which are unlawful. While Google may well have achieved the controlling position it sought in the industry, such a position comes with responsibility for the infringements and ACPA violations that occur under Google's use, supervision, direction, and control.

---

[1] Google explains: ███████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████ oogle Doc. 2297-2299).

3

B.    **Google "Uses" the Domain Names under the ACPA.**

From Google's own documents and records, Google's use and control of infringing domains is unmistakable. Google has expressly obtained a license to use the domain names.[2] Google generates HTML "Landing Pages," exclusively determines the advertising content on the pages, performs keyword transformation of the domains names, and even hosts the domains on servers owned and operated by Google. Google tells this Court that it isn't "using" the domains, but this claim cannot be reconciled with Google's own documents, which plainly show Google receiving a license to "use" the domains. Indeed, the contracts confirm that Google controls every relevant aspect of the domains and their use as parked pages.

i.    **The Google Licenses Specifically Indicate Google's "Use" of the Infringing Domains.**

From the beginning of the AFD program in 2003, Google's contracts with its partners gave Google an express license to "use" the domain names:



Google Doc[3]. 3955, ▮▮▮▮▮▮▮▮▮▮▮▮ (emphasis added). Identical language appears in every one of the following contracts: Google Doc. 4330 ▮▮▮▮▮▮▮▮▮▮▮; Google Doc 2035-2036 Contract with ▮▮▮▮▮▮▮ Google Doc. 2138 Contract with ▮▮▮ ▮▮▮▮ subsequently renewed without change to these provisions; Google Doc. 2154 Contract with ▮▮▮▮▮▮ subsequently renewed without change to these provisions.[4]

In addition, Google's contracts with certain partners, termed "third-party hosters" or "3PH," contain a provision ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] In its Memorandum Google only belatedly acknowledges a single agreement that contains any reference to a "license" despite producing various agreements which expressly include the license language.

[3] All references to "Google Doc." refer to documents produced by Google and are being provided with Plaintiffs' Response to Google's Rule 56.1 Statement and are attached thereto in sequential order.

[4] While Google did not disclose its contracts with the other domain owners or AFD partners, Google indicates that these contracts were "the Standard AFD" Contracts. (Google Doc. 3997).

4

 (Google Doc. 1999). ███████████ Google ███████ ████████ Google repeated this language in the definition of an AFD "Authorized name" ████████████████████████████ *Id.* (emphasis added). This provision was also ████████████ (Google Doc. 4014).

Google not only licenses the domain names and uses those domains, it admits it operates as a parking company as well. Google's AFD Contracts state:



(Google Doc. 2036, 2138, 2154).

With its standard agreements so plainly authorizing Google to "use" the infringing domains and its own characterization of the AFD program as a parking service, Google cannot credibly claim it does not "use" the domains. Likewise, it matters not whether some other agreements between Google and certain partners omit an explicit reference to a license, because their effect is the same. Throughout, Google receives the right to use the domains in the AFD program and to show advertising which generates revenue for Google and others, all predicated on capturing traffic using Plaintiffs' valuable trademarks.

**ii.**   **Google's AFD Necessarily Requires "Use" of AFD Domains.**

Google capably explains the essence of AFD:



(Google Doc. 2532.) Notice the crucial Google roles set out in this simple summary: ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████   Further, it is Google's use and processing of the domains that provides

5

the advertising on these parked pages. Without Google's use and processing, Google concedes these pages would be blank or contain an error page. Of course, in that scenario Google would not generate any revenue, which explains Google's desire to use and process the URLs into pages that generate revenue.

Google exclusively manages and controls all aspects of the advertising process in the AFD program. Google, and not AFD partners, managed relationships with current and potential advertisers, received requests to purchase advertising, and handled customer service pertaining to advertising sales. *See* Google's AdWords site generally (http://adwords.google.com) and "AdWords     Help     –     Parked     Domain     Site" (https://adwords.google.com/support/aw/bin/answer.py?hl=en&answer=50002). Google, and not AFD partners, selected which ads to display. *See* ¶16 of Plaintiffs' Response to Defendant Google, Inc.'s Rule 56.1 Statement. ██████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ It was Google, and not the owner of the domains, who used the domains to create the parked pages.

