IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VULCAN GOLF, LLC, JOHN B. SANFILIPPO & SON, INC., BLITZ REALTY GROUP, INC., and VINCENT E. "BO" JACKSON, | ) ) ) ) | |
| Plaintiffs, | ) ) | Hon. Blanche M. Manning |
| v. | ) ) | 07 C 3371 |
| GOOGLE INC., | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiffs Vulcan Golf, LLC, John B. Sanfilippo & Son, Inc. ("JBSS"), Blitz Realty Group, Inc., and Vincent E. "Bo" Jackson, have sued Google (the other defendants have been dismissed pursuant to settlement agreements) alleging that it engaged in a wide-ranging scheme whereby it receives "billions of dollars in ill-gotten advertising and marketing revenue" by knowingly and intentionally registering, licensing and monetizing purportedly deceptive domain names at the expense of the plaintiff-mark owners. The plaintiffs alleged numerous claims based on these general allegations and the court dismissed some of the claims after two motions to dismiss. In addition, the court has denied the plaintiffs' motion for class certification.

Defendant Google has filed a motion asserting that it is entitled to judgment on the Anticybersquatting Consumer Protection Act ("ACPA") count. For the reasons stated below, the motion is denied.

**I.  Facts**

The court assumes familiarity with the facts of this case based on its prior orders, but will provide a brief overview. The plaintiffs' cybersquatting count as it now stands focuses on Google's advertising product AdSense for Domains ("AFD"). According to Google, the AFD product "is designed to provide relevant search results and advertisements to website owners, who typically display those results on websites that have been registered but not yet developed." Google's Memorandum in Support of Summary Judgment, Dkt. # 287, at 3. A simplified description of the AFP product follows. Historically, when one typed into a search engine a web address or a domain name that did not have a developed website associated with it, the user would generally see an error message or simply a placeholder page indicating that the site was "under construction." However, for participants in the AFD program, Google will generate search results, advertising (known at Google as "Sponsored Links"), related searches and common search terms for display on the undeveloped webpage which are relevant to the web

address entered by the user. Google sends back this "content" to the AFD partner[1], which plugs it into the webpage and presents it to the user who is conducting the search. According to Google, this all occurs in less than a second millions of times a day. If the user clicks on an advertisement (*i.e.*, Sponsored Link) for that webpage, the advertiser is billed a few cents which Google and the AFD partner share.

The plaintiffs contend that certain individuals or companies intentionally register or license domain names that are the same as or substantially and confusingly similar to the plaintiffs' distinctive trade names or marks. If the user types in the confusingly similar domain name into the web browser, the user is faced with a webpage (created using the AFP program) with search results and advertisements for companies that offer products and services similar to those of the domain name that was entered but which are not actually offered by the company that the user may have been looking for. For example, the Third Amended Complaint ("TAC") alleges that an entity might register the domain name "wwwVulcanGolf.com." TAC ¶ 26. This domain name is obviously very similar to the domain name "www.VulcanGolf.com," which is registered to and has been used by plaintiff Vulcan since May 1997.

According to the plaintiffs' theory, the registrant of "wwwVulcanGolf.com" intentionally registered this domain name without the period after the "www" expecting that a certain number of internet users will mistype the name and land on another "deceptive" webpage that the registrant or parking company has created with the assistance of the AFD product. This webpage will contain links and advertisements to other websites that offer products or services similar to those offered by Vulcan Golf, LLC but are *not* Vulcan Golf products. Thus, while the user may have initially been seeking out products specifically offered by Vulcan Golf, the simple misstep in typing could divert the user to look at and buy products offered by a competitor of Vulcan Golf. Google and the AFD partner profit if the internet user clicks on the advertising that is placed on the "deceptive" webpage that has been created using the AFD program. Accordingly, the plaintiffs' allege that Google and the AFD partner profit from the misuse of the plaintiffs' trademarks.

## II.     Summary Judgment Standard

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[1]Google refers to its AFD customers as "AFD partners." Many of these AFD partners are so-called parking companies, which aggregate domain names for undeveloped websites from multiple registrants. Thus, a domain name owner can "park" the name with a parking company, which will host the webpage associated with a specific domain name. Several parking companies were previously named as defendants in this case but have been dismissed pursuant to settlement agreements with the plaintiffs. Thus, Google is the only defendant remaining in the case.

322 (1986). The party opposing the summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading"; rather, it must respond with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992).