### iii.     Google Controlled, Designed and Programmed Landing Page Templates for AFD Pages.

Google is disingenuous in suggesting that it uses AFD domains no more than it uses the domain name chicagotribune.com. Google does not control the content or appearance of chicagotribune.com. Nor does the Chicago Tribune defer the appearance of its site to Google. However, in the AFD program, it is Google who controls the visual appearance of AFD domains. To the extent that a Google partner may propose a change of the visual appearance of the site, ████████████████████████████████████████████████ (Google Doc. 3708-3709).[5] Google designed two distinct types of Landing Pages. ███████████████████ ████████████████████████████████████████████████████ (Google Doc.

---

████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

2536). Others were designated for ███████████████████████████████████████████████
██████████ (Google Doc. 2539). Google, and Google alone, decided which format of page to serve on a given domain.

Google's contracts with AFD partners further confirm Google's exclusive right to design and control landing pages. ████████████████████████████████████████████████████████
████████████████████████████████████████████ and each element of the Landing Pages and Results Pages ███████████████████████████████████████████████████████████████
████████████████████████████████████████████ Google Doc 2035-2036; See also Google Doc. 2137-2138 Google AFD contract ██████████ Google Doc. 2153-2154 Google AFD contract ██████████ ███████████████████████████████████████████
█████████████████████████████████████████████████

With its exclusive control over the appearance of landing pages, Google also performed tests and experiments, including changes to templates, designs, images and other elements–all in Google's insatiable desire to increase revenue. These tests were performed without domain owners' involvement or knowledge. ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████ Google Doc. 2523 and 2334,
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████; Google Doc. 2517 ██████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████

---

[6] See Google Doc 4013 ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████ emphasis added)

#### iv. <u>AFD Landing Pages Were Hosted on Google-Owned Servers at Google-Owned IP Addresses.</u>

In an effort to support its claim that Google merely provides advertising content, Google's memorandum claims Google does not host domain names, and claims that AFD domain names do not point to IP addresses owned or operated by Google. But publicly-available documents on Google's own servers indicate exactly the contrary. Google does host domain names, and AFD domains are often pointed to IP addresses owned by Google.

In Google's "Domain Set-up Guide", Google gives explicit instructions on how to point domain names to Google at Google-owned IP addresses 216.239.32.21, 216.239.34.21, 216.239.36.21 and 216.239.38.21. *See,* "Domain Set-Up Guide" (https://www.google.com/adsense/support/bin/answer.py?answer=76049); Plaintiffs' Response to Google's Rule 56.1 Statement ¶10. If a user follows Google's detailed instructions, the user ultimately receives the following message: "Congratulations! Your domain is now configured to point to Google." *Id.* Indeed, as the message indicates, such domains load their entire web pages directly from Google servers, without those pages ever passing through any server operated by any party other than Google. *Id.*

Furthermore, when users request certain AFD sites, users are directed to Google-owned URLs. Google describes that forwarding process as follows:



(Google Doc. 3182). Oingo.com is owned by Google.[7]

Google's responsibility for the servers to support AFD is confirmed by Google's substantial spending on AFD servers. In 2005 alone, Google ███████████████████ ███████████████ (Google Doc. 3804). By 2006, Google servers would ███████ ███████████████████ (Google Doc. 2334). Thus, contrary to Google's

---

[7] http://www.whois.net/whois/oingo.com.com (showing Google, Inc. as the Registrant).

claim, Google does host AFD domains and does allow AFD domain names to be pointed at an IP address that Google owns. Once again, such activities further show Google's use of the domains and at the very least raise genuine issues of material fact regarding Google's use of the domains.