### III. Google's Objections to the Plaintiff's Exhibits

Google objects on various grounds, including hearsay and lack of authentication, to the exhibits which the plaintiffs have attached to their responses to Google's statement of undisputed facts. The plaintiffs' exhibits A through E appear to be printouts of webpages while the remaining exhibits appear to documents produced by Google to the plaintiffs during discovery.

As to the webpages, the court has not considered these in deciding the instant motion and thus need not resolve any objections related to these documents.

As to the documents that were apparently produced by Google, these also are not supported by affidavit. Generally, "'[t]o be admissible [on summary judgment], documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.'" *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006)(citation omitted). However, as noted by the Seventh Circuit, "[a]uthentication relates only to whether the documents originated from [their purported source]; it is not synonymous to vouching for the accuracy of the information contained in those records." *U.S. v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982). Therefore, "[the] very act of production [is] implicit authentication." *Id*. *See also Thanongsinh v. Board of Educ.*, 462 F.3d 762 (7th Cir. 2006)("Requiring authenticating affidavits . . . would be an empty formality" where the defendant drafted the relevant documents and produced them during discovery). Therefore, Google's challenge to the authenticity of the documents that they produced to the plaintiffs is overruled.

As to the objection that they are hearsay, the court also rejects this argument as the contracts are not being offered for the truth of the matter asserted but merely to demonstrate what the parties agreed to. Thus, the hearsay objection is overruled.

Despite these rulings, the court notes in this order other problems with the documents cited by both parties.

### IV. Analysis

The relevant portion of the ACPA states as follows:

> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard

Page 3

>             to the goods or services of the parties, that person
>
>                 . . .
>
>                 (ii) registers, traffics in, or uses a domain name that--
>
>                 (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
>                 (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
>
>                 (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.
>     . . .
>
>             (D) A person shall be liable for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.
>
>             (E) As used in this paragraph, the term "traffics in" refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration.

15 U.S.C. § 1125(d).

The ACPA provides remedies to victims of "cybersquatting," which has been defined by one court as "the bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another." *Solid Host, NL v. NameCheap, Inc.*, 652 F. Supp. 2d 1092, 1099 (C.D. Cal. 2009)(citations omitted). As is relevant in this case, cybersquatters include those who "'register well-known marks to prey on customer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site.'" *Id.* at 1100 (*quoting* the Senate Report accompanying the ACPA, S. Rep. No. 106-140)(other citations omitted).

The ACPA imposes liability on one who "registers, traffics in, or uses" the allegedly infringing domain names. 15 U.S.C. § 1125(d)(1)(A)(ii). The court will first analyze Google's argument that it does not "register" or "use" domain names and then will discuss whether Google "traffics in" domain names under the ACPA.

    A.    <u>Does Google "register" or "use" the domain names?</u>

Google argues that it does not "register" domain names and is not liable for "using" the

domain names.

> 1. *Register*

As for whether Google "registers" or is a "registrant" of domain names, Google asserts in its undisputed statement of facts, *see* Google SOF at ¶ 35, that it "has never registered any of the domain names at issue, and plays no role in the registration of any of those domain names." The plaintiffs dispute the statement of fact, *see* Response to Google SOF at ¶ 35, and make several statements in response, but fail to point to any record evidence that Google itself registered domain names. Accordingly, the court concludes that Google does not "register" domain names and is not a "registrant of" the domain names at issue.

> 2. *Use*

Google next argues that it cannot be held liable under the ACPA for "using" a domain name because the ACPA imposes liability for "using" a domain name only "if that person is the domain name registrant or that registrant's authorized licensee." 15 U.S. C. § 1125(d)(1)D). The court has already concluded that Google is not a registrant of domain names for purposes of this motion. Thus, Google can only be liable for using domain names if it is a "registrant's authorized licensee." According to Google, the plaintiffs cannot point to any evidence supporting their contention that Google is a "registrant's authorized licensee."

The plaintiffs assert that Google has obtained a license pursuant to its contracts with its AFD partners. In support, they point to a contract, bates-stamped G000003955, which is entitled Google Domain Park Agreement. The document is very blurry and difficult to read and does not appear to be the entire contract as no signature page is provided. In any event, the agreement appears to be between Google Technology, Inc. and Dotster, Inc., a former defendant and parking company. In their response brief, the plaintiffs quote Section 3.2, which is entitled "Google License," as stating that:

> 3.2 Google License. Customer grants Google Technology a worldwide, sublicensable (to corporate affiliates of Google Technology), non-exclusive, fully paid up, royalty free right and license to use the domain names contained in the AFD Request for AFD Results Pages, Landing Pages, and in otherwise performing the AFD Service, as contemplated under the Agreement."