> **v.** **Google Tracks Page Views, Queries, and Revenue for Each Domain Under its Management.**

By 2005, Eytan Elbaz, the head of Google's Domain Channel, boasted to domain owners at an invitation-only domain conference, that Google ███████████████████ ████████████████████ (Google Doc. 3733). Elbaz's ███████████████████ in consistent with Plaintiffs' claims Google is using and controlling the infringing domains and inconsistent with Google's assertion that it merely provides advertising content. He went on to confirm Google's ████████████████████████████████████ ████████████████████████████████████ ████████████ (Google Doc. 3738). Google's efforts to increase AFD revenue are borne out in internal analyses of ████████████████████████



Google Doc. 3858 (listing by year the ████████████████████ ████████████████████ Google tabulated each domain's traffic in great detail[8] and engages in such extensive analysis to show its partners how Google is using the domain names and to maximize revenue.

> **vi** **Google Manually Selects Keywords to "Transform" Advertising Selection, Including on Domains Google Knew Were Infringing.**

Google would like this Court to believe its entire process under the AFD Program in automated and it merely provides advertising content. However, Google unilaterally, and often

---

[8] For example, after the transformation of ████████████████████████████ ████████████████████████

manually, optimizes and transforms its Landing Pages without partners' specific approval or knowledge. Google provides the following description of ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

(Google Doc. 2415). Google's analyses revealed the increased revenues resulting from term transformation. For example, Google found █████████████████████████████

██████████████████████ (Google Doc. 2574-2577). ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

### C.   Case Law Confirms that Google "Uses" AFD Domains under the ACPA.

Google repeatedly argues that its conduct falls outside the ACPA's prohibitions. In so doing, Google tellingly relies on *Bird v. Parsons*, 289 F.3d 865 (6th Cir.2002) and *Ford Motor Co. v. Great Domains Inc.*, 177 F.Supp.2d 635 (E.D. Mich. 2001). However, these cases arise out of completely different factual circumstances. In *Bird* and *Ford*, Defendants failed to exercise any level of control over the domains. In each case, the main defendant acted as a broker or online auction site. These defendants did not configure domains to maximize value (e.g. to select or target ads), nor did their involvement in any other way reach the level of Google's participation. In contrast, more recent cases have considered conduct far closer to Google's AFD program, and have found liability under the ACPA.

In *Verizon California Inc. v. Navigation Catalyst Systems, Inc.* 568 F.Supp.2d 1088 (C.D. Cal. 2008), the court specifically held that domain registration was not required for liability under the ACPA. The Court held that Navigation Catalyst 'used' the domain names stating "[t]hat is, they hosted websites using the challenged domain names, on which were posted paid

---

██████████████████████████████████████████████████

████████

advertising links to other websites." *Id.* at 1095. See also *Verizon California Inc. v. Onlinenic, Inc.*, 2009 WL 2706393, *10 (N.D.Cal.,2009) (stating "[h]ere, the infringing domain names are used to provide pay-per-click advertisements that provide revenue to the domain name owner each time they are clicked on by a web user."). Like the Defendants in the *Verizon* cases, and unlike the auction site defendants in *Bird* and *Ford,* Google uses the domain names to provide pay per click revenue to Google each time they are clicked on. To generate that revenue, Google processes domain names, strips and examines a domain name, creates and hosts Landing Pages at domain names, causes ads to be displayed on domain names, experiments with the Landing Pages accessible at the domain names, unilaterally transforms domain names, and retains profits that reflect advertising performance–activities that clearly exceed the "use" prohibited in ACPA.

Plaintiffs agree that *Bird* recognizes that "liability for using a domain name can only exist for the registrant or that person's authorized licensee." 15 U.S.C. § 1125(d)(1)(D); *Bird,* at 880. However, that is where the similarity between this case and *Bird* ends. In this case, licenses show Google to be an authorized licensee to use the domains. Similarly, unlike the present case, in *Bird* there were no allegations (let alone a mountain of documents) indicating that the defendant licensed, used, hosted, designed landing pages for, served webpages at, showed advertising on, experimented with, or trafficked in the domain names at issue.