> i. <u>Documents</u>

As an initial matter, the documents cited to by both the plaintiffs and Google regarding this point are problematic. For example, the document cited to by the plaintiffs in support of the quoted language does not actually contain the quoted language. Specifically, as noted above, G000003955 appears to be an agreement between Google Technology and Dotster, and Section

3.2 of that agreement is entitled "Google License."  However, the quotation set forth in the plaintiffs' response brief on page 4 does not match the language in Section 3.2 as shown on G000003955.  The plaintiffs assert that the same language appears in agreements with Snapnames [2] for 2003 (G000004330) and 2006 (G000002035-36), IREIT (G000002138) and Dotster (G000002154).[3]  However, the last of these documents, G000002153-54, does not appear to be a complete document as it contains only "Page 2 of 6" and "Page 3 of 6."  These documents are attached by the plaintiffs to their response to Google's statement of undisputed facts.  They are unsupported by any deposition or affidavit testimony and so the court has no basis on which to ascertain what these agreements actually are and whether the information contained therein is accurate.

Nevertheless, Google does not dispute that it maintained agreements with its AFD partners and attaches as exhibits to the affidavit of Michael Page, its outside counsel in this case, certain Google AFD agreements with Sedo, Oversee, IREIT and Dotster.  Google asserts that the contracts with Sedo, Oversee and IREIT do not contain the license language quoted above, and indeed, the versions of the agreements attached to Page's affidavit do not contain this language.  Page's affidavit, however, merely states that each document is a true correct copy of *an* agreement between Google and Sedo, Oversee, IREIT and Dotster, without specifically identifying what the agreements are.  *See e.g.*, Page Affidavit, ¶ 3 ("Attached hereto as Exhibit B is a true and correct copy of *an* agreement between Sedo GmbH and Google Ireland Limited effective January 1, 2007.")(emphasis added).  While Exhibit B, for example, seems to be the current contract between Sedo and Google with respect to Google's provision of the AFD product to Sedo, the "Order Form" attached to the front of the agreement notes that the "Initial Services Term" is "[f]rom the Order Form Effective Date to 30 November 2009."  Thus, it appears to have expired.

As for Dotster, the version of the agreement attached to Page's affidavit at Exhibit E appears to be the same as the Dotster agreement referred to by the plaintiffs, G000002153-54.  However, as already noted, the plaintiffs provide only part of the agreement, and thus, while the court assumes that it is the same document as Exhibit E to Page's affidavit, the court has no way of knowing for certain whether they are indeed the same document.  The relevance of this document is that, unlike the other agreements with Sedo, Oversee and IREIT, this Dotster agreement does contain the above-quoted Section 3.2 entitled "Google License."

---

[2] The court notes that Snapnames was not a Parking Company Defendant in this case.

[3] While the plaintiffs assert that the IREIT and Dotster agreements "were subsequently renewed without change to these [license] provisions," *see* Plaintiffs' Memorandum in Response, Dkt. # 284, at 4, they fail to provide record citations to the renewed contracts and the court therefore cannot confirm the accuracy of this statement.  The court notes that what appears to be the current contract with IREIT, attached as Exh. D to Michael Page's affidavit, does *not* contain the license language quoted above.

Google also asserts that its contract with Dotster has since terminated. Google states in footnote 45 to its opening brief, Dkt. #287 at page 9, that it terminated the agreement with Dotster and notes that Dotster no longer parks domain names because it sold that part of its business, known as RevenueDirect, to Sedo in February 2009. While this may be true, Google has not pointed to any authority indicating that termination of the contract prohibits the plaintiffs from establishing a right to past damages.

Thus, the documents cited by the parties do little to assist the court in resolving the instant motion. Nevertheless, the court will set aside these issues for now in order to address the merits of Google's motion.

      ii.    <u>Merits</u>

As to the the plaintiffs' argument that the license provision in (at least) the Dotster agreement causes Google to be a "registrant's authorized licensee" within the meaning of the ACPA, the court agrees despite Google's arguments to the contrary.