In addition, this Court's prior reasoning is equally applicable here and is confirmed by Google's documents. This Court previously stated "the FAC alleges that the purported parking company defendants, of which Oversee is one, did more than just auction domain names: they also registered, licensed and sublicensed domain names, among other things." (Dct. #145 at 10). This licensing and sublicensing also directly involves Google. As such, Dotster's alleged conduct in *Bird* is also inapposite to Google's conduct in this case, in that Dotster was functioning as a domain registrar simply registering the domain. In contrast, Google cannot argue it is simply the domain registrar. Rather, Google has licensed and sublicensed the domain names, and was actively using, tracking, hosting, developing websites at, showing advertising on, experimenting with and trafficking in the domain names in a desire to maximize each domain's revenue.

Google also misconstrues the holding in *Ford*. The Court did not, as Google states, hold "that Great Domains did not register the domains itself, and that because it was not the domain name registrant, it did not use the domain either." (Google Memo at p. 12) Rather, the court

determined that because there was no license from the registrant to Great Domains (an auction site), the only ACPA provision giving rise to possible liability was "trafficking in." The Court declined to extend the "trafficking in" definition to the *Ford* defendants' conduct, noting a need for "some level of ownership or control passing between the person transferring and the person receiving." (*Ford*, at 644-645). Here Google's far-reaching control is evident, as detailed above, providing a proper basis for a finding of trafficking.

Google asks the court to apply the ACPA only to domain registrants. But in fact recent cases have applied ACPA to all parties that use infringing domains. See e.g. *Solid Host, NL v. Namecheap, Inc.*, F.Supp.2d, 2009 WL 2225726, (C.D. Cal.2009) extending ACPA liability to a registrar when that registrar did not act solely as a registrar with respect to a given infringing domain; see also this Court's acknowledgment the term "use" has been interpreted broadly in cases involving the internet and domain names. (Dct. #145 at 17-19). Indeed, contrary to Google's contentions, the ACPA was not targeted to a particular category of defendants. Rather, ACPA liability extends to all who "use" an infringing domain in the manner proscribed by the ACPA. Google may not be the registrant of AFD domains, but Google has engaged in pervasive, knowing, and egregious conduct in trafficking in and the using infringing domains with an intent to profit. Therefore Google must be subject to liability under the ACPA. At the very least, there are genuine issues of material fact as to whether Google uses the domains under the ACPA.

### D.   Google Also "Traffics" in AFD Domains.

Google also "traffics in" AFD domains, within the meaning of the ACPA.  To wit, as detailed above, Google licenses often on an exclusive basis the traffic from AFD domains, including infringing domains. The ACPA unequivocally provides that "trafficking in" includes "licenses". 15 U.S.C.A. §1125(d)(1)(E). As discussed, Google for consideration (a share of advertising revenue) receives a license to use AFD domain names, and these licenses satisfy the ACPA's licensing test.  Moreover, the definition of "traffics in" features the inclusive scope "and any other transfer for consideration" in the definition of "licensing" is telling: If Congress wanted the courts to narrowly construe this provision, it would not have included such an expansive catch all.

Google cites *Ford* for the proposition that ACPA "trafficking in" liability requires a transfer of an ownership interest in the domain name. Google's analysis is erroneous for several

reasons. In *Ford,* the Court declined to expand the "trafficking in" definition to the auctioneers conduct because it concluded that if Congress had intended to extend the ACPA to auction, banking, or other similar auxiliary service providers, Congress would have set forth factors that meaningfully could be applied in determining whether such entities had acted in bad faith. (*Ford,* at 645). In this case, such a rationale supports a finding that Google is trafficking in the domains. 15 U.S.C.A §1125(d)(1)(B)(i)(V) identifies a bad faith factor squarely covering Google's conduct:

> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark...for commercial gain.

Certainly Google uses the AFD domains for commercial gain. Furthermore, Google harms a trademark owner's goodwill by presenting AFD ads (including links to competitors) rather than the site the user sought to reach. Thus, *Ford's* rationale supports a finding that Google is trafficking in the domains as evidenced by a specific bad faith factor applicable to Google's conduct which was not present in *Ford.*

Based on the foregoing, Google undoubtedly uses the domains and traffics in the domains under the ACPA. In an attempt to persuade this Court to the contrary despite contracts granting Google a license and exclusive control over the AFD domains, Google raises extraneous issues such as its "Trademark Enforcement Policy" and its supposed inability to know which domains are owned or parked with AFD partners prior to an AFD Request. Each of Google's claims is incorrect, and the following sections further establish Google's knowing use of domains in violation of the ACPA.