Google first asserts that the license language does not confer a license to "use the domain name as a domain name, as the ACPA requires . . . .[r]ather, it is merely a license to use the names as necessary 'for performing the AFD Service, as contemplated under th[e] Agreement.'" Google Memorandum, Dkt. # 287 at 17. The court rejects this distinction without a difference. In addition, according to Google, because the ACPA strictly limits liability to the registrant, the registrant's "authorized licensee" and anyone who buys and sells the domain name, the court should not construe the definition of "authorized licensee" to include Google. In support, Google points to certain legislative history of the ACPA, including the Senate Report on the bill, which states in relevant part:

> The purpose of the bill is to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by *prohibiting the bad-faith and abusive registration* of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks–a practice commonly referred to as "cybersquatting."

S. Rep. No. 106-240 (1999)(emphasis by Google). Google also cites to statements by Senator Hatch regarding amendments to the bill as follows:

> In addition, the Senate is considering today an amendment I am offering with Senator LEAHY to make three additional clarifications. First, our amendment will clarify that the prohibited "uses" of domain names contemplated by the bill are limited to uses by the domain name registrant or his authorized licensee and *do not include uses by others, such as in hypertext links, directory publishing, or search engines.*

45 Cong. Rec. S10516 (daily ed. Sept. 8, 1999)(emphasis by Google).

The court, however, need not delve into the legislative history of the ACPA, because the statutory language is clear: A person may only be held liable for "using" a domain name if that person is a registrant or a registrant's authorized licensee. *Ortega v. Holder*, 592 F.3d 738, 743 (7th Cir. 2010)("If the plain wording of the statute is clear, our work is at an end.")(*citing BedRoc, Ltd. v. United States*, 541 U.S. 176, 183 (2004) (noting that the task of statutory interpretation "ends there [if] the text is unambiguous")). To the extent that the cited license provision existed in relevant contracts between Google and its AFD partners who had registered the domain names at issue in this case,[4] Google is an "authorized licensee" as that term is used under the Act. Thus, the legislative history is not required to understand the plain meaning of the term licensee as the statutory language itself does not support the reading espoused by Google.

Nor is the court persuaded differently by Google's assertion that its agreements with the parking companies at issue in this case expressly prohibit the use of a domain name that would infringe trademark rights. *See, e.g.*, Google Services Agreement with Sedo GmbH, attached as Exh. B to Page Affidavit, B-34 at ¶ 5.2 ("Customer guarantees that neither the Site nor the Customer Client Application (if any) contains any pornographic, hate-related, violent, politically extreme or otherwise offensive content or contains any other material, products or services that violate or encourage conduct that would violate . . . any *third party rights*.")(emphasis added). Google again resorts to the legislative history in support of this argument. Specifically, it notes that the House report in support of the bill states that:

> Paragraph 1(D) further clarifies that a use of a domain name shall be limited to a use of the domain name by the registrant or his or her authorized licensee. This provision limits the right to use the domain name as a means to infringe on another's other bona fide trademark rights.

In its strained reading of the second sentence, Google contends that "in order to be an 'authorized licensee,' one must be licensed by the domain name registrant 'to use the domain name as a means to infringe on another's other bona fide trademark rights." Google's Reply Memorandum of Points and Authorities, Dkt. #302, at 5-6 (*quoting* H.R. Rep. No. 106-412 at 14 (1999)). As an initial matter, as just noted above, the court need not look to the legislative

---

[4]In an apparent attempt to expand Google's liability for being the registrant's authorized licensee beyond those instances, if any, in which Google's agreement with a registrant includes the above-quoted license language, the plaintiffs argue that regardless of whether the license language is actually used in the agreement, Google should be held to be a licensee because the "effect is the same" in that "Google receives the right to use the domains in the AFD program and to show advertising which generates revenue for Google and others, all predicated on capturing traffic using Plaintiffs' valuable trademarks." Plaintiff's Memorandum in Response, Dkt. #284 at 5. But the plaintiffs do not point to any authority in support of their contention that a license can exist in such circumstances and the court rejects this argument.

history to discern the meaning of the statutory term at issue.  Moreover, even if the court were to consider the House Report, it would reject Google's position.  The court agrees that the second sentence of the excerpt above is not entirely clear.  However, without even addressing what that sentence means, Google's interpretation simply makes no sense–one can only be an "authorized licensee" if it has a license expressly allowing it to infringe another's trademark rights?  The court does not accept this as a reasonable reading of the sentence and rejects Google's argument that its contract, in conjunction with the language from the House Report, bars a finding that it is an authorized licensee under the ACPA.