**E.**      **Google's Trademark Enforcement Policy Is Largely Illusory.**

Google continues to tout its trademark enforcement policy and its supposed willingness to immediately cease using disputed domains.[10] Google also continues to claim to be

---

[10] While it does not appear germane to Google's argument that it does not use the domain names, Google felt compelled to erroneously inform this Court the Plaintiffs have never availed themselves of Google's "fail list." In a letter dated, August 11, 2008, Attorney Gratz, counsel for Google, wrote in Response to Plaintiffs' Counsel email stating "First, Google has placed each of the domains listed in the body of the email, as well as each of the domains listed in the file you attached to the email, on the AdSense for Domains 'Fail list'." Interestingly, one of the many domains on that list was fishernutrecipes.com which remains on the fail list. Despite Google's awareness of

unaware of trademark violations unless a trademark holder makes a complaint. (Google Memo. p.7-8). Such claims are squarely disproven by litigation documents and Google's internal documents.

First, as detailed in the Third Amended Complaint, ("TAC") Google continued to use domains even after Plaintiffs identified specific infringements of their rights and even after this case was filed. *See* TAC¶ 65. Moreover, even at this late juncture Google's continues to use and profit from www.fishernutsrecipes.com–further confirming that Google uses domains even after receiving trademark owners' complaints. Such disregard for trademark owners' rights is not limited to the Plaintiffs in this case but is prevalent.

Indeed, Google has admitted that it continues to use infringing domains even after trademark owners complain. In a



(Google Doc. 3819). In other words, even after a trademark owner's complains, and even after Google confirms that a domain contains a distinctive trademark term, it is standard Google policy to *continue to show ads* on the domain. Google thus continues to *use* the domain to show advertisements and to generate revenue. While Google may counter that the ads are "generic," even a random selection of ads still constitute "use" within the plain language of the ACPA.

Google's internal documents also demonstrate that for years, Google knew it was licensing, using and earning revenue from trademark-infringing AFD Domains. In ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Google acknowledged  one way users ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (Google Doc. 3840). In a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Plaintiffs' protected mark and its "trademark enforcement policy," Google currently continues monetizing fishernutsrecipes.com. See ¶8 of Plaintiffs' Responses to Google's Rule 56.1 Statement.

█████████████████████████████████████████████████ by all indications a reference to typosquatting. (Google Doc. 3837, 3857). ███████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ (Google Doc. 3837).

Elaborating on the ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ (Google Doc. 3841). The document continues with a frank admission of Google's position relative to competitors: ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ (Google Doc. 3841).

Google even attempted ███████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████ (Google Doc. 3846). These large estimates reveal the breadth of typosquatting within AFD. In a ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ (Google Doc. 3130). Yet another AFD document █████████████████████████████████████████████████ (Google Doc. 2363). Google even ███████████████████████████████████████████████ █████████████████ (Google Doc. 2315, 3281). Over and over, Google staff admitted internally ██████████████████████████████████.[11] (Google Doc. 3124).

Google went so far as to acknowledge it █████████████████████████ " One email commented: ████████████████████████████████████████████████ ██████████████████████████████████████████ (Google Doc. 3135). Google said it

---

[11] Google's reluctance to respond to trademark holders complaints given the revenue at stake is hardly surprising given from the outset of AFD, Google made a concerted effort to keep trademark holders and the public from discovering that Google was the owner of the AFD pages being served at Deceptive Domains by not allowing Google branding on the AFD pages. ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ (Google Doc. 2433).

████████████████████████████████████████████████████

(Google Doc. 2281). Yet it seems this ██████████████████████████████ letting Google continue to use infringing domains with impunity.