The same is true for Google's assertion that it is not an "authorized licensee" because it has implemented a comprehensive trademark protection policy for AFD by which a domain name owner can submit to Google any domain names that it believes violate its trademark.  Google asserts that when it is notified of an allegedly infringing domain name, it places the name on its "fail list" and if the domain name contained in any AFD request is on the "fail list," Google does not return content for that AFD request.  However, Google fails to point to any authority for the proposition that it can avoid statutory licensee status on the ground that it maintains a "fail list," and the court rejects this argument.

In the interest of completeness, the court addresses another argument raised by the plaintiffs in their response brief.  They argue that the AFD program necessarily requires Google to "use" the domain names because it "exclusively manages and controls all aspects of the advertising process in the AFD program."  *Id*. at 6.  The plaintiffs contend that Google "uses" the domain names because:  (1) Google controls, designs and programs landing page templates for AFD pages, (2) AFD landing pages are hosted on Google-Owned Servers at Google-Owned IP addresses and (3) that Google tracks page views, queries and revenue for each domain under its management.  But, as Google clarifies in its reply brief, any argument that Google "uses" the domain names as required under the ACPA is inapposite because under the express language of the statute, Google asserts it cannot be held liable for "using" a domain name if it is not the registrant or registrant's authorized licensee.  *See* Google's Reply, Dkt. # 302 at 9 ("In short, Plaintiffs attempt to muddy the waters with a mass of nearly incomprehensible technical arguments [regarding Google's "use" of domain names] about facts that actually has [sic] no bearing on the question before the Court.  Quite simply, there are no genuine issues of material fact precluding this Court from holding on summary judgment that *Google is not an "authorized licensee."*)(emphasis added).  Because Google does not move for judgment on the ground that it did not use the domain names, but instead on the ground that it is not a registrant's authorized licensee, the court need not address the plaintiffs' arguments as to Google's purported use of domain names.

In sum, the court concludes that Google can be held to be a registrant's authorized licensee if the contract with the AFD (who was the actual registrant of the allegedly infringing

domain name at issue in this case) contained the licensing language quoted above.[5]  However, the court notes that it is not clear from the record, given the problems noted above, which agreements were valid during which period of time or which agreements, if any, actually contained the relevant license language.  This is an issue to be resolved before trial.

      B.      <u>Does Google "traffic in" domain names?</u>

Google also contends that it does not "traffic in" domain names because it has no involvement in the "selection, registration, acquisition, or sale of any of the domains." Google Memorandum, Dkt. #247, at 16.  As provided in the ACPA, the term "'traffics in' refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration." 15 U.S.C. § 1125(d)(1)(E).

At least one court has concluded that the phrase "'traffics in' contemplates a direct transfer or receipt of ownership interest in a domain name to or from the defendant." *Ford Motor Co., Inc. v. GreatDomains*, 177 F. Supp. 2d 635, 644-45 (E.D. Mich. 2001).  Based on its construction of the statutory language, the *GreatDomains* court concluded that the defendant, a company that specialized in auctioning Internet domain names, was not liable for trafficking in domain names under the ACPA because "as an auctioneer, Great Domains does not transfer or receive for consideration the domain names that are sold over its website." *Id*. at 645 ("[T]he ACPA does not cover Great Domain's provision of ancillary services, which merely facilitate the statutorily targeted transfers and receipts.").  Google contends, based on statements such as these, that because it does not transfer or receive an ownership interest in the domain names, it does not traffic in the names.

However, the statutory definition of "traffics in" in the ACPA includes the licensing of domain names.  For the reasons stated in the previous section, the court concludes that Google could be held liable for trafficking in the relevant domain names.  Accordingly, Google's motion for partial summary judgment is denied.

---

[5] While Google contends that most of domain names were owned by third parties and not the AFD partners, it states that certain of the AFD partners owned and operated the domain name themselves. *See, e.g.*, Google's Memorandum in Support of Summary Judgment, Dkt. # 274 at 4 ("Typical AFD partners either host domains registered and owned by others, or domains the AFD partner itself owns, or both."). It is again unclear from the record, however, whether any of the domain names at issue in this case were owned by the AFD partners.  This is an issue to be resolved at trial.

## IV. Conclusion

For the reasons stated herein, Google's motion for partial summary judgment [273-1] is denied. Before setting a trial date, the court directs the parties to contact the magistrate judge's chambers to set a date for a settlement conference. Given that this ruling presumably narrows the relevant issues, the court again strongly urges the parties to attempt to resolve this matter.

**ENTER**:

DATE: June 9, 2010

_____
**Blanche M. Manning**
**United States District Judge**