###  F.     Google Has Often and Repeatedly Received Lists of Partners' Domains.

Google has repeatedly represented to this Court that it does not receive lists of partners' domains. Most recently, Google claimed to have "no knowledge of what domain names are owned by or parked with any of its partners; it learns that information only as it comes in the AFD request." (Google Memo p. 7). To the contrary, Google receives domain lists from partners in a variety of contexts, and Google often receives lists of partners' domains prior to any AFD Request and prior to any user typing a domain name into an address bar.

Until 2008, Google directed parties interested in joining AFD to provide Google with a list of their domains for Google to review:

> "If you would like to *submit your portfolio* to be considered for the AdSense for domains program, please fill out the information request form on the contact us page. If *your portfolio* meets the AdSense for domains requirements, a Google representative will get back to you shortly."[12]

Furthermore, Google has now implemented an AFD submission process for single domain owners which specifically requires submitting each domain for Google's advance approval.  See  https://www.google.com/adsense/support/bin/answer.py?answer=105483:  "What do the AdSense for domains status messages mean? When validation of your domains is pending, you'll see the status next to each one to indicate the domain's standing with our system. Verifying Domain and Checking Policy Compliance: Your domain was just added and is waiting for approval."  Internal documents reveal Google also ██████████████████████████ ███████████████████ (Google Doc. 4008).

These documents undermine Google's position that it did not and does not receive partners' domain lists, and that it is therefore purportedly unable to prevent the use of infringing domains. Quite the contrary, Google does receive such lists on an ongoing basis, and Google has the ability to check the domains for trademark infringement before responding to AFD requests.

---

[12]     See    http://web.archive.org/web/20080224110159/http://www.google.com/domainpark/faq.html.    (emphasis added.) This page has now been removed from Google.com for reasons unknown to Plaintiffs.

IV.     **<u>CONCLUSION</u>**

The ACPA was enacted to prevent the very harm Google is causing to legitimate trademark holders such as the Plaintiffs.[13] Through its AFD program, Google receives a license to use the domains and controls virtually every aspect of the domain's use as a parked page. Google uses and traffics in the domain names with an intent to profit from Plaintiffs' valuable marks, in specific violation of the ACPA. Minimally, there are genuine issues of material fact concerning Google's licensing, use, and control over the domains which requires a denial of Google's Motion for Summary Judgment.

Dated:  January 8, 2010                                  Respectfully submitted,


                                                         /s/Robert M. Foote
                                                         Robert M. Foote, Esq. (#03124325)
                                                         Craig S. Mielke, Esq. (#03127485)
                                                         Matthew J. Herman, Esq. (#06237297)
                                                         Foote Meyers Mielke & Flowers, LLC
                                                         3 North Second Street
                                                         Suite 300
                                                         St. Charles, Illinois 60174
                                                         Tel. No.: (630) 232-6333
                                                         Facsimile: (630) 845-8982

                                                         Kathleen C. Chavez, Esq. (#6255735).
                                                         Chavez Law Firm, P.C.
                                                         3 North Second Street
                                                         Suite 300
                                                         St. Charles, Illinois 60174

                                                         ***Attorneys for Plaintiffs***

---

[13] Google apparently takes issue with the fact Blitz Realty Group Inc. was dissolved on February 27, 2009. However, pursuant to 805 ILCS 5/12.30(c), dissolution of a corporation does not prevent suit by or against the corporation in its corporate name, nor does it abate or suspend any civil proceeding pending by or against the corporation on the effective date of the dissolution.

## CERTIFICATE OF SERVICE

The undersigned attorney, deposes and states that he mailed a true and correct copy of **Plaintiffs' Memorandum of Points and Authorities in Response to Defendant Google, Inc.'s Motion for Partial Summary Judgment** to the counsel listed below, via the PDF and First Class U.S. Mail with proper postage prepaid, on January 8, 2010.

Michael H. Page
Joseph C. Gratz
DURIE TANGRI PAGE LEMLEY ROBERTS & KENT LLP
332 Pine St., Suite 200
San Francisco, CA 94104

Jonathan M. Cyrluk, Esq.
STETLER & DUFFY, LTD.
11 South LaSalle Street
Suite 1200
Chicago, IL 60603

/s/Robert M. Foote
Robert M. Foote, Esq.

18